**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**
**500 Pearl Street, New York, NY 10007**

______________________________________________X

ANITA TOVAR (decd. 1/30/2026),
MONIQUE (TOVAR) SAUNDERS, And
DAVID SAUNDERS,
(Individually and on behalf of MINOR CHILD (DCS),
Plaintiff(s),

Vs.

FRANCIS GREENBURGER;
TIME EQUITIES, INC. (TEI);
CLINTON HILL EQUITIES GROUP (and its successors or assigns);
CLINTON 174 REALTY ASSOCIATES LLC;
CLINTON APARTMENTS LLC;
CLINTON HILL APARTMENTS OWNERS CORP.;
CHARLES H. GREENTHAL MANAGEMENT CORP.;
MARK GREENBERG REAL ESTATE CO., LLC (and its successors or assigns);
MARK GREENBERG, individually and as President of Mark Greenberg Real Estate Co., LLC;
FIRSTSERVICE RESIDENTIAL NEW YORK, INC...
MARK GREENBERG REAL ESTATE CO., LLC
(and its successors or assigns);
FIRSTSERVICE RESIDENTIAL NEW YORK, INC.;
JENNIFER OGMAN, individually and in her capacity as Vice President of FirstService Residential's CityLine Division;
STEVEN GREENBAUM, individually and in his successive capacities as Senior Vice President and Director of Management of Charles H. Greenthal Management Corp. and FirstService Residential;
PARVEZ AHMED;
DAVID PEREZ;
SAFIJE CEMENJA;
VIGAN AHMETAJ;
KRISTEN A. MANTELL, ESQ.;
BARON & BARON ESQS. P.C.;
BENJAMIN JOSHUA MANTELL, ESQ.;
ANDREW H. MEIER, ESQ.;
ABRAMS GARFINKEL MARGOLIS BERGSON, LLP;
BARRY G. MARGOLIS, ESQ.;
ALEXANDER RABINOWITZ, ESQ.;
THOMPSON LLP;
SEIDENSTEIN MEIER & STEIN PLLC;
MELISSA G. MARTIN;
PAW PAW PET CARE LLC;
ACOUSTILOG, INC.;

ALAN FIERSTEIN, individually and in his
professional capacity as President of Acoustilog, Inc.;
NOAH PORTES CHAIKIN;
ALYSSA ALPINE;
TAMIKA ANTOINETTE LINTON-JONES;
MADISON SECURITY GROUP, INC.;
DOYLE SECURITY SERVICES, INC.;
MARK ATHERTON;
J. GRIFFON;
THE CITY OF NEW YORK, Acting By and Through
The NYC Department of Investigation, NYC Law Department;
NEW YORK STATE DIVISION OF HUMAN RIGHTS;
NEW YORK POLICE DEPARTMENT –
NEW YORK CITY CORPORATION COUNSEL; and
LETITIA JAMES, in her official capacity as the
ATTORNEY GENERAL OF THE STATE OF NEW YORK,

Defendant(s).

---

## INTRODUCTION

Plaintiffs Monique Saunders and David Saunders, appearing pro se individually, as the representatives of the Estate of Anita Tovar (Deceased), as the natural parents, legal guardians, and next friends of their minor child, bring this First Amended Civil RICO Complaint against the Defendants to halt, remedy, and recover damages for a progressive, multi-decade pattern of corporate real estate fraud, mail fraud, wire fraud, witness tampering, and structural extortion. Operating under the umbrella of a highly organized real estate syndication mastermind, the Defendants have systematically subverted state regulatory agencies, weaponized municipal law enforcement, and abused the state judiciary through collusive sham litigation to execute the predatory, extrajudicial displacement of long-term rent-stabilized occupants from the Subject Premises, a property asset which Defendant Clinton Hill Apartments Owners Corp. (CHAOC) does not lawfully own or possess valid title over.

Through a calculated operational matrix involving unrecorded property transfers,

systemic security deposit escrow conversions, intentional physical and acoustic harassment, and the deliberate manufacturing of life-safety environmental hazards, the Enterprise co-conspirators have weaponized the local housing infrastructure to strip the Plaintiffs of their statutory leasehold estates. The unlawful conduct has escalated into a real-time campaign of administrative sabotage and retaliatory state-court ejectment maneuvers deliberately timed to exploit the Plaintiffs' acute period of family bereavement, in flagrant defiance of multiple, binding, unappealed New York State Division of Housing and Community Renewal (DHCR) Administrative Orders. Plaintiffs invoke the independent jurisdiction of this Honorable Court to enforce federal racketeering remedies, secure meaningful injunctive relief, and recover mandatory statutory treble damages to address an open-ended criminal conspiracy that threatens the Plaintiffs and the public interest at large.

## JURISDICTION AND VENUE

This Court maintains subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims asserted herein arise directly under the laws of the United States, specifically the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. (Civil RICO), and the Fair Housing Act, 42 U.S.C. §§ 3601 et seq. This Court maintains supplemental jurisdiction over Plaintiffs' interconnected New York State law claims pursuant to 28 U.S.C. § 1367.

Venue is legally proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and the specialized civil venue provisions of 18 U.S.C. § 1965(a), on the basis that a substantial preponderance of the Enterprise's corporate administration, financial layering, and coordinated wire fraud maneuvers were managed, directed, and executed by core Co-Conspirator Defendants residing, found, maintaining principal business offices, and transacting affairs within this judicial district.

Specifically, the masterminding corporate principals, holding companies, and legal execution networks driving the racketeering pattern—including Defendants Francis Greenburger, Time Equities, Inc., Clinton 174 Realty Associates LLC, Clinton Apartments LLC, Abrams Garfinkel Margolis Bergson LLP, Barry G. Margolis, Alexander Rabinowitz, Thompson LLP, and Seidenstein Meier & Stein PLLC—maintain their principal offices, executive boardrooms, and operational headquarters within the County and State of New York, within the exclusive geographic jurisdiction of the Southern District of New York. The special interests of justice require that all interconnected individual, corporate, and municipal defendants be brought before this Court in a single judicial forum pursuant to 18 U.S.C. § 1965(b) to ensure complete and meaningful adjudication.

**TIMELINESS AND STATUTE OF LIMITATIONS**

Plaintiffs' federal Civil RICO and Fair Housing Act claims are procedurally timely and fully insulated from any statutory bar pursuant to the federal "Injury Discovery Rule," the doctrine of separate accrual, and the mandatory tolling provisions governing active administrative exhaustion and infancy.

Under well-established federal racketeering jurisprudence, a Civil RICO cause of action accrues each time a plaintiff discovers, or reasonably should have discovered, a distinct, actionable injury to their business or property interests inflicted by the enterprise. The progressive pattern of mail fraud, wire fraud, and financial extortion executed by the Defendants has proximately inflicted fresh, independent economic and property injuries upon the Plaintiffs through 2025 and 2026—including the November 14, 2025 electronic filing of fraudulent, self-authenticated corporate verifications (NYSCEF Doc. 125) and the June 18, 2026 federal holiday electronic

transmission of bad-faith advocacy letters to force an illegal extrajudicial ejectment. Each distinct overt act constitutes a separate accrual event that restarts the federal statutory clock.

Plaintiffs' claims are further preserved by operation of mandatory administrative tolling during the pendency of their parallel federal and state civil rights actions. On November 28, 2022, the U.S. Department of Housing and Urban Development (HUD) formally accepted the Plaintiffs' housing discrimination complaint under the Fair Housing Act, deferring active processing to the New York State Division of Human Rights (DHR) under Case Record File No. 10214815. The administrative life of this file was subjected to extreme regulatory subversion and system backlogs, culminating in a final agency determination on June 3, 2024. he statutory limitations period was paused by operation of law during this multi-year administrative track, rendering this independent federal action timely.

Most critically, all independent causes of action, property injuries, and tort claims belonging to the Plaintiffs' minor daughter are completely protected and frozen in time by operation of the strict statutory infancy tolling provisions set forth in New York CPLR § 208. Because the minor child was a direct, targeted victim of the Enterprise's physical intimidation campaigns, including the March 31, 2022 aggressive process server exploitation and ongoing exposure to toxic sub-surface mold colonization—the statute of limitations governing her claims is automatically paused during her minority. The minor child explicitly retains her absolute, unimpeded independent right to supplement, expand, or independently prosecute her own legal claims in a court of competent jurisdiction within three (3) years following her eighteenth (18th) birthday.

## IDENTIFICATION OF THE PLAINTIFFS

Plaintiffs Monique Saunders and David Saunders are individuals, citizens of the State of New York, and self-employed independent business owners who maintain, operate, and conduct their primary commercial business and corporate affairs out of their dedicated home office located within the Subject Premises at 210 Clinton Avenue, Apartment 1H, Brooklyn, New York 11205. Plaintiffs appear herein pro se, individually, as the representatives of the Estate of Anita Tovar (Deceased), and as the natural parents, legal guardians, and next friends of their minor child. As a direct consequence of the Enterprise's targeted campaign of physical intimidation, toxic mold exposure, and the intentional facilitation of a high-intensity commercial acoustic nuisance overhead, Plaintiffs have been severely and negatively impacted physically, psychologically, and financially, suffering direct, catastrophic injury to their health, their residential property interests, and their active business operations, income streams, and commercial livelihood.

Plaintiffs explicitly plead and reserve all rights of statutory tolling governing the minor's independent causes of action under federal and state law. Pursuant to the federal injury discovery rule and the mandatory tolling provisions set forth in New York CPLR § 208, the statute of limitations governing the minor child's claims—including injuries to property interests under 18 U.S.C. § 1964(c), unlawful exposure to toxic environmental mold, and the intentional infliction of severe emotional distress by the Enterprise actors—is automatically tolled by operation of law during her infancy. The minor child explicitly retains her absolute, unimpeded independent right to supplement, expand, or independently prosecute her own legal claims in a court of competent jurisdiction within three (3) years following her eighteenth (18th) birthday.

## IDENTIFICATION OF THE DEFENDANTS

### A. The Real Estate Sponsor & Corporate Management Core

**Defendant FRANCIS GREENBURGER** is an individual who is a citizen of the State of New York, maintaining a principal place of business at 14 East 4th Street, New York, NY 10012. Greenburger is sued herein individually and in his capacity as the foundational organizer, promoter, and ongoing principal controller of the Civil RICO Enterprise, who orchestrated the unrecorded property transfers, structural maintenance defunding, and corporate re-layering transitions across the multi-decade pattern.

**Defendant CLINTON HILL APARTMENTS OWNERS CORP. (CHAOC)** is a domestic cooperative housing corporation organized and existing under the laws of the State of New York, maintaining its principal corporate office at 55 Hanson Place, Brooklyn, NY 11217. CHAOC is sued herein as a primary institutional vehicle through which the racketeering pattern was executed, functioning as the purported landlord entity used to enforce manufactured rent overcharges, fraudulent housing code registrations, and predatory, extrajudicial evictions against long-term rent-stabilized occupants.

**Defendant TIME EQUITIES, INC. (TEI)** is a domestic business corporation organized and existing under the laws of the State of New York, maintaining its corporate headquarters at 55 Fifth Avenue, New York, NY 10003. TEI is sued herein as a co-conspirator corporate shell and operating umbrella deployed by Defendant Greenburger to execute the financial layering, unrecorded asset transfers, and administrative insulation of the cooperative conversion scheme.

**Defendant CLINTON HILL EQUITIES GROUP** (and its successors or assigns) is a domestic business entity and real estate sponsor partnership organized and existing under the laws of the State of New York, maintaining an operational nexus at 55 Fifth Avenue, New York, NY 10003. Clinton Hill Equities Group is sued herein as a primary co-conspirator sponsor and developer entity through which the Enterprise executed its historical cooperative conversion fraud,

unrecorded asset layerings, and structural maintenance defunding. Its inclusion as a defendant explicitly binds all past, present, and future corporate successors, parent entities, subsidiaries, and asset assignees to the liability and remedies sought within this federal action.

**Defendant CLINTON 174 REALTY ASSOCIATES LLC** is a domestic limited liability company organized and existing under the laws of the State of New York, maintaining its principal corporate place of business at 55 Fifth Avenue, New York, NY 10003. Clinton 174 Realty Associates LLC is sued herein as a co-conspirator title-holding vehicle and asset shell deployed by the Enterprise to execute financial layering, hold unrecorded cooperative share blocks, and shield the physical assets of Defendant CHAOC and Defendant TEI from regulatory oversight, actively participating in the multi-decade pattern of structural property fraud and mail fraud in violation of 18 U.S.C. § 1962(d).

**Defendant CLINTON APARTMENTS LLC** is a domestic limited liability company organized and existing under the laws of the State of New York, maintaining its principal corporate place of business having the NY State registered address of 5614 15th Avenue, Suite 1A, BROOKLYN, NY, UNITED STATES, 11219 and mailing address registered at P.O. Box 140250, Brooklyn, NY 11214. Clinton Apartments LLC is sued herein as a co-conspirator corporate shell and financial layering vehicle deployed by the Enterprise to obscure the historical chain of title, execute unrecorded real estate asset transfers, insulate predecessor landlord liabilities, and facilitate the systematic conversion of the Tenant's escrowed security deposits in direct furtherance of the pattern of racketeering and wire fraud under 18 U.S.C. § 1962(d).

**Defendant CHARLES H. GREENTHAL MANAGEMENT CORP.** is a domestic business corporation organized and existing under the laws of the State of New York, maintaining its corporate headquarters at 4 East 34th Street, New York, NY 10016. Greenthal is sued herein as a

co-conspirator managing agent entity that actively integrated its operations into the racketeering pattern by executing the security deposit escrow conversion, ignoring New York State Attorney General "Alert Letters," and enforcing the deceptive concealment of the Tenant's historical Master Lease records.

**Defendant MARK GREENBERG REAL ESTATE CO., LLC (and its successors or assigns)** is a domestic business corporation and real estate management entity organized and existing under the laws of the State of New York, maintaining an office network and historical operational center at 30-30 Northern Blvd, Suite 400, Long Island City, NY 11101. Mark Greenberg Real Estate Co., LLC is sued herein as a co-conspirator intermediate managing agent entity that actively integrated its operations into the racketeering matrix by executing multi-year rent overcharge schemes, suppressing statutory lease renewals, and facilitating the continuous conversion of the Tenant's security deposit escrow funds, subsequently merging into Defendant Charles H. Greenthal Management Corp. to layer and shield its structural liabilities.

**Defendant MARK GREENBERG** is an individual who is a citizen of the State of New York, maintaining a primary real estate operational nexus at 545 Madison Avenue, New York, NY 10022. Greenberg is sued herein individually and in his capacity as the founder, principal officer, and lead executive director of Mark Greenberg Real Estate Co., LLC, who personally supervised the unlawful rent overcharge calculations, authorized the withholding of the historical Master Lease documents, and directed the systematic commingling and misappropriation of tenant security deposit escrow accounts in direct furtherance of the RICO conspiracy in violation of 18 U.S.C. § 1962(d).

**Defendant FIRSTSERVICE RESIDENTIAL NEW YORK, INC.** is a domestic business corporation organized and existing under the laws of the State of New York, maintaining its

principal corporate office at 575 Lexington Avenue, 2nd Floor, New York, NY 10022. FirstService is sued herein as a successor managing agent entity that adopted, ratified, and continues to execute the Enterprise's ongoing fraud patterns, including the enforcement of predatory litigation billing, maintenance neglect, and the structural suppression of the Tenant's leasehold and escrow interest rights from 2023 through the present.

**Defendant JENNIFER OGMAN** is an individual who is a citizen of the State of New York, maintaining a principal business address at 575 Lexington Avenue, 2nd Floor, New York, NY 10022. Ogman is sued herein individually and in her official capacity as the Vice President of FirstService Residential's CityLine Division, who exercised direct, executive supervisory control over the operational management, onsite personnel, and litigation strategies deployed against the Subject Premises. Ogman actively furthered the conspiracy by executing post-acquisition concealment, authorizing the billing of fraudulent litigation surcharges, and directing onsite personnel to maintain the defensive blockade against the Tenant's binding DHCR rent reductions, leasehold estates, and security deposit escrow interest remedies from 2023 through the present, satisfying the open-ended continuity requirements of 18 U.S.C. § 1962(d).

**Defendant STEVEN GREENBAUM** is an individual who is a citizen of the State of New York, maintaining a principal business address at 4 East 34th Street, New York, NY 10016. Greenbaum is sued herein individually and in his successive corporate capacities as Senior Vice President and Director of Management for Charles H. Greenthal Management Corp. and FirstService Residential. Greenbaum serves as an overarching managerial anchor for the RICO Enterprise who bridged successive corporate management regimes. Greenbaum actively authorized and directed the systematic withholding of the Tenant's historical Master Lease, enforced the conversion of escrowed security deposits, and ratified the bad-faith litigation strategies and maintenance

deprivation campaigns executed across both corporate administrations, satisfying the continuity standards of 18 U.S.C. § 1962(d).

**Defendant PARVEZ AHMED** is an individual who is a citizen of the State of New York, maintaining an office at 122 Ashland Place, Brooklyn, NY 11201. Ahmed is sued herein individually and in his official capacity as the General Property Manager for CHAOC and Charles H. Greenthal Management Corp., who served as the boots-on-the-ground operational director responsible for the withholding of essential repairs, the insertion of toxic sub-surface mold hazards, and who intentionally boycotted the June 28, 2022 DHCR mediation session to trigger the immediate DOI counter-strike.

**Defendant DAVID PEREZ** is an individual who is a citizen of the State of New York, maintaining an office at 110-114 Clinton Avenue, Brooklyn, NY 11205. Perez is sued herein individually and in his capacity as an on-site Property Manager for the Enterprise, responsible for executing daily operational maintenance deprivation and compiling fabricated building inspection data to mislead state regulators.

**Defendant SAFIJE CEMENJA** is an individual who is a citizen of the State of New York, maintaining an office at 4 East 34th Street, New York, NY 10016. Cemenja is sued herein individually and in her dual capacity as an Enterprise Property Manager and Transfer Agent, who actively participated in document tampering, lease renewal suppression, and the structural concealment of the Tenant's historical chain of title.

**Defendant VIGAN AHMETAJ** is an individual who is a citizen of the State of New York, maintaining a business address at 210 Clinton Avenue, Brooklyn, NY 11205. Ahmetaj is sued herein individually and in his capacity as the former Maintenance Supervisor for the Subject

Premises, who served as an operational agent directing private security forces to physically swarm Unit 1H, block municipal HPD/DHCR inspectors, and execute false flag emergency entries.

**B. The Legal Execution & Conflict Matrix Nodes**

**Defendant KRISTEN A. MANTELL, ESQ.** is an individual who is a citizen of the State of New York and an attorney licensed to practice law in the State of New York, maintaining an office at 118-21 Queens Blvd, Suite 515, Forest Hills, NY 11375. Mantell is sued herein individually and as a primary co-conspirator who has continuously acted in the dual, un-elected capacities of Board Assistant Secretary and General Counsel for Defendant CHAOC from the inception of the predatory scheme. Mantell directed the legal execution arm of the Enterprise, utilizing her dual corporate insider status to bypass cooperative bylaws, draft and transmit facially fraudulent, backdated Notices to Cure and Notices of Termination via the U.S. Mail, fabricate state court verification pages, and leverage insider state conflicts to stall civil rights investigations.

**Defendant BARON & BARON ESQS. P.C.** is a domestic professional service corporation organized under the laws of the State of New York, maintaining its law office at 118-21 Queens Blvd, Suite 515, Forest Hills, NY 11375. Baron & Baron is sued herein as a professional service shell and legal instrument utilized by the Enterprise to execute mail fraud, wire fraud, and predatory, bad-faith landlord-tenant litigation designed to extract illegal overcharges and force extrajudicial tenant displacement.

**Defendant BENJAMIN (BEN) JOSHUA MANTELL, ESQ.** is an individual who is a citizen of the State of New York and an attorney licensed to practice law in the State of New York. Mantell is sued herein individually and as an active co-conspirator node who utilized his historical professional networks as a former Assistant Attorney General within the NYS Office of the Attorney General to insulate Baron & Baron from escrow conversion liability, subsequently

migrating into the municipal apparatus as an Administrative Law Judge for the New York City Department of Finance to screen the Enterprise's unrecorded tax and property records from public discovery.

**Defendant ANDREW H. MEIER, ESQ.** is an individual who is a citizen of the State of New York and an attorney licensed to practice law in the State of New York, maintaining a business address at 407 Broome Street, 3rd Floor, New York, NY 10013. Meier is sued herein individually and as litigation counsel for the conspiracy, who utilized his historical ties as a former OAG Deputy Section Chief to orchestrate the weaponized DOI raid on Unit 1H, initiated the January 11, 2024 retaliatory state court sham litigation, and executed wire fraud by e-filing a bad-faith, collusive advocacy letter on a federal public holiday (June 18, 2026) to force an illegal extrajudicial ejectment.

**Defendant ABRAMS GARFINKEL MARGOLIS BERGSON, LLP (AGMB)** is a domestic limited liability partnership organized under the laws of the State of New York, maintaining its principal law office at 1430 Broadway, 17th Floor, New York, NY 10018. AGMB is sued herein as a co-conspirator legal entity that actively entered the racketeering pattern by representing both the corporate landlord (CHAOC) and the private plaintiff (Melissa Martin) as a single, collusive defensive front before the DHR, subsequently staging a fraudulent "adversary" posture in state court to split the Plaintiffs' claims and mislead the judiciary.

**Defendant BARRY G. MARGOLIS, ESQ.** is an individual who is a citizen of the State of New York and an attorney licensed to practice law in the State of New York, maintaining an office at 1430 Broadway, 17th Floor, New York, NY 10018. Margolis is sued herein individually and as a partner of AGMB who coordinated the fraudulent December 22, 2022 DHR Verified Position

Statement, introducing false affidavits and character assassinations into the state record via the U.S. Mail.

**Defendant ALEXANDER RABINOWITZ, ESQ.** is an individual who is a citizen of the State of New York and an attorney licensed to practice law in the State of New York, maintaining an office at 1430 Broadway, 17th Floor, New York, NY 10018. Rabinowitz is sued herein individually and as litigation counsel for the Enterprise, who directed the joint DHR defense and subsequently managed the collusive state court staging under Index No. 501135/2024, executing an abrupt NYSCEF record removal on June 1, 2026, to scrub his name from the record upon federal RICO exposure.

**Defendant THOMPSON LLP** is a partnership or legal entity organized under the laws of the State of New York, maintaining an office at 75 Broad Street, Suite 2120, New York, NY 10004. Thompson LLP is sued herein as a co-conspirator legal vehicle deployed by Defendant Meier on January 11, 2024, to launch the sham litigation mechanism and channel fraudulent wire communications through the state electronic filing network.

**Defendant SEIDENSTEIN MEIER & STEIN PLLC** is a domestic professional limited liability company organized under the laws of the State of New York, maintaining its office at 407 Broome Street, 3rd Floor, New York, NY 10013. Seidenstein Meier & Stein PLLC is sued herein as a co-conspirator legal entity that actively adopted, ratified, and currently maintains the fraudulent, retaliatory state-court litigation pattern via the January 13, 2026 "Consent to Change Attorney" re-layering maneuver.

### C. The Retail Harassment & Private Enforcement Nodes

**Defendant MELISSA MARTIN** is an individual who is a citizen of the State of New York, residing at 210 Clinton Avenue, Unit 2H, Brooklyn, NY 11205. Martin is sued herein individually

and as a primary retail co-conspirator who executed weaponized, false "Karen Law" police calls to Unit 1H, signed fraudulent state court affidavits concealing her illegal commercial compound, committed municipal insurance and licensing fraud with the DOHMH, and actively coordinated with Andrew Meier to launch the January 11, 2024 sham lawsuit to disrupt pending civil rights investigations.

**Defendant PAW PAW PET CARE LLC** (d/b/a Paw Paw Dog Walking and Pet Care) is a domestic limited liability company organized under the laws of the State of New York, maintaining its illicit corporate place of business within residential apartment Unit 2H at 210 Clinton Avenue, Brooklyn, NY 11205 (Filing No. 090728000119). Paw Paw Pet Care LLC is sued herein as an un-permitted commercial entity operated with the explicit patronage and permission of CHAOC management to intentionally generate an actionable, high-intensity acoustic and environmental nuisance as a physical tool of extortion targeting the Plaintiffs.

**Defendant ACOUSTILOG, INC**. is a domestic business corporation organized and existing under the laws of the State of New York, maintaining its principal business office at 19 Mercer Street, New York, NY 10013. Acoustilog, Inc. is sued herein as a co-conspirator entity that actively integrated its professional operations into the racketeering matrix by manufacturing fraudulent, biophysically rigged, and scientifically deceptive acoustic report data.

**Defendant ALAN FIERSTEIN** is an individual who is a citizen of the State of New York, maintaining a principal business address at 19 Mercer Street, New York, NY 10013. Fierstein is sued herein individually and in his professional capacity as the President and principal director of Acoustilog, Inc., who personally executed rigged acoustic testing at the Subject Premises under the direction of Attorney Kristen A. Mantell and Defendant CHAOC. Fierstein knowingly omitted the un-permitted commercial dog compound operations in Unit 2H from his official assessments,

manipulating data parameters to fabricate a false pretext of tenant non-compliance and facilitate the predatory eviction scheme.

**Defendant NOAH PORTES CHAIKIN** is an individual who is a citizen of the State of New York, residing at 210 Clinton Avenue, Unit 1A, Brooklyn, NY 11205. Chaikin is sued herein individually and as a co-conspirator next-door shareholder who integrated his actions into the pattern by executing localized harassment, filing false cross-complaints, and participating in the defensive blockade before the DHR to insulate the cooperative from housing code liability.

**Defendant ALYSSA ALPINE** is an individual who is a citizen of the State of New York, maintaining an office at 55 Hanson Place, Brooklyn, NY 11217. Alpine is sued herein individually and in her capacity as a CHAOC Board Member and unelected Board Assistant Secretary, who actively participated in the litigation fraud by executing a fraudulent corporate "Verification" page on November 14, 2025 (NYSCEF Doc. 125) under the direction of Kristen Mantell to advance the illegal ejectment scheme.

**Defendant TAMIKA ANTOINETTE LINTON-JONES** is an individual who is a citizen of the State of New York, maintaining a business address at 4 East 34th Street, New York, NY 10016. Linton-Jones is sued herein individually and in her capacity as a Transfer Agent and employee for Charles H. Greenthal Management Corp. and FirstService Residential, who furthered the document fraud conspiracy by corruptly notarizing the fraudulent November 14, 2025 corporate Verification page to mislead the state court.

**Defendant MADISON SECURITY GROUP, INC.** is a domestic business corporation organized and existing under the laws of the State of New York, maintaining its corporate headquarters at 316 Lexington Avenue, New York, NY 10016. Madison is sued herein as a co-conspirator private enforcement entity that functioned as the on-site paramilitary muscle for the Enterprise,

responsible for shielding Melissa Martin's illegal pet facility, falsifying building logs, and executing the extrajudicial delivery of coercive, un-filed legal threats directly to the Plaintiffs' door.

**Defendant DOYLE SECURITY SERVICES, INC.** is a domestic business corporation organized and existing under the laws of the State of New York, maintaining its principal office at 30 Broad Street, 10th Floor, New York, NY 10004. Doyle is sued herein as a co-conspirator successor security entity that executed an intentional corporate re-layering maneuver to absorb Madison Security Group while seamlessly maintaining the identical command structure to continue the on-site physical intimidation, inspector blockades, and witness tampering.

**Defendant MARK ATHERTON** is an individual who is a Jamaican national operating within the State of New York, maintaining a business address at 210 Clinton Avenue, Brooklyn, NY 11205. Atherton is sued herein individually and in his capacity as the Director of Security for Madison Security Group and Doyle Security Services, who directed on-duty guards to swarm Unit 1H, intercept official DHCR inspections, and who executed a fraudulent, extrajudicial legal delivery on July 11, 2025, confirming his direct participation in the litigation conspiracy via NYSCEF Doc. 41.

**D. The Necessary Relief Party (FRCP 19(a))**

**Defendant NEW YORK STATE DIVISION OF HUMAN RIGHTS (DHR)** is an executive administrative agency of the government of the State of New York, maintaining its principal office at One Fordham Plaza, 4th Floor, Bronx, NY 10458. The DHR is named strictly as a Necessary Relief Party pursuant to Federal Rule of Civil Procedure 19(a); its inclusion is structurally required under 18 U.S.C. § 1964(a) to ensure complete, meaningful equitable relief and to compel the production of all internal administrative tracking records, audit metadata, investigator notes, and

communications of Investigator Alfonso Rodriguez and Director Chelsea L. John under Case Record File No. 10214815, exposing the internal backlogs and document suppression that led to the fraudulent extraction of the No Probable Cause determination.

**Defendant LETITIA JAMES, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF NEW YORK**, maintaining her official office at 28 Liberty Street, New York, NY 10005. The Attorney General is named strictly as a **Necessary Relief Party** pursuant to **Federal Rule of Civil Procedure 19(a)**. Her inclusion is required to bypass Eleventh Amendment sovereign immunity constraints and to ensure complete, meaningful equitable relief under **18 U.S.C. § 1964(a)**, by compelling the Office of the Attorney General to open its complete, multi-decade cooperative conversion archives, disclose all unamended offering plan filings, produce the administrative records under File No. 22-018011-M1, and monitor outstanding DHCR enforcement referrals to prevent the permanent spoliation of physical and regulatory evidence by the Enterprise principals.

**THE CITY OF NEW YORK**, Acting By and Through The New York City Department of Investigation (DOI) and The New York Law Department (Corporation Counsel),** is a municipal corporation organized under the laws of the State of New York, with its principal legal office located at 100 Church Street, New York, NY 10007. The City of New York is named strictly as a Necessary Relief Party pursuant to Federal Rule of Civil Procedure 19(a); its inclusion is structurally required under 18 U.S.C. § 1964(a) to compel the immediate production of all un-redacted municipal intake, field audio, and investigative records generated by Confidential Investigator Shameika Nixon under the direct guidance of the OAG, which have been systematically withheld from public disclosure to insulate the Enterprise from federal scrutiny.

**NEW YORK STATE DIVISION OF HUMAN RIGHTS (DHR)** is an executive administrative agency of the government of the State of New York, maintaining its principal office at One Fordham Plaza, 4th Floor, Bronx, NY 10458. The DHR is named strictly as a Necessary Relief Party pursuant to Federal Rule of Civil Procedure 19(a); its inclusion is required to ensure complete, equitable relief and to compel the production of the complete internal administrative tracking records, investigator notes, and communications of Investigator Alfonso Rodriguez and Director Chelsea L. John under Case Record File No. 10214815, exposing the internal backlogs and structural document suppression that led to the fraudulent extraction of the No Probable Cause determination.

**NEW YORK CITY POLICE DEPARTMENT (NYPD)** is an executive administrative agency of Defendant City of New York, maintaining its headquarters at One Police Plaza, New York, NY 10038. The NYPD is named strictly as a Necessary Relief Party pursuant to Federal Rule of Civil Procedure 19(a); its inclusion is required to compel the immediate production of all localized precinct dispatch data, responding officer audio transmissions, and domestic log entries concerning the Subject Premises from 2020 through the present, exposing the on-site operational mechanics utilized by Security Supervisor J. Griffon to intercept responding officers and suppress official police reporting.

## I. PROCEDURAL POSTURE AND RIGHT TO AMEND

1. Plaintiffs filed the initial Complaint on November 17, 2025. This Court subsequently granted an extension of time to perfect service of process.
2. Defendant New York Police Department (New York City Corporation Counsel) and Defendant New York City Department Of Investigation (New York City Corporation Counsel) were formally served on April 7, 2026. As of the date of this filing, no responsive

pleading or motion under Rule 12 has been served by any Defendant. Accordingly, Plaintiffs timely file this First Amended Complaint as a matter of course pursuant to **Federal Rule of Civil Procedure 15(a)(1)**.

3. Service of process remains pending as to the remaining Defendants. Pursuant to federal practice, the remaining unserved Defendants will be served with this operative First Amended Complaint and its accompanying summonses.

4. Following the formal Statement of Death filed on February 25, 2026 (ECF No. 13), the surviving Plaintiffs submit this filing to maintain the integrity of the action within the 90-day window of **FRCP 25(a)(1)**, pending the imminent formal substitution of the representative for the Estate of Anita B. Tovar.

## II. HISTORICAL BACKGROUND AND SUBJECT PREMISES

6. The real property at issue is a residential apartment unit originally constructed as U.S. Navy housing within the Clinton Hill Apartments complex, identified as 210 Clinton Avenue, Apartment 1H, Brooklyn, New York 11205 (the "Subject Premises").

7. The Subject Premises is alternately recorded in New York City municipal housing records under the address 204 Clinton Avenue, Apartment 1H, Brooklyn, New York 11205.

8. Late Plaintiff Anita B. Tovar established lawful occupancy of the Subject Premises in 1972. Plaintiff Monique (Tovar) Saunders resided in the Subject Premises through her young adulthood, maintaining a continuous legal interest and familial nexus to the property.

9. In 2020, during the COVID-19 pandemic, Plaintiff Monique Saunders returned to reside physically at the Subject Premises to provide essential medical care for her ill mother, subsequently re-establishing full-time physical residency alongside the remaining Plaintiffs.

10. Late Plaintiff Anita B. Tovar maintained the Subject Premises as her primary residence for over 45 years.

11. Her spouse, Emmanuel Tovar, was a U.S. Army National Guard Medical Specialist who co-occupied the premises under honorable military service status, as documented by forms NGB-55 and DD-214 (attached hereto as Exhibit 1).

12. This decades-long, stable tenancy establishes the historical baseline of the Plaintiffs' possessory rights and sets the chronological framework for the enterprise's continuous, multi-decade scheme to obscure ownership, manipulate tenancy records, and commit property fraud.

## III. THE FORMATION AND FRAUDULENT REGISTRATION SCHEME (1978–PRESENT)

13. In 1979, Emmanuel Tovar was placed on State Active Duty with the New York National Guard during a state emergency, as confirmed by official correspondence from Major General Vito J. Castellano, Chief of Staff to Governor Hugh Carey (attached hereto as **Exhibit 2**).

14. This active-duty military status triggered strict federal and state statutory protections for both the service member and his dependent spouse, late Plaintiff Anita B. Tovar, under the **New York State Soldiers' and Sailors' Civil Relief Act (NYS Military Law § 300 et seq.)**.

15. Plaintiffs allege that the RICO Enterprise initiated its multi-decade fraudulent property registration and ownership concealment scheme during this exact window of military service, capitalizing on the enforced absence of the head of household to manipulate tenancy and property records without detection.

16. The enforced absences of Emmanuel Tovar due to active military deployments created specific financial and administrative vulnerabilities for late Plaintiff Anita B. Tovar and her dependent child.

17. The RICO Enterprise intentionally targeted these vulnerabilities—as part of a broader, systemic pattern directed at similarly situated low-income, foreign-born, or dependent tenants in Brooklyn, New York—to execute its fraudulent real estate schemes, obscure corporate ownership, and evade regulatory oversight without detection.

## IV. THE INITIATION OF THE DECEPTIVE SCHEME AND FRAUDULENT LEASE PRESENTATION

18. On December 27, 1978, while Emmanuel Tovar was deployed on active military duty, an agent of Defendant Clinton Hill Apartments Corporation ("CHAC"), identified by the initials "K.W.," presented late Plaintiff Anita Tovar with a "Standard Form of Apartment Lease" published by The Real Estate Board of New York, Inc. (attached hereto as **Exhibit 3**).

19. Plaintiff Anita Tovar declined to execute the presented lease agreement, as the Tovar family's occupancy was predicated upon Emmanuel Tovar's active federal/state military housing status at the Brooklyn Navy Yard complex, rendering the corporate lease demand factually and legally inapplicable.

20. Plaintiffs allege that the generation and presentation of this unsigned, unauthorized corporate lease form marked the inception of the Enterprise's systemic use of deceptive instruments.

21. This document was subsequently utilized via interstate wires and the U.S. Mail to generate and submit fraudulent rent registration statements to the New York State Division of

Housing and Community Renewal ("DHCR"), creating a fictitious paper trail to obscure the true regulatory status and beneficial ownership of the Subject Premises.

22. Defendant Clinton Hill Apartments Corporation ("CHAC") is a distinct legal entity from Defendant Clinton Hill Apts. Owners Corp. ("CHAOC") (New York Department of State ID: 721162, incorporated on September 8, 1981).

23. A direct corporate and operational nexus exists between CHAC and CHAOC. This nexus arose from consecutive real estate sales, the conversion of rent-stabilized apartment inventories within the Clinton Hill Apartments complex into cooperative units, and the subsequent systemic deregulation of rent-regulated units.

24. Plaintiffs allege that the structural transitions between CHAC and CHAOC were utilized by the RICO Enterprise as a deceptive mechanism to carry out unlawful constructive evictions, manipulate tenancy records, and obscure the continuity of ownership from ijntmunicipal regulatory bodies and tenants.

25. On August 28, 1981, during a period when Emmanuel Tovar was mobilized on active military service, an agent of Defendant CHAC presented late Plaintiff Anita Tovar with a typed notice on corporate letterhead (attached hereto as Exhibit 4).

26. This correspondence asserted that execution of the document would constitute a legally binding extension of a lease and would incorporate all terms from a prior, non-existent lease agreement.

27. Plaintiffs allege that this correspondence constituted a material misrepresentation transmitted to a vulnerable dependent, executed with the intent to establish a fraudulent paper trail of corporate tenancy and to systematically strip the occupants of their statutory military housing protections.

28. Attached to the August 28, 1981, CHAC correspondence was a typed document entitled "Rent Stabilization Rider for Apartment House Tenants in New York City" and a corporate "120 Day Lease Expiration Notice" (attached hereto as **Exhibit 1, 3, 4)**.

29. This Rider was presented independently of any standard, authorized lease renewal form approved by the Real Estate Board of New York, Inc., and deceptively mirrored compliance with the New York City Rent Stabilization Law and Code.

30. On or about November 1981, late Plaintiff Anita Tovar, then a non-citizen dependent whose spouse was deployed on active military service, signed the CHAC correspondence.

31. Her signature was procured through actionable economic duress, the imminent threat of eviction, and a material omission regarding her absolute statutory right as a military dependent to remain in the occupancy without a corporate lease agreement under **NYS Military Law § 300 *et seq*.**

32. The Enterprise executed this transaction with knowledge that late Plaintiff Anita Tovar lacked the legal authority to unilaterally waive or alter the family's primary federal and state military occupancy rights.

33. Plaintiffs allege that the generation and mailing of these deceptive, unauthorized regulatory notices constituted predicate acts of mail fraud used to force a protected military occupancy into a fraudulent corporate rent-stabilization framework.

34. Defendant CHAC omitted to provide either late Plaintiff Anita Tovar or Emmanuel Tovar with a fully executed 1981 Lease Agreement containing the standardized terms, covenants, clauses, or statutory tenant rights mandated by New York State and City real property laws.

35. Defendant CHAC further omitted to provide any documentary evidence demonstrating a lawful conveyance of the Subject Premises from the United States military to CHAC that

would legally compel an active-duty servicemember to execute a corporate lease to maintain possessory rights.

36. Instead, the Enterprise utilized the signature procured from late Plaintiff Anita Tovar on the August 28, 1981 correspondence as a pretextual instrument.

37. This facially deficient document, lacking essential lease terms, was subsequently deployed by the Enterprise to construct a fraudulent paper trail of corporate tenancy, violating New York Real Property Law requirements and advancing the scheme to misrepresent the regulatory status of the Subject Premises to municipal authorities.

38. On June 1, 1982, approximately six months after procuring late Plaintiff Anita Tovar's signature on the pretextual correspondence, the Enterprise utilized the U.S. Mail to transmit a "Property Sale Announcement Letter" to the Tovar family (attached hereto as Exhibit 5).

39. This correspondence was authored by Defendant Frederick J. Rudd, acting as Director of Management for Defendant Time Equities, Inc. ("TEI"). The letter asserted that an entity named "Clinton Hill Equities Group" had acquired the complex from "Clinton Hill Associates," and had appointed TEI as the managing agent.

40. Late Plaintiff Anita B. Tovar was not admitted to United States citizenship through naturalization until February 28, 1984, as documented by Certificate of Naturalization No. 11833063 (attached hereto as Exhibit 6).

41. Plaintiffs allege that the Enterprise introduced sequential corporate layers—including TEI and various unverified partnership entities—while late Plaintiff Anita Tovar was still a non-citizen dependent. This strategic timing was calculated to exploit her immigration status, maintain her legal and administrative isolation, and insulate the shifting "strawman" owners from scrutiny.

42. At all times relevant to this action, Defendant Francis Greenburger was the Founder, Chairman, and Chief Executive Officer of Defendant Time Equities, Inc. ("TEI").

43. Defendant Greenburger directed and controlled the acquisition of the twelve-building Clinton Hill Apartments complex through Defendant Clinton Hill Equities Group, a New York general partnership dominated and controlled by Greenburger and TEI.

44. Defendant Clinton Hill Equities Group acted as the Sponsor for the cooperative conversion of the complex. The Sponsor implemented a non-eviction cooperative conversion plan under the direction of Defendant Greenburger.

45. Defendant Greenburger secured the capital and financing necessary to execute this conversion scheme from Goldome Bank and GD Manhattan Realty Corp.

46. Plaintiffs allege that Defendant Greenburger utilized this multi-tiered corporate and partnership structure—comprising TEI, Defendant Clinton Hill Equities Group, and Clinton Hill Apartments Owners Corp. ("CHAOC")—as an association-in-fact enterprise. This enterprise pooled capital, structured financing, and deployed successive corporate shells to systematically alter the regulatory status of rental units and shield the principal actors from statutory tenant liabilities

## V. THE COMMERCIAL SCALE AND CONTINUITY OF THE RICO ENTERPRISE

47. Defendant Time Equities, Inc. ("TEI") was incorporated in March 1966 by Defendant Francis J. Greenburger and business partner Philip J. Rudd.

48. Defendant Frederick J. Rudd subsequently assumed the role of Director of Management for TEI, maintaining familial and operational continuity within the upper management of the enterprise.

49. TEI operates as a high-volume real-estate investment and cooperative conversion corporation. Throughout the 1980s, the enterprise executed the systematic conversion and sale of more than 5,000 residential apartments across New York City, as documented in contemporary industry records compiled by The New York Times.

50. Plaintiffs allege that the enterprise utilized its vast commercial infrastructure, shared familial management structures, and high-volume cooperative conversion model to systematically absorb rent-regulated inventories.

51. The scale of these operations heavily engaged the channels of interstate commerce, utilizing interstate wires, institutional bank financing, and the U.S. Mail to execute the property conversions, mortgage placements, and regulatory filings central to the fraudulent scheme.

## VI. OPERATIONAL HISTORY AND EXTENSION OF THE ENTERPRISE

52. Defendant Time Equities, Inc. ("TEI"), under the executive direction of Defendant Francis J. Greenburger and partner Philip J. Rudd, executed the cooperative conversion of the twelve-building complex known as the Clinton Hill Apartments in 1984. This conversion resulted in the formation of Defendant Clinton Hill Apartments Owners Corp. ("CHAOC").

53. The Enterprise principals maintain a documented, systematic pattern of using corporate real estate vehicles to improperly deregulate residential properties. Specifically, founder Philip J. Rudd specialized in the systemic removal of New York properties from residential rent-control frameworks.

54. Furthermore, his successor, Defendant Frederick Rudd, has a documented history of executing illegal, fraudulent rent-stabilization deregulation schemes across Manhattan

property inventories, as established by State Supreme Court litigation (see *[Tenants of 28 Bedford Street] v. Rudd Realty Management*, Index No. [X] [N.Y. Sup. Ct. 2017]).

55. Plaintiffs allege that the Enterprise attempted to apply this identical deregulation and stabilization *modus operandi* to the Subject Premises (Apartment 1H).

56. However, the Subject Premises was a designated United States Navy/military housing unit. As a matter of federal and state law, the unit sat entirely outside local rent-stabilization jurisdictions, rendering the Enterprise's sequential demands for leases, rent escalations, and corporate conversions factually and legally void *ab initio.*

## VII. THE UNAUTHORIZED EXERCISE OF CONTROL AND MAIL FRAUD COMMUNICATIONS

57. Throughout the 1970s, the United States Department of Defense (DOD) maintained absolute ownership of the Subject Premises. Neither the DOD nor the Tovar family executed any lease, contract, or occupancy agreement with Defendants CHAC, CHAOC, Time Equities, Inc. ("TEI"), or Clinton Hill Equities Group.

58. Despite this total absence of contractual privity or legal title, the Enterprise utilized the U.S. Mail to issue a "Property Sale Announcement Letter" on June 1, 1982, executed by Defendant Frederick J. Rudd in his capacity as Director of Management for TEI (attached hereto as **Exhibit [X]**).

59. This correspondence contained explicit, material misrepresentations designed to validate a fraudulent corporate tenancy, specifically asserting that TEI's "computerized records" established a verified rent of $233.39, a security deposit of $233.39, and a binding lease expiration date of December 31, 1984.

60. Attached to this mailing was an institutional notice from Clinton Hill Associates declaring that the complex—consisting of over 1,000 apartment units—had been sold to Defendant

Clinton Hill Equities Group and that all tenant security deposits had been assigned and transferred.

61. These corporate transfer documents contained a total **material omission** regarding the unique federal military housing status of the Subject Premises, intentionally hiding the fact that the Enterprise was unilaterally absorbing federal military infrastructure into a private cooperative inventory.

62. This deceptive omission aligns with a documented *modus operandi* of executing unauthorized real estate de-regulations to maximize profits while receiving municipal benefits, as established in subsequent enforcement litigation involving Defendant Frederick Rudd's firm (see Yang v. Creative Industries Corp. / Rudd Realty Management).

## VIII. THE SPONSOR'S SCIENTER AND UNAUTHORIZED INSIDER TRANSACTIONS

63. At all times relevant to this action, Defendants Frederick J. Rudd, Francis J. Greenburger, and Time Equities, Inc. ("TEI") possessed actual and constructive knowledge, through contemporaneous business records, that Emmanuel Tovar was an active-duty U.S. Army National Guardsman occupying the Subject Premises under protected federal military housing status.

64. At the time of the purported complex sale, the entity designated as the seller, "Clinton Hill Associates," was a non-existent entity unregistered with the New York Department of State, Division of Corporations, rendering it legally incapable of executing a valid real property conveyance or assigning tenant security deposits.

65. The designated purchaser, Defendant Clinton Hill Equities Group (a New York general partnership), maintained an overlapping corporate nexus with Defendant Greenburger,

who acted as the sole stockholder, Chairman, and CEO of TEI, the managing agent for the conversion.

66. Plaintiffs allege that this transaction was a fraudulent insider mechanism designed to transfer real property control to an entity controlled by the same principal actors, without a lawful title chain from the United States military.

67. The Enterprise intentionally omitted to disclose this conflict of interest and the unique military housing status of the Subject Premises to the occupants, utilizing the U.S. Mail to issue fraudulent collection and tenancy notices in furtherance of the scheme to defraud.

## IX. THE SPONSOR'S KNOWLEDGE AND ACCUSATIONS OF INSIDER FRAUD

68. At all times relevant to this action, Defendants Frederick J. Rudd, Francis J. Greenburger, and Time Equities, Inc. ("TEI") possessed actual and constructive knowledge that the Subject Premises was an active United States military housing unit occupied by a protected servicemember and his dependents.

69. At the time of the purported complex-wide sale, the designated seller, "Clinton Hill Associates," was a non-existent corporate entity unregistered with the New York Department of State, rendering its purported real estate conveyance and assignment of security deposits legally void *ab initio*.

70. The designated purchaser, Defendant Clinton Hill Equities Group, maintained an identity of interest with Defendant Greenburger, who simultaneously served as the sole stockholder, Chairman, and CEO of TEI, the managing agent executing the conversion.

71. The Enterprise intentionally concealed these structural corporate defects and conflicts of interest from the occupants. They utilized the U.S. Mail to issue fraudulent collection

notices and lease demands, intentionally bypassing federal and state military housing protections to execute a predatory property acquisition.

## X. THE INCEPTION OF STRUCTURAL LATENT DEFECTS AND DEFENDANTS' NOTICE

72. On March 26, 1983, a catastrophic flooding event (the "1983 Flood") occurred within the Subject Premises, originating from structural failures in the surrounding building infrastructure.

73. Contemporaneous corporate business records, specifically a Clinton Hill Apartments Security Incident Report executed by Security Captain Jessie Moore, document that water simultaneously breached the Subject Premises from three separate entry points: (1) the main ingress door, and (2) two separate common adjacent walls shared between Apartment 1G and the Subject Premises (attached hereto as **Exhibit [X]**).

74. The 1983 Flood caused extensive, documented damage to the real property infrastructure and the Plaintiffs' personal property, causing the immediate saturation and subsequent buckling of the structural subfloors and wall-to-wall carpeting across the bedroom, bathroom, and dual foyers.

75. Late Plaintiff Anita Tovar timely executed and delivered a detailed "Estimate of Damage by Water" report to Defendants Clinton Hill Equities Group and Time Equities, Inc. ("TEI") at their designated operational office located at 345 Clinton Avenue, Brooklyn, New York 11238, documenting immediate structural damage totaling $1,006.25 (attached hereto as **Exhibit [Y]**).

76. Plaintiffs allege that the 1983 Flood provided the Enterprise with immediate, actual written notice of severe, latent structural defects within the building's drainage and common wall infrastructure.

77. Despite this notice, and while Emmanuel Tovar was deployed on active military service, the Enterprise omitted to execute structural remediation or replace the water-saturated subfloors. This deliberate omission initiated a continuous, multi-decade pattern of concealing latent defects, creating a toxic environment for the propagation of dangerous fungal spores and mycotoxins, in violation of the Implied Warranty of Habitability (**NYS Real Property Law § 235-b**).

78. Following the 1983 Flood, the underlying structural floorboards and subflooring within the Subject Premises sustained progressive, long-term degradation, including organic wood rot, severe warping, and structural buckling.

79. The 1983 Flood constitutes the first of three discrete, catastrophic flooding events that caused severe property damage to the Subject Premises over a forty-year period.

80. Despite continuous, documented notice of these recurring events, the Enterprise, its corporate successors, and its assigns omitted to execute any structural remediation, moisture extraction, or subfloor replacement, allowing the structural deterioration to persist to the present day.

81. Plaintiffs allege that the Enterprise's intentional refusal to remediate these latent defects, combined with the ongoing concealment of its true corporate ownership from municipal housing regulators, constitutes the Enterprise's "regular way of doing business."

82. This calculated omission allowed the Enterprise to systematically reduce operational expenditures, evade building code enforcement, and misappropriate rental and cooperative maintenance funds through a continuous, decades-long pattern of mail and wire fraud.

## XI. THE 1989 FLOOD, DECEPTIVE INSURANCE REPRESENTATIONS, AND BIOLOGICAL COLONIZATION

83. On August 24, 1989, a second catastrophic flooding event (the "1989 Flood") breached the Subject Premises, causing severe structural damage to the bathroom ceiling, kitchen floor infrastructure, foyer hardwood floorboards, and bedroom subflooring.

84. On August 31, 1989, late Plaintiff Anita Tovar delivered a formal written incident report and a $1,500.00 property damage estimate to Defendants Clinton Hill Equities Group and Time Equities, Inc. ("TEI") at their 345 Clinton Avenue management office (attached hereto as **Exhibit [X]**).

85. On September 5, 1989, Defendant TEI utilized the U.S. Mail to transmit a written response to late Plaintiff Tovar, stating that the damage claim had been "forwarded to our insurance company for handling" (attached hereto as **Exhibit [Y]**).

86. Despite this written representation, the Enterprise omitted to compensate the Plaintiffs, denied the property damage claim, and refused to execute structural repairs or moisture mitigation inside the apartment.

87. As a direct result of Defendant TEI's refusal to remediate the saturated structural components, the underlying subflooring, drywall, and hardwood boundaries developed active, progressive toxic mold and mildew colonies.

88. Plaintiffs allege that the Enterprise utilized the U.S. Mail to transmit deceptive insurance notices to pacify the tenants and shield the Enterprise from liabilities. This step advanced a continuous pattern of property fraud and systematic denial of required services, directly exacerbating the biological health hazards initiated during the 1983 Flood.

## XII. THE 1995 FLOOD, SUPERINTENDENT NOTICE, AND PREDATORY MAINTENANCE NEGLECT

89. On July 10, 1995, a third catastrophic water intrusion event (the "1995 Flood") breached the Subject Premises, caused by a faulty ballcock installation within the building's common plumbing infrastructure.

90. The building superintendent, identified as Superintendent Casey, executed an official "Notice of Accident or Property Damage Report" that was countersigned by late Plaintiff Anita Tovar (attached hereto as **Exhibit [X]**).

91. This contemporaneous corporate business record explicitly documented severe dampness, pervasive odors of stagnation, water-saturated carpeting, structural damage to the kitchen flooring, and the destruction of furniture and personal effects.

92. Plaintiffs Anita Tovar and Monique Saunders were physically present inside the Subject Premises during the 1995 Flood and witnessed the structural breach and property destruction.

93. Despite actual written notice and the capture of photographic evidence by corporate agents, Defendants CHAOC and TEI denied compensation and omitted to perform any remedial structural repairs to the saturated floorboards or underlying infrastructure.

94. Plaintiffs allege that this systematic, decades-long refusal to repair structural latent defects was a calculated predatory mechanism deployed by the Enterprise to execute a constructive eviction of long-term occupants, artificially lower operational overhead, and maximize illegal cooperative conversion profit margins.

95. To date, the Defendants have failed to remediate or restore the water-damaged, mold-replete hardwood subfloors, allowing the hazardous environmental degradation of the Subject Premises to persist continuously.

## XIII. THE EXECUTION OF THE MAIL FRAUD SCHEME AND FORCED RENT REGISTRATIONS

96. On or about April 1, 1985, Defendant Time Equities, Inc. ("TEI") utilized the U.S. Mail and interstate wires to file a fraudulent Annual Apartment Registration with the New York State Division of Housing and Community Renewal ("DHCR") for the Subject Premises.

97. In this regulatory filing, Defendant TEI falsely designated itself as the "managing agent" and misrepresented that the Subject Premises was a standard commercial rent-stabilized unit subject to private corporate ownership, rather than an exempt United States military housing unit.

98. Defendant TEI subsequently mailed a tenant copy of this 1985 DHCR registration to Emmanuel and Anita Tovar at the Subject Premises (attached hereto as **Exhibit [X]**). The Enterprise executed this mailing with actual knowledge that:

- Emmanuel Tovar maintained active military housing status;
- The Subject Premises was designated federal military infrastructure; and
- No valid master lease agreement had ever been executed by the Tovar family.

99. In 1986, Defendant TEI filed another fraudulent Annual Apartment Registration with the DHCR, listing Emmanuel Tovar as the "Tenant" and setting a rent of $254.39 per month (attached hereto as **Exhibit [Y]**). The Enterprise executed this electronic and mail transmission despite possessing actual knowledge that no lawful master lease or signed lease renewal agreement existed.

100. On September 16, 1988, Defendant TEI presented late Plaintiff Anita Tovar with a New York City Rent Stabilization Lease Renewal Form, accompanied by written communications containing threats of immediate eviction if the packet was not executed.

101. Driven by fear of unlawful eviction, late Plaintiff Anita Tovar signed the documents and paid an unauthorized financial surcharge and an increased security deposit demanded by Defendant TEI.

102. As part of this transaction, Defendant TEI required late Plaintiff Tovar to execute DHCR Form RA-23.5 ("Notice To Owner Of Persons Other Than Tenant Residing In Apartment"), on which she explicitly listed her daughter, Plaintiff Monique Tovar [Saunders], then 15 years of age (attached hereto as **Exhibit [Z]**).

103. Although Defendant TEI routinely collected the inflated monthly rent and deposited the funds into its Citibank "Time Equities-Clinton Hill Rent Security Account," the Enterprise principals intentionally omitted to sign the lease document or provide the Plaintiffs with a fully executed copy.

104. Plaintiffs allege that the systematic filing and mailing of these facially deficient, unsigned lease forms and false DHCR registrations constituted a continuous pattern of **predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343**. This mechanism was deployed by the Enterprise to create a fictitious regulatory record, extract illicit surcharges, and mask the unauthorized conversion of federal military property into a private cooperative inventory.

## XIV. FINANCIAL LAYERING, CORPORATE SHIFTING, AND INSTITUTIONAL INSULATION

105. On March 7, 1990, late Plaintiff Anita Tovar received a correspondence on the letterhead of GD (Goldome) Manhattan Realty Corp.—a wholly-owned subsidiary of Goldome Savings Bank of New York—asserting a transfer of ownership of the Subject Premises from Clinton Hill Equities Group to GD Manhattan Realty Corp. (attached hereto

as **Exhibit [X]**). This notice directed all future rent payments to a Post Office Box in Buffalo, New York.

106. On March 28, 1990, the Enterprise transmitted an identical, unsigned duplicate of the March 7 ownership transfer notice to late Plaintiff Anita Tovar, reiterating the demand to route funds to the Buffalo banking repository.

107. On April 5, 1990, eight days after the duplicate notice, late Plaintiff Tovar received a conflicting directive executed by Kathryn M. Mulloy, Vice President of GD Manhattan Realty Corp. (attached hereto as **Exhibit [Y]**). This notice countermanded the prior payment instructions and directed that rent payments for May 1990 and thereafter be redirected to a new managing agent, Defendant Mark Greenberg Real Estate Co., Inc. ("MGRE").

108. Plaintiffs allege that these rapid, sequential alterations of financial routing instructions and corporate roles within a 30-day window constituted a deliberate "layering" mechanism executed via the U.S. Mail. This pattern of mail fraud predicates (**18 U.S.C. § 1341**) was designed to obscure the chain of title, generate administrative confusion for the tenants, and insulate the shifting "strawman" owners from regulatory scrutiny.

109. The March 1990 correspondences further disclosed that GD Manhattan Realty Corp. had retained the law firm Weil, Gotshal & Manges to represent its interests regarding the property transfers.

110. Plaintiffs allege that the Enterprise utilized prominent institutional legal counsel to structure these unrecorded corporate hand-offs and manage underlying regulatory risks. This step effectively insulated the Enterprise from direct liability to the occupants while

converting federal military housing assets into private cooperative inventories without Plaintiff(s)'s participation or informed consent

## XV. THE SPONSOR COLLAPSE, FRAUDULENT COLLATERALIZATION, AND MORTGAGE KICKBACK SCHEME

111. Throughout the early 1990s, the Enterprise's ongoing manipulation of tenancy records and constructive eviction tactics occurred against a backdrop of community-wide displacement, marked by an escalation of weekly evictions across rent-regulated inventories in the Clinton Hill neighborhood.

112. In April 1990, late Plaintiff Anita Tovar received an institutional notification from Defendant Clinton Hill Apartment Owners Corporation ("CHAOC") titled "Important Letter To All Clinton Hill Residents - Special Notice" (attached hereto as **Exhibit [X]**).

113. This corporate disclosure revealed that in December 1989, Sponsor Francis Greenburger (CEO of Defendant Time Equities, Inc. ["TEI"]) had formally disclosed to the New York State Attorney General's Office an impending financial insolvency, rendering the Sponsor unable to pay mandatory maintenance fees on the 693 *unsold* cooperative apartments he controlled out of the complex's 1,214 total units.

114. To prevent a catastrophic default that would destabilize the cash flow of Defendant CHAOC, Defendant Greenburger and TEI entered into a financial restructuring agreement with Goldome Savings Bank of New York to guarantee complex maintenance costs effective February 1990.

115. Under this restructuring agreement, Defendant Greenburger pledged a sweeping inventory of apartment units to Goldome Savings Bank as loan collateral. Consequently, Goldome Savings Bank transferred titular ownership of these collateralized units to its

wholly-owned real estate subsidiary, GD Manhattan Realty Corp., which subsequently appointed Defendant Mark Greenberg Real Estate Co., Inc. ("MGRE") as its asset management agent.

116. Plaintiffs allege that Defendant Greenburger, TEI, Goldome Savings Bank, and GD Manhattan Realty Corp. knowingly integrated the Subject Premises (Apartment 1H) into this commercial collateral pool.

117. The Enterprise executed this pledge despite possessing actual and constructive knowledge that neither the Sponsor nor Defendant CHAOC possessed lawful title to the Subject Premises, which remained a designated United States military housing unit.

118. Plaintiffs further allege that Defendants MGRE, Mark Greenberg, and the institutional banking actors established an illicit mortgage procurement and kickback scheme.

119. This scheme utilized the U.S. Mail and interstate wires to secure leveraged equity investments and institutional mortgage financing by knowingly offering the Subject Premises as fraudulent bank collateral.

120. This step advanced a multi-layered real estate fraud operation that generated illicit liquidity for the collapsing Sponsor while intentionally misrepresenting the legal and regulatory status of federal military infrastructure to financial institutions and municipal regulators, constituting a distinct pattern of bank fraud (**18 U.S.C. § 1344**) and mail fraud (**18 U.S.C. § 1341**).

121. During this financial restructuring, the Enterprise intentionally omitted to disclose to late Plaintiff Anita Tovar her specific statutory housing rights and protections as a military dependent under the **New York State Soldiers' and Sailors' Civil Relief Act**.

122. Instead, the Enterprise used the administrative confusion to coerce her into routing monthly rental payments to unauthorized corporate entities, including Goldome Savings Bank and its real estate subsidiaries, who held no legitimate chain of title to the federal property.

123. In the April 1990 Special Notice, Defendant CHAOC's Board of Directors explicitly affirmed that because the conversion plan for the Clinton Hill Apartments was a non-eviction plan, non-purchasing tenants were not required to vacate the premises upon a change in titular ownership (attached hereto as **Exhibit [X]**).

124. Operating within her rights as a military dependent and given the federal housing status of the Subject Premises, late Plaintiff Anita Tovar never elected to execute a purchase agreement or participate in the cooperative conversion of the Subject Premises.

125. Plaintiffs allege that the Enterprise utilized these non-eviction clauses as a deceptive tool to keep the protected family inside the unit. This step allowed them to continue collecting illicit rents and use the apartment as fraudulent bank collateral, while systematically denying the structural maintenance and repairs required under the Implied Warranty of Habitability (**NYS Real Property Law § 235-b**).

126. The explicit non-eviction mandate in the April 1990 Special Notice confirmed that non-purchasing occupants retained a continuous, uninterrupted right of possession, independent of corporate ownership transfers.

127. Late Plaintiff Anita Tovar strictly conformed to this non-eviction framework. She consistently declined to execute any purchase agreements, preserving her family's status as protected, non-purchasing residents.

128. Plaintiffs allege that the Enterprise intentionally used this non-eviction status to exploit the family. By keeping the occupants inside the unit, the Enterprise could continue collecting rent and using the unit as bank collateral, while entirely abandoning its structural maintenance obligations.

## XVI. MANAGEMENT TRANSITIONS AND THE CONTINUITY OF SITE PERSONNEL

129. The April 1990 Special Notice issued by Defendant CHAOC's Board of Directors further informed the occupants that effective April 1, 1990, Defendant Time Equities, Inc. ("TEI") would cease its property management operations across its cooperative portfolio (attached hereto as **Exhibit [X]**).

130. To maintain operational continuity, Defendant CHAOC contracted with a successor entity, Elm Management Associates, Inc. ("Elm Management"), explicitly stipulating that the successor must retain the pre-existing on-site management, accounting, bookkeeping, and maintenance staff.

131. Late Plaintiff Anita Tovar complied with these directives, routing monthly rental payments to Elm Management as instructed by Defendant CHAOC's corporate agents.

132. She executed these payments without knowledge of the underlying structural ownership defects, the lack of a valid chain of title from the United States military, or the fraudulent collateralization schemes.

133. Plaintiffs allege that the intentional retention of the identical on-site personnel across successive property management transitions was a calculated operational mechanism deployed by the Enterprise.

134. Maintaining this unbroken chain of core personnel ensured that the systemic practices of falsifying tenancy records, concealing structural latent defects, and diverting security deposits remained insulated from external discovery or regulatory intervention.

135. Plaintiffs allege that this structural continuity directly facilitated an ongoing pattern of state law infractions, including grand larceny, criminal possession of stolen property, and the falsification of business records, which served as the operational foundation for the Enterprise's federal racketeering predicates.

## XVII. THE DECEPTIVE SECURITY DEPOSIT TRANSFER AND ACCOUNT MANIPULATION

136. On May 14, 1990, less than thirty days after receiving the CHAOC Special Notice, late Plaintiff Anita Tovar received a written notice via the U.S. Mail from Defendant Mark Greenberg Real Estate Co., Inc. ("MGRE") (attached hereto as **Exhibit [X]**).

137. This correspondence formally stated: *"Your Landlord, GD Manhattan Realty Corp., has transferred your security deposit and accrued interest to an interest-bearing account at Goldome. You will receive from Goldome a check in the amount of the interest earned on your security deposit on an annual basis."*

138. The Enterprise executed this financial transfer and transmitted the accompanying mail notice with actual knowledge that neither GD Manhattan Realty Corp. nor Goldome Savings Bank held a legitimate, lawful chain of title to the Subject Premises.

139. Plaintiffs allege that the generation and mailing of this notice constituted an affirmative **predicate act of mail fraud under 18 U.S.C. § 1341**.

140. The transaction was a deceptive mechanism deployed to validate an unlawful property interest, create a fraudulent paper trail of commercial landlord-tenant escrow

compliance, and obscure the conversion and commingling of tenant funds within a collapsing banking institution.

141. Enclosed within the May 14, 1990 correspondence from Defendant MGRE was an IRS Form W-9, accompanied by a written directive warning late Plaintiff Anita Tovar that *"failure to comply with completing the [enclosed] W9 form as required by government regulation will result in 20% withholding of interest"* (attached hereto as **Exhibit [X]**).

142. Plaintiffs allege that this statutory tax demand was a **pretextual artifice** deployed via the U.S. Mail to fraudulently procure late Plaintiff Tovar's Social Security Number and Personally Identifiable Information (PII).

143. Because the underlying property transfer and collateralization scheme lacked a valid legal chain of title from the United States military, no lawful landlord-tenant escrow account existed under **New York General Obligations Law § 7-103**.

144. The Enterprise principals—including Defendants CHAOC, MGRE, Mark Greenberg, Goldome Savings Bank, and GD Manhattan Realty Corp.—procured this sensitive financial data with the specific intent to utilize the tenant's PII to open unauthorized financial sub-accounts, mask illicit layering transactions, and obscure the unauthorized conversion of federal military property from federal regulatory oversight, violating **18 U.S.C. § 1028 (Identity Fraud)** and **18 U.S.C. § 1341 (Mail Fraud)**.

145. Prior to the May 14, 1990 correspondence issued by Defendant MGRE, no corporate real estate entity associated with the Subject Premises had ever requested or required the production of the Tovar family's Social Security Numbers or sensitive Personally Identifiable Information (PII).

146. The rapid, sequential redirection of rental payments from Elm Management to MGRE, coupled with the sudden demands for private financial data by an external entity lacking contractual privity or recorded title, effectively altered the administrative status of the military housing unit.

147. Plaintiffs allege that the Enterprise intentionally orchestrated these unsettling and rapid management modifications to create structural instability, which served to prevent the occupants from identifying the underlying property conversion.

148. The execution of this documentation strategy effectively forced a private commercial tenancy model onto a protected military occupancy, using deceptive data collection practices to systematically erode the family's long-term housing security in furtherance of the scheme to defraud.

## XVIII. THE FDIC RECOVERY, MATERIAL REGULATORY MISREPRESENTATIONS, AND RE-LAYERING

149. On July 27, 1990, late Plaintiff Anita Tovar received a written notification issued on the letterhead of GD Manhattan Realty Corp. (attached hereto as **Exhibit [X]**).

150. This correspondence explicitly misrepresented the nature of a federal regulatory intervention, falsely stating: *"GD Manhattan Realty Corp. has sold its interest in your apartment to the Federal Deposit Insurance Corporation (FDIC). Please make your check or money order payable to the FDIC and continue to send your rent payments to Mark Greenberg Real Estate Co. Inc. (MGRE)."*

151. In factual reality, no bona fide, arms-length commercial "sale" occurred; rather, the FDIC had executed a mandatory regulatory seizure of the insolvent Goldome Savings Bank and its wholly-owned subsidiary, GD Manhattan Realty Corp., to stabilize a historic banking collapse.

152. The Enterprise utilized the U.S. Mail to transmit this deceptive notice to shield its illicit underlying collateralization scheme from detection by the tenants and to maintain active control over the routing of rental income.

153. Plaintiffs allege that the directive commanding the tenants to continue mailing funds to Defendant MGRE on behalf of the FDIC constituted a **predicate act of mail fraud under 18 U.S.C. § 1341**.

154. By active misrepresentation and material omission regarding the bank's insolvency and seizure, the Enterprise successfully engineered a "re-layering" mechanism, inserting a federal regulatory agency's name into the billing cycle to falsely legitimize its unauthorized commercial possession of a United States military housing unit.

155. In factual reality, Goldome Savings Bank and its wholly-owned subsidiary, GD Manhattan Realty Corp., did not execute a voluntary commercial divestment; rather, the institutions were involuntarily seized by federal regulators due to severe corporate insolvency.

156. This regulatory takeover constituted the largest and most expensive savings-bank collapse in United States history up to that date, resulting in the dividing of Goldome's legitimate assets between two independent banking competitors, as confirmed by contemporary public records compiled by the Associated Press and *The New York Times*.

157. Plaintiffs allege that the Enterprise deliberately concealed the involuntary nature of this federal seizure from the occupants to prevent them from discovering that the Subject Premises had been improperly entangled in an insolvent bank's collateral pool.

158. By utilizing the U.S. Mail to mischaracterize this mandatory regulatory intervention as a routine "property sale," the Enterprise successfully maintained its operational control

and continued the unauthorized collection of rental income through Defendant MGRE, advancing the broader scheme to defraud.

159. On or about July 27, 1990—five months prior to the expiration of the existing lease of record and seven months prior to the public finalization of the FDIC's asset seizure protocols—Defendant MGRE presented late Plaintiff Anita Tovar with a premature "Lease Renewal Form" (attached hereto as **Exhibit [X]**).

160. This regulatory instrument listed the "F.D.I.C." as the formal property owner and Defendant MGRE as the authorized legal agent, creating a false appearance of federal agency oversight and direct mandate.

161. Late Plaintiff Anita Tovar executed this premature instrument on September 4, 1990, driven by the manufactured threat of displacement during a period of institutional restructuring.

162. Defendant MGRE intentionally withheld the fully executed copy of the lease agreement for nearly three months, failing to return it to the occupants until November 30, 1990.

163. Plaintiffs allege that the generation and mailing of this premature lease renewal was a tactical maneuver designed to lock the protected occupants into a commercial tenancy model before the insolvent bank's collateral pool underwent final federal winding-down procedures.

164. Upon securing late Plaintiff Tovar's signature, the Enterprise immediately used the U.S. Mail to issue a new financial routing directive, countermanding the prior FDIC collection instructions and ordering her to redirect all monthly rent payments to a separate

entity, "Marvin Gold Management," at 2940 Avenue X, Brooklyn, New York 11235 (attached hereto as **Exhibit [Y]**).

165. Plaintiffs allege that this abrupt redirection of funds to a private entity immediately following the procurement of a lease under the "FDIC" name constituted a **predicate act of mail fraud under 18 U.S.C. § 1341**. This structural "bait-and-switch" maneuver allowed the Enterprise to leverage federal regulatory authority to coerce compliance while routing cash flows to unrecorded corporate actors.

166. On August 28, 1990, late Plaintiff Anita Tovar received an "Important Notice" letter transmitted via the U.S. Mail by Defendant MGRE (attached hereto as **Exhibit [X]**). This correspondence stated: *"Since there is an assignment of rents in force for your apartment, please pay your rent directly to Marvin Gold Management and mail your payment to 2940 Avenue X, Brooklyn, NY 11235. You will be notified by this office and the managing agent for your building when to commence paying your rent to Mark Greenberg Real Estate Co. Inc."*

167. Plaintiffs allege that the principal motive underlying this premature lease execution and immediate redirection of rental income away from MGRE was to divert late Plaintiff Tovar's cash flows to Marvin Gold and Defendant Marvin Gold Management Co., Inc.

168. This diversion was engineered to intercept the funds before the FDIC's formal finalization and split of Goldome Bank's asset portfolio between rival institutions could take effect, as documented in public financial records compiled by The New York Times.

169. In addition to the fraudulent collateralization involving the insolvent bank, Defendant CHAOC and its Board of Directors sequentially contracted property

management services to Elm Management Associates, Inc. and Marvin Gold Management Co., Inc.

170. Both corporate entities and their executive leadership were subsequently indicted in June 1999 by the New York County District Attorney and the New York City Department of Investigation (DOI) as two organized criminal enterprises, designated respectively as "The Elm Group" and "The Gold Group."

171. As established by official New York City Department of Investigation records, these entities were charged with Enterprise Corruption (**NYS Penal Law § 460.20**), grand larceny, commercial bribery, and bid-rigging schemes [168]. The criminal operations involved widespread collusion among property management companies, contractors, and cooperative board members to misappropriate over $4 million in building maintenance and capital funds [168].

172. Plaintiffs allege that the Enterprise seamlessly integrated these indicted property management rings into its operational infrastructure to victimize the occupants of the Subject Premises.

173. Utilizing these corrupt operators allowed the Enterprise to execute unlawful financial extractions and maintain a systematic barrier against the discovery of its underlying title fraud, while using the U.S. Mail to transmit fraudulent billing statements in violation of **18 U.S.C. § 1341**.

174. According to the New York City Department of Investigation (DOI) records, the primary Enterprise Corruption indictment charged Defendant Marvin Gold Management Co., Inc. (subsequently known as Jansl, Inc.), its President, Marvin Gold, and its Vice

President, Jeffrey C. Gold, with operating a criminal enterprise designated as "The Gold Group" (attached hereto as **Exhibit [X]**).

175. The indictment established that Marvin Gold led the enterprise in defrauding the residents and shareholders of 26 cooperatives of more than $1.7 million by extracting illicit kickbacks directly from contractors, which were then coordinated and split by Jeffrey Gold among on-site management personnel.

176. The sequential Enterprise Corruption indictment filed by the New York County District Attorney charged Defendant Elm Management Associates, Inc., its President, Arnold Zabinsky, and multiple property managers and vendors with operating a separate criminal enterprise designated as "The Elm Group."

177. The DOI investigation established that Zabinsky directed the enterprise in defrauding the residents and shareholders of 29 cooperatives of more than $1.3 million, with Zabinsky personally acquiring 75% of the illicit contractor kickbacks.

178. Plaintiffs allege that the Enterprise intentionally integrated these corrupt management apparatuses—The Gold Group and The Elm Group—into the administrative framework governing the Clinton Hill Apartments complex.

179. The systemic extraction of contractor kickbacks and widespread bid-rigging executed by these entities served as the primary financial mechanism that deprived the Subject Premises of necessary structural maintenance funds. This operational nexus directly resulted in the intentional abandonment and concealment of the toxic mold, spores, and structural subfloor defects, converting local corporate corruption into a continuous pattern of federal mail fraud predicates under **18 U.S.C. § 1341**.

## XIX. SYSTEMATIC THEFT OF PROPERTY INTERESTS AND THE FDIC ROUTING DIRECTIVES

180. Plaintiffs allege that the Enterprise, utilizing the corrupt operational frameworks of Defendants Elm Management Associates, Inc. and Marvin Gold Management Co., Inc., executed a multi-layered scheme to defraud. This scheme targeted the Tovar family through the fraudulent conversion and theft of:

- The possessory and residency interest in the Subject Premises (Apartment 1H);
- Monthly rental payments;
- Compounded annual rent-stabilization increases; and
- Inflated escrow security deposits.

181. This financial extraction was carried out under the false pretense that Defendant CHAOC possessed lawful title to the Subject Premises, and under the further deceptive representation that the Enterprise had legally registered this exempt federal military housing unit as a standard commercial rent-stabilized apartment with Defendant DHCR.

182. On February 11, 1991, the structural routing of the Enterprise's collection mechanism shifted again when the FDIC utilized the U.S. Mail to transmit a formal directive to late Plaintiff Anita Tovar, signed by Charles J. Altman (attached hereto as **Exhibit [X]**).

183. This correspondence stated: *"Pursuant to our rights under agreements with the 'owner' of your apartment the Federal Deposit Insurance Corporation ('FDIC') is authorized to collect your monthly rent. As you may know, the FDIC has been paying the maintenance for your apartment to the co-op corporation. To date Mark Grenberg Real Estate Co. has served as our Property Manager for rent collection. We have now engaged the services of Douglas Elliman Gibbons & Ives to serve as Property Manager for your*

*apartment. They will shortly be in touch with you. Please pay your monthly rent directly to them."*

184. Plaintiffs allege that the transmission of this February 11, 1991 notice constituted an affirmative **predicate act of mail fraud under 18 U.S.C. § 1341**.

185. The introduction of yet another institutional property manager—Douglas Elliman Gibbons & Ives—served to further layer the administrative record. This mechanism allowed the Enterprise to leverage federal agency terminology to enforce rent collections and mask the underlying lack of a valid chain of title from the United States military.

186. Plaintiffs allege that the Federal Deposit Insurance Corporation ("FDIC") was actively misled by the Enterprise into believing that Defendant CHAOC possessed legitimate ownership of the Subject Premises, or alternatively, that a Sponsor had acquired lawful "unsold shares" allocated to the unit.

187. The primary actors responsible for this structural deception and the misrepresentation of the title chain were the CHAOC Board of Directors, Defendant Francis Greenburger, Defendant Time Equities, Inc. ("TEI"), GD Manhattan Realty Corp., Marvin Gold, and Defendant Marvin Gold Management Co., Inc.

188. Plaintiffs allege that these corporate and individual defendants utilized unrecorded insider transfers, unverified partnership agreements, and false regulatory filings to present a fraudulent paper trail to federal banking regulators.

189. By intentionally obscuring the true United States military ownership history of the Subject Premises, the Enterprise induced the FDIC to inject capital, place loans, and manage the unit under a commercial cooperative framework, thereby advancing a multi-

decade scheme to defraud and violating **18 U.S.C. § 1341 (Mail Fraud)** and **18 U.S.C. § 1344 (Bank Fraud)**.

## XX. THE INTRODUCTION OF DEGI AND FRAUDULENT COOPERATIVE SHARE MARKETING

190. On February 15, 1991, late Plaintiff Anita Tovar and Plaintiff Monique Saunders received a written notice via the U.S. Mail from Douglas Elliman-Gibbons & Ives ("DEGI") (attached hereto as **Exhibit [X]**). This correspondence stated that DEGI "had been appointed by the Federal Deposit Insurance Corporation to represent their interest in your [210-1H] apartment" and directed that future rent checks be made payable directly to DEGI effective March 1, 1991.

191. On March 22, 1991, the Enterprise utilized the U.S. Mail to transmit a follow-up solicitation through DEGI (attached hereto as **Exhibit [Y]).** This communication asserted that an entity named "Figgie Acceptance Corporation" was the "owner of the unsold shares to your apartment" and sought to induce the occupants into negotiations to purchase the Subject Premises at a purported "fair market price."

192. The Plaintiffs declined to participate in these purchase discussions, as the Tovar family's continuous possessory interest was predicated upon an exempt federal military housing occupancy that sat completely outside the scope of the Sponsor's cooperative conversion plan.

193. Plaintiffs allege that Defendant DEGI maintained an undisclosed, fraudulent conflict of interest by simultaneously acting as the fiduciary managing agent for the FDIC and the exclusive managing and marketing agent for Figgie Acceptance Corporation.

194. Plaintiffs further allege that the generation and mailing of these March 1991 marketing notices constituted predicate acts of mail fraud under 18 U.S.C. § 1341.

195. The Enterprise introduced Figgie Acceptance Corporation as a new "strawman" entity to invent a fictitious chain of cooperative share ownership. This step allowed them to use a prominent real estate brokerage to pressure protected military dependents into buying property that the Enterprise had no legal right to possess, sell, or convert.

## XXI. MULTI-AGENT ROTATION AND THE FICTITIOUS OFFERING PLAN AMENDMENTS

196. On May 31, 1991, Defendant Jeffrey C. Gold, in his capacity as Vice President of Marvin Gold Management Co., Inc. (The Gold Group), utilized the U.S. Mail to transmit a General Notice to late Plaintiff Anita Tovar, introducing Peter Kerpen as the new on-site "General Manager" (attached hereto as **Exhibit [X]**).

197. On October 23, 1991, five months after the Gold Group notice, Defendant DEGI utilized the U.S. Mail to issue an independent operational directive to late Plaintiff Tovar (attached hereto as **Exhibit [Y]**). This notice assigned Account Executive Patrick Freydberg and Management Supervisor Paul Morton to oversee the collection cycle for the FDIC collateral pool, including the Subject Premises.

198. On August 19, 1992, late Plaintiff Anita Tovar received a 23-page corporate instrument transmitted via the U.S. Mail from Defendant DEGI's Madison Avenue office (attached hereto as **Exhibit [Z]**).

199. This 23-page instrument was delivered unsigned by any corporate agent, lacked official corporate letterhead, and was vaguely captioned as the *"Thirtieth Amendment to 201, 210, 361 and 365 Clinton Avenue, Brooklyn, New York, Dated: June 15, 1992."*

200. The introduction paragraph of this purported regulatory filing explicitly stated: *"This Thirtieth Amendment modifies and supplements the terms of the 'Cooperative Offering Plan for the Premises known as 29 West 64th Street, New York, NY (the "Building") dated December 1, 1982 (the "Plan") and should be read in conjunction with the Plan, as previously amended…'"*

201. Plaintiffs allege that the rapid, sequential rotation of on-site managers (The Gold Group) and institutional account executives (DEGI) within a 5-month window constituted an ongoing pattern of mail fraud predicates (**18 U.S.C. § 1341**) to fracture the administrative record and maintain coercive collection pressure on the occupants.

202. Plaintiffs further allege that the generation and mailing of the purported "Thirtieth Amendment" constituted an open act of **document fraud and mail fraud**.

203. The Enterprise transmitted an offering amendment detailing an entirely separate geographic property interest located in Manhattan (**29 West 64th Street**) to a Brooklyn military housing occupant (**210 Clinton Avenue**). This intentional cross-filing was a deceptive mechanism used to generate compliance confusion, manufacture a complex regulatory paper trail, and insert unrecorded, non-privy corporate layers into the billing cycle to continue the systematic theft of rental funds.

## XXII. STRUCTURAL FRAUD AND EXCLUSION FROM THE PURPORTED CHAIN OF TITLE

204. The real property located at 29 West 64th Street, New York, New York, referenced in the "Thirtieth Amendment," was and remains a separate residential cooperative property known as "The Tristan," which possesses no legal, geographical, or structural connection to the Clinton Hill Apartments or the Subject Premises.

205. The Thirtieth Amendment further declared that on September 30, 1991, Multi Boro Realty Corp. ("Multi Boro")—an affiliate of Citicorp Real Estate, Inc. located at 599 Lexington Avenue, New York, New York—had acquired titular interest to the shares and proprietary leases appurtenant to the "Unsold Apartments" from the collapsing original Sponsor, Clinton Hill Equities Group.

206. This document formally designated Multi Boro as the new holder of Unsold Shares, offered those units for sale to the public on a "first come, first served" basis, and confirmed Defendant DEGI as the operative Managing Agent for the asset inventory.

207. However, "Exhibit A" of this purported regulatory amendment, which itemized the specific Clinton Hill Apartments complex inventory held by Multi Boro, completely omitted any listing for the Subject Premises (Apartment 1H).

208. Plaintiffs allege that the deliberate transmission of this erroneous and facially fraudulent 23-page instrument via the U.S. Mail constituted an affirmative **predicate act of mail fraud under 18 U.S.C. § 1341**.

209. The Enterprise used this cross-filed, conflicting document as a deceptive mechanism to manufacture an appearance of comprehensive institutional and banking oversight by Citicorp affiliates.

210. In factual reality, because the Subject Premises was entirely excluded from Multi Boro's recorded inventory, the mailing was a tactical artifice designed to overwhelm the occupants with complex regulatory data, conceal the underlying lack of a valid chain of title, and insulate the Enterprise from detection while continuing the systematic theft of monthly rental payments.

## XXIII. THE FICTITIOUS CHAIN OF TITLE AND REDIRECTION OF FUNDS AWAY FROM THE FDIC

211. On August 26, 1992, Defendant Douglas Elliman-Gibbons & Ives ("DEGI"), acting as the purported agent for the Federal Deposit Insurance Corporation ("FDIC"), utilized the U.S. Mail to transmit a New York State Renewal Lease Form, a Tenant Information Sheet, and various operational riders to the Tovar family (attached hereto as **Exhibit [X]**).

212. Defendants Clinton Hill Apartments Owners Corp. ("CHAOC"), Time Equities, Inc. ("TEI"), and Francis Greenburger intentionally omitted to notify the FDIC or Defendant DEGI that the Subject Premises was an exempt United States military housing unit occupied by a protected military family. The Enterprise concealed this material fact to obscure the reality that Defendant CHAOC had never legally acquired or owned the Subject Premises since the inception of the cooperative conversion plan.

213. Within twelve months of executing the unrecorded "Thirtieth Amendment," the corporate shell utilized to pass title, Multi Boro Realty Corp., filed its Biennial Statement with the New York Department of State, Division of Corporations, on June 8, 1993, and immediately thereafter ceased all corporate filings and operations.

214. Plaintiffs allege that the Enterprise utilized Multi Boro Realty Corp. as a temporary "strawman" vehicle to layer the asset trail. The sudden cessation of this entity's corporate filings was calculated to break the regulatory paper trail, leaving tenants and federal bank liquidators unable to verify the underlying structural defects or the chain of title.

215. Concurrently with this corporate layering, Defendant CHAOC and its designated agents continuously purported to be the lawful owners of the Subject Premises, while systematically failing to make structural repairs mandated by New York state and local laws. This ongoing omission left the 1983, 1989, and 1995 flood-damaged subfloors unremediated, promoting toxic microbial growth.

216. Between February 1992 and 1999, Defendants CHAOC, TEI, T.C. Equities Holding Corp., and Francis Greenburger deployed a series of shifting corporate notices to redirect the monthly rental income derived from the Subject Premises away from the FDIC and directly into bank accounts under the exclusive control of Defendant CHAOC and its management networks.

217. The Enterprise executed these financial redirections via the U.S. Mail with actual knowledge that the Subject Premises was not owned by Francis Greenburger, TEI, T.C. Equities Holding Corp., Clinton Hill Equities Group, Clinton Hill Equities Corp., B.Y. Equities, Inc., or B.B.Y. Enterprises, Inc.

218. Plaintiffs allege that the systematic routing of these deceptive collection directives constituted a continuous pattern of **predicate acts of mail fraud under 18 U.S.C. § 1341**. This mechanical rotation of non-existent or unrecorded corporate owners was executed to strip the military occupants of their funds under false pretenses, bypass federal banking oversight, and maintain an illicit possessory hold over federal property.

## XXIV. CONTINUED DOCUMENT FRAUD AND EXCLUSION FROM THE 2001–2002 RESTATED OFFERING PLANS

219. Plaintiffs allege that the Enterprise executed its fraudulent collection and property management activities with actual knowledge that the official regulatory disclosures filed with the New York State Attorney General—specifically the *"Second Amendment To The Restated Offering Plan"* (dated July 1, 2001) and the *"Third Amendment To The Restated Offering Plan"* (dated June 17, 2002)—were entirely devoid of any reference to the Subject Premises (attached hereto as **Exhibits [X] and [Y]**).

220. In December 1998, the Enterprise utilized the U.S. Mail to transmit a fraudulent "Renewal Lease Form" to late Plaintiff Anita Tovar for immediate execution, introducing

a new corporate entity identified as "Insignia Residential Group" acting as the purported agent for Defendant CHAOC.

221. This 1998 Renewal Lease Form was an unauthorized instrument that featured a generic, fabricated "DHCR" logo at the top, intentionally omitting the official State of New York seal and standard regulatory text mandated for legitimate New York City Rent Stabilization renewal agreements.

222. On December 21, 1998, driven by the ongoing threat of eviction and family displacement, late Plaintiff Anita Tovar executed this deficient instrument.

223. Enclosed within this 1998 lease packet was a fraudulent version of DHCR Form RA-23.5, entitled simply *“Notice to Owner of Persons Other Than Tenant Residing in Apartment,”* which lacked any municipal housing agency captions or the official New York State seal.

224. This instrument deliberately altered the caption of the official DHCR Form RA-23.5 (5-87), which legally reads: *“Notice To Owner Of Family Members Residing With The Named Tenant in the Apartment Who May Be Entitled to Succession Rights/Protection From Eviction.”*

225. Late Plaintiff Anita Tovar and her daughter, Plaintiff Monique Saunders (then a college student), completed and returned the accompanying generic "Tenant Information Sheet" to maintain a paper trail of their occupancy and preserve their future constitutional rights to housing due process (attached hereto as **Exhibit [Z]**).

226. Plaintiffs allege that the generation, alteration, and mailing of these facially deceptive lease renewal packets constituted individual **predicate acts of mail fraud under 18 U.S.C. § 1341**.

227. The Enterprise, acting through Defendant CHAOC and Insignia Residential Group, fabricated regulatory documents and altered statutory language to deliberately obscure the Plaintiffs' legal succession and eviction-protection rights, ensuring the Enterprise could continue extracting rental funds while shielding its unauthorized conversion of federal military property from state and federal housing oversight.

228. The 1998 Renewal Lease Form generated by the Enterprise documented a "Current Deposit" baseline of $424.55. Under this instrument, the Enterprise escalated the monthly rent to $456.53 and extracted an additional security deposit surcharge of $31.98 as a mandatory condition for the household's continued occupancy.

229. The Enterprise imposed these cumulative financial extractions while intentionally omitting to disclose late Plaintiff Anita Tovar's statutory housing protections as a military dependent, and with actual knowledge that they had failed to remediate the progressive structural subfloor wood rot and microbial growth caused by the 1983, 1989, and 1995 floods.

230. On January 6, 1999, Defendants CHAOC, Francis Greenburger, TEI, and their agent Insignia Residential Group utilized the U.S. Mail to transmit what they characterized as a "fully executed copy" of the lease renewal agreement (attached hereto as **Exhibit [X]**).

231. This mailing comprised only the execution page of the deficient 1998 Renewal Lease Form paired with a Rent Stabilization Association (RSA) Lease Rider revised in May 1996; the Enterprise completely omitted any countersigned acknowledgment or receipt of late Plaintiff Tovar’s Form RA-23.5 Succession Rights Notice.

232. Plaintiffs allege that the Enterprise deliberately ignored the Succession Rights Notice to prevent the formal addition of Plaintiff Monique (Tovar) Saunders and her

household to the lease records, thereby impeding the administrative tracking of her lawful succession rights.

233. Plaintiffs further allege that the generation and mailing of this incomplete regulatory packet on January 6, 1999, constituted a **predicate act of mail fraud under 18 U.S.C. § 1341**.

234. This tactical omission was deployed to maintain an unrecorded, parallel billing stream, insulate the Enterprise's unauthorized conversion of federal military property from municipal housing audits, and continue the systematic theft of rental funds through instruments entirely excluded from Defendant CHAOC's official unamended corporate books.

## XXV. REGULATORY DOCUMENT FRAUD AND EXPLOITATION OF THE DHCR ELECTRIC SUBMETERING APPLICATION

235. In June 2004, Defendant CHAOC utilized interstate wires and the U.S. Mail to file a fraudulent Form RA-70 (10/92) with the New York State Division of Housing and Community Renewal ("DHCR"), captioned as an *"Owner's Application For Termination of Rent Inclusion Of Electric Current"* (attached hereto as **Exhibit [X]**).

236. The Enterprise executed this regulatory application for the Subject Premises with actual knowledge that:

- Defendant CHAOC lacked lawful title or ownership of the Subject Premises;
- No Sponsor had ever been legally designated or affiliated with this specific federal military housing unit;
- The FDIC had previously asserted total collection authority over the unit's underlying revenue streams in 1991; and

- The application contained false and material misrepresentations regarding compliance with utility regulations.

237. Defendant CHAOC further omitted to serve late Plaintiff Anita Tovar with copies of the mandatory structural attachments required by Form RA-70, intentionally concealing the data required for the occupants to verify the application or execute informed consent.

238. Due to this intentional concealment, late Plaintiff Anita Tovar was prevented from executing or submitting DHCR Form RTP-3A (3/90) (*"Answer To Notice And/Or Application"*), thereby withholding legal permission for the Enterprise to alter or decrease her dwelling space, utilities, or essential services (attached hereto as **Exhibit [Y]**).

239. At the time of this fraudulent 2004 regulatory filing, the monthly rental extraction imposed upon the Plaintiffs was $521.88. The formal relief sought by Defendant CHAOC in the Form RA-70 was a *"reduction in rent with a corresponding requirement that tenant pay the electric charges for the apartment as billed on the submeter."*

240. To justify this complex-wide shift, the Enterprise cited an overall electrical installation cost of approximately $3,711,803 across the building complex executed during 2002 and 2003.

241. However, instead of implementing the rent reductions mandated by their own DHCR filing, the Enterprise utilized the U.S. Mail to continuously transmit lease renewals extracting compounded, escalating monthly rent schedules, including: $521.88 in 2005; $520.53 in 2006; $551.84 in 2007; $619.15 in 2008; $619.15 in 2009; and $672.84 in 2010.

242. Plaintiffs allege that the systematic filing of this false Form RA-70, followed by the parallel mailing of escalating rent demands that contradicted the application's stated relief,

constituted a continuous pattern of **predicate acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343**.

243. The Enterprise utilized the DHCR utility submetering framework as a deceptive financial tool to shift operational utility costs onto the tenants, while simultaneously extracting unmitigated, overcharged rent balances via the U.S. Mail to artificially pad its unrecorded cash flows.

244. On March 14, 2005, Defendant CHAOC, acting in concert with Defendant Mark Greenberg Real Estate Co. LLC ("MGRE"), utilized the U.S. Mail to transmit an explicit financial directive to late Plaintiff Anita Tovar (attached hereto as **Exhibit [X]**).

245. This correspondence formally declared: *"...If you choose to renew your lease, we may legally collect an additional amount of security from you, since your monthly rent will increase if you renew your lease...Please be sure to remit your check when you return the signed copies of the renewal. Said check MUST be made payable to CHAOC."*

246. The Enterprise issued this mail directive with actual knowledge that the demand for increased security deposit balances directly violated the financial terms set forth in their concurrent June 2004 DHCR Form RA-70 submetering application.

247. Plaintiffs allege that the generation and mailing of this March 14, 2005 collection letter constituted an affirmative **predicate act of mail fraud under 18 U.S.C. § 1341**.

248. This instrument was deployed as a deceptive tool to enforce a parallel, un-credited billing stream and extract illicit escrow balances under the false pretense of statutory rent-stabilization compliance, while intentionally withholding required structural utilities and maintenance from the occupants.

## XXVI. THE FRAUDULENT EXTRACTION OF DUAL DHCR UTILITY ORDERS AND MATERIAL CONCEALMENT

249. On August 16, 2006, the Enterprise, acting through Defendants Francis Greenburger, TEI, MGRE, and CHAOC, utilized fraudulent submissions to procure two parallel administrative orders from the DHCR Office of Rent Administration (attached hereto as **Exhibit [X]**).

250. The first regulatory instrument was an *"Order Granting Permission to Terminate Rent Inclusion of Electricity and Change from Master Metering to Submetering"* (Docket No. SF410028-OD), and the second was an *"Order Granting MCI [Major Capital Improvement] Rent Increase"* (Docket No. TB 230072 OM). Both instruments were executed under the signature of Rent Administrator Lilia Albano.

251. The Enterprise procured these administrative orders with actual knowledge that the Subject Premises was an exempt United States military housing unit that sat completely outside the jurisdiction of local rent-stabilization utility conversions, and that the underlying applications contained false statements regarding tenant notice and compliance.

252. These orders deliberately omitted any mandatory dispute resolution mechanisms or recourse protocols for billing disputes, leaving the occupants entirely vulnerable to arbitrary, un-audited electrical extractions.

253. Upon receiving these unexpected orders via the U.S. Mail, late Plaintiff Anita Tovar immediately documented the lack of regulatory transparency by opening an official complaint log with the City of New York via the municipal 311 system and the Department for the Aging, recording the tracking data directly onto the face of the administrative order (attached hereto as **Exhibit [Y]**).

254. On or about August 31, 2006, the Enterprise utilized the U.S. Mail to transmit a highly deceptive notice letter executed by Defendant MGRE on behalf of Defendants CHAOC, Greenburger, and TEI (attached hereto as **Exhibit [Z]**).

255. This correspondence enclosed only a copy of the submetering order and stated: *"Enclosed is a copy of the DHCR rent reduction order which provides that you will begin paying electric charges for your apartment directly. Your rent no longer includes electricity…effective September 1, 2005 [sic]."*

256. The Enterprise executed this mailing with a retroactively backdated effective date to manufacture immediate utility arrears, while entirely **omitting and concealing the existence of the second concurrent administrative order**—the Order Granting MCI Rent Increase.

257. Plaintiffs allege that the deliberate withholding and concealment of the MCI Rent Increase Order from the notice packet was a tactical artifice designed to prevent late Plaintiff Anita Tovar from discovering the full compounded financial impact of the submetering scheme.

258. This concealment stripped the occupants of their right to file a timely administrative challenge, seek a military housing exemption under applicable grandfather clauses, or withhold consent from the reduction of their primary housing benefits.

259. Plaintiffs allege that the coordinated procurement, backdating, and selective mailing of these fraudulent DHCR orders constituted individual **predicate acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343**.

260. The Enterprise utilized the state's administrative apparatus as a weapon to shift capital installation costs ($3.7+ million) onto the tenants, while simultaneously extracting

unauthorized, fluctuating utility fees via the U.S. Mail to inflate its unrecorded corporate revenue streams.

261. Plaintiffs allege that the Enterprise conspired to deceive late Plaintiff Anita Tovar and her household into complying with these contradictory DHCR orders to manufacture a fraudulent, un-audited baseline of consent.

262. The Enterprise utilized this deceptive framework to systematically misrepresent the Subject Premises as a standard, commercial "rent-stabilized unit" owned by Defendant CHAOC to multiple external entities, including:

- **Financial Lending Institutions**: To secure millions of dollars in leveraged commercial mortgages and lines of credit under false collateral pretenses;
- **Housing Regulatory Agencies**: To evade strict building code enforcement and avoid executing the required structural repairs to the flood-damaged subfloors;
- **The NYC Department of Finance (DOF)**: To improperly secure municipal property tax abatements;
- **The NYS Department of Taxation and Finance**: To secure unauthorized state tax relief; and
- **The Internal Revenue Service (IRS) and Federal Agencies**: To secure illicit federal tax credits and municipal infrastructure grants.

263. Defendants Francis Greenburger, TEI, and CHAOC executed these multi-agency filings with actual knowledge that they held no lawful title, deed, or ownership interest in the Subject Premises, which remained an exempt federal military housing unit.

264. On February 27, 2007, Defendant CHAOC and Defendant MGRE utilized the U.S. Mail to transmit a generic "Renewal Lease Form" paired with a coercive corporate Demand Notice to late Plaintiff Tovar (attached hereto as **Exhibit [X]**).

265. This instrument completely omitted the official State of New York seal and mandated regulatory text, demanding an escalated monthly rent of $587.84 and an increased security deposit surcharge of $39.74 as a mandatory condition for continued residency.

266. This 2007 renewal form further concealed the administrative record by intentionally omitting any disclosure regarding the "Current Deposit" baseline balances, which the Enterprise had been manipulating since the initial coerced transaction in August 1981.

267. Plaintiffs allege that the coordinated transmission of these multi-agency tax filings, loan applications, and fraudulent lease demands constituted individual **predicate acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343**.

268. The Enterprise utilized these deceptive instruments as a core financial engine to extract liquid assets from the occupants under false pretenses, while simultaneously leveraging a federal military asset to defraud municipal, state, and federal tax authorities for corporate enrichment.

## XXVII. COMPROMISED ENVIRONMENTAL CONDITIONS, MATERIAL CONCEALMENT, AND INTENSIFIED PHYSICAL AND ECONOMIC INJURIES

269. The Enterprise, acting through its corporate officers and designated property management agents, continuously issued fraudulent maintenance logs and false internal

reports asserting a total absence of toxic mold or environmental hazards within the Subject Premises.

270. These material misrepresentations and deliberate omissions were deployed via the U.S. Mail to intentionally prevent late Plaintiff Anita Tovar and Plaintiff Monique Saunders from identifying the true structural source of the contamination, resulting in prolonged exposure, severe biological injuries, and concurrent economic losses.

271. On July 31, 2013, following decades of continuous exposure to the unremediated, toxic microbial colonies, fungal spores, and organic wood rot proliferating beneath the saturated subfloors, late Plaintiff Anita Tovar suffered an acute, life-threatening medical emergency.

272. This event required immediate Emergency Medical Services (EMS) ambulatory transport to a local Brooklyn hospital, where diagnostic procedures confirmed that her respiratory, cardiac, and vascular systems were profoundly compromised, necessitating a seven-day inpatient hospitalization for life-saving medical intervention (attached hereto as **Exhibit [X]**).

273. Plaintiffs allege that the Enterprise's multi-decade concealment and intentional refusal to remediate the environmental hazards—in direct breach of the Implied Warranty of Habitability—constituted the direct and proximate cause of the severe degradation of late Plaintiff Tovar's physical health and her subsequent 2013 hospitalization.

274. This severe physical collapse resulted in extensive economic injuries to the household, including thousands of dollars in uncompensated medical liabilities, ongoing rehabilitation costs, and forced temporary relocation expenses to Washington, D.C., where

Plaintiff Monique Saunders—a licensed New York Registered Nurse—was compelled to provide full-time medical care for her mother.

275. This forced relocation directly fractured Plaintiff Monique Saunders' business and professional assets, requiring her to place the commencement of her legal career on immediate hold and forcing the indefinite delay of her formal District of Columbia Bar Admission swearing-in ceremony.

276. Plaintiffs allege that the Enterprise executed this pattern of maintenance neglect and document fraud to avoid the significant capital expenditures required to remediate a structurally compromised federal military asset.

277. This calculated omission directly resulted in severe, un-remediated environmental hazards that proximately inflicted catastrophic physical injuries and concrete, measurable financial devastation upon the Plaintiffs' business and property interests, satisfying the civil enforcement requirements of **18 U.S.C. § 1964(c)**.

278. Late Plaintiff Anita Tovar's acute 2013 medical emergency resulted in clinical incapacitation, leaving her cognitively and verbally incoherent due to a cerebrovascular accident (CVA/stroke) caused by severe systemic vascular and inflammatory stress.

279. This sudden incapacitation required Plaintiff Monique Saunders—as sole next-of-kin and a single mother—to immediately halt her professional activities in Washington, D.C., and execute emergency vehicular transit with her minor child to Brooklyn, New York, to assume primary medical advocacy and bedside care.

280. Diagnostic chest radiographs (X-rays) performed upon admission at New York-Presbyterian Brooklyn Methodist Hospital confirmed severe respiratory system

pathology, documenting specific clinical abnormalities including abnormally low lung volumes, platelike atelectasis, patchy bibasilar atelectasis, and consolidation (attached hereto as **Exhibit [X]**).

281. The diagnostic imaging further revealed an ill-defined opacity immediately adjacent to the midthoracic spine.

282. Plaintiffs allege, based on contemporaneous medical records and established clinical pathology, that these specific radiographic markers—low lung volumes, bibasilar atelectasis, and thoracic spinal opacities—constitute direct objective indicators of chronic, restrictive inflammatory lung disease.

283. This localized pathological presentation is etiologically linked to long-term inhalation exposure to toxic indoor mold colonies, aerosolized fungal spores, and circulating mycotoxins. This biological colonization was caused by the Enterprise's multi-decade refusal to remediate the saturated flooring infrastructure of the Subject Premises, violating **NYS Real Property Law § 235-b**.

284. Peer-reviewed toxicological and epidemiological data, including clinical research from the University of Texas Southwestern Medical Center (UTSW), establishes that multi-decade inhalation exposure to indoor mold, localized fungal spores, and aerosolized mycotoxins acts as the direct etiological mechanism for hypersensitivity pneumonitis (HP).

285. This chronic inflammatory pathway causes permanent pulmonary scarring and progressive restriction, leading to measurable lung volume loss.

286. Clinical research further establishes that advanced age acts as a severe adverse prognostic factor for mold-induced hypersensitivity pneumonitis, wherein chronic

environmental exposure rapidly accelerates the progression of the disease into irreversible, fibrotic HP.

287. This specific fibrotic pathology matches the permanent, restrictive pulmonary volume loss documented in late Plaintiff Anita Tovar during the final two decades of her life.

288. Plaintiffs allege that the chronic, recurring moisture incursions—specifically the 1983, 1989, and 1995 flooding events—promoted continuous microbial colonization within the subfloors, kitchen floor infrastructure, baseboards, and wall cavities of the Subject Premises.

289. This unmitigated biological growth served as the direct proximate cause of late Plaintiff Tovar's respiratory degradation, systemic vascular inflammation, and subsequent July 2013 emergency hospitalization.

290. By July 2013, this persistent, hidden environmental contamination had also inflicted documented biological injuries upon Plaintiff Monique Saunders, who experienced chronic restrictive respiratory deficits—including an inability to sustain normal breath-holding volumes—originating from her childhood exposure within the Subject Premises.

291. Pediatric pulmonology data compiled by the United States Environmental Protection Agency (EPA) confirms that infants and children possess immature respiratory systems, breathe at a higher baseline rate, and inhale a significantly greater volume of air relative to body mass than adults, multiplying their localized exposure to bio-aerosols.

292. Early-life exposure to toxic indoor dampness and mold is clinically linked to a permanent 6% decrease in Forced Vital Capacity (FVC) that persists through adolescence, causing irreversible structural modifications to the developing lung parenchyma.

293. Plaintiffs allege that the remaining living Plaintiffs—including minor child Plaintiff D.C.S., who occupies the Subject Premises—are currently subjected to this identical, unremedied toxic environment.

294. The Enterprise's intentional concealment of these latent defects and its fraudulent maintenance reporting continue to expose the surviving family members to an imminent threat of irreversible pulmonary and systemic pathology.

295. This calculated omission was executed to avoid the capital costs of structural remediation, directly causing a continuous, severe injury to the Plaintiffs' possessory property interests and inflicting measurable financial and physical devastation in violation of **18 U.S.C. § 1964(c)**.

296. Plaintiffs allege that the Enterprise systematically refused to execute necessary structural repairs or mitigate the severe environmental hazards within the Subject Premises for the predatory purpose of forcing late Plaintiff Anita Tovar and her household to permanently vacate the apartment (commonly known as an engineered "self-eviction" or "constructive eviction").

297. The Enterprise calculated that forcing the protected occupants to abandon the premises would allow corporate agents to enter, alter, and permanently destroy the physical evidence of their multi-decade property fraud, financial layering, and gross negligence.

298. Executing this constructive eviction would effectively spoliate the primary physical evidence of the building's latent structural defects and toxic biological colonization before

it could be documented by independent experts, thereby shielding the principal actors from regulatory accountability, criminal exposure, and civil RICO liability under 18 U.S.C. § 1962.

## XXVIII. ADMINISTRATIVE HOUSING RE-LAYERING AND THE INSERTION OF AKAM ASSOCIATES

299. On March 19, 2014, approximately eight months after late Plaintiff Anita Tovar's acute emergency medical collapse, the Enterprise utilized the U.S. Mail to transmit an institutional "Welcome Package" to the Subject Premises (attached hereto as **Exhibit [X]**).

300. This corporate packet, issued on the letterhead of Defendant AKAM Associates, Inc. ("AKAM"), formally declared: *"AKAM Associates, Inc. has been appointed as managing agent of Clinton Hill Apts. Owners Corp., effective April 1, 2014…[introducing] new AKAM on-site General Manager James (Jim) Heller."*

301. The billing and financial instructions contained within this mailing explicitly restricted their application to a single class of residents, specifying in bold capitalization that *"the information below applies to tenants of Clinton Hill Apts. Owners Corp. ONLY…[and] THE INSTRUCTIONS BELOW APPLY TO CHAOC TENANTS."*

302. Because the Subject Premises remained a designated United States military housing unit outside the corporate jurisdiction or recorded title of Defendant CHAOC, the Plaintiffs did not constitute "CHAOC tenants."

303. Nevertheless, on or about February 6, 2015, Defendants Francis Greenburger, TEI, CHAOC, and their agents utilized the U.S. Mail to route a standard New York State Rent-Stabilized Renewal Lease Form through Defendant AKAM to the occupants, demanding immediate execution under the ongoing threat of eviction.

304. The corporate agent who transmitted this lease renewal packet intentionally omitted their signature from the AKAM transmittal letter, leaving the regulatory instrument facially unauthenticated.

305. On or about February 2015, while still suffering from severe, persistent pulmonary infections, chronic cardiovascular disease, and metabolic disorders originating from her decades-long toxic exposure within the apartment, late Plaintiff Anita Tovar signed and returned the renewal form out of fear of immediate family displacement.

306. Plaintiffs allege that the generation, back-office masking, and selective mailing of these unauthenticated lease forms by Defendant AKAM constituted distinct **predicate acts of mail fraud under 18 U.S.C. § 1341**.

307. The Enterprise introduced Defendant AKAM as an institutional shield to perpetuate a parallel, un-audited billing track, mask the underlying title defects from municipal housing regulators, and extract unlawful monthly rental surcharges from an incapacitated military dependent under false pretenses.

## XXIX. SECRECY IN FINANCIAL EXTRACTIONS AND VIOLATIONS OF ESCROW MANDATES

308. On February 26, 2016, approximately one year after routing lease renewals through AKAM, the Enterprise introduced yet another property management entity, utilizing the U.S. Mail to transmit an institutional cover letter and an IRS Form W-9 to late Plaintiff Anita Tovar (attached hereto as **Exhibit [X]**).

309. This correspondence, issued on the letterhead of Defendant Charles H. Greenthal Management Corp. ("Greenthal Management"), formally declared: *"Please be advised that Charles H. Greenthal Management Corp has received your security deposited check(s) from AKAM Associates. In order to complete the financial transaction transitioning from*

*the prior agent to the current agent, we ask that you complete and return the enclosed W-9 form to the on-site management office…Erica Martinez…Clinton Hill Apts. Owner's Corp. 345 Clinton Avenue, Brooklyn, NY 11238."*

310. This transmittal letter was delivered entirely unsigned by any corporate agent, replicating the unauthenticated document layout previously deployed by AKAM to avoid direct employee accountability.

311. The Enterprise executed these complex escrow movements and corporate hand-offs in total secrecy, keeping the occupants entirely unaware that their personal security deposit funds had been transferred from TEI to AKAM in 2014, and subsequently transferred from AKAM to Defendant Greenthal Management in 2016.

312. Plaintiffs allege that the secret routing of these escrow accounts between third-party entities, coupled with the failure to provide formal statutory disclosures, constituted an explicit violation of **New York General Obligations Law § 7-105 (Failure to Notify of Security Deposit Transfer)**.

313. Under **GOL § 7-105**, a transferring landlord or management entity must notify the tenant of an escrow transfer **by registered or certified mail within five days**, explicitly detailing the name and address of the transferee corporate successor. Under **GOL § 7-105(3)**, any willful failure to comply with this statutory mandate constitutes an active **misdemeanor**.

314. Plaintiffs further allege that the Enterprise's unrecorded shifting of these funds constituted an explicit **Breach of the Trust Account Mandate under New York General Obligations Law § 7-103**.

315. Under **GOL § 7-103**, tenant security deposits remain the exclusive personal property of the tenant and **must be maintained as trust funds** inside a designated New York banking escrow account, strictly prohibited from being commingled with corporate capital or operational revenue assets.

316. Moving these funds secretly between third-party corporate entities without delivering a verified, formal accounting to the tenant demonstrates that the Enterprise failed to maintain a legitimate escrow trust account, constituting the tort of **conversion** and a **breach of fiduciary duty**.

317. Plaintiffs allege that the generation and mailing of this February 26, 2016 unauthenticated transmittal packet constituted a distinct **predicate act of mail fraud under 18 U.S.C. § 1341**.

318. The Enterprise deployed the IRS Form W-9 request as a **pretextual artifice** to fraudulently extract late Plaintiff Tovar's Social Security Number and Personally Identifiable Information (PII) to open unrecorded financial sub-accounts and mask illicit layering transactions, hiding its unauthorized conversion of federal military property from federal regulatory oversight.

## XXX. COMMON LAW BUSINESS TORTS AND CONVERSION OF ESCROW ASSETS

319. Plaintiffs allege that the corporate actions and systemic omissions executed by Defendant Charles H. Greenthal Management Corp. ("Greenthal Management") constitute actionable common law business torts, independent of their integration into the overarching racketeering pattern.

320. By executing the unauthorized, unrecorded, and concealed transfer of the Plaintiffs' personal escrow funds from Defendant AKAM to Defendant Greenthal Management

without the occupants' knowledge or prior written consent, the Enterprise committed the common law tort of **conversion**.

321. Under New York law, the Enterprise intentionally exercised unauthorized dominion and control over the Plaintiffs' specific, identifiable liquid property interest, permanently depriving the household of their possessory rights over their cash escrow assets.

322. Plaintiffs further allege that under **New York General Obligations Law § 7-103**, a landlord and their designated property management agents operate as statutory fiduciary trustees regarding a tenant's security deposit funds.

323. Defendant Greenthal Management, acting as the designated operational agent for Defendant CHAOC, assumed this strict fiduciary duty upon taking physical custody of the Plaintiffs' converted escrow checks.

324. The Enterprise directly breached this fiduciary duty by executing secret inter-corporate account transfers and transmitting an unsigned, unauthenticated transmittal notice to intentionally obscure the identity of the operational actors.

325. These deceptive practices violated the strict non-commingling and trust account mandates of **GOL § 7-103**, directly executing a breach of trust to shield an unauthorized property interest from discovery and advance the broader scheme to defraud under **18 U.S.C. § 1341**.

326. Plaintiffs allege that Defendant CHAOC and Defendant Greenthal Management (subsequently operating as FirstService Residential) are liable for Fraudulent Concealment under New York common law.

327. The Enterprise utilized a systematic pattern of unsigned corporate correspondence to intentionally obscure the true nature of the property ownership, unrecorded property transfers, and hidden financial transactions.

328. As statutory escrow trustees under New York General Obligations Law § 7-103, the Defendants held an affirmative fiduciary duty to disclose these material property and account facts to the Plaintiffs, but instead intentionally withheld them.

329. The Enterprise executed these account movements without delivering the mandatory legal notices required by GOL § 7-105, utilizing the unauthenticated, unsigned letters as a deliberate tool of concealment to shield their structural defects from detection and advance the mail and wire fraud schemes.

330. The IRS Form W-9 demand issued by Defendant Greenthal Management constituted a pretextual artifice designed to fraudulently procure late Plaintiff Anita Tovar's Social Security Number and sensitive Personally Identifiable Information (PII).

331. Because the Defendants had already converted and commingled the security deposit funds in direct violation of NYS GOL § 7-103, no legitimate banking trust account existed for the Subject Premises at the time of the demand.

332. The Enterprise sought this PII with the specific intent to utilize the tenant's sensitive personal identity data to open unauthorized financial sub-accounts, mask illicit corporate layering transactions, and insulate its unauthorized conversion of federal military property from federal regulatory oversight, violating 18 U.S.C. § 1028 (Identity Fraud) and 18 U.S.C. § 1341 (Mail Fraud).

## XXXI. ALTERATION OF IDENTITY DESIGNATIONS AND EXPLOITATION OF AN OCTOGENARIAN OCCUPANT

333. By October 2017, the Enterprise, acting through Defendants Francis Greenburger, TEI, CHAOC, and Greenthal Management, altered its payment directives and utilized the U.S. Mail to transmit updated collection mandates to the Subject Premises (attached hereto as **Exhibit [X]**).

334. This administrative directive instructed late Plaintiff Anita Tovar to make all future rental instruments payable directly to *"Clinton Hill Apts. Owners Corp."* and explicitly ordered her to designate her apartment unit identifier as "1HX" instead of the historical and contractually recognized designation of "1H."

335. This newly fabricated "1HX" notation had never previously been utilized by any municipal agency, housing utility provider, or corporate predecessor across the four decades of the Tovar family's occupancy.

336. At the time of this abrupt identifier modification, late Plaintiff Anita Tovar was an octogenarian, 80 years of age, who suffered from multiple chronic respiratory and systemic inflammatory pathologies resulting from her long-term exposure to the unmitigated toxic mold colonies, aerosolized spores, and decaying subfloor structures inside the unit.

337. Plaintiffs allege that the Enterprise generated and mailed this arbitrary "1HX" designation as an active **predicate act of mail fraud under 18 U.S.C. § 1341**.

338. The alteration was a deceptive data-entry mechanism designed to bifurcate the property record, manipulate the municipal tax and housing registration rolls, and isolate the unit's cash flow into an unrecorded parallel tracking ledger.

339. The Enterprise executed these confusing administrative changes against severely ill elderly dependent to undermine her tracking of the property's title defects and ensure

corporate agents could maintain an illicit possessory hold over the federal military asset, satisfying the civil enforcement elements of **18 U.S.C. § 1964(c)**.

## XXXII. THE COORDINATED HARASSMENT AND WEAPONIZATION OF PUBLIC RESOURCES (2020–PRESENT)

340. In January 2020, concurrent with the initial emergence of the COVID-19 pandemic in New York City, late Plaintiff Anita Tovar experienced a second life-threatening respiratory and systemic medical emergency.

341. In June 2020, to ensure continuous clinical advocacy, medical isolation management, and quarantine enforcement, Plaintiff Monique Saunders—a licensed New York Registered Nurse—re-established physical residency within the Subject Premises alongside her spouse, Plaintiff David Saunders, and minor child, Plaintiff D.C.S.

342. Late Plaintiff Tovar's medical isolation, clinical vulnerability, and quarantine protocols were profoundly exacerbated and prolonged by her underlying, permanent restrictive lung capacity damage, which originated from multi-decade exposure to the toxic subfloor mold colonies inside the unit.

343. On or about July 30, 2020, the Plaintiffs delivered multiple formal requests for outstanding structural repairs, reasonable accommodation, and essential services to the Enterprise's management office.

344. Following these demands, Defendant CHAOC's Maintenance Supervisor, Vigan Ahmetaj, along with various corporate agents, entered and inspected the Subject Premises on multiple separate occasions.

345. Despite acquiring direct visual notice during these inspections, the Enterprise systematically ignored and denied the Plaintiffs' repair requests, affirmatively refusing to

remediate the patent structural defects and visible toxic mold colonies proliferating across the bedroom baseboards, bathroom ceiling, kitchen subfloors, and common hallways.

346. Plaintiffs allege that the intentional refusal by Defendant Ahmetaj and the corporate principals to remediate these long-standing, 40-year latent defects constituted an ongoing breach of the Implied Warranty of Habitability under **New York Real Property Law § 235-b**.

347. The Enterprise utilized the administrative disruptions of the COVID-19 pandemic as a regulatory shield to maintain an environmental hazard, advance its pattern of tenant harassment, and continue the systematic extraction of rental funds via the U.S. Mail in violation of **18 U.S.C. § 1341**.

348. Upon establishing residency in June 2020 and discovering the un-remediated, hazardous state of the Subject Premises, Plaintiffs Monique Saunders and David Saunders formally revived late Plaintiff Anita Tovar's long-disregarded demands for structural repairs, reasonable medical accommodations, and essential housing services.

349. In direct retaliation for reviving these demands, the Enterprise— acting through Defendants Francis Greenburger, TEI, CHAOC, and Greenthal Management—initiated a coordinated campaign of tenant harassment, intentionally disregarding the Plaintiffs' multi-agency maintenance notifications for a subsequent twenty-one (21) month period.

350. On April 12, 2022, in response to Greenthal Management's ongoing gross negligence, tenant discrimination, and structural maintenance deprivation, Plaintiffs opened an official municipal complaint log via the NYC-311 system, triggering an emergency investigation by the New York City Department of Housing Preservation and Development ("HPD"). Concurrently, Plaintiffs executed and filed a formal Decreased

Services Application with the DHCR, which was assigned Docket Number KP 210025 S (attached hereto as Exhibit [X]).

351. On Monday, April 18, 2022, an HPD Inspector conducted a comprehensive physical and environmental inspection of the Subject Premises, formally documenting at least fourteen (14) distinct municipal code violations inside the apartment.

352. These fourteen official HPD violations were classified under strict statutory hazard levels, comprising two (2) Class A violations (non-hazardous conditions), ten (10) Class B violations (hazardous conditions), and two (2) Class C violations (immediately hazardous conditions, including unmitigated mold and structural ceiling breaches) (attached hereto as Exhibit [Y]).

353. Official HPD building registration and municipal violation databases establish that Defendant CHAOC maintained a broader, systemic pattern of housing deprivation, recording at least 137 open, un-remediated building code violations across the complex in 2022.

353-A. The Enterprise's multi-year, bad-faith regulatory defiance and escalation of this infrastructure neglect is established by a subsequent, extraordinary official disclosure letter transmitted via the U.S. Mail to the Plaintiffs by the HPD on March 19, 2024, explicitly signed by Correspondence Liaison Crystal Cepeda. In this formal administrative notice, the HPD issued an official apology for its delayed response and formally disclosed that, following a comprehensive regulatory review of the property as of March 19, 2024, the HPD maintained fifty-eight (58) active, un- remediated housing code complaints on permanent public file specifically targeting the address of the Subject Premises at 210 Clinton Avenue, Apartment 1H, Brooklyn, New York 11205. Correspondence Liaison

Crystal Cepeda confirmed that the HPD had already served the property owner—Defendant CHAOC—with formal Notices of Violations detailing comprehensive instructions to correct the hazardous conditions in a timely manner, explicitly advising the Plaintiffs of their statutory right to initiate an immediate tenant enforcement action against the owner for non-compliance.

354. Plaintiffs allege that these open violations were disproportionately concentrated within rent-regulated units occupied by Black and African American tenants, demonstrating a discriminatory and predatory operational policy across the highly gentrified neighborhood.

355. Following the issuance of the emergency HPD violations, the Enterprise agreed to address only minor, low-cost maintenance issues within the Subject Premises, while affirmatively refusing to remediate the primary, latent structural defects—specifically the subfloor toxic mold, the water-warped floorboards, and the recurring plumbing leaks originating from the building's main common wall pipe chase

356. Plaintiffs allege that the intentional deployment of a multi-decade maintenance deprivation scheme, followed by selective, non-compliant repairs to bypass emergency municipal code violations, constituted individual predicate acts of wire fraud under 18 U.S.C. § 1343 and mail fraud under 18 U.S.C. § 1341.

357. The Enterprise utilized these deceptive administrative postures to extract full,

unmitigated monthly rental and maintenance fees via the U.S. Mail under the false pretense of legal compliance, while intentionally maintaining a hazardous biological environment that caused severe, permanent injury to the Plaintiffs' business and property interests.

## XXXIII. THE UNLAWFUL COMMERCIAL ENTERPRISE AND SYSTEMIC TENANT INTIMIDATION

358. In November and December 2020, Plaintiffs delivered multiple formal written notifications to Defendant CHAOC's designated property management agents—specifically David Perez, Sophia Cemenja, and Parvez Ahmed of Defendant Greenthal Management (subsequently operating as FirstService Residential).

359. These notices detailed a continuous, severe private nuisance originating from Apartment 2H, located directly above the Subject Premises, which included daily unmitigated dog barking, structural thumping, high-impact stomping, and systemic animal scratching.

360. These extreme noise and structural disturbances originated from an unauthorized commercial dog boarding and pet care business operated inside Apartment 2H by Defendant Melissa G. Martin, which she registered with the New York Department of State under the corporate entity "Paw Paw Pet Care LLC" (attached hereto as **Exhibit [X]**).

361. Plaintiffs concurrently and repeatedly reported these severe disruptions to Defendant Madison Security Group's on-site personnel, including Security Guard Griffon and Security Directors Cordero and Atherton.

362. This security infrastructure and its core personnel, including Guard Griffon and Director Mark Atherton, were subsequently absorbed without operational interruption by Defendant Doyle Security Services under a successor commercial security contract with Defendant CHAOC.

363. On December 28, 2020, in direct retaliation for Plaintiffs exercising their lawful right to lodge noise complaints with corporate security personnel, Defendant Melissa G. Martin executed a coordinated campaign of physical intimidation at the Subject Premises.

364. Within a twenty-minute window, Defendant Martin repeatedly rang the Plaintiffs' doorbell and forcefully banged on the main entrance door on two separate occasions, attempting to coerce the occupants into opening the entryway during a period of mandatory medical quarantine.

365. Plaintiffs refused to open the entrance door or engage with Defendant Martin, explicitly instructing her through the door's viewing port to vacate the area and immediately cease the high-impact structural disturbances overhead.

366. Defendant Martin temporarily vacated the scene and returned to hang a concealment package on the Plaintiffs' doorknob containing decaying organic matter and an attached written directive stating: *"My name is Melissa Martin and I am your neighbor in 2H. If you hear noise, don't call security. Call me. My number is (917) 482-4356."* (attached hereto as **Exhibit [Y]**).

367. Plaintiffs allege that the generation and delivery of this directive by Defendant Martin was a calculated tactical maneuver executed in coordination with the broader Enterprise to intercept and suppress operational data.

368. Defendant Martin sought to coerce the Plaintiffs into bypassing the building's official security log network, thereby preventing corporate agents from documenting the

ongoing commercial lease violations and shielding the Enterprise from regulatory and judicial scrutiny.

369. Plaintiffs further allege that the Enterprise's intentional refusal to intervene, combined with its active licensing of an illegal commercial animal operation directly above a medically compromised military dependent, constituted a deliberate violation of the Implied Warranty of Habitability under **New York Real Property Law § 235-b**.

370. The Enterprise utilized this continuous, weaponized nuisance as an extractive tool to degrade the Plaintiffs' physical environment, interfere with their quiet enjoyment, and force a constructive eviction to advance the broader scheme to defraud under **18 U.S.C. § 1962**.

## XXXIV. THE COLLUSIVE WEAPONIZATION OF EMERGENCY SERVICES AND SYSTEMIC COMMERCIAL VIOLATIONS

371. Plaintiffs allege that Defendants Francis Greenburger, TEI, CHAOC, Charles H. Greenthal Management Corp., FirstService Residential, and Attorney Kristen A. Mantell of Baron & Baron Esqs. P.C. colluded with upstairs resident Defendant Melissa Martin and her corporate entity, Paw Paw Pet Care LLC, to execute a coordinated campaign of tenant harassment. Throughout 2021, Plaintiffs repeatedly emailed and called the CHAOC-Greenthal management office and Madison Security Group to complain of the extreme noise disturbances coming through the ceilings of the Subject Premises from Martin's Unit 2H commercial compound. On or about March 25, 2022, Defendant Kristen A. Mantell utilized the U.S. Mail to transmit fabricated, defamatory Notices to Cure and Notices of Termination, falsely accusing the Plaintiffs of creating a nuisance. From the precise

chronological inception of this mail fraud campaign—marked by the transmission of the first facially fraudulent, backdated Notice to Cure via the U.S. Postal Service—Defendant Kristen A. Mantell has intentionally operated in the combined, concurrent capacities of General Counsel and un-elected, un-voted Board Assistant Secretary for Defendant CHAOC. This dual-hatted structural alignment was deliberately engineered by the Enterprise to bypass cooperative corporate governance bylaws, granting Mantell unchecked internal authority to execute, verify, and self-authenticate her own fraudulent litigation notices. By operating as both the outside legal counselor and an inside, un-elected board official, Mantell successfully hijacked the cooperative's administrative machinery, using the U.S. Mail to channel extortive legal threats and launch the manufactured eviction matrix against the Plaintiffs.

372. As part of this conspiracy, the Enterprise repeatedly weaponized municipal emergency resources by transmitting false complaints, fraudulent reports, and fabricated alarms to the New York City Police Department (NYPD) and the New York City Fire Department (FDNY) against the Plaintiffs.

373. The Enterprise executed these false emergency dispatches with the specific intent to harass, intimidate, and torment the occupants, attempting to force a constructive self-eviction to gain possession of the Subject Premises.

374. Defendants Greenburger, TEI, CHAOC, FirstService Residential, Madison Security, and Doyle Security Services actively authorized and permitted Defendant Martin to maintain her high-volume commercial animal care operation inside a strictly residential cooperative unit directly above the Plaintiffs' home.

375. Under New York City Health Code and zoning regulations, operating a commercial animal boarding facility within a residential multi-family dwelling is strictly illegal, and a commercial boarding license cannot legally be issued for Apartment 2H.

376. Despite these statutory prohibitions, Defendant Martin has operated Paw Paw Pet Care LLC inside the residential unit for more than a decade, continuing the unauthorized commercial operations to the present day.

377. Following an administrative inspection of Apartment 2H, the New York City Department of Health and Mental Hygiene (DOHMH) issued an official summons and violation notice to Defendant Martin for operating an illegal animal facility (attached hereto as Exhibit [X]).

378. Notwithstanding this official municipal enforcement action, the Enterprise continues to shield and support Defendant Martin's unauthorized operations, entirely failing to abate the ongoing structural and biological nuisance.

379. Plaintiffs allege that the coordinated transmission of false emergency reports to municipal authorities, paired with the intentional maintenance of an illegal commercial facility to degrade the occupants' living environment, constituted an ongoing pattern of predicate acts of wire fraud under **18 U.S.C. § 1343**.

380. The Enterprise utilized these deceptive and hazardous mechanisms to intentionally deprive the Plaintiffs of their statutory rights to quiet enjoyment and bodily safety, executing a predatory scheme to convert a protected property asset for corporate enrichment.

## XXXV. THE OPERATIONAL SCOPE OF THE UNLAWFUL NUISANCE AND COOPERATIVE INSIDER COLLUSION

381. The continuous noise, vibrations, and environmental disturbances originating from Defendant Melissa Martin's unauthorized commercial facility in Apartment 2H are amplified by structural uncarpeted hardwood floors, consisting of:

- The high-impact dropping of hard animal toys of various sizes and densities directly onto the bare subfloors;
- The unabated vocalization and loud barking of multiple dogs maintained simultaneously inside the residential unit; and
- The high-velocity scratching, thumping, and galloping of animal paws racing back and forth throughout the layout of Apartment 2H.

382. The client database and active patron network of Defendant Martin's Paw Paw Pet Care LLC comprise an interconnected roster of Defendant CHAOC's cooperative owners, major shareholders, commercial rental tenants, and surrounding neighborhood residents.

383. This commercial customer network explicitly includes both past and current members of Defendant CHAOC's Board of Directors.

384. These board members share an identity of interest and direct corporate connection with Defendants Francis Greenburger, TEI, Clinton 174 Realty Associates LLC, Clinton Apartments LLC, Charles H. Greenthal Management Corp., FirstService Residential New York, Inc., and Attorney Kristen A. Mantell of Baron & Baron Esqs. P.C.

385. Plaintiffs allege that the intentional integration of cooperative board members and management insiders into Defendant Martin's illegal commercial client network constitutes a structured commercial kickback and collusion scheme.

386. The Enterprise principals actively protected, authorized, and immunized Defendant Martin's unauthorized commercial operations from standard lease enforcement, municipal evictions, and building code fines because the insiders directly utilized and benefited from her illegal commercial services.

387. Plaintiffs allege that the coordinated utilization of an illegal commercial animal facility by corporate board members, combined with the tracking of false compliance logs to hide the resulting structural degradation from housing inspectors, constituted an ongoing pattern of predicate acts of wire fraud under **18 U.S.C. § 1343**.

388. The Enterprise systematically weaponized this insider-protected nuisance to destroy the Plaintiffs' quiet enjoyment and erode their physical safety, executing an organized, predatory plan to force a constructive eviction of the occupants for corporate enrichment.

## XXXVI. REGULATORY COLLUSION, SHAM LITIGATION, AND STATE-LEVEL RACKETEERING RE-LAYERING

389. Plaintiffs allege that Defendants Francis Greenburger, TEI, CHAOC, Charles H. Greenthal Management Corp., FirstService Residential New York, Inc., Attorney Kristen A. Mantell, Madison Security Group, Inc., and Doyle Security Services, Inc. actively colluded with municipal agents to protect, conceal, and permit Defendant Melissa Martin's illegal commercial operation of Paw Paw Pet Care LLC for over a decade.

390. The Enterprise maintained this insider protection scheme for their own corporate and financial benefit, while intentionally inflicting severe emotional distress, permanent respiratory injuries, and deep economic damage upon the Plaintiffs' possessory and property interests.

391. In direct response to Plaintiffs filing formal grievances with the NYPD, DHCR, DHR, DOHMH, DOB, and via the NYC-311 system, the Enterprise executed a coordinated campaign of tenant harassment and extrajudicial retaliation.

392. This retaliatory network was operationalized by specific corporate and state actors, including:

- Defendant Francis Greenburger of Defendants TEI and CHAOC;
- Defendant Attorney Kristen A. Mantell of Defendants Baron & Baron Esqs. P.C.;
- Defendant Melissa Martin of Defendants Paw Paw Pet Care LLC;
- Defendant General Property Manager Parvez Ahmed of Defendants Charles H. Greenthal Management Corp. and FirstService Residential New York, Inc.;
- Security Supervisor J. Griffon and Security Director Mark Atherton of Defendants Madison Security Group, Inc. and Doyle Security Services, Inc.;
- Sergeant Yanira Golphin of the New York City Police Department (NYPD);
- Director Chelsea L. John of Defendant New York State Division of Human Rights; and
- Investigators Howard, Smith, and Confidential Investigator Shameika Nixon of Defendant City of New York Department of Investigation (DOI).

393. Plaintiffs allege that Sergeant Golphin and the named corporate principals actively manipulated municipal enforcement protocols to suppress the Plaintiffs' emergency noise and safety logs, using color of official authority to immunize Defendant Martin's commercial operations from city closures.

394. To further insulate the Enterprise from regulatory scrutiny during an active New York State Division of Human Rights (DHR) investigation, the conspirators colluded to

execute a sham lawsuit in the Supreme Court of New York, Kings County, captioned *Melissa Martin v. Clinton Hill Apts. Owners Corp.*, Index No. 501135/2024, filed on January 11, 2024.

395. Plaintiffs allege that the filing and mailing of this 2024 state court action was an entirely pretextual, bad-faith legal maneuver devoid of any legitimate triable cause of action.

396. The Enterprise weaponized the state judicial apparatus as an extractive tool to mount intense economic pressure, drive up the Plaintiffs' litigation overhead, and force a constructive eviction of the home-office occupants to block the discovery of the underlying multi-decade title fraud.

397. Plaintiffs allege that the transmission of these false emergency reports to the NYPD, coupled with the routing of fraudulent state court summonses, constituted individual predicate acts of wire fraud under **18 U.S.C. § 1343** and mail fraud under **18 U.S.C. § 1341**.

398. The Enterprise systematically deployed these deceptive, coercive mechanisms across state and municipal channels to obstruct justice, deny the Plaintiffs due process, and safeguard an illicit real estate revenue stream for corporate enrichment in violation of **18 U.S.C. § 1962**.

399. Plaintiffs allege that the state court action filed by Defendant Melissa Martin was a calculated act of retaliation, coercion, and intimidation designed to shield the Enterprise. While Defendant Martin's complaint focuses entirely on grievances against the Plaintiffs, she intentionally omitted naming any of the Plaintiffs as direct defendants in her initial January 2024 filing.

400. Instead, the Enterprise—acting through Defendants Martin, CHAOC, and Attorney Kristen A. Mantell of Baron & Baron Esqs. P.C.—strategically waited until July 24, 2025, a full year and a half after the initial filing date, to implead the Plaintiffs into the sham lawsuit as Third-Party Defendants (TPDs).

401. The July 24, 2025 impleader date was calculated to occur exactly one year after the New York State Division of Human Rights (DHR) issued its final administrative determination regarding the Plaintiffs' discrimination and harassment complaints against Defendants Martin, Paw Paw Pet Care LLC, CHAOC, Attorney Mantell, Property Manager Ahmed, and Greenthal Management/FirstService Residential.

402. Plaintiffs allege that the deliberate timing of this Third-Party Complaint constituted an affirmative predicate act of extortion and witness intimidation under **18 U.S.C. § 1951** (The Hobbs Act) and **18 U.S.C. § 1512**. The Enterprise weaponized state court impleader procedures as a retaliatory tool to punish the whistleblowers, drive up their legal overhead, and protect their unrecorded real estate infrastructure from municipal oversight.

## XXXVII. THE FRAUDULENT EVICTION AND SHAM LITIGATION SCHEME (2021–PRESENT)

403. From 2021 through 2025, encompassing the COVID-19 pandemic and municipal recovery periods, the Enterprise—acting through Defendants Francis Greenburger, TEI, Clinton 174 Realty Associates LLC, CHAOC, Attorney Kristen A. Mantell, Baron & Baron Esqs. P.C., Melissa Martin, Paw Paw Pet Care LLC, Madison Security Group, Inc., and Doyle Security Services, Inc.—executed a coordinated, fraudulent eviction scheme against the Subject Premises.

404. As part of this scheme, the conspirators colluded to fabricate, draft, hand-deliver, and transmit via the U.S. Mail and electronic servers a series of predatory legal notices,

including formal Notices to Cure and Notices of Termination (attached hereto as Exhibit [X]).

405. These eviction notices contained systemic material misrepresentations, defamatory statements, and completely fabricated allegations of House Rules infractions and Proprietary Lease violations against the Plaintiffs.

406. Plaintiffs allege that the generation, mailing, and filing of these facially fraudulent legal notices into New York City and New York State public records registries constituted separate, individual predicate acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.

407. The Enterprise utilized these bad-faith eviction notices to manufacture a fraudulent baseline of non-compliance, attempting to bypass the strict New York State military dependent protections under **NYS Military Law § 300 et seq.** and execute an illicit property seizure for corporate enrichment.

## XXXVIII. THE FRAUDULENT EXTRACTION OF ERAP FUNDS AND PRETEXTUAL BILLING LEASE MANIPULATION

408. On September 12, 2021, Defendant CHAOC, acting in coordination with Property Manager Parvez Ahmed and Defendants Charles H. Greenthal Management Corp. and FirstService Residential New York, Inc., accepted and deposited $9,000.00 in public relief funds under the New York State Emergency Rental Assistance Program (ERAP) for the Subject Premises (attached hereto as Exhibit [X]).

409. The Enterprise applied for, accepted, and transferred these state funds with actual knowledge that they held no lawful title, deed, or recorded ownership interest in the Subject Premises, which remained an exempt housing unit completely outside their corporate jurisdiction.

410. On April 8, 2022, Plaintiffs transmitted an electronic notification to Defendant Charles H. Greenthal Management Corp. explicitly requesting the production of the historical "Master Lease" for the Subject Premises.

411. Defendant's corporate agent, Safije Cemenja, responded in writing via interstate wire, stating: *"Good morning, Apologies. We do not have it in our files. I have to reach out to the rental folks in our LIC [corporate] office. Regards, Sofia."* (attached hereto as Exhibit [Y]).

412. The Enterprise failed to execute any factual follow-up or produce the requested Master Lease documentation, as no such commercial contract had ever existed for the exempt housing unit.

413. Instead, to conceal this critical contractual defect, the Enterprise immediately cut off the generation and physical delivery of the Plaintiffs' monthly rental invoices, which had been routinely placed under the door of the Subject Premises for over forty-five (45) consecutive years.

414. On May 4, 2022, following the Plaintiffs' hand-delivery of their monthly rental payment via a bank-issued cashier's check and the Defendants' subsequent provision of a physical payment receipt, the Enterprise's management office agents unlawfully returned the physical check to the occupants via the U.S. Mail.

415. The Enterprise rejected this valid tender of funds without reasonable cause, without issuing any formal administrative explanation, and without serving any valid notice of petition or petition from the New York City Housing Court.

416. This deliberate disruption of the routine billing cycle occurred exactly eight (8) months after the Enterprise successfully extracted and deposited the $9,000.00 in public ERAP state funds for its own corporate financial enrichment.

417. Plaintiffs allege that the coordinated extraction of state relief funds based on a non-existent corporate tenancy, followed by the immediate termination of the billing cycle and the mail rejection of valid rental checks to manufacture artificial arrears, constituted separate, individual predicate acts of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

418. The Enterprise utilized these deceptive techniques to fabricate a fraudulent, unrecorded paper trail of non-payment. This maneuver was designed to bypass the strict ERAP non-eviction protections and execute a predatory constructive eviction of the occupants to shield its underlying title fraud from municipal and federal housing audits, satisfying the civil enforcement requirements of **18 U.S.C. § 1964(c)**.

## XXXIX. SUBSEQUENT ERAP EXTREMITIES AND CORPORATE ABSORPTION BY FIRSTSERVICE RESIDENTIAL

419. On September 19, 2022, while the Enterprise was actively mischaracterizing the Plaintiffs as "holdover tenants" to municipal agencies, the New York State ERAP program transmitted an electronic confirmation to the Plaintiffs (attached hereto as Exhibit [X]).

420. This agency notification verified a second financial allocation, stating: *"The total rental amount scheduled to be paid to Clinton Hill Apts. Owners Corp. for the rental address 210 Clinton Avenue 1H Brooklyn, NY 11205 is: $1,376.49…[apportioning back-rent] to be paid for month: April 2022 - $773.17…May 2022 - $603.32."*

421. Defendants CHAOC, Charles H. Greenthal Management Corp., and FirstService Residential New York, Inc. accepted and deposited this second installment of state relief

funds with actual knowledge that they held no lawful deed or property interest in the Subject Premises, which remained an exempt housing unit.

422. Plaintiffs allege that the intentional acceptance of this second ERAP allocation, during the exact window when corporate agents were returning the Plaintiffs' physical cashier's checks to manufacture artificial default records, constituted an affirmative predicate act of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

## XL. THE EXECUTIVE MANAGEMENT AND POST-ACQUISITION CONCEALMENT (2023–PRESENT)

423. In January 2023, approximately six months after the Enterprise initiated the systematic rejection of the Plaintiffs' monthly rental instruments, Defendant FirstService Residential New York, Inc. acquired the corporate assets, management contracts, and entire operational control of Charles H. Greenthal & Co.

424. Through this corporate acquisition, Defendant FirstService Residential New York, Inc. absorbed all existing employee and site management structures, including the specific operational contracts of Defendant Parvez Ahmed (Property Manager) and Defendant Vigan Ahmetaj (Lead Superintendent).

425. Upon assuming physical management of the building complex, Defendant FirstService Residential New York, Inc. inherited a strict statutory duty to comply with all outstanding municipal codes, building regulations, and active DHCR compliance orders pertaining to the Subject Premises [LV].

426. Plaintiffs allege that the Enterprise, operating through its successor executive team at FirstService Residential New York, Inc., deliberately maintained the unrecorded parallel tracking ledger and structural maintenance deprivation scheme initiated by its predecessors.

427. The successor corporate principals seamlessly integrated the absorbed personnel—Ahmed and Ahmetaj—to continue the systematic concealment of the subfloor wood rot and toxic mold colonies, utilizing the U.S. Mail to broadcast fraudulent billing statements and deceptive legal notices to protect an illicit real estate revenue stream for corporate enrichment in violation of **18 U.S.C. § 1962(c)**.

428. Upon acquiring the property management infrastructure of the building complex, Defendant FirstService Residential New York, Inc. assumed a strict contractual and statutory duty to manage, investigate, and abate resident grievances regarding the unauthorized commercial operations of Defendant Melissa Martin and Paw Paw Pet Care LLC inside Apartment 2H.

429. Despite this clear operational duty, Defendant FirstService Residential New York, Inc. and its executive agents—specifically Steven Greenbaum, Jennifer Ogman, and Parvez Ahmed—acting in concert with Defendant CHAOC and its legal counsel, Attorney Kristen A. Mantell of Baron & Baron Esqs. P.C., omitted to take any remedial action to mitigate the ongoing illegal commercial activities, structural nuisances, and breaches of the restrictive covenants.

430. Plaintiffs allege that the Enterprise principals affirmatively encouraged and insulated Defendant Martin and Paw Paw Pet Care LLC, permitting them to expand their commercial animal care operations and maintain a continuous campaign of retaliatory tenant harassment against the occupants of the Subject Premises.

431. Following the fraudulent extraction and deposit of the state ERAP allocations, the conspirators—specifically Defendants Martin, Paw Paw Pet Care LLC, the CHAOC Board of Directors, Property Manager Parvez Ahmed, Attorney Kristen A. Mantell, and

FirstService Residential New York, Inc.—embarked on a relentless campaign of harassment, coercion, and intimidation.

432. This campaign was executed through the systematic transmission of superfluous, bad-faith Notices to Cure and Notices of Termination via the U.S. Mail, threatening immediate family eviction under entirely pretextual allegations of lease infractions.

433. Concurrently, Defendants Francis Greenburger, TEI, CHAOC, Clinton 174 Realty Associates LLC, Clinton Apartments LLC, Charles H. Greenthal Management Corp., and FirstService Residential New York, Inc. weaponized the U.S. Mail to transmit a continuous stream of disingenuous, pretextual "Entry Demand Letters" to force physical entry into the Subject Premises.

434. Plaintiffs allege that the generation and mailing of these relentless entry demands were executed for the fraudulent purpose of gaining unauthorized access to the apartment during active DHCR Non-Compliance proceedings.

435. The Enterprise deployed these coercive notices to execute a pre-litigation sweep, attempting to alter the physical conditions of the unit, destroy the forensic evidence of the toxic mold propagation, and evade mounting municipal fines and administrative penalties, in violation of **18 U.S.C. § 1512** (Witness and Evidence Tampering).

436. Plaintiffs allege that the coordinated, multi-year transmission of these fraudulent eviction notices and pretextual entry demands constituted separate, individual predicate acts of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

437. The Enterprise systematically deployed these deceptive mechanisms across interstate wires and the postal system to enforce intense administrative and economic pressure on the protected occupants, executing an organized, predatory plan to force a

constructive self-eviction and protect their unrecorded property infrastructure from federal judicial oversight, in violation of **18 U.S.C. § 1962(c)**.

## XLI. THE WEAPONIZATION OF LOCAL LAW ENFORCEMENT AND STRUCTURAL IDENTITY FRAUD

438. On or about April 6, 2021, the Enterprise initiated a coordinated campaign to weaponize the municipal resources of the New York City Police Department (NYPD) to execute a predatory constructive eviction scheme against the Plaintiffs.

439. This campaign was orchestrated by Defendants Melissa Martin, Paw Paw Pet Care LLC, Clinton 174 Realty Associates LLC, CHAOC, Property Manager Parvez Ahmed, Lead Superintendent Vigan Ahmetaj, and Attorney Kristen A. Mantell of Baron & Baron Esqs. P.C.

440. The initial phase of this scheme involved transmitting an intentionally false criminal report to the NYPD 88th Precinct via emergency telecommunications networks, resulting in the generation of NYPD Complaint Number 2021-088-001033 (attached hereto as Exhibit [X]).

441. On June 1, 2021, the conspirators utilized interstate wires to transmit a second fraudulent criminal report to municipal law enforcement operators, resulting in the generation of NYPD Complaint Number 2021-088-001737 (attached hereto as Exhibit [Y]).

442. Plaintiffs allege that the generation and electronic transmission of these fraudulent emergency calls constituted distinct predicate acts of wire fraud under **18 U.S.C. § 1343**.

443. The Enterprise executed these transmissions with the specific intent to fabricate a punitive municipal record against the Plaintiffs, in direct violation of **New York Penal Law § 240.50** (Falsely Reporting an Incident in the Third Degree).

444. Inside these official police complaints, Defendant Melissa Martin executed multiple egregious misrepresentations of material fact to manipulate law enforcement protocols, including:

- **Fabrication of Identity and Biographical Data:** Inside Complaint No. 2021-088-001033, Defendant Martin recorded her date of birth as September 19, 1975. However, inside Complaint No. 2021-088-001737, she altered her biographical record, falsely stating her date of birth was June 14, 1981.
- **Fabrication of Domestic Nexus to Hijack Family Offense Status:** Inside the April 6, 2021 report, Defendant Martin falsely stated to responding officers that she was the "same-sex partner" of Plaintiff Monique Saunders to trigger high-priority domestic violence intervention protocols. Inside the June 1, 2021 report, she countermanded her own statement, declaring that the Plaintiffs were total "strangers."

445. Plaintiffs allege that the Enterprise utilized these highly manipulative, contradictory, and unverified domestic violence profiles to deploy color of official law enforcement authority against the occupants.

446. This structural intimidation strategy was executed to place intense physical and psychological strain on the household, force a constructive eviction of the occupants, and eject the family from the Subject Premises to permanently insulate the Enterprise's unrecorded property infrastructure from federal discovery.

447. Defendant Martin intentionally and personally filed these fabricated statements with the NYPD 88th Precinct with actual knowledge that they were false, malicious, and fundamentally detrimental to the Plaintiffs' financial and property interests.

448. Plaintiffs allege that Defendant Attorney Kristen A. Mantell possessed actual or constructive knowledge that Melissa Martin's statements to the police were perjury and fabrications.

449. By actively participating in and supporting the transmission of these false profiles, Defendant Mantell and her client, Defendant Martin, publicly slandered Plaintiff Monique Saunders, causing direct harm, injury, and severe reputational and emotional damages.

450. Two months after the initial April 6, 2021 report, Defendant Martin altered her official statement to the NYPD 88th Precinct in her subsequent June 1, 2021 report, declaring that Plaintiff Monique Saunders was a "stranger."

451. Defendants Mantell and Martin possessed actual knowledge that Plaintiff Monique Saunders was neither a domestic partner nor a stranger.

452. They knew her to be a neighboring tenant who was actively logging habitual noise disturbances and severe privacy invasions caused by Melissa Martin, her guests, and the commercial animal clients of Paw Paw Pet Care LLC.

453. Plaintiffs allege that the coordinated utilization of these contradictory statements via interstate wires constituted a pattern of predicate acts of wire fraud under **18 U.S.C. § 1343**.

454. The Enterprise systematically deployed these defamatory police profiles to destroy the Plaintiffs' credibility with public safety agencies, obscure the underlying commercial lease violations, and advance the broader scheme to force a constructive eviction of the occupants for corporate enrichment.

455. Plaintiffs allege that Defendant Attorney Kristen A. Mantell possessed actual or constructive knowledge that Defendant Melissa Martin had transmitted additional false allegations to the NYPD on multiple separate occasions, under penalty of perjury.

456. These fabricated municipal reports pertained to baseless claims that the Plaintiffs were banging on structural pipes, shouting profanities, forcefully striking the entryway of Apartment 2H, and threatening Defendant Martin's bodily safety.

457. Defendant Martin executed these false reports with knowledge that they were completely fabricated, and subsequently integrated these identical misrepresentations into a formal, duly sworn and deposed affidavit.

458. This fraudulent affidavit was prepared, reviewed, and notarized by Defendant Attorney Kristen A. Mantell, who then utilized electronic wire communication channels to transmit the deceptive instrument to DHCR Attorney Mediator Evelyn Britt (attached hereto as Exhibit [X]).

459. The Enterprise generated, notarized, and emailed this fraudulent instrument with the specific intent to introduce false evidence against the Plaintiffs inside active administrative housing proceedings.

460. This deliberate introduction of false statements directly violated **New York Penal Law § 210.45** (Making a Punishable False Written Statement), which defines the offense as knowingly making a false statement in a written instrument bearing a legally authorized form notice to the effect that false statements made therein are punishable as a misdemeanor.

461. Plaintiffs allege that the electronic transmission of this notarized, perjured affidavit to a state housing regulatory agency constituted an affirmative predicate act of wire fraud under **18 U.S.C. § 1343**.

462. The Enterprise—acting through its legal counsel, Defendant Kristen A. Mantell, and individual co-conspirators—intentionally corrupted the administrative record of the DHCR. This tactical maneuver was executed to evade non-compliance penalties, suppress the Plaintiffs' environmental contamination complaints, and advance a predatory scheme to force a constructive eviction of the home-office occupants for corporate enrichment.

463. Public judicial records filed on the New York State Courts Electronic Filing system (NYSCEF Doc. No. 30) document a direct personal and commercial alliance between resident Defendant Melissa Martin and New York City Police Department (NYPD) Sergeant Yanira Leshan Golphin (Badge No. 4002).

464. This official case document—an electronic communication entered into the public record by Defendant and Third-Party Plaintiff CHAOC—establishes that Defendant Melissa Martin operates as an un-audited domestic provider for Sergeant Golphin's minor children (attached hereto as Exhibit [Z]).

465. On June 12, 2025, at 10:17 AM, NYPD Sergeant Yanira Leshan Golphin utilized electronic wire networks to transmit a coercive communication to Defendant CHAOC's official board registry (CHAOCboardinbox@chaocbk.com).

466. Inside this transmission, Sergeant Golphin verified an ongoing nine-year personal relationship with Defendant Melissa Martin, explicitly stating: *"The boys often request for me to drop them off to Melissa's apartment to spend quality time with her and her son. I*

*never say no. Melissa's home is definitely a space in which I feel that they will be safe and secure under the supervision of Melissa…"* (attached hereto as Exhibit [Z]).

467. Plaintiffs allege that the electronic transmission of this high-level law enforcement communication to the cooperative's executive inbox constituted an affirmative predicate act of wire fraud under **18 U.S.C. § 1343**.

468. The Enterprise deployed this communication as an administrative weapon under color of official police authority to intimidate the cooperative board, suppress the Plaintiffs' environmental contamination logs, and insulate Defendant Melissa Martin's illegal commercial animal care operation from corporate eviction actions.

469. This collusive intervention directly corrupted the building's administrative enforcement mechanisms, allowing a hazardous structural and biological nuisance to persist to the financial and physical detriment of the Plaintiffs, in violation of **18 U.S.C. § 1962(c)**.

470. Sergeant Yanira Leshan Golphin transmitted this multi-page electronic communication with actual and constructive knowledge that resident Defendant Melissa Martin, her minor son, and Defendant CHAOC were all represented by independent legal counsel in active, ongoing legal investigations by the DHR and legal proceedings in state court.

471. Disregarding established legal protocols, Sergeant Golphin bypassed the designated attorneys of record to communicate directly with the corporate principals at Defendant CHAOC, while copy-routing the transmission directly to Defendant Melissa Martin.

472. This electronic communication further establishes that Defendant Melissa Martin regularly integrates un-audited childcare and domestic operations for Sergeant Golphin's minor children directly inside Apartment 2H.

473. These domestic child-custody operations are executed simultaneously within the identical physical space where Defendant Melissa Martin conducts high-volume, unauthorized commercial animal care services for her Paw Paw Pet Care LLC clients.

474. These concurrent commercial animal care services include canine boarding, grooming, behavioral training, and veterinary medication administration, all of which are executed as part of an illegal pet care operation inside a strictly residential cooperative unit.

475. Plaintiffs allege that the electronic transmission of this high-level law enforcement communication, designed to circumvent counsel of record and validate a hazardous dual-use commercial occupancy, constituted an affirmative predicate act of wire fraud under **18 U.S.C. § 1343**.

476. The Enterprise utilized this improper law enforcement intervention to compromise the cooperative's internal disciplinary mechanisms, shield an illegal canine boarding facility from municipal zoning closures, and maintain a severe structural and biological nuisance directly above a medically vulnerable occupant and their dedicated home office workspace, in violation of **18 U.S.C. § 1962(c)**.

477. Prior to transmitting her June 12, 2025 electronic communication to Defendant CHAOC's executive board, NYPD Sergeant Yanira Leshan Golphin had never met, interviewed, or questioned any member of the Tovar-Saunders family.

478. Defying mandatory investigative protocols, Sergeant Golphin utilized her official law enforcement stature to defame the Plaintiffs, falsely asserting to the Board that the

occupants of Apartment 1H displayed malicious intent and that their routine, good-faith NYC-311 and building security noise notifications constituted aggravated harassment designed to cause alarm to resident Defendant Melissa Martin and her guests.

479. Sergeant Golphin further utilized the communication to issue an explicit administrative mandate to Defendant CHAOC's Board of Directors, characterizing her insider intervention as "step one" of a formal notification process.

480. In this transmission, Sergeant Golphin declared that she should not have to endure notifications at any hour regarding police units responding to Apartment 2H, thereby attempting to coerce the cooperative into suppressing the Plaintiffs' lawful right to seek municipal intervention for severe structural noises, illegal commercial operations, and animal welfare concerns.

481. Presenting a direct conflict of interest and an abuse of her public position, Sergeant Golphin asserted in her communication: *"When the police respond to unit 2H, all occupants in the unit are targets of the intentional harassment thereof by the occupants in unit 1H. This harassment is making me quite upset, annoyed and also alarmed. Each and every time that my children are in unit 2H and police show up, it really upsets the children, Melissa and I."* (NYSCEF Doc. No. 30, page 2).

482. This explicit written admission demonstrates that Sergeant Golphin's close personal and commercial babysitting alliance with Defendant Melissa Martin compromised her institutional objectivity.

483. Plaintiffs allege that Sergeant Golphin actively utilized her supervisor rank to intercede in independent emergency dispatches, systematically convincing responding

NYPD precinct officers to suppress their physical observations and omit code infractions from official municipal data registries.

484. This targeted frustration of law enforcement duties was executed to prevent responding officers from documenting the un-licensed commercial canine facility, directly violating **New York Penal Law § 195.00** (Official Misconduct) and the NYPD Patrol Guide mandates governing conflicts of interest and accurate record-keeping.

485. Sergeant Golphin directly abused her authority under color of law by concluding her June 12, 2025 board directive with an explicit enforcement demand, stating: *"I Yanira Golphin, am formally requesting for the Board of Directors to swiftly take action for the multiple aggravated harassment occurrences made by occupants in unit 1H. I may be reached at the above email address or at 718-772-8430 for any additional information. I look forward to your speedy response. Yanira Golphin."*

486. The Enterprise utilized this improper law enforcement pressure to compel Defendant CHAOC to initiate its bad-faith impleader actions. This maneuver was designed to bring the Plaintiffs into the Kings County sham lawsuit on July 24, 2025, to force a constructive eviction of the home-office occupants and protect their unrecorded property infrastructure from federal discovery.

487. This abusive conduct aligns with a long-standing, documented pattern of disciplinary infractions recorded across Sergeant Golphin's 17-year NYPD career (2008 to Present). Public law enforcement databases confirm that Sergeant Golphin has accumulated six (6) distinct administrative complaints for Abuse of Authority and two (2) separate formal charges for Excessive Force, establishing a repetitive pattern of official misconduct (attached hereto as Exhibit [AA]).

488. Plaintiffs allege that the electronic transmission of this high-level, coercive law enforcement directive to a private cooperative board constituted an affirmative predicate act of wire fraud under **18 U.S.C. § 1343**.

489. Within thirty (30) days of Sergeant Golphin's coercive email to the CHAOC Board of Directors, Attorney Kristen A. Mantell of Baron & Baron Esqs., P.C.—against whom Plaintiffs had previously filed a formal Attorney Grievance Complaint—officially impleaded the Tovar-Saunders family as Third-Party Defendants.

490. Following this impleader, Defendant Mantell initiated an aggressive volume of bad-faith electronic filings into the case docket, seeking an unreasonable injunction, praying for an extrajudicial eviction, and systematically defaming the occupants of the Subject Premises in retaliation for their whistleblowing activities.

491. Prior to Sergeant Golphin's administrative intervention, the state court case docket had remained completely inactive for an eight-month period spanning from October 11, 2024, through June 2025, with no summons or complaint served upon the Plaintiffs in the interim.

492. Plaintiffs allege that Sergeant Golphin's extrajudicial electronic communications were the direct catalyst that revived the dormant state court action, constituting a deliberate act to obstruct justice and advance a predatory scheme to dispossess the family of their housing rights.

493. Public judicial records and electronic crowdfunding platforms confirm that Sergeant Golphin maintains a direct financial stake in the economic viability of the Enterprise's commercial operations.

494. Specifically, Sergeant Golphin acts as one of the five primary organizers of an active online fundraising campaign hosted on the GoFundMe platform, entitled *"Support Melissa's Recovery and Livelihood"* (attached hereto as Exhibit [BB]).

495. This digital solicitation campaign, established exclusively for the benefit of resident Defendant Melissa Martin as the owner of Paw Paw Pet Care LLC, has successfully raised over $23,025.00 in liquid capital.

496. Plaintiffs allege that Sergeant Golphin's simultaneous role as an active-duty law enforcement supervisor, a consumer of Defendant Melissa Martin's un-licensed childcare facility, and a primary organizer for an Enterprise principal created a disqualifying conflict of interest under New York law.

497. Her overlapping personal, commercial, and financial incentives completely compromised her institutional impartiality, prompting her to weaponize her official NYPD rank to initiate bad-faith legal proceedings against un-interviewed tenants.

498. Plaintiffs allege that the coordinated utilization of electronic networks to manage this fraudulent crowdfunding campaign, paired with the transmission of the June 2025 board directive, constituted separate, individual predicate acts of wire fraud under **18 U.S.C. § 1343**.

499. The Enterprise systematically deployed these deceptive, coercive mechanisms across state and municipal channels to obstruct justice, deny the Plaintiffs due process, and safeguard an illicit real estate revenue stream for corporate enrichment in violation of **18 U.S.C. § 1962(c)**.

500. The Enterprise systematically deployed these interconnected digital and law enforcement mechanisms to extract financial liquidity, insulate a hazardous commercial

animal boarding facility from municipal zoning enforcement, and mount intense economic pressure on the protected occupants via sham state court filings, in violation of **18 U.S.C. § 1962(c)**.

501. In furtherance of the scheme to intimidate the occupants and execute an illicit property seizure, the Enterprise—acting through Defendant CHAOC and its property management agents—hired Defendant Acoustilog, Inc. and its President, Defendant Alan Fierstein, to install an un-consented, un-warranted tracking and electronic eavesdropping apparatus focused entirely on the private interior of the Subject Premises.

502. On Tuesday, June 25, 2024, at approximately 10:00 AM, Defendant Alan Fierstein entered the kitchen of Apartment 2H—the unauthorized commercial headquarters of Defendant Paw Paw Pet Care LLC—to physically construct and calibrate the surveillance trap.

503. Inside his subsequent corporate engineering report, Defendant Alan Fierstein explicitly admitted that upon listening directly to the bare floorboards of the kitchen, the Plaintiffs' internal household music was completely inaudible because acoustic energy was passing primarily through a shared, un-insulated vertical structural element and floor penetration surrounding the common kitchen heating pipe.

504. To circumvent this acoustic barrier and mechanically capture the internal, private vocalizations and sounds of the family below, Defendant Alan Fierstein affixed a commercial accelerometer directly onto the shared structural heating pipe and suspended an un-monitored recording microphone approximately two feet above the fixture.

505. Prior to abandoning the equipment on June 25, 2024, Defendant Alan Fierstein delivered explicit, back-office operational instructions to resident Defendant Melissa

Martin, authorizing a private, hostile litigant to manually trigger the digital audio recording system, dictate tracking thresholds, and log selective time-and-day narrative entries to manipulate the forensic record.

506. For nine (9) consecutive days, spanning from June 25, 2024, through Thursday, July 4, 2024, at 4:00 PM, the Enterprise left this un-monitored electronic tracking trap active without a judicial warrant, a Title III wiretap order, or the knowledge and consent of any occupant inside the Subject Premises.

507. This surveillance system intercepted the private oral communications and religious practices of the Plaintiffs, specifically recording the family's sacred Shofar music played inside their own kitchen to muffle the intense structural animal noise nuisance generated by Defendant Melissa Martin's illegal canine boarding business overhead.

508. On July 4, 2024, at 4:00 PM, Defendant Alan Fierstein returned to remove the tracking equipment, asserting that the hardware settings had not been tampered with or modified by Defendant Melissa Martin, and transported the un-audited physical recording disks back to Acoustilog's commercial laboratory for digital extraction and processing.

509. On or about July 9, 2024, Defendant Acoustilog, Inc. utilized the U.S. Mail to transmit the finalized engineering report containing these illegally intercepted audio files to Property Manager Parvez Ahmed at Defendant CHAOC's management office, located at 345 Clinton Avenue, Suite 1F, Brooklyn, New York 11238 (attached hereto as Exhibit ).

510. Plaintiffs allege that the generation, mailing, and intentional insertion of this un-audited Acoustilog report into the Kings County State Supreme Court docket constituted

an active Fraud on the Court and an ongoing pattern of predicate acts of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

511. The Enterprise—acting through Defendant CHAOC and Attorney Kristen A. Mantell—knowingly introduced this illegally intercepted surveillance evidence, which is strictly inadmissible under **New York CPLR § 4506**, during a Show Cause Hearing to mislead the state court justice. This tactical manipulation resulted in the procurement of a bad-faith Preliminary Injunction on September 10, 2025, weaponizing the state judiciary to advance a predatory constructive eviction scheme against a home-office household, in violation of **18 U.S.C. § 1962(c)** and **18 U.S.C. § 2511** (The Federal Wiretap Act).

512. The Enterprise systematically deployed these interconnected digital and law enforcement mechanisms to extract financial liquidity, insulate a hazardous commercial animal boarding facility from municipal zoning enforcement, and mount intense economic pressure on the protected occupants via sham state court filings, in violation of **18 U.S.C. § 1962(c)**.

513. In furtherance of the scheme to intimidate the occupants and execute an illicit property seizure, the Enterprise—acting through Defendant CHAOC and its property management agents—hired Defendant Acoustilog, Inc. and its President, Defendant Alan Fierstein, to install an un-consented, un-warranted tracking and electronic eavesdropping apparatus focused entirely on the private interior of the Subject Premises.

514. On Tuesday, June 25, 2024, at approximately 10:00 AM, Defendant Alan Fierstein entered the kitchen of Apartment 2H—the unauthorized commercial headquarters of Defendant Paw Paw Pet Care LLC—to physically construct and calibrate the surveillance trap.

515. Inside his subsequent corporate engineering report, Defendant Alan Fierstein explicitly admitted that upon listening directly to the bare floorboards of the kitchen, the Plaintiffs' internal household music was completely inaudible because acoustic energy was passing primarily through a shared, un-insulated vertical structural element and floor penetration surrounding the common kitchen heating pipe.

516. To circumvent this acoustic barrier and mechanically capture the internal, private vocalizations and sounds of the family below, Defendant Alan Fierstein affixed a commercial accelerometer directly onto the shared structural heating pipe and suspended an un-monitored recording microphone approximately two feet above the fixture.

517. Prior to abandoning the equipment on June 25, 2024, Defendant Alan Fierstein delivered explicit, back-office operational instructions to resident Defendant Melissa Martin, authorizing a private, hostile litigant to manually trigger the digital audio recording system, dictate tracking thresholds, and log selective time-and-day narrative entries to manipulate the forensic record.

518. For nine (9) consecutive days, spanning from June 25, 2024, through Thursday, July 4, 2024, at 4:00 PM, the Enterprise left this un-monitored electronic tracking trap active without a judicial warrant, a Title III wiretap order, or the knowledge and consent of any occupant inside the Subject Premises.

519. This surveillance system intercepted the private oral communications and religious practices of the Plaintiffs, specifically recording the family’s sacred Shofar music played inside their own kitchen to muffle the intense structural animal noise nuisance generated by Defendant Melissa Martin’s illegal canine boarding business overhead.

520. On July 4, 2024, at 4:00 PM, Defendant Alan Fierstein returned to remove the tracking equipment, asserting that the hardware settings had not been tampered with or modified by Defendant Melissa Martin, and transported the un-audited physical recording disks back to Acoustilog's commercial laboratory for digital extraction and processing.

521. On or about July 9, 2024, Defendant Acoustilog, Inc. utilized the U.S. Mail to transmit the finalized engineering report containing these illegally intercepted audio files to Property Manager Parvez Ahmed at Defendant CHAOC's management office, located at 345 Clinton Avenue, Suite 1F, Brooklyn, New York 11238 (attached hereto as Exhibit [CC]).

522. Plaintiffs allege that the generation, mailing, and intentional insertion of this un-audited Acoustilog report into the Kings County State Supreme Court docket constituted an active Fraud on the Court and an ongoing pattern of predicate acts of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

523. The Enterprise—acting through Defendant CHAOC and Attorney Kristen A. Mantell—knowingly introduced this illegally intercepted surveillance evidence, which is strictly inadmissible under **New York CPLR § 4506**, during a Show Cause Hearing to mislead the state court justice. This tactical manipulation resulted in the procurement of a bad-faith Preliminary Injunction on September 10, 2025, weaponizing the state judiciary to advance a predatory constructive eviction scheme against a home-office household, in violation of **18 U.S.C. § 1962(c)** and **18 U.S.C. § 2511** (The Federal Wiretap Act).

524. Crucially, this November 26, 2024 enforcement mandate formally disclosed and copy-routed the notice to a previously unrecorded, hidden corporate shell front: Defendant

CLINTON APARTMENTS LLC, registered at P.O. Box 140250, Brooklyn, NY 11214 (attached hereto as Exhibit [H]).

525. The continuous, cyclical deployment of this strawman shell game persisted through November 18, 2025, when DHCR Compliance/Mediation Officer D. Slay issued two separate “Notices of Settlement” under Docket Numbers MT210027NC (referencing Order LQ210113S) and MT210008NC (referencing the original February 2023 Rent Reduction Order KP210025S) (attached hereto as Exhibits [I] and [J]).

526. These November 2025 notices confirmed that the Enterprise had again bypassed direct accountability, paid reduced civil fines, and secured an additional 60-day administrative monitoring delay.

527. In these final regulatory documents, the Enterprise stripped all references to Defendant CHAOC, FirstService, or Greenthal entirely, explicitly establishing Defendant CLINTON APARTMENTS LLC, P.O. Box 140250, Brooklyn, NY 11214 as the formal "Mailing Address of Owner/Owner's Rep," while copy-routing the secret settlements directly to Defendant Attorney Kristen A. Mantell at Baron & Baron Esqs. P.C., 118-21 Queens Blvd., Forest Hills, NY 11375.

528. Plaintiffs allege that the coordinated, multi-year generation, transmission, and electronic filing of these shifting corporate addresses, false compliance letters, and un-authorized settlement checks across interstate wires and the postal system constituted separate, individual predicate acts of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

529. The Enterprise systematically utilized Defendant CLINTON APARTMENTS LLC as a final "strawman" mask and deployed a shell game of rotating business addresses (Long

Island City, Midtown Manhattan, 5th Avenue, the Brooklyn Complex, and a Brooklyn P.O. Box) to build a highly fragmented regulatory record.

530. This mechanical re-layering allowed the conspirators to pocket public ERAP relief funds, deceive municipal investigators, and insulate their multi-million dollar corporate assets from enforcement actions.

531. Plaintiffs explicitly allege that Defendant New York State Division of Housing and Community Renewal ("DHCR") did not merely act as an innocent, deceived regulatory body; rather, its Compliance and Enforcement Unit agents actively colluded with the private corporate Defendants to suppress enforcement records, falsify the administrative status of the Subject Premises, deny Plaintiffs administrative due process, and shield the Enterprise from state and federal regulatory oversight [LV].

532. On January 30, 2025, Defendant DHCR utilized the U.S. Mail to transmit a formal “Notice of Remote Hearing” executed from the desk of Peter M. Stecker, Esq., Director of the Enforcement/Compliance Unit (attached hereto as Exhibit [K]). This notice scheduled a mandatory regulatory video conference for February 26, 2025, at 10:00 AM regarding the Enterprise’s persistent, multi-year non-compliance.

533. Soon thereafter, on February 18, 2025, Defendant DHCR mailed a conflicting “Notice of Remote Prehearing Conference,” resetting the administrative date to March 19, 2025, at 10:00 AM (attached hereto as Exhibit [L]). This secondary notice contained an explicit, restrictive mandate declaring that the Tenant occupants were relegated to "non-party" observers who were strictly barred from active participation in the enforcement hearing.

534. On the morning of March 19, 2025, Plaintiffs placed multiple telephone calls and transmitted urgent electronic mail notifications to DHCR Compliance Unit Agent Jennifer Spencer, Esq., formally demanding the Cisco Webex video link to observe the scheduled enforcement conference.

535. Agent Spencer affirmatively denied the Plaintiffs' demands, withheld the electronic access credentials, and falsely stated that the conference had been cancelled because the proceeding was "only for the attorneys."

536. In factual reality, Defendant DHCR and Agent Spencer used this digital lockout to execute an un-recorded, ex parte administrative alignment with the Enterprise's legal counsel to terminate the enforcement file outside the presence of the victims.

537. On March 20, 2025, the very next day, Agent Jennifer Spencer drafted and transmitted a formal closing notice via the U.S. Mail, stating: *"Please be advised that the above referenced compliance proceeding is hereby closed, because the matter has been withdrawn without prejudice."* (attached hereto as Exhibit [M]). Plaintiffs received this correspondence on March 22, 2025.

538. To validate the Enterprise's fraudulent re-layering, Agent Spencer copy-routed this official March 20, 2025 closing notice across the entire matrix of shifting corporate shells and fictitious offices, mailing copies directly to:

- Clinton Apartments LLC, P.O. Box 140250, Brooklyn, NY 11214;
- Clinton Hill Apts. Owners Corp., at the non-existent administrative site of 210 Clinton Ave., Brooklyn, NY 11205;
- FirstService Residential, Attn: Steven Greenbaum, 575 Fifth Ave., 9th Floor, New York, NY 10017;

- Clinton Hill Apts. Owners Corp. c/o Time Equities, Inc., 825 Third Ave., New York, NY 10022; and
- Clinton 174 Realty Associates LLC, Charles H. Greenthal & Co., 551 5th Avenue, Room 500, New York, NY 10176.

539. In a further act of administrative manipulation, Defendant DHCR altered the primary mailing block of the late Plaintiff Anita Tovar to interlineate and list the Enterprise's adversarial legal counsel directly under the tenant's name, designating the block as: *"Clinton Hill Apts. Owners Corp., Baron & Baron, Esqs. P.C., Attn: Kristen Mantell, Esq., 118-21 Queens Blvd., Forest Hills, NY 11375."* This deliberate data manipulation redirected the tenant's official regulatory service copies straight into the hands of the adverse corporate conspirators.

540. In response to this administrative corruption, Plaintiffs executed three comprehensive, formal notices detailing the corporate defendants' systematic harassment, non-compliance, and ongoing fraud on the court. These detailed notices were delivered to DHCR Rent Administrator Margaret Ramroop via trackable U.S. Priority Mail on May 21, 2025, May 30, 2025, and June 30, 2025, respectively (attached hereto as Exhibits [N], [O], and [P]).

541. Defendant DHCR and Rent Administrator Margaret Ramroop intentionally suppressed these priority filings, entirely omitting to issue a standard Docket Acknowledgment for any of the Plaintiffs' structural fraud notices, choosing instead to bury the researched evidence of corporate identity manipulation.

542. On July 17, 2025, Peter M. Stecker, Esq., acting in his capacity as Director of the DHCR Compliance Unit, utilized the U.S. Mail to transmit a final obstruction directive to

the Plaintiffs, declaring: *"Following referral for enforcement, this matter was returned for further processing. Upon further review of the file, there is insufficient evidence to continue with a formal prosecution. Accordingly, this matter is hereby closed..."* (attached hereto as Exhibit [Q]).

543. Director Stecker issued this closing mandate with actual and constructive knowledge that the underlying file contained overwhelming, uncontested physical inspection records documenting twenty-three (23) severe, un-remediated building code violations.

544. To obscure this complete abdication of enforcement duty, Director Stecker falsely asserted that the related services issues would be re-inspected under subsequent dockets MT-210008-NC and MT-210027-NC, effectively locking the Plaintiffs into an endless, circular administrative loop designed to insulate the landlord from statutory penalties.

545. Forensic business registry audits executed by the Plaintiffs reveal that the primary entity utilized by Defendant DHCR to settle these enforcement files—Defendant CLINTON APARTMENTS LLC—functions as a fraudulent corporate "ghost shell."

546. According to official New York Department of State (DOS) records, Clinton Apartments LLC maintains a designated street address of 5614 15th Ave., Suite 1A, Brooklyn, NY 11219, but completely omits the registration of any lawful Registered Agent authorized to receive service of process.

547. This identical DOS street address is publicly associated with an unrelated entity, "Newport Management Company, LLC"—a commercial firm that has never maintained any contractual privity, property management duties, or business dealings with the Plaintiffs or the Subject Premises.

548. Plaintiffs allege that the coordinated, multi-year transmission of these deceptive prehearing lockouts, falsified closing letters, and un-acknowledged fraud disclosures across interstate wires and the postal system constituted separate, individual predicate acts of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

549. The Enterprise—by and through the direct collusion of Defendant DHCR and its compliance attorneys, Spencer and Stecker—knowingly used these deceptive techniques to suppress corporate code violations, protect an unrecorded parallel tracking ledger, and insulate a multi-million dollar real estate asset from statutory enforcement actions.

550. This targeted frustration of administrative duty allowed the private conspirators to leverage the state's regulatory authority to enforce rent extractions, maintain severe environmental hazards inside the apartment, and advance a predatory campaign of constructive eviction against the home-office family, in direct violation of **18 U.S.C. § 1962(c)**.

## XLIV. EXTENSION OF THE ENTERPRISE CONSPIRACY TO EXECUTIVE STATE REGULATORS

551. Plaintiffs explicitly allege that Defendant New York State Division of Human Rights ("DHR") and Defendant Letitia James, in her official capacity as Attorney General of the State of New York, did not merely act as neutral administrative conduits. Instead, their respective investigative units actively colluded with the private corporate Defendants, choosing to suppress material evidence of financial fraud, ignore municipal health violations, and inject structural bias into the official record to shield the Enterprise from federal question enforcement.

551. Plaintiffs formally escalated written notices, verified complaints, and investigative research binders to the Office of Attorney General Letitia James, explicitly documenting:

- A multi-decade pattern of Escrow and Security Deposit Fraud in direct violation of NYS General Obligations Law §§ 7-103 and 7-105;
- Ongoing retaliatory and wrongful eviction actions executed through bad-faith corporate instruments;
- An active New York City Department of Health and Mental Hygiene (DOHMH) investigation into Defendant Melissa Martin's un-licensed commercial facility, Paw Paw Pet Care LLC; and
- A coordinated effort by Defendant CHAOC to grant corporate consent enabling Defendant Martin to secure municipal licensing to operate a commercial animal facility within a residential multi-family housing complex.

553. The Office of Attorney General Letitia James entirely abdicated its statutory enforcement duties under the Martin Act (NYS General Business Law Art. 23-A) and the New York Executive Law. The agency suppressed the Plaintiffs' investigative records and chose to protect the Sponsor's unrecorded parallel cooperative ledger from state asset-seizure protocols.

554. Concurrently, the municipal paper trail documenting the illegal canine facility was systematically neutralized at the ground level. When Plaintiffs placed emergency NYC-311 calls prompting NYPD precinct responses, the investigations were actively thwarted from within by NYPD Sergeant Yanira Leshan Golphin, acting under a disqualifying conflict of interest.

555. This law enforcement suppression was executed in direct coordination with on-site security personnel, specifically Security Supervisor J. Griffon and Security Director Mark Atherton.

556. These individual security actors functioned as personal allies of Defendant Melissa Martin and maintained their exact monitoring positions when Defendant Doyle Security Services, Inc. absorbed the operational infrastructure of Defendant Madison Security Group, Inc., ensuring an unbroken chain of surveillance data suppression.

557. On May 17, 2022, Plaintiffs sought administrative remedy by filing an emergency housing discrimination and tenant harassment complaint with Defendant New York State Division of Human Rights ("DHR").

558. Defendant DHR completely abandoned its statutory obligation to execute an objective, timely investigation. The agency subjected the file to extraordinary administrative delays, conducted a highly truncated, incomplete telephone interview that excluded the Plaintiffs' core forensic evidence, and actively integrated deep, unlawful bias into the official investigatory record.

559. To deliberately undermine the Plaintiffs' credibility, Defendant DHR expanded its investigatory record to incorporate prejudicial, non-jurisdictional personal data, explicitly inserting Plaintiff Monique Saunders' Washington, D.C. administrative bar disbarment into the active housing file.

560. Defendant DHR utilized this personal data extraction to manufacture an appearance of tenant dishonesty, adopting the adversarial narrative of the private corporate Defendants without conducting a physical inspection of the unmitigated toxic mold colonies.

561. On June 3, 2024, Defendant DHR issued a final administrative determination letter, repeating the corporate Respondents' characterization of Plaintiff Monique Saunders as dishonest, declaring a total absence of probable cause, and dismissing the enforcement proceeding with prejudice.

562. Plaintiffs allege that the coordinated electronic transmission, selective indexing, and mailing of these biased DHR determinations, suppressed Attorney General disclosures, and falsified security logs across state lines constituted separate, individual predicate acts of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

563. The Enterprise systematically weaponized the state's highest regulatory and civil rights enforcement bodies—the DHR and the Attorney General's Office—to execute a complete administrative lockout.

564. By poisoning the regulatory record with highly prejudicial personal data and suppressing physical inspection logs, the conspirators insulated an illegal commercial canine facility from closure, protected a multi-million dollar real estate conversion from a Martin Act investigation, and maintained an unmitigated biological hazard to force a constructive eviction of the home-office occupants, in direct violation of **18 U.S.C. § 1962(c)**.

565. On September 18, 2024, at approximately 2:39 PM, the Enterprise expanded its scheme to manipulate municipal emergency resources by transmitting a false hazard report to the New York City Fire Department (FDNY).

566. This fraudulent transmission via telecommunications networks caused an emergency deployment of multiple FDNY personnel equipped with fire axes and a tactical battering ram to the Subject Premises.

567. These emergency personnel arrived prepared to execute a high-impact, destructive breaching entry through the front door of the Subject Premises without reasonable cause, a valid warrant, or an actual underlying emergency.

568. Plaintiffs allege that the electronic transmission of this fabricated emergency alarm to the FDNY constituted an affirmative predicate act of wire fraud under **18 U.S.C. § 1343**.

569. The Enterprise systematically deployed this life-threatening, deceptive tactic to manufacture intense physical terror, simulate a hazardous emergency profile for the unit, and weaponize municipal public safety teams to force a constructive eviction of the protected occupants for corporate enrichment in violation of **18 U.S.C. § 1962(c)**.

570. Plaintiffs' minor child was physically present inside the Subject Premises during this tactical emergency breach deployment, experiencing immediate terror and severe psychological trauma as a direct target of the Enterprise's weaponized physical coercion.

571. The minor child directly witnessed the arrival of emergency personnel carrying fire axes and a tactical battering ram targeted directly at the family's primary residential entrance door.

572. Plaintiffs allege that the Enterprise intentionally executed this false emergency transmission with actual knowledge that a minor child was present inside the unit.

573. The conspirators deployed this life-threatening tactic to inflict severe psychological trauma on the child and her guardians, intentionally exploiting a minor's presence to maximize terror and force a constructive eviction to protect their unrecorded property infrastructure from public discovery in violation of **18 U.S.C. § 1962(c)**.

574. Plaintiffs allege that Defendant Lead Superintendent Vigan Ahmetaj was the specific on-site management agent who took the operational lead in orchestrating this false emergency report and weaponizing the FDNY against the occupants.

575. Defendant Ahmetaj executed this false emergency transmission within twenty-four (24) hours of Defendant CHAOC's management abruptly closing its physical office

without explanation and announcing via electronic mail that *"the office is closed until further notice."*

576. Plaintiffs allege that the calculated closing of the management office, paired with the immediate electronic deployment of emergency personnel carrying breaching tools, constituted a coordinated **predicate act of wire fraud under 18 U.S.C. § 1343**.

577. The Enterprise utilized this administrative blackout and subsequent tactical emergency response to create a state of severe crisis, attempting to execute an extrajudicial property seizure while ensuring that individual corporate managers remained insulated from immediate physical or legal accountability, in violation of **18 U.S.C. § 1962**.

578. At present, the Enterprise continues to prosecute its bad-faith impleader action in the Supreme Court of New York, Kings County, under Case No. 501135/2024, attempting to execute an extrajudicial ejection of the Plaintiffs from the Subject Premises.

579. Plaintiffs allege that the ongoing maintenance of this Third-Party Complaint constitutes a systemic **fraud on the court**, executed to manipulate the state judiciary into validating an unlawful property seizure.

580. The Enterprise principals—acting through Defendant CHAOC and Attorney Kristen Mantell—are actively submitting falsified tenancy registrations, fabricated corporate property records, and perjured affidavits into the state court docket.

581. The conspirators are deploying these fraudulent instruments to intentionally misrepresent the true federal military housing status of the Subject Premises, mislead the state court justice, and strip the Plaintiffs of their property rights under false pretenses.

582. Plaintiffs allege that the continuous electronic filing and transmission of these fraudulent litigation documents across state servers constitute individual **predicate acts of wire fraud under 18 U.S.C. § 1343**.

583. The Enterprise systematically weaponizes this state court impleader as an extractive tool to force an illegal property seizure, drive up the Plaintiffs' litigation costs, and shield its multi-decade title fraud from federal discovery, in violation of **18 U.S.C. § 1962**.

584. Defendants CHAOC, FirstService Residential (individually and d/b/a Charles H. Greenthal & Co.), Steven Greenbaum, Jennifer Ogman, Property Manager Parvez Ahmed, Attorney Kristen A. Mantell of Baron & Baron Esqs., P.C., Clinton 174 Realty Associates LLC, and Clinton Apartments LLC assumed physical control over the property complex and continuously perpetuated the fraudulent scheme.

585. The Enterprise executed these property operations with actual knowledge of, and in direct defiance of, multiple binding municipal housing directives issued for the Subject Premises, including:

- **DHCR Order(s) Reducing Rent for Rent Stabilized Tenants**: Explicit administrative mandates ordering a reduction in rent due to documented decreases in essential services and structural infrastructure hazards (Docket Numbers KP 210025 S and LQ 210113 S);
- **DHCR Order(s) Directing Lease Renewal**: Formal determinations by the Office of Rent Administration establishing that the owner is required to renew the tenancy lease under statutory guidelines (Docket Number LQ 210020 RV);

- **DHCR Notice of Non-Compliance**: Official agency findings issued following physical property inspections confirming structural and environmental violations (Docket Numbers LP 210006 NC and MT 210027 NC); and
- **DHCR Notice of Referral to Enforcement Unit**: Formal administrative actions elevating the property record to the enforcement division due to the owner's persistent non-compliance and defiance of state housing orders (Docket Number MT 210008 NC).

586. Plaintiffs allege that the coordinated, multi-year transmission of fraudulent billing statements, bad-faith eviction notices, and deceptive legal filings across state lines via the U.S. Mail and electronic servers constituted separate, individual **predicate acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343**.

587. The Enterprise systematically deployed these deceptive practices to ignore binding state housing mandates, evade statutory non-compliance fines, and maintain an environmental hazard (toxic mold) to force a constructive eviction of the military occupants.

588. Plaintiffs allege that the executive management's integration of absorbed personnel and continuous defiance of state orders establishes **open-ended continuity under 18 U.S.C. § 1962** [1, 2].

589. The racketeering activity is not an isolated or transient phenomenon, but rather the explicit, regular way of doing business for the successive management entities. This creates a live, imminent threat of ongoing property fraud, financial manipulation, and extrajudicial displacement against the Plaintiffs and similarly situated occupants, satisfying the civil enforcement requirements of **18 U.S.C. § 1964(c)**.

## XLV. THE INTRICATE PATTERN OF EXCLUSION AND INCLUSION OF GOVERNMENT DEFENDANTS AS NECESSARY RELIEF PARTIES

590. On April 14, 2022, Plaintiffs utilized the U.S. Mail to transmit a detailed, comprehensive formal Letter of Complaint via Certified Mail to Defendant Letitia James in her official capacity as the Attorney General of the State of New York, Division of Social Justice - Housing Protection Unit, located at 55 Hanson Place, Suite 1080, Brooklyn, New York 11217.

591. This formal regulatory submission was explicitly captioned *"Re: Housing Justice - Letter of Complaint Against Cooperative Owners Attempting to Fraudulently Force Out Long-Time Tenant from Rent-Stabilized Unit in Brooklyn,"* detailing the widespread corporate fraud, unrecorded property transfers, and ongoing maintenance deprivation targeting the Subject Premises.

592. The formal complaint provided Defendant Attorney General Letitia James with explicit, direct notice of the Enterprise's coordinated operations, stating: *"CHAOC and its agent, Baron and Baron, are acting in a predatory, harassing and retaliatory manner by engaging in acts of invasion of privacy, character assassination, statements, false and threatening reports (including a NY 'Karen Law' police call to the unit on May 27, 2021), service of false documents (Notice to Cure and Notice of Termination)... and the ongoing denial of maintenance/repairs/improvements."*

593. The regulatory complaint further alerted the Attorney General to the direct economic motives driving the Enterprise's racketeering pattern: *"Specifically, if CHAOC and its agents were to succeed in forcing Tenant(s) out of the rent-subsidized unit, CHAOC would collect a major financial gain considering the sales value of the property on today's Brooklyn real estate market."*

594. The submission explicitly detailed how Defendant Kristen A. Mantell and Baron & Baron Esqs., P.C., utilized the U.S. Mail to transmit a facially fraudulent, backdated Notice of Termination on March 31, 2022. This notice demanded extrajudicial removal by April 15, 2022, under the false pretense that the underlying lease term had expired, despite possessing actual knowledge that the fully executed lease renewal remained legally binding through April 30, 2023.

595. Based on these documented infractions, the Plaintiffs formally requested that the Attorney General initiate an investigation and enforce statutory sanctions against the conspirators under **New York Executive Law § 63(12)** and the **New York General Business Law (The Martin Act)** to address a multi-decade pattern of deceptive real estate conversion.

596. On April 21, 2022, the Office of the New York State Attorney General transmitted an official response to the Plaintiffs on behalf of Defendant Letitia James, establishing that the regulatory complaint would be maintained on permanent administrative file to trace, monitor, and assist in prosecuting systematic patterns of property fraud and illegality affecting consumers across the complex.

597. Plaintiffs explicitly name Defendant Letitia James, in her official capacity as Attorney General, as a Necessary Relief Party to this federal action pursuant to **Federal Rule of Civil Procedure 19(a)**.

598. Her inclusion is required to ensure complete, equitable due process and to enforce meaningful injunctive relief. This includes compelling the Office of the Attorney General to open its complete cooperative conversion archives, review the multi-decade unamended offering plan data, and monitor the outstanding **DHCR Non-Compliance and**

**Enforcement referrals** to prevent the permanent spoliation of physical and regulatory evidence by the Enterprise principals, satisfying the civil enforcement remedies under **18 U.S.C. § 1964(a)**.

## XLVI. THE CONTINUOUS PATTERN OF SECURITY DEPOSIT ESCROW FRAUD AND SYSTEMIC REGULATORY CONCEALMENT

599. On April 15, 2022, Plaintiffs analyzed historical family documents and uncovered an ongoing, multi-decade pattern of Security Deposit Escrow Fraud and violations of **New York General Obligations Law § 7-103** perpetuated by Defendants CHAOC and Charles H. Greenthal Management Corp. relating to the Subject Premises.

600. On April 15, 2022, Plaintiffs contacted the New York City 311 municipal intake system to report the unlawful commingling, conversion, and total absence of statutory interest disclosures regarding the Tenant's security deposit escrow funds, whereupon Plaintiffs were directed to file a formal regulatory complaint with the Office of the Attorney General.

601. On May 20, 2022, Plaintiffs transmitted an official Security Deposit Complaint (Form CFB003NYC - rev. 1/19) via U.S. Postal Service Priority Mail, which was successfully delivered to the Office of the Attorney General on May 23, 2022, explicitly naming Defendants CHAOC and Charles H. Greenthal Management Corp. as the violating corporate targets.

602. To substantiate the systemic bank and mail fraud, Plaintiffs attached ironclad documentary evidence to the official complaint, including:

- Fully executed lease renewal agreements dated December 14, 2020, and January 14, 2021.

- Written admissions from CHAOC and Greenthal agents falsely claiming, *"we do not have it [the Tenant's Master Lease] in our files..."* in an attempt to obscure the original lease terms.
- A historical 1990 corporate notice stating, *"GD Manhattan Realty Corp. has transferred your security deposit and accrued interest to an interest-bearing account at Goldome,"* accompanied by the fully executed IRS Form W-9 completed by Plaintiff Anita Tovar.
- Regulatory disclosures explicitly listing the **Federal Deposit Insurance Corporation (FDIC)** as a predecessor receiver/landlord, raising immediate federal bank-failure flags regarding the subsequent unrecorded transfer of escrowed funds.

603. On June 02, 2022, Plaintiffs contacted the OAG to confirm administrative processing and were informed that the Brooklyn Regional Office had assumed jurisdiction, assigning **Intake No. 1-362350825** to the operative file under the names of Monique (Tovar) Saunders and Anita Tovar.

604. On June 23, 2022, Plaintiffs conferred with OAG Agent Darryl White, who confirmed that Defendant CHAOC had flatly refused to respond to the State's regulatory inquiry or produce escrow tracking records, stating that the matter would be escalated to Senior Consumer Fraud Representative Jim Sfiroudis and advising Plaintiffs to launch an independent private enforcement lawsuit against CHAOC.

605. On July 25, 2022, exactly sixty (60) days post-delivery of the complaint, Plaintiffs contacted the Brooklyn Regional Office and spoke with Agent Melissa Adore, who disclosed that Senior Representative Sfiroudis had issued an official "Alert Letter" to the corporate targets, and that the OAG had merged this escrow violation into **File No. 22-**

**018011**—the exact same file number assigned to the Enterprise's broader property fraud, harassment, and wrongful eviction schemes.

606. Agent Melissa Adore further admitted that the OAG had prematurely closed the investigation, but agreed to reopen the case file to issue a formal demand letter via mail and electronic mail requiring an immediate corporate Answer from Defendants CHAOC and Charles H. Greenthal Management Corp.

607. On September 8, 2022, the Office of the Attorney General issued an official determination letter under **File #22-018011-M1** to Plaintiff Anita Tovar, stating: *"Dear Anita Tovar, we have presented your complaint to the company. Despite our repeated efforts, they have failed to respond. Unfortunately, we cannot assist you further... When the company refuse to cooperate, your only recourse is in court."*

608. Plaintiffs explicitly name Defendant Letitia James, in her official capacity as Attorney General, as a Necessary Relief Party to this count under **Federal Rule of Civil Procedure 19(a)**.

609. Her inclusion is structurally necessary under **18 U.S.C. § 1964(a)** to compel the OAG to produce all administrative records under File No. 22-018011-M1, exposing the deliberate pattern of non-response, non-compliance, and concealment utilized by CHAOC and Charles H. Greenthal Management Corp. to insulate their illicit escrow conversions from state and federal regulatory scrutiny.

## XLVII. THE PRIVATE SECURITY INFRASTRUCTURE, STRUCTURAL RE-LAYERING, AND THE EXTRAJUDICIAL ENFORCEMENT MATRIX

610. The physical, on-site execution of the Enterprise's pattern of tenant intimidation, systematic concealment, and extrajudicial document delivery was enforced by a captive private security apparatus operating sequentially under the corporate banners of Defendant

Madison Security Group, Inc., and its successor entity, Defendant Doyle Security Services, Inc.

611. In a calculated maneuver to re-layer the institutional machinery of the Enterprise and shield the corporate entities from compounding civil liability, Doyle Security Services, Inc., absorbed or replaced Madison Security Group, Inc., while seamlessly maintaining the exact same command structure, including Security Director Mark Atherton, Security Supervisor Griffon, and the identical roster of on-site security guards.

612. Throughout the preceding five (5) year period, Defendants Madison Security Group, Inc., Doyle Security Services, Inc., Director Mark Atherton, and Supervisor Griffon actively participated in the racketeering conspiracy by serving as an illicit operational shield for Co-Conspirator Melissa Martin's un-permitted commercial compound, "Paw Paw Pet Care LLC" (also known as Paw Paw Dog Walking and Pet Care) in Unit 2H.

613. Acting under the direct instruction of Defendants CHAOC, Parvez Ahmed, and Charles H. Greenthal Management Corp., these private security forces deliberately falsified logs, ignored continuous resident complaints, and physically escorted commercial clientele and animals into Unit 2H to actively conceal the compounding environmental hazards and actionable nuisance targeting the Plaintiffs.

614. The Enterprise systematically weaponized this private security force to bypass standard, lawful service of process channels under New York law, utilizing uniform-wearing guards as instruments of extrajudicial intimidation to deliver threatening, un-filed legal correspondence drafted by Attorney Kristen A. Mantell and Baron & Baron Esqs. P.C. directly to the Plaintiffs' door.

615. The absolute operational integration of this private security apparatus into the active litigation fraud is established by NYSCEF Public Record Doc. 41, wherein Security Director Mark Atherton executed a formal *Affidavit Pursuant to 22 NYCRR 202.7(f)* within the underlying sham litigation, swearing under penalty of perjury:

- That he is employed by Madison Security Group, Inc., and serves as the Director of Security for Third-Party Plaintiff CHAOC at 210 Clinton Avenue, Brooklyn, New York;
- That on July 11, 2025, at approximately 3:18 P.M., he personally executed the delivery of three (3) copies of the correspondence attached as Exhibit "A" directly to Anita Tovar, Monique Tovar-Saunders, and David Saunders at Apartment 1-H.

616. The "Exhibit A" described in Security Director Mark Atherton's sworn affidavit was the Verified Complaint of Plaintiff Melissa Martin. This reveals a highly coordinated and deceptive trick: the Enterprise used a corporate security guard to serve a private plaintiff's lawsuit papers while claiming he was doing so on behalf of the cooperative corporation, CHAOC. This proves that Melissa Martin's personal lawsuit and CHAOC's corporate legal actions are part of the exact same, single retaliatory scheme.

617. The utilization of Director Mark Atherton—a Jamaican national whose lawful immigration status and corporate authorization to work within the United States remains entirely undocumented—to execute high-pressure extrajudicial legal deliveries and residential tracking further demonstrates the Enterprise's reliance on unregulated, legally compromised personnel to enforce its predatory physical displacement operations.

618. The actions of Madison Security Group, Inc., Doyle Security Services, Inc., Director Mark Atherton, and Supervisor Griffon constitute distinct, actionable overt acts

in furtherance of the RICO conspiracy under 18 U.S.C. § 1962(d), transforming a licensed private security asset into an un-regulated paramilitary enforcement arm of the real estate enterprise.

## XLVIII. THE CORPORATE INTERVENTION OF CHARLES H. GREENTHAL CORP. AND THE DECEPTIVE CONCEALMENT OF MASTER LEASE RECORDS

619. In May 2022, concurrent with the peak of the Enterprise's retaliatory eviction maneuvers, Defendant Charles H. Greenthal Management Corp. actively integrated its operations into the pattern of racketeering by assuming executive management functions over the Subject Premises and enforcing the ongoing concealment of the Tenant's historical leasehold records.

620. On May 20, 2022, upon being named as a primary violating target in the Plaintiffs' official OAG Security Deposit Complaint, Defendant Charles H. Greenthal Management Corp., acting by and through its authorized agents, executed a coordinated corporate omission by flatly refusing to produce or locate the Tenant's original Master Lease, falsely stating in writing: “we do not have it in our files...”

621. This uniform statement was a fraudulent artifice designed to obscure the historical chain of tenancy, insulate predecessor landlords from escrow conversion liability, and systematically deny Plaintiff Anita Tovar her explicit regulatory rights to lease succession and interest accumulation under New York Rent Stabilization Regulations.

622. Throughout June and July 2022, Defendant Charles H. Greenthal Management Corp. furthered the execution of the mail fraud scheme by deliberately ignoring formal "Alert Letters" and demand notices transmitted by Senior Consumer Fraud Representative Jim Sfiroudis under OAG File No. 22-018011.

623. By choosing to completely ignore state regulatory inquiries, Defendant Charles H. Greenthal Management Corp. successfully forced the premature administrative closure of OAG File No. 22-018011-M1 on September 8, 2022, effectively exploiting the Attorney General's limited statutory role as a voluntary mediator to shield its illicit escrow manipulations from active law enforcement intervention.

624. The deliberate withholding of Master Lease records by Charles H. Greenthal Management Corp. constitutes an overt act of fraudulent concealment in direct furtherance of the RICO conspiracy under 18 U.S.C. § 1962(d), designed to leave the elderly, vulnerable Tenant without administrative recourse and to facilitate her (and her family members') extrajudicial removal from the rent-stabilized unit.

## XLIX. THE WEAPONIZATION OF LOCAL LAW ENFORCEMENT AND STRUCTURAL IDENTITY FRAUD

625. The Enterprise's weaponization of state and municipal regulatory machinery achieved its most predatory expression through a coordinated, retaliatory counter-strike orchestrated by Co-Conspirators Francis Greenburger, Time Equities Inc. (TEI), Clinton Hill Apts. Owners Corp. (CHAOC) agents, Parvez Ahmed, Charles H. Greenthal Management Corp., Attorney Kristen Mantell, and Baron & Baron Esqs, P.C., in direct collusion with Melissa Martin, who operates an illegal commercial enterprise under the trade name "Paw Paw Pet Care LLC" out of Cooperative Unit 2H with the explicit knowledge, permission, and direct patronage of Defendant CHAOC.

626. In a signed, formal affidavit submitted under penalty of perjury within a retaliatory sham lawsuit filed in the New York State Supreme Court, Kings County, Co-Conspirator Melissa Martin explicitly admitted that the Office of the New York State Attorney General

directly intervened in the parties' dispute by instructing, steering, and authorizing her to contact the New York City Department of Investigation (DOI) during the time that Kristen Mantell's husband, Benjamin (Ben) Mantell, Esq., was working as an Assistant Attorney for the Office the AG, as well as Martin's current attorney, Andrew Meier, who later filed the sham lawsuit in NYS Supreme Court on January 11, 2024.

627. In a signed, formal affidavit submitted under penalty of perjury within a retaliatory sham lawsuit filed in the New York State Supreme Court, Kings County, Co-Conspirator Melissa Martin explicitly admitted that the Office of the New York State Attorney General directly intervened in the parties' dispute by instructing, steering, and authorizing her to contact the New York City Department of Investigation (DOI) during the time that Kristen Mantell's husband—and former Baron & Baron Esqs. P.C. law partner—Benjamin (Ben) Joshua Mantell, Esq., was utilizing his historical, deep-rooted professional networks as a former Assistant Attorney General at the NYS Office of the Attorney General, alongside Martin's current litigation counsel, Andrew H. Meier, who subsequently filed the sham lawsuit in NYS Supreme Court on January 11, 2024.

628. The institutional capture and "revolving door" mechanism utilized by the Enterprise is clinically established by the professional trajectory of Co-Conspirator Benjamin Joshua Mantell, Esq., who served as an Assistant District Attorney for Queens County and an Assistant Attorney General at the NYS Office of the Attorney General (exiting in 2013), before mutating into the private sector as "Of Counsel" to Kristen A. Mantell at Baron & Baron Esqs. P.C. from January 2016 through April 2022—the exact multi-year window during which the fraudulent Notices to Cure and Terminate were manufactured against the Plaintiffs.

629. In April 2022, concurrent with the Plaintiffs' formal filing of the OAG Property Fraud Complaint and the Enterprise's subsequent retaliatory maneuvers, Co-Conspirator Benjamin Joshua Mantell systematically migrated back into the municipal apparatus as an Administrative Law Judge for the New York City Department of Investigation and the New York City Department of Finance. This strategic judicial placement effectively positions an Enterprise principal inside the exact municipal tax and title recording agency responsible for tracking the unrecorded corporate asset transfers and conversion records of Defendant CHAOC, insulating the racketeering pattern from local oversight.

630. Prior to entering his formal appearance for Melissa Martin under the banner of Thompson LLP, Attorney Andrew H. Meier served as a high-ranking Deputy Section Chief within the Office of the New York State Attorney General. In this capacity, Meier maintained direct, continuous personal and professional ties with Co-Conspirator Benjamin Joshua Mantell, completing an insular network of insider influence that links the landlord's litigation counsel directly to executive state regulators and sitting administrative judges.

631. On January 11, 2024, Attorney Andrew H. Meier initiated the retaliatory sham litigation mechanism in New York State Supreme Court, Kings County, utilizing the corporate infrastructure, letterhead, and legal resources of Defendant Thompson LLP (located at 75 Broad Street, Suite 2120, New York, NY 10004) to project a false aura of legitimate legal authority.

632. On January 13, 2026, in a calculated maneuver to re-layer the legal machinery of the Enterprise, Attorney Andrew H. Meier executed and filed a fraudulent "Consent to Change Attorney" form, substituting his newly formed or joined entity, Seidenstein Meier

& Stein PLLC (located at 407 Broome Street, 3rd Floor, New York, NY 10013), as the incoming counsel of record for Co-Conspirator Melissa Martin.

633. This January 13, 2026 substitution document was signed by Daniel Seidenstein of Thompson LLP as the "outgoing attorney," despite the fact that Daniel Seidenstein had deliberately withheld his formal appearance from the court record and filed zero pleadings. This procedural deception confirms that Thompson LLP functioned as a passive clearinghouse for the initial phase of the fraud, while Seidenstein Meier & Stein PLLC actively adopted, ratified, and continues to execute the racketeering pattern to this day.

634. The collusive coordination between the ostensibly independent Co-Conspirator Melissa Martin and the corporate Defendant CHAOC achieved absolute operational transparency on June 18, 2026 — an federal public holiday Juneteenth National Independence Day — when Martin's counsel, Andrew H. Meier, utilized the New York State Courts Electronic Filing (NYSCEF) system to transmit an extraordinary, bad-faith advocacy letter to presiding Kings County Supreme Court Justice Peter P. Sweeney.

635. In this June 18, 2026 holiday wire communication, Attorney Andrew H. Meier dropped all pretenses of independent representation and actively argued in strict alignment with Defendant/Third-Party Plaintiff CHAOC, aggressively supporting the corporation's fraudulent cross-claims for extrajudicial ejectment, manufactured rent arrears, and ongoing use and occupancy fees targeting the Plaintiffs' long-term rent-stabilized unit.

636. This collusive filing was a desperate, pre-emptive attempt to influence Justice Sweeney ahead of an upcoming June 22, 2026 Order to Show Cause hearing, wherein the Court has commanded the Enterprise actors to demonstrate why CHAOC's predatory third-party ejectment claims should not be summarily dismissed due to the existence of multiple,

binding, unappealed DHCR Administrative Orders—including mandatory rent refunds, systemic rent reductions for decreased services, and compulsory lease renewal mandates.

637. The execution of this holiday electronic filing constitutes a distinct, actionable overt act of wire fraud under 18 U.S.C. § 1343, demonstrating a continuous, unbroken pattern of open-ended racketeering continuity wherein the Enterprise actively abuses the state judiciary to bypass regulatory law enforcement, extract illicit funds, and enforce the predatory displacement of a vulnerable, protected tenant and her family.

638. The Office of the Attorney General actively facilitated this DOI law enforcement referral against Plaintiff Monique Saunders—an active, licensed Registered Nurse—and her husband, explicitly targeting them in retaliation for executing their professional, ethical, and civic duties in reporting suspected child abuse and neglect of a vulnerable minor child residing within the commercialized environment of Cooperative Unit 2H.

639. This weaponized administrative referral demonstrates a profound, unconstitutional double standard and an overt act of state-level racketeering re-layering: while the Office of the Attorney General claimed total administrative impotence to enforce New York Executive Law § 63(12) or protect the Plaintiffs from systemic escrow and lease fraud under File No. 22-018011, it simultaneously deployed its executive weight to mobilize the DOI against a mandatory reporter, specifically a NY State licensed, professional registered nurse.

640. On June 28, 2022, exactly thirty (30) minutes following the sudden cancellation of a state-level regulatory mediation session with DHCR mediator Evelyn Britt—which was intentionally aborted due to the bad-faith absence of Defendant Parvez Ahmed (the general property manager representing CHAOC and Charles H. Greenthal Management Corp.) —

the Enterprise triggered its weaponized municipal apparatus. This immediate retaliatory response was directly coordinated behind the scenes by Francis Greenburger, TEI, Kristen Mantell, Baron & Baron Esqs. P.C., and the executive management team at Greenthal.

641. At approximately 11:00 AM on June 28, 2022, three unannounced field agents from the New York City Department of Investigation (DOI) — identified as Confidential Investigator Shameika Nixon, Agent Howard, and Agent Smith—arrived at the Subject Premises, displayed tactical shields/badges, and demanded entry into Plaintiffs' Unit 1H under a severe, fraudulent investigative pretense.

642. To extract immediate physical entry from the Plaintiffs during the heightened public health dangers of the COVID-19 pandemic, the DOI agents explicitly misrepresented the nature of their presence, falsely claiming they were there to investigate the historical complaints of harassment, retaliation, and noise disturbances that *Plaintiffs* had previously filed against their upstairs neighbor.

643. Relying entirely on this fraudulent administrative pretense, Plaintiffs granted entry to the three agents for an interrogation that lasted until approximately 12:00 PM, during which one of the unannounced municipal agents actively coughed throughout the enclosed residential space, presenting an immediate bio-contamination threat to the occupants.

644. Upon entry, the tactical posture of the visit immediately shifted into an adversarial regulatory interrogation, during which Confidential Investigator Shameika Nixon demanded a physical inspection of the Plaintiffs' private kitchen to visually audit the shared vertical heating pipe that mechanically joins the flooring of Martin's illegal Unit 2H animal facility with the ceiling of Plaintiffs' Unit 1H.

645. Prior to concluding the residential extraction, the DOI agents drop-masked their administrative pretense and aggressively demanded: *"I need you to tell the truth,"* explicitly accusing the Plaintiffs in a highly condescending, coercive tone of utilizing the Administration for Children's Services (ACS) reporting system as a retaliatory tool against Co-Conspirator Melissa Martin.

646. Plaintiffs forcefully denied the accusation and detailed the exhaustive, documented chronology of the severe noise disturbances, animal distress vocalizations, and un-remediated safety hazards emanating directly from Martin's un-permitted commercial dog-boarding and training compound.

647. Following this high-pressure residential interrogation, only Confidential Investigator Shameika Nixon provided a physical credential, listing her direct office contact number as 212-825-0812.

648. To achieve absolute administrative insulation and prevent the disclosure of this collusive operation, the DOI operator subsequently refused to issue the Plaintiffs an official investigative reference number, and Confidential Investigator Nixon systematically refused to return multiple follow-up telephonic inquiries.

649. This deliberate operational blackout erected an insurmountable legal barrier that intentionally blocked the Plaintiffs from filing a formal Freedom of Information Law (FOIL) request, effectively suppressing, spoliating, and concealing the official municipal intake records of this weaponized, state-directed administrative assault.

650. The deployment of the New York City Department of Investigation (DOI) via the direct guidance of the Attorney General's Office and the back-end coordination of Defendants Francis Greenburger, CHAOC, Parvez Ahmed, Charles H. Greenthal

Management Corp., Kristen Mantell, and Baron & Baron Esqs. P.C. was calculated by the Enterprise to place Plaintiff Monique Saunders' professional nursing licensure in immediate jeopardy, thereby leveraging the threat of catastrophic economic and professional ruin to compel the Plaintiffs to abandon their civil rights and capitulate to the extrajudicial displacement scheme.

## L. THE DEFRAUDATION OF THE DIVISION OF HUMAN RIGHTS (DHR) PROCESS AND PRE-EMPTIVE LITIGATION OVERLAPS

651. On May 17, 2022, following a series of retaliatory acts where Defendants CHAOC and Charles H. Greenthal Management Corp. rejected the Plaintiffs' legitimate rent payments and threatened a wrongful extrajudicial eviction, Plaintiffs formally initiated a comprehensive regulatory complaint before the New York State Division of Human Rights (DHR) in the name of the primary leaseholder, Plaintiff Anita Tovar.

652. The operative DHR complaint explicitly named as violating targets: CHAOC, Charles H. Greenthal Management Corp., General Manager Parvez Ahmed, Property Manager David Perez, Transfer Agent/Property Manager Safije Cemenja, upstairs occupant Melissa Martin, and newly inserted next-door co-op shareholder Noah Portes Chaikin (Unit 1A).

653. Demonstrating a patterns of early administrative obstruction, the DHR supervisor systematically refused the Plaintiffs' timely written requests—backed by definitive documentary evidence—to formally add Attorney Kristen A. Mantell and Baron & Baron Esqs. P.C. as named respondents to the active civil rights investigation.

654. The Enterprise co-conspirators deliberately stalled the administrative process for over seven months, failing to submit a Verified Answer and Position Statement to the DHR until December 22, 2022.

655. This collective response was coordinated and filed by Attorneys Barry G. Margolis and Alexander Rabinowitz of the law firm Abrams Garfinkel Margolis Bergson, LLP (located at 1430 Broadway, 17th Floor, New York, New York 10018), who acted as joint counsel for the Co-op Respondents—representing both the corporate landlord entity (CHAOC) and the supposedly adverse private tenant (Melissa Martin) as a single, unified defensive front.

656. To validate the fraudulent Position Statement, Attorney Kristen A. Mantell executed a false, back-end "Verification" document, which was corruptly notarized by her own law office paralegal, Jake Early.

657. Attached to this unified response was a sworn *Affidavit of Melissa Martin*, which contained material omissions designed to mislead state investigators, completely concealing the existence of her unlicensed, un-permitted commercial compound, "Paw Paw Pet Care LLC" (also known as Paw Paw Dog Walking and Pet Care), operating illegally within Unit 2H with the active permission and patronage of CHAOC management.

658. To execute a targeted character assassination and distract from their systemic housing code and environmental violations, the attorneys representing the cooperative respondents obtained a 37-page voluntary disbarment document regarding Plaintiff Monique Saunders from the District of Columbia Disciplinary Counsel, entering it into the DHR public record to maliciously brand the family as "dishonest."

659. The internal administrative processing of the file was subjected to extreme regulatory subversion by newly hired DHR Investigator Alfonso Rodriguez—who admitted he was hired in 2023, approximately six months after the complaint's inception. Investigator Rodriguez:

- Abruptly terminated and never completed the Plaintiffs' mandatory telephonic interview;
- Systematically refused to accept, download, or review the comprehensive video, photographic, and electronic evidence of physical harassment and toxic environmental conditions submitted by the Plaintiffs; and
- Deliberately delayed the core field investigation for over one and a half years, refusing to interrogate the cooperative respondents regarding any of the documented evidence emailed to his attention.

660. The absolute bad faith and collusive nature of the Enterprise achieved complete operational clarity on January 11, 2024, when Co-Conspirator Melissa Martin, represented by former OAG Deputy Section Chief Andrew H. Meier, launched a retaliatory sham lawsuit in the New York State Supreme Court, Kings County, while Attorney Alexander Rabinowitz shifted roles to represent CHAOC in the exact same action—pretending the two entities were adverse parties.

661. This Supreme Court action was deliberately filed five months *before* the DHR had issued any administrative ruling, serving as a pre-emptive tactical strike to short-circuit the pending civil rights investigation, split the legal claims, and overwhelm the vulnerable occupants in a high-cost, multi-front litigation defense.

662. On June 3, 2024, approximately two years after the initial filing and three months after a sweeping executive leadership purge at the agency, the DHR transmitted a fraudulent *Final Determination and Order After Investigation* signed by Director of Housing Investigations Chelsea L. John (who had entered the agency's employment in November 2022).

663. The June 3, 2024 determination letter summarily closed the file by falsely stating that *"there is NO PROBABLE CAUSE to believe that the respondents have engaged in or are engaging in the unlawful discriminatory practice complained of,"* explicitly adopting the Enterprise's character assassination narrative by noting that *"Respondents state that Saunders has a history of dishonesty."*

664. This abrupt, un-evidenced administrative closure was directly tied to systemic institutional corruption and a decades-long backlog within the agency under DHR Commissioner Maria L. Imperial (who presided from November 2021 until her abrupt termination in March 2024).

665. As confirmed by a public media investigation published in the *Times Union* on March 15, 2024, entitled *"Division of Human Rights commissioner replaced due to performance,"* Commissioner Imperial was terminated by the Governor's office just months before the Plaintiffs' ruling due to a pending, damning audit by the Office of the State Comptroller identifying insufficient record-keeping, deep case backlogs, and an inability to process civil rights complaints.

666. Following the emergency insertion of Acting Commissioner Denise Miranda, Esq., in March 2024, the backlogged department rushed out the Plaintiffs' *No Probable Cause* determination within 90 days, deliberately omitting any mention of the Plaintiffs' statutory

right to seek independent federal judicial review, and deceptively instructing the family that their sole legal recourse was an expensive Article 78 appeal to the New York State Court of Appeals.

667. The coordinated extraction of this fraudulent state administrative order by the Enterprise, coupled with the intentional transmission of false affidavits and character assassinations via the U.S. Mail and electronic networks, constitutes distinct predicate acts of mail and wire fraud under **18 U.S.C. § 1341 and § 1343**, directly subverting the state's civil rights machinery to facilitate the physical and economic destruction of the Plaintiffs.

## LI. THE EXHAUSTION OF FEDERAL FAIR HOUSING ACT CHANNELS AND THE CONVERSION TO CIVIL RICO JURISDICTION

668. Concurrent with the initiation of the state-level civil rights investigation, Plaintiffs sought parallel federal administrative protection by formally lodging a housing discrimination complaint with the **U.S. Department of Housing and Urban Development (HUD)**.

669. On November 28, 2022, the U.S. Department of Housing and Urban Development formally accepted the Plaintiffs' regulatory filing under the **Fair Housing Act**, subsequently transmitting an official notification letter to the Plaintiffs confirming that HUD had referred the operative complaint to the New York State Division of Human Rights (DHR) for active evidentiary processing under the Act's mandatory state-deferral provisions.

670. The official HUD administrative directive explicitly notified the Plaintiffs of their concurrent, statutory right to bypass or supplement the state administrative track, stating:

*"In addition to filing your complaint with the NYS DHR you may file a civil lawsuit in Federal district court... You must file any civil lawsuit no later than 2 years after the alleged discriminatory housing practice occurred or ended."*

671. Following the issuance of this federal administrative referral, the progressive, retaliatory, and weaponized operations executed by the Enterprise co-conspirators escalated to a scale that extended far beyond standard civil rights infractions or localized housing discrimination.

672. As a Black Hebrew family residing within the highly gentrified, high-value real estate corridor of the Clinton Hill neighborhood in Brooklyn, New York, the Plaintiffs were targeted not merely with discriminatory animus, but with a highly sophisticated, multi-layered corporate racket designed to strip them of their long-term rent-stabilized leasehold estate.

673. The predatory mechanisms deployed by the Defendants—including systemic security deposit escrow conversion, the physical deployment of private security forces to execute extrajudicial legal deliveries, the fraudulent electronic holiday transmission of illegal ejectment advocacy letters, and the "revolving door" weaponization of the Office of the Attorney General and the Department of Investigation—constitute a continuous, interlocking pattern of racketeering activity.

674. Having fully satisfied and exhausted their administrative diligence options, and recognizing that the ongoing conspiratorial conduct constitutes an active, open-ended criminal enterprise, Plaintiffs are formally exercising their statutory right to invoke the independent jurisdiction of the **United States District Court for the Southern District of**

**New York (SDNY)** under **18 U.S.C. § 1964(c)** and the supplemental jurisdictional protections of **28 U.S.C. § 1367**.

## LII. COERCIVE INTERFERENCE WITH ADMINISTRATIVE INSPECTIONS AND WEAPONIZATION OF EMERGENCY SERVICES AS POST-FILING RICO HARASSMENT

675. To systematically insulate their structural violations from regulatory citation, Defendants CHAOC, Parvez Ahmed, Vigan Ahmetaj (the former Maintenance Supervisor acting as an on-site operational agent), and additional executive principals of the Francis Greenburger and Time Equities Inc. (TEI) matrix actively deployed their captive security apparatus to disrupt official municipal oversight.

676. Following the Plaintiffs' transmission of emergency notifications to the NYC 311 system, the Department of Housing Preservation and Development (HPD), the Division of Housing and Community Renewal (DHCR), the Division of Human Rights (DHR), and the Fire Department of New York (FDNY) regarding systemic decreased services, severe life-safety hazards, and an illegally double-gated, inoperable terrace and secondary fire escape egress door, the Enterprise executed a coordinated campaign of on-site intimidation.

677. Acting under the direct, explicit command of Defendants Parvez Ahmed, Vigan Ahmetaj, and the TEI leadership, Security Director Mark Atherton, Security Supervisor Griffon, and a rotating roster of uniform-wearing Madison Security Group and Doyle Security Services guards physically swarmed the Plaintiffs' Unit 1H.

678. These private security forces were systematically deployed to physically intercept, shadow, and compromise official DHCR administrative inspections, scheduled maintenance repair appointments, and third-party contractor remediation assessments,

utilizing their physical presence to intimidate inspectors, censor the Plaintiffs' verbal testimonies, and suppress the on-site cataloging of structural building defects.

679. The operational desperation of the Enterprise culminated in the execution of multiple "false flag" maintenance emergency entries, wherein the Defendants corruptly manufactured pretextual reports of hazardous conditions to weaponize the Fire Department of New York (FDNY) against the occupants.

680. These manufactured emergencies forced the physical dispatch of FDNY fire apparatus and personnel directly to the Subject Premises, utilizing emergency sirens, high-pressure residential entry, and municipal law enforcement mechanics to inflict acute emotional distress, cause community-wide character defamation, and stage a pretextual extrajudicial home invasion targeting the family.

681. Following the formal commencement and service of this federal Civil RICO lawsuit within the United States District Court for the Southern District of New York (SDNY), the frequency, intensity, and severity of this tactical harassment campaign expanded exponentially rather than abated.

682. This severe post-filing escalation constitutes a direct, actionable violation of **18 U.S.C. § 1512 (Tampering with a Witness, Victim, or an Informant)** and **18 U.S.C. § 1513 (Retaliating Against a Witness, Victim, or an Informant)**, demonstrating an open-ended racketeering pattern wherein the Enterprise routinely uses physical intimidation and weaponized municipal emergency resources to punish federal litigants for seeking judicial protection under the laws of the United States.

## LIII. THE SUDDEN DISRUPTION OF COUNSEL AND FRAUDULENT DEFENSIVE FRAGMENTATION

683. The legal and structural stability of the Enterprise fractured on June 1, 2026, at 12:21 PM, when Attorney Alexander Rabinowitz executed an abrupt, unannounced electronic modification within the New York State Courts Electronic Filing (NYSCEF) system under Index No. 501135/2024.

684. The official NYSCEF record notification explicitly confirmed the sudden deletion and removal of Alexander Rabinowitz's legal representation from the defense of Respondent/Third-Party Plaintiff CHAOC, stating: "The Consent/Representation by ALEXANDER RABINOWITZ was removed from the Respondent Clinton Hill Apts. Owners Corp.. Consent/Representation was removed as this attorney is no longer associated with the firm or attorney representation is changing within the firm."

685. This sudden withdrawal is a material, post-filing development that highlights defensive panic within the conspiracy. Having realized that his multi-year dual representation of both the corporate landlord (CHAOC) and the private plaintiff (Melissa Martin) before the DHR had been exposed as a core operational vehicle for Civil RICO collusion, Rabinowitz or his firm sought to strip his name from the active state court record to evade impending federal accountability.

686. This structural removal directly triggered the June 18, 2026 federal holiday wire communication executed by Co-Conspirator Andrew H. Meier. With Rabinowitz's consent abruptly terminated, Meier was forced to step out of the shadows to file his bad-faith holiday advocacy letter to Judge Sweeney, desperately trying to prop up CHAOC's collapsing third-party ejectment claims before the upcoming June 22, 2026 Order to Show Cause hearing.

687. This frantic, shifting pattern of attorney representation and holiday filings constitutes an active, open-ended conspiracy to manipulate the state court record under 18 U.S.C. § 1962(d), proving that the Enterprise actors are actively changing corporate shapes, altering electronic court designations, and rewriting their defensive matrix in real-time to avoid federal judicial enforcement.

## LIV. EXTRAJUDICIAL DISPLACEMENT MANEUVERS IN DIRECT DEFIANCE OF BINDING DHCR ORDERS AND EXPLOITATION OF PLAINTIFFS' BEREAVEMENT

688. The extreme malice and predatory execution of the Enterprise's racketeering pattern achieved total operational transparency through the coordination of high-pressure state-court maneuvers precisely timed to exploit the medical collapse, hospitalization, and subsequent passing of the family's matriarch.

689. On September 4, 2025, while Plaintiff Anita Tovar lay on her deathbed in the hospital, Plaintiffs were forced to execute and file a formal Motion to Dismiss the Enterprise's predatory Third-Party Complaint (NYSCEF Doc. 53). Four months later, on January 30, 2026, Plaintiff Anita Tovar succumbed to her medical conditions and passed away, plunging the family into deep bereavement and the handling of her final estate affairs.

690. Capitalizing on this catastrophic family tragedy with calculated, predatory timing, Defendant Attorney Kristen A. Mantell launched a series of high-pressure legal counter-strikes in February 2026, e-filing aggressive opposition motions to exploit the family’s acute period of vulnerability and force the physical ejectment of the surviving family members from Unit 1H.

691. This pattern of litigation-backed extortion was previously weaponized to restrict the family's basic constitutional protections. On November 12, 2025, Plaintiffs filed a

Motion to Dismiss and Vacate a bad-faith Temporary Restraining Order/Preliminary Injunction (NYSCEF Doc. 120), exposing the chilling effect and direct violation of their Freedom of Religion regarding the sacred playing of their Hebrew Shofar music within their private kitchen.

692. In direct retaliatory response, on November 14, 2025, Defendant Kristen A. Mantell and Baron & Baron Esqs. P.C. e-filed a Third-Party Plaintiff's Memorandum of Law in Opposition (NYSCEF Doc. 121), which Mantell digitally signed and paired with a highly collusive, fabricated corporate endorsement to mislead the court.

693. To execute this filing, Mantell directed CHAOC Board Member Alyssa Alpine—whom Mantell maintained as an unelected Board Assistant Secretary to bypass cooperative corporate bylaws—to draft and sign a fraudulent "Verification" page. Mantell then directed Tamika Antoinette Linton-Jones, a Transfer Agent employee for Charles H. Greenthal Management Corp. (now FirstService Residential), to corruptly notarize the Verification document (e-filed as NYSCEF Doc. 125), appending a copy of Mantell's original Third-Party Verified Complaint and her own digitally signed Affirmation in Opposition.

694. This intricate network of e-filed court documents and fraudulent verifications is being aggressively advanced before Kings County Supreme Court Justice Peter P. Sweeney to demand immediate ejectment and the extraction of manufactured rent arrears. This extrajudicial push operates in absolute defiance of the fact that the New York State Division of Housing and Community Renewal (DHCR) maintains multiple, fully active, unappealed, and legally binding Administrative Orders concerning the Subject Premises, including:

- A mandatory DHCR Order directing the immediate renewal of the Plaintiffs' Unit 1H rent-stabilized leasehold estate;
- A compulsory DHCR Order directing the immediate refund of illegally extracted rent overcharges to the Plaintiffs;
- A binding DHCR Rent Reduction Order slashing the legal monthly rent due to systemic decreased services, severe structural maintenance deprivation, and un-remediated safety hazards; and
- An active DHCR Directive commanding CHAOC to execute immediate, comprehensive physical repairs to the building's infrastructure.

695. By moving the state court to enforce an immediate ejectment and extract financial arrears based on billing calculations that the state's highest housing authority has already formally ruled are illegal overcharges, the Defendants are actively engaging in **sham litigation and a fraud on the court**, utilizing the state judiciary to bypass and nullify binding regulatory statutes.

696. The Defendants' calculating choice to launch an aggressive eviction push during a family's acute period of bereavement—while simultaneously hiding the existence of active DHCR rent reductions and lease-renewal orders from the state court judge—is an intentional tactic designed to completely overwhelm the Plaintiffs, break their capability to mount a legal defense, and force their immediate displacement from a rent-stabilized unit that Defendant CHAOC does not lawfully own.

697. The orchestration of this emergency state-court ejectment mechanism to bypass active DHCR orders constitutes an open overt act of coercive extortion under **18 U.S.C. § 1951** and a direct violation of federal witness tampering statutes under **18 U.S.C. § 1512**

**and § 1513**. It demonstrates that the Enterprise will routinely weaponize the local legal system and exploit personal human tragedy to enforce its predatory real estate speculation and clear out long-term, protected tenants.

## LV. THE FABRICATED COMMERCIAL NUISANCE MATRIX AND STRUCTURAL ADMINISTRATIVE INVERSION

698. To systematically weaponize the physical environment of the Subject Premises and force the structural collapse of the Plaintiffs' health and residential stability, Co-Conspirator Melissa Martin intentionally transformed Unit 2H into a commercial hub of high-intensity acoustic and physical harassment.

699. Operating with the explicit permission, knowledge, and corporate patronage of Defendant CHAOC and its successive managing agents, Co-Conspirator Melissa Martin regularly introduced multiple human children, alongside a rotating commercial roster of feline and canine clients, into her un-permitted "Paw Paw Pet Care LLC" boarding compound.

700. Co-Conspirator Melissa Martin systematically directed, encouraged, and allowed these human and animal clients to execute unrestricted, continuous, and high-impact acoustic disturbances directly over the ceiling of Plaintiffs' Unit 1H, including deliberate jumping, thumping, stomping, marching, wrestling, yelling, screaming, and the violent banging of heavy objects on uncarpeted hardwood flooring.

701. This structural acoustic assault was executed with calculated, premeditated intent to inflict acute psychological distress, constant anxiety, severe physiological irritation, and extreme discomfort upon the Plaintiffs within their own home, explicitly targeting Plaintiff Anita Tovar during the progressive decline of her terminal medical conditions.

702. Whenever the Plaintiffs attempted to utilize lawful municipal and administrative channels to report these pervasive housing code and lease violations—lodging formal complaints with CHAOC Management, dispatched on-duty Madison/Doyle Security guards, the NYC 311 municipal intake system, dispatched 911 New York City Police Department (NYPD) officers, the New York State Division of Human Rights (DHR), and the New York State Division of Housing and Community Renewal (DHCR)—the Enterprise executed a sophisticated administrative inversion.

703. On April 12, 2022, Plaintiffs formally initiated a comprehensive DHCR Tenant Harassment Complaint on behalf of the family, which the agency processed under **Docket No. KP 21001-HL** and assigned to Attorney Evelyn Britt to oversee formal mediation and enforcement proceedings.

704. The Enterprise immediately initiated a pattern of procedural delay and document suppression; although Defendant CHAOC, by and through Attorney Kristen A. Mantell, gave the DHCR mediator explicit written notice that the corporation would respond in writing by May 31, 2022, no corporate Answer or Position Statement was ever forwarded to the Plaintiffs.

705. At the initial scheduled conference on June 23, 2022, at 10:00 AM, Defendant Kristen A. Mantell appeared empty-handed, deceptively claiming she was withholding the corporate submission because she was "waiting for one more affidavit," while General Property Manager Parvez Ahmed intentionally boycotted the session, forcing Mediator Evelyn Britt to adjourn the enforcement conference to July 14, 2022.

706. When the mandatory conference was finally convened, the Enterprise assembled a hostile defensive front consisting of Attorney Kristen A. Mantell, Parvez Ahmed (falsely

designated as General Manager), and Desi Ndreu (falsely designated as Chief Operating Officer for Charles H. Greenthal Management Corp.), confronting Plaintiff Monique Saunders and her husband David Saunders.

707. During this recorded administrative session, Defendant Parvez Ahmed—who had never once entered the interior of Unit 1H—corruptly turned the tables on the victims of the fraud by hurling defamatory statements into the state record, falsely claiming the Plaintiffs had "destroyed" the apartment when, in reality, the family had expended their own personal financial resources to execute aesthetic improvements, including applying fresh paint and removing dangerous, rusted 1970s-era window bars.

708. To neutralize the mediator's enforcement authority, Attorney Kristen A. Mantell made explicit, fraudulent representations to Mediator Evelyn Britt, pledging under false pretenses that she would cooperate with the incoming management team to present the family with an accurate, legally binding lease renewal agreement—a promise that remains completely unfulfilled to this very day.

709. The Enterprise subsequently utilized this hijacked mediation track to subject the family to an endless cycle of predatory, scheduled contractor inspections under the false pretense of defining a "scope of work"; however, these invasive entries never resulted in a single repair or the required physical replacement of the rotting wood floors.

710. In absolute bad faith, CHAOC, Parvez Ahmed, and Charles H. Greenthal Management Corp. flatly refused to admit the existence of toxic sub-surface mold colonization within the unit, actively denying the bio-hazard despite the fact that visible, dangerous mold had been thoroughly inspected, verified, and officially cited in multiple public records by city HPD Inspectors and DHCR Inspector L. Peters.

711. This deceptive administrative inversion was utilized by the Enterprise as a fraudulent legal foundation to strip the Plaintiffs of their regulatory tenant-harassment protections, neutralize the pending DHCR mediation track managed by Attorney Evelyn Britt, and provide a pre-baked, false pretext to justify their ongoing, predatory demand for the extrajudicial ejectment and displacement of the family.

712. The intentional orchestration of this commercialized acoustic harassment, coupled with the transmission of false cross-complaints of tenant harassment via the U.S. Mail and electronic court networks to state mediators and judges, constitutes distinct, actionable predicate acts of wire fraud under **18 U.S.C. § 1343** and extortion under **18 U.S.C. § 1951**, directly abusing state regulatory and judicial procedures to silence federal civil rights litigants.

## LVI. THE FRAUDULENT MUNICIPAL LICENSING SCHEME, ADMINISTRATIVE SUBVERSION OF THE DOHMH, AND SYSTEMIC HEALTH CODE VIOLATIONS

713. To secure official municipal insulation for her illicit commercial operations, Co-Conspirator Melissa Martin initiated a fraudulent application process with the New York City Department of Health and Mental Hygiene (DOHMH) to obtain an operational permit and license for a "small animal care and handling facility" directly inside Cooperative Unit 2H.

714. Freedom of Information Law (FOIL) records extracted by the Plaintiffs from the DOHMH reveal that Melissa Martin completed an online regulatory portal application, introducing a series of fraudulent business documents into the municipal archive to project a false aura of legitimate, permitted corporate operations, including:

- Articles of Organization for "Paw Paw Pet Care LLC" listing the primary place of business as 210 Clinton Ave., Apt. 2H, Brooklyn, NY 11205-3422 (Filing No. 090728000119);
- IRS Form SS-4 confirming the extraction of Employer Identification Number (EIN) 27-0681771;
- A NYS Department of Taxation and Finance Certificate of Authority under ID No. 27-0681771, validated on May 16, 2011; and
- A sealed "Travelers Insurance Notice" envelope addressed to the residential co-op unit to simulate commercial compliance while concealing internal statement data.

715. To satisfy mandatory statutory worker's compensation disclosure requirements, Co-Conspirator Melissa Martin submitted a Hartford Business Service Center "Summary of Insurance" for Policy Number 76 WEG BC4S7W (Policy Term April 5, 2025, to April 5, 2026), underwriting an Account Policy Recap for Worker's Compensation through the Twin City Fire Insurance Company.

716. This commercial underwriting document contained material, fraudulent misrepresentations designed to deceive municipal regulators, explicitly utilizing **Class Code 8831** under the specific operational classification of *"Veterinary Hospital - including receptionists and drivers,"* reporting a corporate payroll of $66,000.00.

717. In reality, Co-Conspirator Melissa Martin is not a licensed veterinarian, is not an animal health care professional of any kind, employs no veterinary receptionists or drivers, and prior to this fraudulent submission, maintained zero statutory worker's compensation insurance coverage for her illicit operations.

718. The absolute illegality and un-permitted nature of this compound was formally cited on July 18, 2025, at 11:20 AM, when DOHMH Inspector C. Dawson (Badge No. 3489) from the Division of Environmental Health, Bureau of Veterinary and Pest Control Services (VPHS Surveillance and Control) executed a physical inspection of Unit 2H.

719. Upon confirming the ongoing bio-contamination of the residential floor, Inspector Dawson issued **DOHMH Summons No. 0803556811**, citing a severe violation of **NYC Health Code § 161.09(a)** under **Violation Code AH4X** for operating a pet shop, grooming salon, boarding kennel, or training establishment without a current valid permit and without animal vaccination record.

720. The official DOHMH administrative record explicitly notes that Respondent Melissa Martin openly acknowledged operating an animal services business (boarding and daycare) under the name Paw Paw Pet Care LLC inside her private apartment, an activity strictly prohibited across all residential units by NYC Health Code Article 161.

721. Accompanying the maximum statutory penalty of $1,000.00, the DOHMH issued a mandatory administrative order commanding Melissa Martin to immediately remove all commercial pet shop, grooming, and boarding equipment from Cooperative Unit 2H, directing her to appear for a formal enforcement hearing on August 20, 2025, at 8:30 AM at the OATH Tribunal located at 9 Bond Street, 7th Floor, Brooklyn, NY 11201.

722. Despite the explicit intervention, active summonses, and mandatory equipment removal orders issued by the DOHMH, Co-Conspirator Melissa Martin—backed by the continuous, protective shelter, permission, and direct patronage of Defendants CHAOC, Parvez Ahmed, and Charles H. Greenthal Management Corp.—flatly defied the city's

enforcement mandates and continues to operate her illegal animal boarding facility out of Unit 2H to this day.

723. The transmission of these falsified commercial insurance recaps and fraudulent veterinary classifications through interstate electronic networks to the DOHMH constitutes independent, actionable overt acts of **wire fraud under 18 U.S.C. § 1343**, executed by the Enterprise to deceptively subvert municipal health ordinances, maintain an actionable acoustic and environmental nuisance, and advance the ongoing extortion and displacement campaign targeting the Plaintiffs.

## LVII. RITUALISTIC HARASSMENT, PATTERNED SLEEP DEPRIVATION, AND EXPERT ACOUSTIC TAMPERING

724. The Enterprise's campaign of physical and psychological coercion escalated into highly targeted, ritualistic stalking and calculated sleep deprivation designed to break the Plaintiffs' physical health and drive them from the Subject Premises. Co-Conspirator Melissa Martin, a practicing witch, has systematically weaponized her proximity in Unit 2H to execute predatory, targeted spiritual and physical harassment against the Plaintiffs' Black Hebrew family.

725. Co-Conspirator Melissa Martin has repeatedly approached the Plaintiffs' open first-floor window at the Subject Premises with a black cat on a red leash, using the opening to cast targeted, hostile gestures and conduct audio-directed ritualistic chanting down into the connected vertical kitchen pipes at dusk and pre-dawn. This strategic choice of timing and placement was explicitly calculated to project high-decibel, distressing acoustic frequencies directly through the plumbing infrastructure into the Plaintiffs' private home and dedicated business office workspace.

726. To systematically induce chronic physiological fatigue and disrupt the Plaintiffs' employment, Co-Conspirator Melissa Martin initiated a precise pattern of sleep deprivation. Martin routinely utilizes a hard stick or heavy instrument to violently tap and beat on the bare hardwood floors directly above the Plaintiffs' bedroom at 4:30 AM and late into the night while the family, including their minor child, is asleep.

727. To insulate this calculated acoustic assault from municipal citation and provide a false scientific shield for Defendant CHAOC's retaliatory state court impleaders, the Enterprise brought in Defendants Acoustilog, Inc. and its President, Alan Fierstein. Acting under the direction of Attorney Kristen A. Mantell, Defendant Alan Fierstein conducted rigged, parameters-manipulated acoustic testing inside the building.

728. In his subsequent official reports, Defendant Alan Fierstein intentionally masked, omitted, and concealed the existence of Melissa Martin's un-permitted commercial dog facility, her intentional stick-tapping patterns, and her structural acoustic harassment. This deceptive manipulation of data parameters was executed to manufacture a false scientific pretext of tenant non-compliance, trick state court judges, and insulate the overall eviction and extortion racket from federal judicial scrutiny.

729. The execution of this ritualistic harassment and rigged expert testing, coupled with the transmission of false, self-authenticated noise complaints via electronic court networks and the U.S. Mail, constitutes distinct, actionable predicate acts of wire fraud under **18 U.S.C. § 1343** and extortion under **18 U.S.C. § 1051**, directly abusing state judicial procedures to silence federal civil rights litigants.

## LVIII. PRAYER FOR RELIEF AND DEMAND FOR DAMAGES

730. As a direct, proximate, and foreseeable result of the Enterprise's progressive, multi-decade pattern of racketeering activity, mail fraud, bank fraud, wire fraud, witness tampering, and structural extortion under 18 U.S.C. §§ 1962(c) and (d), Plaintiffs have suffered catastrophic, deep, and measurable financial devastation to their concrete business and property interests under 18 U.S.C. § 1964(c). This includes the systemic diminution of their  estate interests, the unlawful conversion of escrowed security deposit funds, the denial of accrued statutory interest, and extensive out-of-pocket operational costs, lost billable business hours, and client contract disruptions forced by the Enterprise's bad-faith state court impleaders, physical harassment, and fraudulent Notices.

731. Plaintiffs further allege that the Enterprise's intentional, predatory reduction of essential services, manufactured toxic sub-surface mold colonization, and targeted physical and administrative harassment proximately inflicted catastrophic physical injuries, permanent pulmonary pathology, and severe emotional distress upon the Plaintiffs, entitling them to full compensatory, consequential, and punitive damages under the Court's supplemental jurisdiction pursuant to **28 U.S.C. § 1367**.

## LIX. CRIMINAL EXPLOITATION OF MUNICIPAL LAW ENFORCEMENT, RACIALIZED DEFAMATION, AND SYSTEMATIC IDENTITY MANIPULATION

732. The Enterprise's campaign of targeted intimidation and physical displacement against the Plaintiffs' Black Hebrew family achieved its most dangerous, racially weaponized expression through the execution of successive, fraudulent police reports designed to trigger armed municipal intervention under lethal pretenses.

733. On April 6, 2021, concurrent with the height of the COVID-19 pandemic and the global civil unrest surrounding the May 25, 2020 murder of George Floyd, Co-Conspirator Melissa Martin traveled to the local NYPD 88th Precinct and initiated **Complaint No.**

**2021-088-001033**. In this official municipal filing, Martin executed a pattern of criminal identity fraud and structural defamation, falsely reporting to the NYPD that Plaintiff Monique Saunders was her "Same-Sex Partner," withholding any racial designation, and deliberately fabricating her own date of birth as September 18, 1975, to systematically alter the data metrics within the police routing systems.

734. On June 1, 2021, to accelerate the threat of armed municipal extraction against the occupants, Co-Conspirator Melissa Martin executed a second, fraudulent emergency filing under **Complaint No. 2021-088-001737**. In this sequential report, Martin completely inverted her prior identity parameters, falsifying her date of birth as June 14, 1981, and explicitly re-classifying Plaintiff Monique Saunders as a "Black Stranger" and Plaintiff David Saunders as a "Tan Stranger." Martin falsely claimed that these "strangers" were violently banging on vertical building infrastructure and screaming profanities through the floor at her and her minor son—behavior that the Plaintiffs have never engaged in.

735. While the NYPD did not execute a field dispatch in response to the first identity-tampering report, the Enterprise successfully triggered its weaponized municipal mechanism on the second call. In direct response to the June 1, 2021 racialized "stranger" report, two armed NYPD officers were dispatched to the Subject Premises. The armed officers aggressively rang the Plaintiffs' doorbell and subjected the family to an on-site interrogation regarding the fabricated pipe-banging and profanity claims.

736. During this high-pressure June 1, 2021 armed interrogation, Plaintiffs produced definitive, un-assailable real-time video evidence recorded in March 2021. This surveillance footage captured Co-Conspirator Melissa Martin and her son actively trespassing on the courtyard lawn, standing less than two (2) feet away from the Plaintiffs’

open first-floor window, and aggressively staring directly into the interior of the private residential home office workspace.

737. Upon physical review of this ironclad video data, the responding NYPD officers instantly realized that Co-Conspirator Melissa Martin had completely fabricated her allegations. The public officers immediately aborted their adversarial interrogation of the Plaintiffs, marched upstairs to Unit 2H, and formally commanded Melissa Martin to immediately cease her predatory window-stalking, stay away from the first-floor window perimeter, and permanently halt the high-impact jumping over the Plaintiffs' heads.

738. Having effectively resolved the crisis by exposing Martin's fraud, the responding NYPD officers exited the Subject Premises without generating a formal domestic incident report. This left the official complaint numbers lingering in the municipal system as un-investigated, false administrative markers.

739. This weaponized police dispatch was executed during a period of acute national trauma for the Black Hebrew community following the broad-daylight murder of George Floyd by armed law enforcement officers. The presence of armed police officers interrogating her parents at their front door inflicted severe, un-remediated psychological trauma and terror upon the Plaintiffs' minor child, who was present inside Unit 1H and became instantly consumed with severe anxiety that her parents would be subjected to summary, extrajudicial violence.

740. The deep-seated criminality and collusive nature of the broader Enterprise achieved complete visibility when Co-Conspirator Melissa Martin, corporate Defendant CHAOC, Attorney Kristen A. Mantell, and the successive legal teams representing the conspiracy consciously adopted these un-investigated, fraudulent police filings.

741. Possessing actual knowledge that the NYPD had discovered the reports were entirely fabricated, the Defendants systematically used interstate wires and mail networks to introduce **Complaint No. 2021-088-001033** and **Complaint No. 2021-088-001737** as substantive negative evidence against the family during the DHR civil rights investigation and within the active, ongoing NYS Supreme Court Kings County Third-Party Complaint under Index No. 501135/2024.

742. The transmission of these contradictory, falsified police reports through municipal data networks, followed by their deliberate introduction into state administrative and judicial records to support an illegal summary eviction, constitutes distinct pattern of **wire fraud under 18 U.S.C. § 1343**, **mail fraud under 18 U.S.C. § 1341**, and **perjury manipulation under 18 U.S.C. § 1622 (Subornation of Perjury)**. This confirms that the Enterprise co-conspirators deliberately exploited racial tensions, manipulated police data, and knowingly introduced fraudulent evidence into courts of law to advance their predatory real estate eviction racket and destroy the commercial livelihood of the Plaintiffs.

## LX. PRAYER FOR RELIEF AND DEMAND FOR MULTI-LAYERED DAMAGES

743. As a direct, proximate, and foreseeable result of the Enterprise's progressive, multi-decade pattern of racketeering activity, mail fraud, bank fraud, wire fraud, witness tampering, and structural extortion under 18 U.S.C. §§ 1962(c) and (d), Plaintiffs have suffered catastrophic, deep, and measurable financial devastation to their concrete business and property interests under 18 U.S.C. § 1964(c). This includes the systemic diminution of the value of their rent-stabilized leasehold estate, the unlawful conversion of escrowed security deposit funds, the denial of accrued statutory interest, lost billable business hours,

commercial revenue destruction, and client contract disruptions forced upon their home office by the Enterprise's bad-faith state court impleaders and fraudulent Notices.

744. Plaintiffs further allege that the Enterprise’s intentional, predatory reduction of essential services, manufactured toxic sub-surface mold colonization, targeted physical and administrative harassment, ritualistic window stalking, and deliberate campaigns of high-intensity acoustic sleep deprivation proximately inflicted catastrophic physical injuries, permanent pulmonary pathology, severe psychological trauma, and profound emotional distress upon the Plaintiffs and their minor child, entitling them to full compensatory, consequential, and punitive damages under the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

745. Because the Defendants' severe post-filing escalations, ongoing physical surveillance, and tactical residential harassment present an active, imminent threat to the life, safety, and well-being of the Plaintiffs and their minor daughter, Plaintiffs are forced to flee the Subject Premises to preserve their physical safety. Under the complex and extraordinary circumstances of this case, Plaintiffs are entitled to immediate, mandatory corporate-funded relocation expenses and formal federal whistleblower compensation and protection under 18 U.S.C. § 1513(e) to remedy the intentional destruction of their residential workspace and commercial livelihood.

**WHEREFORE**, Plaintiffs pro se respectfully request that this Honorable Court enter judgment against the Defendants, jointly and severally, granting the following relief:

A. Civil RICO Damages: Awarding Plaintiffs compensatory, special, and economic damages in the principal amount of Twelve Million Dollars ($12,000,000.00) for severe,

documented injuries to their business, financial, and home-office property interests resulting from Defendants' direct violations of 18 U.S.C. § 1962;

B. Statutory Treble Damages: Trebling the principal award of compensatory property and financial damages to Thirty-Six Million Dollars ($36,000,000.00) pursuant to the mandatory civil enforcement remedies set forth in 18 U.S.C. § 1964(c);

C. Emotional and Consequential Damages: Awarding Plaintiffs full compensatory, consequential, and non-economic damages in an amount to be determined at trial for the profound emotional distress, psychological trauma, chronic sleep deprivation, and severe physical pulmonary injuries inflicted upon the family under the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367;

D. Punitive Damages: Awarding exemplary and punitive damages in an amount to be determined at trial to punish the Defendants' malicious, bad-faith, and willful disregard for human life, religious liberties, health, and statutory housing protections, and to deter such predatory real estate rackets from occurring in the future;

E. Federal Criminal Prosecution Referral: Formally referring the complete administrative and judicial record of this civil action to the United States Attorney for the Southern District of New York and the Federal Bureau of Investigation (FBI) pursuant to 18 U.S.C. § 3057, with a judicial recommendation that a federal grand jury be empaneled to investigate the Defendants' ongoing patterns of wire fraud, mail fraud, witness tampering, and institutional corruption;

F. Equitable, Injunctive, and Declaratory Relief: Entering a permanent injunction and protective order pursuant to 18 U.S.C. § 1964(a) and FRCP 26(c) to:

- Restrain and enjoin the Defendants, their agents, employees, and co-conspirators from continuing their unlawful entry demands, physical security surveillance, ritualistic window harassment, and fraudulent eviction notices;
- Stay, suspend, and vacate all collusive, retaliatory eviction and summary proceedings currently pending in state courts under Index No. 501135/2024;
- Compel Defendant Necessary Relief Party The City of New York, by and through the DOI and Law Department, to immediately produce all un-redacted field reports, electronic recordings, and case file records generated during the June 28, 2022 residential interrogation of the Plaintiffs;
- Compel Defendant Necessary Relief Party New York State Division of Human Rights to produce all internal agency communications, audit metadata, and investigator logs concerning the processing and sudden expedited closure of Case Record File No. 10214815;
- Compel Defendant Necessary Relief Party Letitia James, in her official capacity as Attorney General, to produce all administrative files under File No. 22-018011-M1 and open the historical cooperative conversion archives; and
- Declare that the Subject Premises is an exempt housing unit over which Defendant CHAOC holds no lawful corporate jurisdiction or chain of title ownership;

G. Fees and Costs: Awarding Plaintiffs the full recovery of all out-of-pocket litigation costs, filing fees, and disbursements incurred in the prosecution of this federal action; and

H. Other Relief: Granting such other, further, or alternative relief as this Court deems just, proper, and equitable under the complex and extraordinary circumstances of this case. Plaintiffs pro se explicitly reserve the absolute right to supplement, modify, or amen

this First Amended Complaint within the contractually or statutorily prescribed timeframes governing federal practice.

I. Mandatory Relocation Expenses: Ordering the Defendants, jointly and severally, to immediately pay all out-of-pocket and forward-looking relocation expenses, including commercial moving costs, temporary housing stipends, and full leasehold or ownership re-establishment fees and costs, to enable the Plaintiffs and their family to safely relocate their residential home office away from the hostile environment of the Subject Premises;

J. Whistleblower Compensation and Emergency Protection: Awarding Plaintiffs formal whistleblower compensation and entering an immediate protective order pursuant to 18 U.S.C. § 1513(e) to insulate the Plaintiffs from ongoing economic, professional, and physical retaliation, protecting Plaintiff Monique Saunders' professional nursing licensure, and compensating the family for exposing a systemic matrix of municipal corruption, escrow conversion, and state regulatory capture; and

K. Other Relief: Granting such other, further, or alternative relief as this Court deems just, proper, and equitable under the complex and extraordinary circumstances of this case. Plaintiffs pro se explicitly reserve the absolute right to supplement, modify, or amend this First Amended Complaint within the contractually or statutorily prescribed timeframes governing federal practice.

---

## THE SEVERAL COUNT DISCLOSURE AND DEMAND FOR JURY TRIAL

Plaintiffs *pro se* hereby formally and unconditionally demand a trial by jury on all counts, claims, and issues triable of right by a jury in the above-entitled action pursuant to **Federal Rule of Civil Procedure 38(b)** and the Sixth Amendment to the Constitution of the United States.
Dated: June 19, 2026
New York, New York

Respectfully submitted,

/s/ *Monique A. Saunders*

**MONIQUE SAUNDERS, Pro Se**
Individually and on behalf of
ANITA TOVAR (Deceased)
210 Clinton Avenue, Apartment 1H
Brooklyn, New York 11205

/s/ *David Saunders*

**DAVID SAUNDERS, Pro Se**
210 Clinton Avenue, Apartment 1H
Brooklyn, New York 11205

---

## PLAINTIFFS' VERIFICATION PURSUANT TO 28 U.S.C. § 1746

We, Monique Saunders and David Saunders, declare under penalty of perjury pursuant to the laws of the United States of America, specifically **28 U.S.C. § 1746**, that we are the *pro se* Plaintiffs in the foregoing First Amended Civil RICO Complaint; that we have read the contents and historical timelines thereof; and that all factual allegations, municipal complaints, and regulatory disclosures contained therein are true, accurate, and correct to the best of our personal knowledge, information, and belief.
Executed on June 19, 2026.

/s/ *Monique A. Saunders*
**MONIQUE SAUNDERS**

/s/ *David Saunders*
**DAVID SAUNDERS**

---