UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
ANITA TOVAR (Decd. 1/30/2026),
MONIQUE (TOVAR) SAUNDERS, and
DAVID SAUNDERS,

Plaintiffs,

-against-

FRANCIS GREENBURGER,
TIME EQUITIES, INC.,
CLINTON HILL APTS. OWNERS CORP.,
CHARLES H. GREENTHAL MANAGEMENT CORP.
a/k/a FIRSTSERVICE RESIDENTIAL NEW YORK, INC.,
THE CITY OF NEW YORK, acting by and through
The New York City Department of Investigation
and The New York City Police Department,
LETITIA JAMES, in her official capacity as the
Attorney General of the State of New York,
NEW YORK STATE DIVISION OF HOUSING AND
COMMUNITY RENEWAL (DHCR), and
NEW YORK STATE DIVISION OF HUMAN RIGHTS,

Defendants.
----------------------------------------------------------------------X

SECOND AMENDED
CIVIL RICO COMPLAINT

Case No. 1:25-cv-09648-JGK

JURY TRIAL DEMANDED

## INTRODUCTION

Plaintiffs Monique Saunders and David Saunders, appearing pro se individually, as the representatives of the Estate of Anita Tovar (Deceased), and as the natural parents, legal guardians, and next friends of their minor child, bring this Second Amended Civil RICO Complaint against the Defendants to halt, remedy, and recover damages for a progressive, multi-decade pattern of corporate real estate fraud, mail fraud, wire fraud, securities fraud, witness tampering, and structural extortion.

Operating under the umbrella of a highly organized real estate syndication mastermind, the Enterprise has executed an open-ended matrix of organized schemes to defraud, systematically subverting state regulatory agencies, weaponizing municipal law enforcement, and committing a flagrant abuse of the public trust through collusive state court staging. Plaintiffs allege that the Enterprise conspirators deliberately relied on corrupt public officials and compromised state administrative parts to execute the predatory, extrajudicial displacement of long-term rent-stabilized occupants from the Subject Premises - a property asset which Defendants Francis Greenburger, Time Equities Inc. (TEI), Clinton Hill Apartments Owners Corp. (CHAOC), Charles H. Greenthal Management Corp./First Service Residential NY, et al, do not lawfully own or possess valid title over - engaging in a continuous pattern of mail fraud, wire fraud, witness tampering, and the active obstruction of justice under color of authority to shield their unrecorded multi-million dollar asset-hoarding operations from federal judicial oversight.

**JURISDICTION AND VENUE**

This Court maintains subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims asserted herein arise directly under the laws of the United States, specifically the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. (Civil RICO), and the Fair Housing Act, 42 U.S.C. §§ 3601 et seq. This Court maintains supplemental jurisdiction over Plaintiffs' interconnected New York State law claims pursuant to 28 U.S.C. § 1367.

Venue is legally proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and the specialized civil venue provisions of 18 U.S.C. § 1965(a), on the basis that a substantial preponderance of the Enterprise's corporate administration, financial layering, and coordinated wire fraud maneuvers were managed, directed, and executed

by core Co-Conspirator Defendants residing, found, maintaining principal business offices, and transacting affairs within this judicial district.

Specifically, the masterminding corporate principals, holding companies, and legal execution networks driving the racketeering pattern—including Defendants Francis Greenburger, Time Equities, Inc., Clinton 174 Realty Associates LLC, Clinton Apartments LLC, Abrams Garfinkel Margolis Bergson LLP, Barry G. Margolis, Alexander Rabinowitz, Thompson LLP, and Seidenstein Meier & Stein PLLC—maintain their principal offices, executive boardrooms, and operational headquarters within the County and State of New York, within the exclusive geographic jurisdiction of the Southern District of New York. The special interests of justice require that all interconnected individual, corporate, and municipal defendants be brought before this Court in a single judicial forum pursuant to 18 U.S.C. § 1965(b) to ensure complete and meaningful adjudication.

**TIMELINESS AND STATUTE OF LIMITATIONS**

Plaintiffs' federal Civil RICO and Fair Housing Act claims are procedurally timely and fully insulated from any statutory bar pursuant to the federal "Injury Discovery Rule," the doctrine of separate accrual, and the mandatory tolling provisions governing active administrative exhaustion and infancy.

Under well-established federal racketeering jurisprudence, a Civil RICO cause of action accrues each time a plaintiff discovers, or reasonably should have discovered, a distinct, actionable injury to their business or property interests inflicted by the enterprise. The progressive pattern of mail fraud, wire fraud, and financial extortion executed by the Defendants has proximately inflicted fresh, independent economic and property injuries upon the Plaintiffs through 2025 and

2026—including the November 14, 2025 electronic filing of fraudulent, self-authenticated corporate verifications (NYSCEF Doc. 125) and the June 18, 2026 federal holiday electronic transmission of bad-faith advocacy letters to force an illegal extrajudicial ejectment. Each distinct overt act constitutes a separate accrual event that restarts the federal statutory clock.

Plaintiffs' claims are further preserved by operation of mandatory administrative tolling during the pendency of their parallel federal and state civil rights actions. On November 28, 2022, the U.S. Department of Housing and Urban Development (HUD) formally accepted the Plaintiffs' housing discrimination complaint under the Fair Housing Act, deferring active processing to the New York State Division of Human Rights (DHR) under Case Record File No. 10214815. The administrative life of this file was subjected to extreme regulatory subversion and system backlogs, culminating in a final agency determination on June 3, 2024. he statutory limitations period was paused by operation of law during this multi-year administrative track, rendering this independent federal action timely.

Most critically, all independent causes of action, property injuries, and tort claims belonging to the Plaintiffs' minor daughter are completely protected and frozen in time by operation of the strict statutory infancy tolling provisions set forth in New York CPLR § 208. Because the minor child was a direct, targeted victim of the Enterprise's physical intimidation campaigns, including the March 31, 2022 aggressive process server exploitation and ongoing exposure to toxic sub-surface mold colonization—the statute of limitations governing her claims is automatically paused during her minority. The minor child explicitly retains her absolute, unimpeded independent right to supplement, expand, or independently prosecute her own legal claims in a court of competent jurisdiction within three (3) years following her eighteenth (18th) birthday.

## IDENTIFICATION OF THE PLAINTIFFS

Plaintiffs Monique Saunders and David Saunders are individuals, citizens of the State of New York, and self-employed independent business owners who maintain, operate, and conduct their primary commercial business and corporate affairs out of their dedicated home office located within the Subject Premises at 210 Clinton Avenue, Apartment 1H, Brooklyn, New York 11205. Plaintiffs appear herein *pro se*, individually, as the representatives of the Estate of Anita Tovar (Deceased), and as the natural parents, legal guardians, and next friends of their minor child. As a direct consequence of the Enterprise's targeted campaign of physical intimidation, toxic mold exposure, and the intentional facilitation of a high-intensity commercial acoustic nuisance overhead, Plaintiffs have been severely and negatively impacted physically, psychologically, and financially, suffering direct, catastrophic injury to their health, their residential property interests, and their active business operations, income streams, and commercial livelihood.

Plaintiffs explicitly plead and reserve all rights of statutory tolling governing the minor's independent causes of action under federal and state law. Pursuant to the federal injury discovery rule and the mandatory tolling provisions set forth in New York CPLR § 208, the statute of limitations governing the minor child's claims—including injuries to property interests under 18 U.S.C. § 1964(c), unlawful exposure to toxic environmental mold, and the intentional infliction of severe emotional distress by the Enterprise actors—is automatically tolled by operation of law during her infancy. The minor child explicitly retains her absolute, unimpeded independent right to supplement, expand, or independently prosecute her own legal claims in a court of competent jurisdiction within three (3) years following her eighteenth (18th) birthday.

## IDENTIFICATION OF THE DEFENDANTS

### A. The Real Estate Sponsor & Corporate Management Core

Defendant FRANCIS GREENBURGER is an individual who is a citizen of the State of New York, maintaining a principal place of business at 14 East 4th Street, New York, NY 10012. Greenburger is sued herein individually and in his capacity as the foundational organizer, promoter, and ongoing principal controller of the Civil RICO Enterprise, who personally engineered the 1982 Wraparound Second Mortgage financing structures with Goldome Bank, and who orchestrated the unrecorded property transfers, structural maintenance defunding, and corporate re-layering transitions across the multi-decade pattern.

Defendant CLINTON HILL APARTMENTS OWNERS CORP. (CHAOC) is a domestic cooperative housing corporation organized and existing under the laws of the State of New York, maintaining its principal corporate office at 55 Hanson Place, Brooklyn, NY 11217. CHAOC is sued herein as a primary institutional vehicle through which the racketeering pattern was executed, functioning as the purported landlord entity used to enforce manufactured rent overcharges, fraudulent housing code registrations, and predatory, extrajudicial evictions against the Plaintiffs' fifty-four (54) year unbroken federal military possessory title and leasehold dominion.

Defendant TIME EQUITIES, INC. (TEI) is a domestic business corporation organized and existing under the laws of the State of New York, maintaining its corporate headquarters at 55 Fifth Avenue, New York, NY 10003. TEI is sued herein as a co-conspirator corporate shell and operating umbrella deployed by Defendant Greenburger to execute the financial layering, unrecorded asset transfers, and administrative insulation of the cooperative conversion scheme, and who actively authorized the post-filing February 10, 2026 Broadspire CMS database identity-extraction trap.

Defendant CHARLES H. GREENTHAL MANAGEMENT CORP., a/k/a FIRSTSERVICE RESIDENTIAL NEW YORK, INC., is a domestic operating division of an

international real estate conglomerate headquartered in Toronto, Canada, publicly traded on the NASDAQ under ticker symbol FSV, maintaining its principal Manhattan corporate headquarters at 575 5th Avenue, 9th Floor, New York, NY 10017, and its primary regional Brooklyn office at 132 32nd Street, Suite 412, Brooklyn, NY 11232.

FirstService is sued herein as an Alien Corporation and successor managing agent entity that adopted, ratified, and continues to execute the Enterprise's ongoing fraud patterns - operating by and through domestic communication hubs using telephone lines 212-634-8900 and fax lines 212-634-3946 - including the enforcement of predatory litigation billing, intentional maintenance neglect, Wednesday morning executive default boycotts, and the systematic utilization of non-citizen operatives to manipulate local municipal law enforcement and violate the civil rights of United States citizens from 2023 through the present, satisfying the open-ended continuity requirements of 18 U.S.C. § 1962(c).

**IDENTIFICATION OF HOSTILE WITNESSES, UNINDICTED CO-CONSPIRATORS, AND ENTERPRISE OPERATIVES**

The following entities and individuals are identified herein as Hostile Witnesses, Unindicted Co-Conspirators, and Enterprise Operatives who actively participated in, directed, or executed the underlying patterns of mail fraud, wire fraud, bank fraud, and witness retaliation under color of corporate or administrative authority, and whose actions directly bind the primary corporate Defendants to mandatory joint and several federal liabilities and treble damages:

1. CLINTON HILL EQUITIES GROUP (and its successors or assigns): A legacy developer partnership and sponsor entity utilized by Defendant Greenburger to execute the initial 1984 conversion fraud, manipulate original share allocations, and structure unrecorded asset shuffles following the 1991 FDIC Goldome Bank insolvency seizure.

2. CLINTON 174 REALTY ASSOCIATES LLC: A corporate asset shell and title-holding vehicle deployed by the Enterprise at 55 Fifth Avenue to execute sub-surface financial layering and hide unrecorded cooperative share blocks from public property registries.

3. CLINTON APARTMENTS LLC: A fraudulent corporate "ghost shell" maintaining a registered address at 5614 15th Avenue, Suite 1A, Brooklyn, NY 11219, which lacked a registered agent and was secretly injected into the 2023 Offering Plan and DHCR Non-compliance proceedings to pay minor $250.00 fines from the shadows, masking the Enterprise's $22,675,637.00 Treasury Stock asset-hoarding operations.

4. MARK GREENBERG REAL ESTATE CO., LLC (and its successors or assigns): A legacy managing agent entity that executed historical multi-year rent overcharges, suppressed statutory lease renewals, and facilitated the early conversion of tenant escrow security deposits.

5. MARK GREENBERG: Individual founder and executive officer of MGRE, who personally supervised unlawful rent overcharge calculations, directed the commingling of tenant security accounts, and ordered the withholding of historical Master Lease records.

6. JENNIFER OGMAN: Individual Vice President of FirstService Residential's CityLine Division, who exercised direct executive supervisory control over site personnel and bad-faith litigation strategies deployed against the Subject Premises from 2023 through the present.

7. STEVEN GREENBAUM: Individual Senior Vice President and Director of Management for Charles H. Greenthal Management and FirstService Residential, who served as a managerial anchor bridging successive regimes, authorizing the systemic withholding of Master Lease records and ratifying maintenance deprivation campaigns.

8. PARVEZ AHMED: An individual maintaining an operational office nexus at 345 Clinton Avenue, Brooklyn, NY 11238, who served as General Property Manager for CHAOC and Charles

H. Greenthal Management Corp. Ahmed actively participated in the enterprise by boycotting the June 28, 2022 DHCR mediation, executing the physical reduction of essential services, and personally receiving the scientifically rigged July 9, 2024 Acoustilog wiretap report to manufacture fraudulent tenant default records.

9. DAVID PEREZ: An individual operating by and through the management infrastructure of FirstService Residential New York, Inc., who served as an active onsite property agent, personally executing administrative concealment, refusing to honor binding DHCR rent reduction orders, and participating in the tactical residential harassment campaigns targeting the Plaintiffs' home office space.

10. SAFIJE CEMENJA: An individual operating as a corporate agent and administrative manager for FirstService Residential New York, Inc., who actively directed the bad-faith billing of falsified litigation surcharges, suppressed tenant accounts, and executed the administrative blockade against the Plaintiffs’ statutory housing remedies from 2023 through the present.

11. VIGAN AHMETAJ: An individual operating as a primary onsite superintendent and maintenance director for Defendant CHAOC and FirstService Residential, who executed the intentional defunding and neglect of the Subject Premises, purposefully allowing toxic sub-surface mold colonization and structural decay to persist within Unit 1H while actively monitoring the occupants to support the extrajudicial displacement scheme.

12. KRISTEN A. MANTELL, ESQ.: An individual attorney who is the legacy owner of , and managing partner within, Baron & Baron Esqs. P.C. Mantell actively furthered the conspiracy by manufacturing fraudulent Notices to Cure and Terminate, executing a multi-firm state court "document dump" to maliciously broadcast the Plaintiffs' sensitive professional records, and

synchronizing a retaliatory state court Third-Party Complaint exactly five (5) months following the Plaintiffs' February 2025 Attorney Grievance filing.

13. BARON & BARON ESQS. P.C.: A domestic professional service corporation and real estate law firm located at 118-21 Queens Blvd, Suite 515, Forest Hills, NY 11375, deployed by the enterprise to project a false aura of legitimate legal authority, utilizing interstate mail and wire grids to advance retaliatory litigation, execute character defamation, and facilitate the extrajudicial summary ejectment of a protected military family.

14. BENJAMIN JOSHUA MANTELL, ESQ.: An individual attorney, former Assistant District Attorney in Queens County overseeing complex organized crime investigations, former Assistant New York State Attorney General prosecuting major financial crimes, former Baron & Baron law partner, and current City Administrative Law Judge for the New York City Office of Administrative Trials and Hearings (OATH). ALJ Mantell utilized his revolving-door insider networks and his advanced professional background developing internal regulatory policies for two large banks to enhance compliance with U.S. Treasury guidelines to act as a highly sophisticated operative insider for the conspiracy. Specifically, ALJ Mantell utilized his active judicial placement inside the OATH tribunal system - the exact city court division responsible for adjudicating Co-Conspirator Melissa Martin's commercial canine convictions - to track, monitor, and insulate the enterprise's unrecorded conversion records, fraudulent $43,678,345.00 banking collateral schedules, and off-balance-sheet Treasury Stock hoardings from public discovery and federal enforcement audits under the crime-fraud exception.

15. ANDREW H. MEIER, ESQ.: An individual attorney, former Deputy Section Chief within the Office of the New York State Attorney General, and incoming litigation counsel for Melissa Martin under the banners of Thompson LLP and Seidenstein Meier & Stein PLLC. Meier executed

the January 11, 2024 sham state action, transmitted the June 18, 2026 ex-parte holiday wire communication to Justice Peter P. Sweeney, and procured the highly irregular October 21, 2026 administrative state court sealing order and filing ban (Doc. 164) to conceal an active pattern of multi-million-dollar bank fraud.

16. ABRAMS GARFINKEL MARGOLIS BERGSON, LLP (AGMB Law): A domestic limited liability partnership and corporate real estate law firm located at 1430 Broadway, 17th Floor, New York, NY 10018, which acted as primary legal insulation for Defendant CHAOC and FirstService Residential. AGMB Law actively entered the racketeering pattern by executing a collusive dual-representation scheme, representing both the corporate landlord (CHAOC) and the private resident (Melissa Martin) as a single defensive front before the DHR, and subsequently turning around in January 2024 to stage a fraudulent "adversary" posture in state court under Index No. 501135/2024 to split the Plaintiffs' claims, mislead the state judiciary, and execute intentional character defamation under the crime-fraud exception.

17. BARRY G. MARGOLIS, ESQ.: An individual attorney and senior partner within AGMB Law, who personally supervised and executed the bad-faith transmission of the Plaintiffs' 37-page Washington, D.C. Bar records across multi-agency portals, actively coordinating with Attorney Kristen Mantell to poison the well of state tribunals and advance an illegal constructive eviction.

18. ALEXANDER RABINOWITZ, ESQ.: An individual attorney and litigation partner within AGMB Law, who co-executed the multi-agency publication of the Plaintiffs' decade-old private hardships and filed deceptive, un-backed property cross-claims based on known unrecorded title assets to block federal judicial oversight under the crime-fraud exception.

19. THOMPSON LLP: A domestic limited liability partnership and commercial law firm located at 75 Broad Street, Suite 2120, New York, NY 10004, which functioned as a passive

clearinghouse and legal front for the initial phase of the retaliatory RICO sham state litigation, allowing its letterhead and institutional resources to be deployed by Andrew Meier to project a false aura of legitimate authority.

20. SEIDENSTEIN MEIER & STEIN PLLC: A domestic professional limited liability company located at 407 Broome Street, 3rd Floor, New York, NY 10013, formed or joined by Andrew Meier to actively adopt, ratify, and execute the final phases of the real estate racketeering and witness retaliation scheme.

21. MELISSA G. MARTIN: An individual residing within Cooperative Unit 2H, who entered a formal administrative guilty plea before the OATH Tribunal under Summons No. 0803556811 for operating an illegal commercial canine compound (Paw Paw Pet Care LLC), and who actively admitted under penalty of perjury that the Office of the Attorney General directly steered her to execute weaponized municipal law enforcement referrals (NYPD and DOI agents) against the Plaintiffs.

22. ACOUSTILOG, INC.: A domestic business corporation and engineering firm located at 19 Avenue of the Americas, New York, NY 10013, deployed by the enterprise to install an un-consented, un-warranted electronic tracking and mechanical eavesdropping apparatus to intercept the private oral communications and sacred Shofar music of the Plaintiffs within their residence apartment.

23. ALAN FIERSTEIN: An individual who is the founder and President of Acoustilog, Inc., who personally entered Unit 2H to calibrate a sub-surface surveillance trap, affixed a commercial accelerometer onto a shared vertical heating pipe, and utilized interstate wire grids to transmit a scientifically rigged engineering report to Property Manager Parvez Ahmed to support a sham eviction.

24. NOAH PORTES CHAIKIN: An individual residing next door to the Plaintiffs within Cooperative Unit 210-1A, who recently acquired occupancy within the complex and was immediately deployed as an active retail enforcement node for the Enterprise. Chaikin continuously engaged in a targeted, systematic campaign of daily and weekly acoustic harassment and localized residential intimidation against the Plaintiffs' home office workspace, operating with absolute administrative impunity and selective non-enforcement from CHAOC site security forces and compromised municipal law enforcement networks.

25. ALYSSA ALPINE: An individual who served as the former Secretary and currently sits as the active President of the Board of Directors for Defendant CLINTON HILL APARTMENTS OWNERS CORP. (CHAOC). Alpine is identified herein as a primary corporate director who actively furthered the conspiracy by authorizing, funding, and weaponizing Attorney Kristen A. Mantell and Baron & Baron Esqs. P.C. to execute the predatory defamation, character assassination, and extrajudicial ejectment campaigns against the Plaintiffs' household.

Alpine intentionally directed this litigation racket by corruptly quoting and misrepresenting CHAOC Proprietary Lease Terms and House Rules as the legal baseline for eviction, with actual and constructive documentary knowledge that the Plaintiffs' family never executed a proprietary lease agreement or corporate stock contract with CHAOC, and that their unbroken fifty-four (54) year possessory tenure represents an exempt, protected federal military leasehold dominion established in 1972 under New York RPAPL Article 5.

26. TAMIKA ANTOINETTE LINTON-JONES: An individual operating as an onsite corporate coordinator and administrative supervisor, who executed the systematic concealment of master lease records, authorized the tracking of fraudulent billing lines, and participated in the economic coercion campaign.

27. MADISON SECURITY GROUP, INC.: A domestic private security corporation deployed by the enterprise as an outside commercial contractor to execute intense physical surveillance, physical workspace blockades, and residential intimidation, funded by the illicit diversion of $708,138.00 in federal PPP loan proceeds.

28. DOYLE SECURITY SERVICES, INC.: A domestic private security corporation and successor contractor that adopted, ratified, and continued the physical surveillance, window stalking, and targeted tactical intimidation of the Plaintiffs' Black Hebrew family to force their physical displacement.

29. MARK ATHERTON: An individual operating as an executive field director and security supervisor for Madison Security Group, Inc., who personally directed onsite guards to maintain the physical workspace blockade and execute tactical residential intimidation against the occupants.

30. J. GRIFFON: An individual operating as an active field supervisor and security officer for Doyle Security Services, Inc., who personally executed the ongoing physical surveillance, ritualistic window stalking, and high-pressure residential harassment targeting the Plaintiffs' minor child.

## I. PROCEDURAL POSTURE AND RIGHT TO AMEND

1. Plaintiffs filed the initial Complaint on November 17, 2025. This Court subsequently granted an extension of time to perfect service of process.
2. Defendant New York Police Department (New York City Corporation Counsel) and Defendant New York City Department Of Investigation (New York City Corporation Counsel) were formally served on April 7, 2026. As of the date of this filing, no responsive pleading or motion under Rule 12 has been served by any Defendant. Accordingly,

Plaintiffs timely file this Second Amended Complaint as a matter of course pursuant to Federal Rule of Civil Procedure 15(a)(1).

3. Service of process remains pending as to the remaining Defendants. Pursuant to federal practice, the remaining unserved Defendants will be served with this operative Second Amended Complaint and its accompanying summonses.

3.1. Plaintiffs pro se explicitly designate that all public judicial records, electronic docket entries, and administrative filings maintained within the parallel New York State Supreme Court action under Index No. 501135/2024—specifically including the highly irregular administrative sealing order (NYSCEF Doc. 164), all legible and illegible sanctions tracking directives, and all docketed notices of fraud transmitted to the Office of Court Administration (OCA)—are hereby formally and explicitly incorporated herein by reference pursuant to Federal Rule of Civil Procedure 10(c), and that this Honorable Court is respectfully requested to maintain absolute Judicial Notice over the entirety of said state-level proceedings pursuant to Federal Rule of Evidence 201.

4. Following the formal Statement of Death filed on February 25, 2026 (ECF No. 13), the surviving Plaintiffs submit this filing to maintain the integrity of the action within the 90-day window of **FRCP 25(a)(1)**, pending the imminent formal substitution of the representative for the Estate of Anita B. Tovar.

## II. HISTORICAL BACKGROUND AND SUBJECT PREMISES

5. The real property at issue is a residential apartment unit originally constructed as U.S. Navy housing within the Clinton Hill Apartments complex, identified as 210 Clinton Avenue, Apartment 1H, Brooklyn, New York 11205 (the "Subject Premises").

6. The Subject Premises is alternately recorded in New York City municipal housing records under the address 204 Clinton Avenue, Apartment 1H, Brooklyn, New York 11205.

7. Late Plaintiff Anita B. Tovar established lawful occupancy of the Subject Premises in 1972. Plaintiff Monique (Tovar) Saunders resided in the Subject Premises through her young adulthood, maintaining a continuous legal interest and familial nexus to the property.

8. In 2020, during the COVID-19 pandemic, Plaintiff Monique Saunders returned to reside physically at the Subject Premises to provide essential medical care for her ill mother, subsequently re-establishing full-time physical residency alongside the remaining Plaintiffs.

9. Late Plaintiff Anita B. Tovar maintained the Subject Premises as her primary residence for over 45 years.

10. Her spouse, Emmanuel Tovar, was a U.S. Army National Guard Medical Specialist who co-occupied the premises under honorable military service status, as documented by forms NGB-55 and DD-214 (attached hereto as Exhibit 1).

11. This decades-long, stable tenancy establishes the historical baseline of the Plaintiffs' possessory rights and sets the chronological framework for the enterprise's continuous, multi-decade scheme to obscure ownership, manipulate tenancy records, and commit property fraud.

12. Plaintiffs allege that this fifty-four (54) year uninterrupted physical occupancy and multi-generational familial tenure represents an un-cleared federal possessory title and absolute chronological leasehold dominion that pre-dates and structurally trumps the

Enterprise's entire 1984 cooperative conversion scheme under New York RPAPL Article 5, rendering all parallel state-court summary ejectment actions an unconstitutional nullity under the crime-fraud exception.

## III. THE FORMATION AND FRAUDULENT REGISTRATION SCHEME (1978–PRESENT)

13. In 1979, Emmanuel Tovar was placed on State Active Duty with the New York National Guard during a state emergency, as confirmed by official correspondence from Major General Vito J. Castellano, Chief of Staff to Governor Hugh Carey (attached hereto as **Exhibit 2**).

14. This active-duty military status triggered strict federal and state statutory protections for both the service member and his dependent spouse, late Plaintiff Anita B. Tovar, under the **New York State Soldiers' and Sailors' Civil Relief Act (NYS Military Law § 300 et seq.)**.

15. Plaintiffs allege that the RICO Enterprise initiated its multi-decade fraudulent property registration and ownership concealment scheme during this exact window of military service, capitalizing on the enforced absence of the head of household to manipulate tenancy and property records without detection.

16. The enforced absences of Emmanuel Tovar due to active military deployments created specific financial and administrative vulnerabilities for late Plaintiff Anita B. Tovar and her dependent child.

17. The RICO Enterprise intentionally targeted these vulnerabilities—as part of a broader, systemic pattern directed at similarly situated low-income, foreign-born, or dependent tenants in Brooklyn, New York—to execute its fraudulent real estate schemes, obscure corporate ownership, and evade regulatory oversight without detection.

## IV. THE INITIATION OF THE DECEPTIVE SCHEME AND FRAUDULENT LEASE PRESENTATION

18. On December 27, 1978, while Emmanuel Tovar was deployed on active military duty, an agent of Defendant Clinton Hill Apartments Corporation ("CHAC"), identified by the initials "K.W.," presented late Plaintiff Anita Tovar with a "Standard Form of Apartment Lease" published by The Real Estate Board of New York, Inc. (attached hereto as **Exhibit 3**).

19. Plaintiff Anita Tovar declined to execute the presented lease agreement, as the Tovar family's occupancy was predicated upon Emmanuel Tovar's active federal/state military housing status at the Brooklyn Navy Yard complex, rendering the corporate lease demand factually and legally inapplicable.

20. Plaintiffs allege that the generation and presentation of this unsigned, unauthorized corporate lease form marked the inception of the Enterprise's systemic use of deceptive instruments.

21. This document was subsequently utilized via interstate wires and the U.S. Mail to generate and submit fraudulent rent registration statements to the New York State Division of Housing and Community Renewal ("DHCR"), creating a fictitious paper trail to obscure the true regulatory status and beneficial ownership of the Subject Premises.

22. Defendant Clinton Hill Apartments Corporation ("CHAC") is a distinct legal entity from Defendant Clinton Hill Apts. Owners Corp. ("CHAOC") (New York Department of State ID: 721162, incorporated on September 8, 1981).

23. A direct corporate and operational nexus exists between CHAC and CHAOC. This nexus arose from consecutive real estate sales, the conversion of rent-stabilized apartment

inventories within the Clinton Hill Apartments complex into cooperative units, and the subsequent systemic deregulation of rent-regulated units.

24. Plaintiffs allege that the structural transitions between CHAC and CHAOC were utilized by the RICO Enterprise as a deceptive mechanism to carry out unlawful constructive evictions, manipulate tenancy records, and obscure the continuity of ownership from municipal regulatory bodies and tenants.

25. On August 28, 1981, during a period when Emmanuel Tovar was mobilized on active military service, an agent of Defendant CHAC presented late Plaintiff Anita Tovar with a typed notice on corporate letterhead (attached hereto as Exhibit 4).

26. This correspondence asserted that execution of the document would constitute a legally binding extension of a lease and would incorporate all terms from a prior, non-existent lease agreement.

27. Plaintiffs allege that this correspondence constituted a material misrepresentation transmitted to a vulnerable dependent, executed with the intent to establish a fraudulent paper trail of corporate tenancy and to systematically strip the occupants of their statutory military housing protections.

28. Attached to the August 28, 1981, CHAC correspondence was a typed document entitled "Rent Stabilization Rider for Apartment House Tenants in New York City" and a corporate "120 Day Lease Expiration Notice" (attached hereto as **Exhibit 1, 3, 4)**.

29. This Rider was presented independently of any standard, authorized lease renewal form approved by the Real Estate Board of New York, Inc., and deceptively mirrored compliance with the New York City Rent Stabilization Law and Code.

30. On or about November 1981, late Plaintiff Anita Tovar, then a non-citizen dependent whose spouse was deployed on active military service, signed the CHAC correspondence.

31. Her signature was procured through actionable economic duress, the imminent threat of eviction, and a material omission regarding her absolute statutory right as a military dependent to remain in the occupancy without a corporate lease agreement under NYS Military Law § 300 *et seq.*

32. The Enterprise executed this transaction with knowledge that late Plaintiff Anita Tovar lacked the legal authority to unilaterally waive or alter the family's primary federal and state military occupancy rights.

33. Plaintiffs allege that the generation and mailing of these deceptive, unauthorized regulatory notices constituted predicate acts of mail fraud used to force a protected military occupancy into a fraudulent corporate rent-stabilization framework.

34. Defendant CHAC omitted to provide either late Plaintiff Anita Tovar or Emmanuel Tovar with a fully executed 1981 Lease Agreement containing the standardized terms, covenants, clauses, or statutory tenant rights mandated by New York State and City real property laws.

35. Defendant CHAC further omitted to provide any documentary evidence demonstrating a lawful conveyance of the Subject Premises from the United States military to CHAC that would legally compel an active-duty servicemember to execute a corporate lease to maintain possessory rights.

36. Instead, the Enterprise utilized the signature procured from late Plaintiff Anita Tovar on the August 28, 1981 correspondence as a pretextual instrument.

37. This facially deficient document, lacking essential lease terms, was subsequently deployed by the Enterprise to construct a fraudulent paper trail of corporate tenancy, violating New York Real Property Law requirements and advancing the scheme to misrepresent the regulatory status of the Subject Premises to municipal authorities.

38. On June 1, 1982, approximately six months after procuring late Plaintiff Anita Tovar's signature on the pretextual correspondence, the Enterprise utilized the U.S. Mail to transmit a "Property Sale Announcement Letter" to the Tovar family (attached hereto as Exhibit 5).

39. This correspondence was authored by Defendant Frederick J. Rudd, acting as Director of Management for Defendant Time Equities, Inc. ("TEI"). The letter asserted that an entity named "Clinton Hill Equities Group" had acquired the complex from "Clinton Hill Associates," and had appointed TEI as the managing agent.

40. Late Plaintiff Anita B. Tovar was not admitted to United States citizenship through naturalization until February 28, 1984, as documented by Certificate of Naturalization No. 11833063 (attached hereto as Exhibit 6).

41. Plaintiffs allege that the Enterprise introduced sequential corporate layers—including TEI and various unverified partnership entities—while late Plaintiff Anita Tovar was still a non-citizen dependent. This strategic timing was calculated to exploit her immigration status, maintain her legal and administrative isolation, and insulate the shifting "strawman" owners from scrutiny.

42. At all times relevant to this action, Defendant Francis Greenburger was the Founder, Chairman, and Chief Executive Officer of Defendant Time Equities, Inc. ("TEI").

43. Defendant Greenburger directed and controlled the acquisition of the twelve-building Clinton Hill Apartments complex through Defendant Clinton Hill Equities Group, a New York general partnership dominated and controlled by Greenburger and TEI.

44. Defendant Clinton Hill Equities Group acted as the Sponsor for the cooperative conversion of the complex. The Sponsor implemented a non-eviction cooperative conversion plan under the direction of Defendant Greenburger.

45. Defendant Greenburger secured the capital and financing necessary to execute this conversion scheme from Goldome Bank and GD Manhattan Realty Corp.

46. Plaintiffs allege that Defendant Greenburger utilized this multi-tiered corporate and partnership structure—comprising TEI, Defendant Clinton Hill Equities Group, and Clinton Hill Apartments Owners Corp. ("CHAOC")—as an association-in-fact enterprise. This enterprise pooled capital, structured financing, and deployed successive corporate shells to systematically alter the regulatory status of rental units and shield the principal actors from statutory tenant liabilities

## V. THE COMMERCIAL SCALE AND CONTINUITY OF THE RICO ENTERPRISE

47. Defendant Time Equities, Inc. ("TEI") was incorporated in March 1966 by Defendant Francis J. Greenburger and business partner Philip J. Rudd.

48. Defendant Frederick J. Rudd subsequently assumed the role of Director of Management for TEI, maintaining familial and operational continuity within the upper management of the enterprise.

49. TEI operates as a high-volume real-estate investment and cooperative conversion corporation. Throughout the 1980s, the enterprise executed the systematic conversion and

sale of more than 5,000 residential apartments across New York City, as documented in contemporary industry records compiled by The New York Times.

50. Plaintiffs allege that the enterprise utilized its vast commercial infrastructure, shared familial management structures, and high-volume cooperative conversion model to systematically absorb rent-regulated inventories.

51. The scale of these operations heavily engaged the channels of interstate commerce, utilizing interstate wires, institutional bank financing, and the U.S. Mail to execute the property conversions, mortgage placements, and regulatory filings central to the fraudulent scheme.

51.1. Plaintiffs allege that Defendant FIRSTSERVICE RESIDENTIAL NEW YORK, INC. operates as a domestic operating division of FirstService Corporation, a multi-billion-dollar international real estate conglomerate headquartered in Toronto, Canada, publicly traded on the Toronto Stock Exchange (TSX: FSV) and NASDAQ (NASDAQ: FSV), under the executive direction of its global Founder and Chairman, Jay S. Hennick Plaintiffs further allege that the international parent entity systematically executes a predatory commercial business model across municipal markets like Defendant CHAOC, wherein FirstService "purchases" local domestic management companies - specifically including the corporate assets, liabilities, and accounts of Charles H. Greenthal Management Corp. - by and through highly speculative, customized purchase agreements.

51.2. In executing these subsurface mergers, the Enterprise principals intentionally fail to disclose or report the precise structural parameters of these localized purchase agreements to the Securities and Exchange Commission (SEC),

deliberately utilizing regulatory omissions to protect their international public stock valuations and shield their domestic divisions from federal scrutiny. These speculative agreements are explicitly customized to retain and maintain the unbroken workforce, bookkeeping personnel, and on-site property agents of the predecessor managing company, for the corrupt purpose of ensuring the seamless, uninterrupted execution of the Enterprise's ongoing illegal and unethical real estate operations under a new corporate banner.

51.3. By placing a local domestic racketeering enterprise under the protective heading of a Canadian-owned and operated Alien Corporation, FirstService Corporation and its executive directors deliberately manufactured a sophisticated jurisdictional veil, intentionally calculated to mislead public securities markets and prevent the unsuspecting American victims of the RICO Enterprise—including the Plaintiffs' 54-year unbroken military leasehold household—from discovering that a multi-billion-dollar foreign conglomerate had adopted, funded, and weaponized an unrecorded multi-million-dollar property fraud and bank collateral pledging ring to force their physical displacement, constituting a distinct pattern of Securities Fraud under 18 U.S.C. § 1348, Wire Fraud under 18 U.S.C. § 1343, and an open-ended Civil RICO conspiracy in violation of 18 U.S.C. § 1962(d).

51.4. Plaintiffs further allege that Defendant FIRSTSERVICE RESIDENTIAL NEW YORK, INC., operating under the ultimate corporate direction of global Founder Jay S. Hennick, is actively engaged in grand-scale Securities Fraud under 18 U.S.C. § 1348 by systematically defrauding and misleading its United States public shareholders. The Enterprise corruptly deploys public investor capital solicited on the

NASDAQ exchange to actively finance, adopt, and insulate localized criminal operations - including the structural harboring of Co-Conspirator Melissa Martin's un-permitted, narcotics-suspected commercial canine enterprise and the funding of Defendant Acoustilog's un-warranted nine (9) day mechanical wiretap and electronic eavesdropping apparatus targeting the Plaintiffs' residence and home office sanctuary.

51.5. In an egregious breach of corporate fiduciary duties and federal disclosure mandates, the Enterprise principals have executed a coordinated, non-responsive courtroom boycott, consciously refusing to log their formal corporate defense counsel into this Court's electronic registry or advance responsive pleadings. The Enterprise has intentionally hidden this active federal court default tracking from its public shareholders and federal oversight panels to artificially protect its international stock valuations and conceal the fact that its domestic operating divisions have recklessly exposed public investor equity to catastrophic, multi-million dollar treble-damage civil RICO default liabilities, rendering their transnational corporate structure a primary vehicle for continuous wire fraud and public corruption under the crime-fraud exception.

## VI. OPERATIONAL HISTORY AND EXTENSION OF THE ENTERPRISE

52. Defendant Time Equities, Inc. ("TEI"), under the executive direction of Defendant Francis J. Greenburger and partner Philip J. Rudd, executed the cooperative conversion of the twelve-building complex known as the Clinton Hill Apartments in 1984. This conversion resulted in the formation of Defendant Clinton Hill Apartments Owners Corp. ("CHAOC").

53. The Enterprise principals maintain a documented, systematic pattern of using corporate real estate vehicles to improperly deregulate residential properties. Specifically, founder Philip J. Rudd specialized in the systemic removal of New York properties from residential rent-control frameworks.

54. Furthermore, his successor, Defendant Frederick Rudd, has a documented history of executing illegal, fraudulent rent-stabilization deregulation schemes across Manhattan property inventories, as established by State Supreme Court litigation (see *Tenants of 28 Bedford Street v. Rudd Realty Management*, Index No. [*X*] [N.Y. Sup. Ct. 2017]).

55. Plaintiffs allege that the Enterprise attempted to apply this identical deregulation and stabilization *modus operandi* to the Subject Premises (Apartment 1H).

56. However, the Subject Premises was a designated United States Navy/military housing unit. As a matter of federal and state law, the unit sat entirely outside local rent-stabilization jurisdictions, rendering the Enterprise's sequential demands for leases, rent escalations, and corporate conversions factually and legally void *ab initio.*

**VII. THE UNAUTHORIZED EXERCISE OF CONTROL AND MAIL FRAUD COMMUNICATIONS**

57. Throughout the 1970s, the United States Department of Defense (DOD) maintained absolute ownership of the Subject Premises. Neither the DOD nor the Tovar family executed any lease, contract, or occupancy agreement with Defendants CHAC, CHAOC, Time Equities, Inc. ("TEI"), or Clinton Hill Equities Group.

58. Despite this total absence of contractual privity or legal title, the Enterprise utilized the U.S. Mail to issue a "Property Sale Announcement Letter" on June 1, 1982, executed by Defendant Frederick J. Rudd in his capacity as Director of Management for TEI (attached hereto as **Exhibit [X]**).

59. This correspondence contained explicit, material misrepresentations designed to validate a fraudulent corporate tenancy, specifically asserting that TEI's "computerized records" established a verified rent of $233.39, a security deposit of $233.39, and a binding lease expiration date of December 31, 1984.

60. Attached to this mailing was an institutional notice from Clinton Hill Associates declaring that the complex—consisting of over 1,000 apartment units—had been sold to Defendant Clinton Hill Equities Group and that all tenant security deposits had been assigned and transferred.

61. These corporate transfer documents contained a total **material omission** regarding the unique federal military housing status of the Subject Premises, intentionally hiding the fact that the Enterprise was unilaterally absorbing federal military infrastructure into a private cooperative inventory.

62. This deceptive omission aligns with a documented *modus operandi* of executing unauthorized real estate de-regulations to maximize profits while receiving municipal benefits, as established in subsequent enforcement litigation involving Defendant Frederick Rudd's firm (see Yang v. Creative Industries Corp. / Rudd Realty Management).

## VIII. THE SPONSOR'S SCIENTER AND UNAUTHORIZED INSIDER TRANSACTIONS

63. At all times relevant to this action, Defendants Frederick J. Rudd, Francis J. Greenburger, and Time Equities, Inc. ("TEI") possessed actual and constructive knowledge, through contemporaneous business records, that Emmanuel Tovar was an active-duty U.S. Army National Guardsman occupying the Subject Premises under protected federal military housing status.

64. At the time of the purported complex sale, the entity designated as the seller, "Clinton Hill Associates," was a non-existent entity unregistered with the New York Department of State, Division of Corporations, rendering it legally incapable of executing a valid real property conveyance or assigning tenant security deposits.

65. The designated purchaser, Defendant Clinton Hill Equities Group (a New York general partnership), maintained an overlapping corporate nexus with Defendant Greenburger, who acted as the sole stockholder, Chairman, and CEO of TEI, the managing agent for the conversion.

66. Plaintiffs allege that this transaction was a fraudulent insider mechanism designed to transfer real property control to an entity controlled by the same principal actors, without a lawful title chain from the United States military.

67. The Enterprise intentionally omitted to disclose this conflict of interest and the unique military housing status of the Subject Premises to the occupants, utilizing the U.S. Mail to issue fraudulent collection and tenancy notices in furtherance of the scheme to defraud.

## IX. THE SPONSOR’S KNOWLEDGE AND ACCUSATIONS OF INSIDER FRAUD

68. At all times relevant to this action, Defendants Frederick J. Rudd, Francis J. Greenburger, and Time Equities, Inc. ("TEI") possessed actual and constructive knowledge that the Subject Premises was an active United States military housing unit occupied by a protected servicemember and his dependents.

69. At the time of the purported complex-wide sale, the designated seller, "Clinton Hill Associates," was a non-existent corporate entity unregistered with the New York

Department of State, rendering its purported real estate conveyance and assignment of security deposits legally void *ab initio*.

70. The designated purchaser, Defendant Clinton Hill Equities Group, maintained an identity of interest with Defendant Greenburger, who simultaneously served as the sole stockholder, Chairman, and CEO of TEI, the managing agent executing the conversion.

71. The Enterprise intentionally concealed these structural corporate defects and conflicts of interest from the occupants. They utilized the U.S. Mail to issue fraudulent collection notices and lease demands, intentionally bypassing federal and state military housing protections to execute a predatory property acquisition.

## X. THE INCEPTION OF STRUCTURAL LATENT DEFECTS AND DEFENDANTS' NOTICE

72. On March 26, 1983, a catastrophic flooding event (the "1983 Flood") occurred within the Subject Premises, originating from structural failures in the surrounding building infrastructure.

73. Contemporaneous corporate business records, specifically a Clinton Hill Apartments Security Incident Report executed by Security Captain Jessie Moore, document that water simultaneously breached the Subject Premises from three separate entry points: (1) the main ingress door, and (2) two separate common adjacent walls shared between Apartment 1G and the Subject Premises (attached hereto as **Exhibit [X]**).

74. The 1983 Flood caused extensive, documented damage to the real property infrastructure and the Plaintiffs' personal property, causing the immediate saturation and subsequent buckling of the structural subfloors and wall-to-wall carpeting across the bedroom, bathroom, and dual foyers.

75. Late Plaintiff Anita Tovar timely executed and delivered a detailed "Estimate of Damage by Water" report to Defendants Clinton Hill Equities Group and Time Equities, Inc. ("TEI") at their designated operational office located at 345 Clinton Avenue, Brooklyn, New York 11238, documenting immediate structural damage totaling $1,006.25 (attached hereto as **Exhibit [Y]**).

76. Plaintiffs allege that the 1983 Flood provided the Enterprise with immediate, actual written notice of severe, latent structural defects within the building's drainage and common wall infrastructure.

77. Despite this notice, and while Emmanuel Tovar was deployed on active military service, the Enterprise omitted to execute structural remediation or replace the water-saturated subfloors. This deliberate omission initiated a continuous, multi-decade pattern of concealing latent defects, creating a toxic environment for the propagation of dangerous fungal spores and mycotoxins, in violation of the Implied Warranty of Habitability (**NYS Real Property Law § 235-b**).

78. Following the 1983 Flood, the underlying structural floorboards and subflooring within the Subject Premises sustained progressive, long-term degradation, including organic wood rot, severe warping, and structural buckling.

79. The 1983 Flood constitutes the first of three discrete, catastrophic flooding events that caused severe property damage to the Subject Premises over a forty-year period.

80. Despite continuous, documented notice of these recurring events, the Enterprise, its corporate successors, and its assigns omitted to execute any structural remediation, moisture extraction, or subfloor replacement, allowing the structural deterioration to persist to the present day.

81. Plaintiffs allege that the Enterprise's intentional refusal to remediate these latent defects, combined with the ongoing concealment of its true corporate ownership from municipal housing regulators, constitutes the Enterprise's "regular way of doing business."

82. This calculated omission allowed the Enterprise to systematically reduce operational expenditures, evade building code enforcement, and misappropriate rental and cooperative maintenance funds through a continuous, decades-long pattern of mail and wire fraud.

## XI. THE 1989 FLOOD, DECEPTIVE INSURANCE REPRESENTATIONS, AND BIOLOGICAL COLONIZATION

83. On August 24, 1989, a second catastrophic flooding event (the "1989 Flood") breached the Subject Premises, causing severe structural damage to the bathroom ceiling, kitchen floor infrastructure, foyer hardwood floorboards, and bedroom subflooring.

84. On August 31, 1989, late Plaintiff Anita Tovar delivered a formal written incident report and a $1,500.00 property damage estimate to Defendants Clinton Hill Equities Group and Time Equities, Inc. ("TEI") at their 345 Clinton Avenue management office (attached hereto as **Exhibit [X]**).

85. On September 5, 1989, Defendant TEI utilized the U.S. Mail to transmit a written response to late Plaintiff Tovar, stating that the damage claim had been "forwarded to our insurance company for handling" (attached hereto as **Exhibit [Y]**).

86. Despite this written representation, the Enterprise omitted to compensate the Plaintiffs, denied the property damage claim, and refused to execute structural repairs or moisture mitigation inside the apartment.

87. As a direct result of Defendant TEI's refusal to remediate the saturated structural components, the underlying subflooring, drywall, and hardwood boundaries developed active, progressive toxic mold and mildew colonies.

88. Plaintiffs allege that the Enterprise utilized the U.S. Mail to transmit deceptive insurance notices to pacify the tenants and shield the Enterprise from liabilities. This step advanced a continuous pattern of property fraud and systematic denial of required services, directly exacerbating the biological health hazards initiated during the 1983 Flood.

## XII. THE 1995 FLOOD, SUPERINTENDENT NOTICE, AND PREDATORY MAINTENANCE NEGLECT

89. On July 10, 1995, a third catastrophic water intrusion event (the "1995 Flood") breached the Subject Premises, caused by a faulty ballcock installation within the building's common plumbing infrastructure.

90. The building superintendent, identified as Superintendent Casey, executed an official "Notice of Accident or Property Damage Report" that was countersigned by late Plaintiff Anita Tovar (attached hereto as **Exhibit [X]**).

91. This contemporaneous corporate business record explicitly documented severe dampness, pervasive odors of stagnation, water-saturated carpeting, structural damage to the kitchen flooring, and the destruction of furniture and personal effects.

92. Plaintiffs Anita Tovar and Monique Saunders were physically present inside the Subject Premises during the 1995 Flood and witnessed the structural breach and property destruction.

93. Despite actual written notice and the capture of photographic evidence by corporate agents, Defendants CHAOC and TEI denied compensation and omitted to perform any remedial structural repairs to the saturated floorboards or underlying infrastructure.

94. Plaintiffs allege that this systematic, decades-long refusal to repair structural latent defects was a calculated predatory mechanism deployed by the Enterprise to execute a constructive eviction of long-term occupants, artificially lower operational overhead, and maximize illegal cooperative conversion profit margins.

95. To date, the Defendants have failed to remediate or restore the water-damaged, mold-replete hardwood subfloors, allowing the hazardous environmental degradation of the Subject Premises to persist continuously.

## XIII. THE EXECUTION OF THE MAIL FRAUD SCHEME AND FORCED RENT REGISTRATIONS

96. On or about April 1, 1985, Defendant Time Equities, Inc. ("TEI") utilized the U.S. Mail and interstate wires to file a fraudulent Annual Apartment Registration with the New York State Division of Housing and Community Renewal ("DHCR") for the Subject Premises.

97. In this regulatory filing, Defendant TEI falsely designated itself as the "managing agent" and misrepresented that the Subject Premises was a standard commercial rent-stabilized unit subject to private corporate ownership, rather than an exempt United States military housing unit.

98. Defendant TEI subsequently mailed a tenant copy of this 1985 DHCR registration to Emmanuel and Anita Tovar at the Subject Premises (attached hereto as **Exhibit [X]**). The Enterprise executed this mailing with actual knowledge that:

- Emmanuel Tovar maintained active military housing status;
- The Subject Premises was designated federal military infrastructure; and
- No valid master lease agreement had ever been executed by the Tovar family.

99. In 1986, Defendant TEI filed another fraudulent Annual Apartment Registration with the DHCR, listing Emmanuel Tovar as the "Tenant" and setting a rent of $254.39 per month (attached hereto as **Exhibit [Y]**). The Enterprise executed this electronic and mail transmission despite possessing actual knowledge that no lawful master lease or signed lease renewal agreement existed.

100. On September 16, 1988, Defendant TEI presented late Plaintiff Anita Tovar with a New York City Rent Stabilization Lease Renewal Form, accompanied by written communications containing threats of immediate eviction if the packet was not executed.

101. Driven by fear of unlawful eviction, late Plaintiff Anita Tovar signed the documents and paid an unauthorized financial surcharge and an increased security deposit demanded by Defendant TEI.

102. As part of this transaction, Defendant TEI required late Plaintiff Tovar to execute DHCR Form RA-23.5 ("Notice To Owner Of Persons Other Than Tenant Residing In Apartment"), on which she explicitly listed her daughter, Plaintiff Monique Tovar [Saunders], then 15 years of age (attached hereto as **Exhibit [Z]**).

103. Although Defendant TEI routinely collected the inflated monthly rent and deposited the funds into its Citibank "Time Equities-Clinton Hill Rent Security Account," the Enterprise principals intentionally omitted to sign the lease document or provide the Plaintiffs with a fully executed copy.

104. Plaintiffs allege that the systematic filing and mailing of these facially deficient, unsigned lease forms and false DHCR registrations constituted a continuous pattern of **predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343**. This mechanism was deployed by the Enterprise to create a fictitious regulatory record, extract

illicit surcharges, and mask the unauthorized conversion of federal military property into a private cooperative inventory.

## XIV. FINANCIAL LAYERING, CORPORATE SHIFTING, AND INSTITUTIONAL INSULATION

105. On March 7, 1990, late Plaintiff Anita Tovar received a correspondence on the letterhead of GD (Goldome) Manhattan Realty Corp.—a wholly-owned subsidiary of Goldome Savings Bank of New York—asserting a transfer of ownership of the Subject Premises from Clinton Hill Equities Group to GD Manhattan Realty Corp. (attached hereto as **Exhibit [X]**). This notice directed all future rent payments to a Post Office Box in Buffalo, New York.

106. On March 28, 1990, the Enterprise transmitted an identical, unsigned duplicate of the March 7 ownership transfer notice to late Plaintiff Anita Tovar, reiterating the demand to route funds to the Buffalo banking repository.

107. On April 5, 1990, eight days after the duplicate notice, late Plaintiff Tovar received a conflicting directive executed by Kathryn M. Mulloy, Vice President of GD Manhattan Realty Corp. (attached hereto as **Exhibit [Y]**). This notice countermanded the prior payment instructions and directed that rent payments for May 1990 and thereafter be redirected to a new managing agent, Defendant Mark Greenberg Real Estate Co., Inc. ("MGRE").

108. Plaintiffs allege that these rapid, sequential alterations of financial routing instructions and corporate roles within a 30-day window constituted a deliberate "layering" mechanism executed via the U.S. Mail. This pattern of mail fraud predicates (**18 U.S.C. § 1341**) was designed to obscure the chain of title, generate administrative confusion for the tenants, and insulate the shifting "strawman" owners from regulatory scrutiny.

109. The March 1990 correspondences further disclosed that GD Manhattan Realty Corp. had retained the law firm Weil, Gotshal & Manges to represent its interests regarding the property transfers.

110. Plaintiffs allege that the Enterprise utilized prominent institutional legal counsel to structure these unrecorded corporate hand-offs and manage underlying regulatory risks. This step effectively insulated the Enterprise from direct liability to the occupants while converting federal military housing assets into private cooperative inventories without Plaintiff(s)'s participation or informed consent

## XV. THE SPONSOR COLLAPSE, FRAUDULENT COLLATERALIZATION, AND MORTGAGE KICKBACK SCHEME

111. Throughout the early 1990s, the Enterprise's ongoing manipulation of tenancy records and constructive eviction tactics occurred against a backdrop of community-wide displacement, marked by an escalation of weekly evictions across rent-regulated inventories in the Clinton Hill neighborhood.

112. In April 1990, late Plaintiff Anita Tovar received an institutional notification from Defendant Clinton Hill Apartment Owners Corporation ("CHAOC") titled "Important Letter To All Clinton Hill Residents - Special Notice" (attached hereto as **Exhibit [X]**).

113. This corporate disclosure revealed that in December 1989, Sponsor Francis Greenburger (CEO of Defendant Time Equities, Inc. ["TEI"]) had formally disclosed to the New York State Attorney General's Office an impending financial insolvency, rendering the Sponsor unable to pay mandatory maintenance fees on the 693 *unsold* cooperative apartments he controlled out of the complex's 1,214 total units.

114. To prevent a catastrophic default that would destabilize the cash flow of Defendant CHAOC, Defendant Greenburger and TEI entered into a financial restructuring agreement with Goldome Savings Bank of New York to guarantee complex maintenance costs effective February 1990.

115. Under this restructuring agreement, Defendant Greenburger pledged a sweeping inventory of apartment units to Goldome Savings Bank as loan collateral. Consequently, Goldome Savings Bank transferred titular ownership of these collateralized units to its wholly-owned real estate subsidiary, GD Manhattan Realty Corp., which subsequently appointed Defendant Mark Greenberg Real Estate Co., Inc. ("MGRE") as its asset management agent.

116. Plaintiffs allege that Defendant Greenburger, TEI, Goldome Savings Bank, and GD Manhattan Realty Corp. knowingly integrated the Subject Premises (Apartment 1H) into this commercial collateral pool.

117. The Enterprise executed this pledge despite possessing actual and constructive knowledge that neither the Sponsor nor Defendant CHAOC possessed lawful title to the Subject Premises, which remained a designated United States military housing unit.

118. Plaintiffs further allege that Defendants MGRE, Mark Greenberg, and the institutional banking actors established an illicit mortgage procurement and kickback scheme.

119. This scheme utilized the U.S. Mail and interstate wires to secure leveraged equity investments and institutional mortgage financing by knowingly offering the Subject Premises as fraudulent bank collateral.

120. This step advanced a multi-layered real estate fraud operation that generated illicit liquidity for the collapsing Sponsor while intentionally misrepresenting the legal and regulatory status of federal military infrastructure to financial institutions and municipal regulators, constituting a distinct pattern of bank fraud (**18 U.S.C. § 1344**) and mail fraud (**18 U.S.C. § 1341**).

121. During this financial restructuring, the Enterprise intentionally omitted to disclose to late Plaintiff Anita Tovar her specific statutory housing rights and protections as a military dependent under the **New York State Soldiers' and Sailors' Civil Relief Act**.

122. Instead, the Enterprise used the administrative confusion to coerce her into routing monthly rental payments to unauthorized corporate entities, including Goldome Savings Bank and its real estate subsidiaries, who held no legitimate chain of title to the federal property.

123. In the April 1990 Special Notice, Defendant CHAOC's Board of Directors explicitly affirmed that because the conversion plan for the Clinton Hill Apartments was a non-eviction plan, non-purchasing tenants were not required to vacate the premises upon a change in titular ownership (attached hereto as **Exhibit [X]**).

124. Operating within her rights as a military dependent and given the federal housing status of the Subject Premises, late Plaintiff Anita Tovar never elected to execute a purchase agreement or participate in the cooperative conversion of the Subject Premises.

125. Plaintiffs allege that the Enterprise utilized these non-eviction clauses as a deceptive tool to keep the protected family inside the unit. This step allowed them to continue collecting illicit rents and use the apartment as fraudulent bank collateral, while

systematically denying the structural maintenance and repairs required under the Implied Warranty of Habitability (**NYS Real Property Law § 235-b**).

126. The explicit non-eviction mandate in the April 1990 Special Notice confirmed that non-purchasing occupants retained a continuous, uninterrupted right of possession, independent of corporate ownership transfers.

127. Late Plaintiff Anita Tovar strictly conformed to this non-eviction framework. She consistently declined to execute any purchase agreements, preserving her family's status as protected, non-purchasing residents.

128. Plaintiffs allege that the Enterprise intentionally used this non-eviction status to exploit the family. By keeping the occupants inside the unit, the Enterprise could continue collecting rent and using the unit as bank collateral, while entirely abandoning its structural maintenance obligations.

**XVI. MANAGEMENT TRANSITIONS AND THE CONTINUITY OF SITE PERSONNEL**

129. The April 1990 Special Notice issued by Defendant CHAOC's Board of Directors further informed the occupants that effective April 1, 1990, Defendant Time Equities, Inc. ("TEI") would cease its property management operations across its cooperative portfolio (attached hereto as **Exhibit [X]**).

130. To maintain operational continuity, Defendant CHAOC contracted with a successor entity, Elm Management Associates, Inc. ("Elm Management"), explicitly stipulating that the successor must retain the pre-existing on-site management, accounting, bookkeeping, and maintenance staff.

131. Late Plaintiff Anita Tovar complied with these directives, routing monthly rental payments to Elm Management as instructed by Defendant CHAOC's corporate agents.

132. She executed these payments without knowledge of the underlying structural ownership defects, the lack of a valid chain of title from the United States military, or the fraudulent collateralization schemes.

133. Plaintiffs allege that the intentional retention of the identical on-site personnel across successive property management transitions was a calculated operational mechanism deployed by the Enterprise.

134. Maintaining this unbroken chain of core personnel ensured that the systemic practices of falsifying tenancy records, concealing structural latent defects, and diverting security deposits remained insulated from external discovery or regulatory intervention.

135. Plaintiffs allege that this structural continuity directly facilitated an ongoing pattern of state law infractions, including grand larceny, criminal possession of stolen property, and the falsification of business records, which served as the operational foundation for the Enterprise's federal racketeering predicates.

## XVII. THE DECEPTIVE SECURITY DEPOSIT TRANSFER AND ACCOUNT MANIPULATION

136. On May 14, 1990, less than thirty days after receiving the CHAOC Special Notice, late Plaintiff Anita Tovar received a written notice via the U.S. Mail from Defendant Mark Greenberg Real Estate Co., Inc. ("MGRE") (attached hereto as **Exhibit [X]**).

137. This correspondence formally stated: *"Your Landlord, GD Manhattan Realty Corp., has transferred your security deposit and accrued interest to an interest-bearing account at Goldome. You will receive from Goldome a check in the amount of the interest earned on your security deposit on an annual basis."*

138. The Enterprise executed this financial transfer and transmitted the accompanying mail notice with actual knowledge that neither GD Manhattan Realty Corp. nor Goldome Savings Bank held a legitimate, lawful chain of title to the Subject Premises.

139. Plaintiffs allege that the generation and mailing of this notice constituted an affirmative **predicate act of mail fraud under 18 U.S.C. § 1341**.

140. The transaction was a deceptive mechanism deployed to validate an unlawful property interest, create a fraudulent paper trail of commercial landlord-tenant escrow compliance, and obscure the conversion and commingling of tenant funds within a collapsing banking institution.

141. Enclosed within the May 14, 1990 correspondence from Defendant MGRE was an IRS Form W-9, accompanied by a written directive warning late Plaintiff Anita Tovar that *"failure to comply with completing the [enclosed] W9 form as required by government regulation will result in 20% withholding of interest"* (attached hereto as **Exhibit [X]**).

142. Plaintiffs allege that this statutory tax demand was a **pretextual artifice** deployed via the U.S. Mail to fraudulently procure late Plaintiff Tovar's Social Security Number and Personally Identifiable Information (PII).

143. Because the underlying property transfer and collateralization scheme lacked a valid legal chain of title from the United States military, no lawful landlord-tenant escrow account existed under **New York General Obligations Law § 7-103**.

144. The Enterprise principals—including Defendants CHAOC, MGRE, Mark Greenberg, Goldome Savings Bank, and GD Manhattan Realty Corp.—procured this sensitive financial data with the specific intent to utilize the tenant's PII to open unauthorized financial sub-accounts, mask illicit layering transactions, and obscure the

unauthorized conversion of federal military property from federal regulatory oversight, violating **18 U.S.C. § 1028 (Identity Fraud)** and **18 U.S.C. § 1341 (Mail Fraud)**.

145. Prior to the May 14, 1990 correspondence issued by Defendant MGRE, no corporate real estate entity associated with the Subject Premises had ever requested or required the production of the Tovar family's Social Security Numbers or sensitive Personally Identifiable Information (PII).

146. The rapid, sequential redirection of rental payments from Elm Management to MGRE, coupled with the sudden demands for private financial data by an external entity lacking contractual privity or recorded title, effectively altered the administrative status of the military housing unit.

147. Plaintiffs allege that the Enterprise intentionally orchestrated these unsettling and rapid management modifications to create structural instability, which served to prevent the occupants from identifying the underlying property conversion.

148. The execution of this documentation strategy effectively forced a private commercial tenancy model onto a protected military occupancy, using deceptive data collection practices to systematically erode the family's long-term housing security in furtherance of the scheme to defraud.

## XVIII. THE FDIC RECOVERY, MATERIAL REGULATORY MISREPRESENTATIONS, AND RE-LAYERING

149. On July 27, 1990, late Plaintiff Anita Tovar received a written notification issued on the letterhead of GD Manhattan Realty Corp. (attached hereto as **Exhibit [X]**).

150. This correspondence explicitly misrepresented the nature of a federal regulatory intervention, falsely stating: *"GD Manhattan Realty Corp. has sold its interest in your apartment to the Federal Deposit Insurance Corporation (FDIC). Please make your check*

*or money order payable to the FDIC and continue to send your rent payments to Mark Greenberg Real Estate Co. Inc. (MGRE).”*

151. In factual reality, no bona fide, arms-length commercial "sale" occurred; rather, the FDIC had executed a mandatory regulatory seizure of the insolvent Goldome Savings Bank and its wholly-owned subsidiary, GD Manhattan Realty Corp., to stabilize a historic banking collapse.

152. The Enterprise utilized the U.S. Mail to transmit this deceptive notice to shield its illicit underlying collateralization scheme from detection by the tenants and to maintain active control over the routing of rental income.

153. Plaintiffs allege that the directive commanding the tenants to continue mailing funds to Defendant MGRE on behalf of the FDIC constituted a **predicate act of mail fraud under 18 U.S.C. § 1341**.

154. By active misrepresentation and material omission regarding the bank's insolvency and seizure, the Enterprise successfully engineered a "re-layering" mechanism, inserting a federal regulatory agency's name into the billing cycle to falsely legitimize its unauthorized commercial possession of a United States military housing unit.

155. In factual reality, Goldome Savings Bank and its wholly-owned subsidiary, GD Manhattan Realty Corp., did not execute a voluntary commercial divestment; rather, the institutions were involuntarily seized by federal regulators due to severe corporate insolvency.

156. This regulatory takeover constituted the largest and most expensive savings-bank collapse in United States history up to that date, resulting in the dividing of Goldome’s

legitimate assets between two independent banking competitors, as confirmed by contemporary public records compiled by the Associated Press and *The New York Times*.

157. Plaintiffs allege that the Enterprise deliberately concealed the involuntary nature of this federal seizure from the occupants to prevent them from discovering that the Subject Premises had been improperly entangled in an insolvent bank's collateral pool.

158. By utilizing the U.S. Mail to mischaracterize this mandatory regulatory intervention as a routine "property sale," the Enterprise successfully maintained its operational control and continued the unauthorized collection of rental income through Defendant MGRE, advancing the broader scheme to defraud.

159. On or about July 27, 1990—five months prior to the expiration of the existing lease of record and seven months prior to the public finalization of the FDIC's asset seizure protocols—Defendant MGRE presented late Plaintiff Anita Tovar with a premature "Lease Renewal Form" (attached hereto as **Exhibit [X]**).

160. This regulatory instrument listed the "F.D.I.C." as the formal property owner and Defendant MGRE as the authorized legal agent, creating a false appearance of federal agency oversight and direct mandate.

161. Late Plaintiff Anita Tovar executed this premature instrument on September 4, 1990, driven by the manufactured threat of displacement during a period of institutional restructuring.

162. Defendant MGRE intentionally withheld the fully executed copy of the lease agreement for nearly three months, failing to return it to the occupants until November 30, 1990.

163. Plaintiffs allege that the generation and mailing of this premature lease renewal was a tactical maneuver designed to lock the protected occupants into a commercial tenancy model before the insolvent bank's collateral pool underwent final federal winding-down procedures.

164. Upon securing late Plaintiff Tovar's signature, the Enterprise immediately used the U.S. Mail to issue a new financial routing directive, countermanding the prior FDIC collection instructions and ordering her to redirect all monthly rent payments to a separate entity, "Marvin Gold Management," at 2940 Avenue X, Brooklyn, New York 11235 (attached hereto as **Exhibit [Y]**).

165. Plaintiffs allege that this abrupt redirection of funds to a private entity immediately following the procurement of a lease under the "FDIC" name constituted a **predicate act of mail fraud under 18 U.S.C. § 1341**. This structural "bait-and-switch" maneuver allowed the Enterprise to leverage federal regulatory authority to coerce compliance while routing cash flows to unrecorded corporate actors.

166. On August 28, 1990, late Plaintiff Anita Tovar received an "Important Notice" letter transmitted via the U.S. Mail by Defendant MGRE (attached hereto as **Exhibit [X]**). This correspondence stated: *"Since there is an assignment of rents in force for your apartment, please pay your rent directly to Marvin Gold Management and mail your payment to 2940 Avenue X, Brooklyn, NY 11235. You will be notified by this office and the managing agent for your building when to commence paying your rent to Mark Greenberg Real Estate Co. Inc."*

167. Plaintiffs allege that the principal motive underlying this premature lease execution and immediate redirection of rental income away from MGRE was to divert late Plaintiff Tovar's cash flows to Marvin Gold and Defendant Marvin Gold Management Co., Inc.

168. This diversion was engineered to intercept the funds before the FDIC's formal finalization and split of Goldome Bank's asset portfolio between rival institutions could take effect, as documented in public financial records compiled by The New York Times.

169. In addition to the fraudulent collateralization involving the insolvent bank, Defendant CHAOC and its Board of Directors sequentially contracted property management services to Elm Management Associates, Inc. and Marvin Gold Management Co., Inc.

170. Both corporate entities and their executive leadership were subsequently indicted in June 1999 by the New York County District Attorney and the New York City Department of Investigation (DOI) as two organized criminal enterprises, designated respectively as "The Elm Group" and "The Gold Group."

171. As established by official New York City Department of Investigation records, these entities were charged with Enterprise Corruption (**NYS Penal Law § 460.20**), grand larceny, commercial bribery, and bid-rigging schemes. The criminal operations involved widespread collusion among property management companies, contractors, and cooperative board members to misappropriate over $4 million in building maintenance and capital funds.

172. Plaintiffs allege that the Enterprise seamlessly integrated these indicted property management rings into its operational infrastructure to victimize the occupants of the Subject Premises.

173. Utilizing these corrupt operators allowed the Enterprise to execute unlawful financial extractions and maintain a systematic barrier against the discovery of its underlying title fraud, while using the U.S. Mail to transmit fraudulent billing statements in violation of **18 U.S.C. § 1341**.

174. According to the New York City Department of Investigation (DOI) records, the primary Enterprise Corruption indictment charged Defendant Marvin Gold Management Co., Inc. (subsequently known as Jansl, Inc.), its President, Marvin Gold, and its Vice President, Jeffrey C. Gold, with operating a criminal enterprise designated as "The Gold Group" (attached hereto as **Exhibit [X]**).

175. The indictment established that Marvin Gold led the enterprise in defrauding the residents and shareholders of 26 cooperatives of more than $1.7 million by extracting illicit kickbacks directly from contractors, which were then coordinated and split by Jeffrey Gold among on-site management personnel.

176. The sequential Enterprise Corruption indictment filed by the New York County District Attorney charged Defendant Elm Management Associates, Inc., its President, Arnold Zabinsky, and multiple property managers and vendors with operating a separate criminal enterprise designated as "The Elm Group."

177. The DOI investigation established that Zabinsky directed the enterprise in defrauding the residents and shareholders of 29 cooperatives of more than $1.3 million, with Zabinsky personally acquiring 75% of the illicit contractor kickbacks.

178. Plaintiffs allege that the Enterprise intentionally integrated these corrupt management apparatuses—The Gold Group and The Elm Group—into the administrative framework governing the Clinton Hill Apartments complex.

179. The systemic extraction of contractor kickbacks and widespread bid-rigging executed by these entities served as the primary financial mechanism that deprived the Subject Premises of necessary structural maintenance funds. This operational nexus directly resulted in the intentional abandonment and concealment of the toxic mold, spores, and structural subfloor defects, converting local corporate corruption into a continuous pattern of federal mail fraud predicates under **18 U.S.C. § 1341**.

## XIX. SYSTEMATIC THEFT OF PROPERTY INTERESTS AND THE FDIC ROUTING DIRECTIVES

180. Plaintiffs allege that the Enterprise, utilizing the corrupt operational frameworks of Defendants Elm Management Associates, Inc. and Marvin Gold Management Co., Inc., executed a multi-layered scheme to defraud. This scheme targeted the Tovar family through the fraudulent conversion and theft of:

- The possessory and residency interest in the Subject Premises (Apartment 1H);
- Monthly rental payments;
- Compounded annual rent-stabilization increases; and
- Inflated escrow security deposits.

181. This financial extraction was carried out under the false pretense that Defendant CHAOC possessed lawful title to the Subject Premises, and under the further deceptive representation that the Enterprise had legally registered this exempt federal military housing unit as a standard commercial rent-stabilized apartment with Defendant DHCR.

182. On February 11, 1991, the structural routing of the Enterprise's collection mechanism shifted again when the FDIC utilized the U.S. Mail to transmit a formal directive to late Plaintiff Anita Tovar, signed by Charles J. Altman (attached hereto as **Exhibit [X]**).

183. This correspondence stated: *"Pursuant to our rights under agreements with the 'owner' of your apartment the Federal Deposit Insurance Corporation ('FDIC') is authorized to collect your monthly rent. As you may know, the FDIC has been paying the maintenance for your apartment to the co-op corporation. To date Mark Grenberg Real Estate Co. has served as our Property Manager for rent collection. We have now engaged the services of Douglas Elliman Gibbons & Ives to serve as Property Manager for your apartment. They will shortly be in touch with you. Please pay your monthly rent directly to them."*

184. Plaintiffs allege that the transmission of this February 11, 1991 notice constituted an affirmative **predicate act of mail fraud under 18 U.S.C. § 1341**.

185. The introduction of yet another institutional property manager—Douglas Elliman Gibbons & Ives—served to further layer the administrative record. This mechanism allowed the Enterprise to leverage federal agency terminology to enforce rent collections and mask the underlying lack of a valid chain of title from the United States military.

186. Plaintiffs allege that the Federal Deposit Insurance Corporation ("FDIC") was actively misled by the Enterprise into believing that Defendant CHAOC possessed legitimate ownership of the Subject Premises, or alternatively, that a Sponsor had acquired lawful "unsold shares" allocated to the unit.

187. The primary actors responsible for this structural deception and the misrepresentation of the title chain were the CHAOC Board of Directors, Defendant Francis Greenburger, Defendant Time Equities, Inc. ("TEI"), GD Manhattan Realty Corp., Marvin Gold, and Defendant Marvin Gold Management Co., Inc.

188. Plaintiffs allege that these corporate and individual defendants utilized unrecorded insider transfers, unverified partnership agreements, and false regulatory filings to present a fraudulent paper trail to federal banking regulators.

189. By intentionally obscuring the true United States military ownership history of the Subject Premises, the Enterprise induced the FDIC to inject capital, place loans, and manage the unit under a commercial cooperative framework, thereby advancing a multi-decade scheme to defraud and violating **18 U.S.C. § 1341 (Mail Fraud)** and **18 U.S.C. § 1344 (Bank Fraud)**.

## XX. THE INTRODUCTION OF DEGI AND FRAUDULENT COOPERATIVE SHARE MARKETING

190. On February 15, 1991, late Plaintiff Anita Tovar and Plaintiff Monique Saunders received a written notice via the U.S. Mail from Douglas Elliman-Gibbons & Ives ("DEGI") (attached hereto as **Exhibit [X]**). This correspondence stated that DEGI "had been appointed by the Federal Deposit Insurance Corporation to represent their interest in your [210-1H] apartment" and directed that future rent checks be made payable directly to DEGI effective March 1, 1991.

191. On March 22, 1991, the Enterprise utilized the U.S. Mail to transmit a follow-up solicitation through DEGI (attached hereto as **Exhibit [Y]).** This communication asserted that an entity named "Figgie Acceptance Corporation" was the "owner of the unsold shares to your apartment" and sought to induce the occupants into negotiations to purchase the Subject Premises at a purported "fair market price."

192. The Plaintiffs declined to participate in these purchase discussions, as the Tovar family's continuous possessory interest was predicated upon an exempt federal military

housing occupancy that sat completely outside the scope of the Sponsor's cooperative conversion plan.

193. Plaintiffs allege that Defendant DEGI maintained an undisclosed, fraudulent conflict of interest by simultaneously acting as the fiduciary managing agent for the FDIC and the exclusive managing and marketing agent for Figgie Acceptance Corporation.

194. Plaintiffs further allege that the generation and mailing of these March 1991 marketing notices constituted predicate acts of mail fraud under 18 U.S.C. § 1341.

195. The Enterprise introduced Figgie Acceptance Corporation as a new "strawman" entity to invent a fictitious chain of cooperative share ownership. This step allowed them to use a prominent real estate brokerage to pressure protected military dependents into buying property that the Enterprise had no legal right to possess, sell, or convert.

## XXI. MULTI-AGENT ROTATION AND THE FICTITIOUS OFFERING PLAN AMENDMENTS

196. On May 31, 1991, Defendant Jeffrey C. Gold, in his capacity as Vice President of Marvin Gold Management Co., Inc. (The Gold Group), utilized the U.S. Mail to transmit a General Notice to late Plaintiff Anita Tovar, introducing Peter Kerpen as the new on-site "General Manager" (attached hereto as **Exhibit [X]**).

197. On October 23, 1991, five months after the Gold Group notice, Defendant DEGI utilized the U.S. Mail to issue an independent operational directive to late Plaintiff Tovar (attached hereto as **Exhibit [Y]**). This notice assigned Account Executive Patrick Freydberg and Management Supervisor Paul Morton to oversee the collection cycle for the FDIC collateral pool, including the Subject Premises.

198. On August 19, 1992, late Plaintiff Anita Tovar received a 23-page corporate instrument transmitted via the U.S. Mail from Defendant DEGI's Madison Avenue office (attached hereto as **Exhibit [Z]**).

*199.* This 23-page instrument was delivered unsigned by any corporate agent, lacked official corporate letterhead, and was vaguely captioned as the "Thirtieth Amendment to 201, 210, 361 and 365 Clinton Avenue, Brooklyn, New York, Dated: June 15, 1992."

*200.* The introduction paragraph of this purported regulatory filing explicitly stated: "This Thirtieth Amendment modifies and supplements the terms of the 'Cooperative Offering Plan for the Premises known as 29 West 64th Street, New York, NY (the "Building") dated December 1, 1982 (the "Plan") and should be read in conjunction with the Plan, as previously amended… ."

201. Plaintiffs allege that the rapid, sequential rotation of on-site managers (The Gold Group) and institutional account executives (DEGI) within a 5-month window constituted an ongoing pattern of mail fraud predicates (**18 U.S.C. § 1341**) to fracture the administrative record and maintain coercive collection pressure on the occupants.

202. Plaintiffs further allege that the generation and mailing of the purported "Thirtieth Amendment" constituted an open act of **document fraud and mail fraud**.

203. The Enterprise transmitted an offering amendment detailing an entirely separate geographic property interest located in Manhattan (**29 West 64th Street**) to a Brooklyn military housing occupant (**210 Clinton Avenue**). This intentional cross-filing was a deceptive mechanism used to generate compliance confusion, manufacture a complex regulatory paper trail, and insert unrecorded, non-privy corporate layers into the billing cycle to continue the systematic theft of rental funds.

## XXII. STRUCTURAL FRAUD AND EXCLUSION FROM THE PURPORTED CHAIN OF TITLE

204. The real property located at 29 West 64th Street, New York, New York, referenced in the "Thirtieth Amendment," was and remains a separate residential cooperative property known as "The Tristan," which possesses no legal, geographical, or structural connection to the Clinton Hill Apartments or the Subject Premises.

205. The Thirtieth Amendment further declared that on September 30, 1991, Multi Boro Realty Corp. ("Multi Boro")—an affiliate of Citicorp Real Estate, Inc. located at 599 Lexington Avenue, New York, New York—had acquired titular interest to the shares and proprietary leases appurtenant to the "Unsold Apartments" from the collapsing original Sponsor, Clinton Hill Equities Group.

206. This document formally designated Multi Boro as the new holder of Unsold Shares, offered those units for sale to the public on a "first come, first served" basis, and confirmed Defendant DEGI as the operative Managing Agent for the asset inventory.

207. However, "Exhibit A" of this purported regulatory amendment, which itemized the specific Clinton Hill Apartments complex inventory held by Multi Boro, completely omitted any listing for the Subject Premises (Apartment 1H).

208. Plaintiffs allege that the deliberate transmission of this erroneous and facially fraudulent 23-page instrument via the U.S. Mail constituted an affirmative **predicate act of mail fraud under 18 U.S.C. § 1341**.

209. The Enterprise used this cross-filed, conflicting document as a deceptive mechanism to manufacture an appearance of comprehensive institutional and banking oversight by Citicorp affiliates.

210. In factual reality, because the Subject Premises was entirely excluded from Multi Boro's recorded inventory, the mailing was a tactical artifice designed to overwhelm the occupants with complex regulatory data, conceal the underlying lack of a valid chain of title, and insulate the Enterprise from detection while continuing the systematic theft of monthly rental payments.

## XXIII. THE FICTITIOUS CHAIN OF TITLE AND REDIRECTION OF FUNDS AWAY FROM THE FDIC

211. On August 26, 1992, Defendant Douglas Elliman-Gibbons & Ives ("DEGI"), acting as the purported agent for the Federal Deposit Insurance Corporation ("FDIC"), utilized the U.S. Mail to transmit a New York State Renewal Lease Form, a Tenant Information Sheet, and various operational riders to the Tovar family (attached hereto as **Exhibit [X]**).

212. Defendants Clinton Hill Apartments Owners Corp. ("CHAOC"), Time Equities, Inc. ("TEI"), and Francis Greenburger intentionally omitted to notify the FDIC or Defendant DEGI that the Subject Premises was an exempt United States military housing unit occupied by a protected military family. The Enterprise concealed this material fact to obscure the reality that Defendant CHAOC had never legally acquired or owned the Subject Premises since the inception of the cooperative conversion plan.

213. Within twelve months of executing the unrecorded "Thirtieth Amendment," the corporate shell utilized to pass title, Multi Boro Realty Corp., filed its Biennial Statement with the New York Department of State, Division of Corporations, on June 8, 1993, and immediately thereafter ceased all corporate filings and operations.

214. Plaintiffs allege that the Enterprise utilized Multi Boro Realty Corp. as a temporary "strawman" vehicle to layer the asset trail. The sudden cessation of this entity's corporate

filings was calculated to break the regulatory paper trail, leaving tenants and federal bank liquidators unable to verify the underlying structural defects or the chain of title.

215. Concurrently with this corporate layering, Defendant CHAOC and its designated agents continuously purported to be the lawful owners of the Subject Premises, while systematically failing to make structural repairs mandated by New York state and local laws. This ongoing omission left the 1983, 1989, and 1995 flood-damaged subfloors unremediated, promoting toxic microbial growth.

216. Between February 1992 and 1999, Defendants CHAOC, TEI, T.C. Equities Holding Corp., and Francis Greenburger deployed a series of shifting corporate notices to redirect the monthly rental income derived from the Subject Premises away from the FDIC and directly into bank accounts under the exclusive control of Defendant CHAOC and its management networks.

217. The Enterprise executed these financial redirections via the U.S. Mail with actual knowledge that the Subject Premises was not owned by Francis Greenburger, TEI, T.C. Equities Holding Corp., Clinton Hill Equities Group, Clinton Hill Equities Corp., B.Y. Equities, Inc., or B.B.Y. Enterprises, Inc.

218. Plaintiffs allege that the systematic routing of these deceptive collection directives constituted a continuous pattern of **predicate acts of mail fraud under 18 U.S.C. § 1341**. This mechanical rotation of non-existent or unrecorded corporate owners was executed to strip the military occupants of their funds under false pretenses, bypass federal banking oversight, and maintain an illicit possessory hold over federal property.

## XXIV. CONTINUED DOCUMENT FRAUD AND EXCLUSION FROM THE 2001–2002 RESTATED OFFERING PLANS

219. Plaintiffs allege that the Enterprise executed its fraudulent collection and property management activities with actual knowledge that the official regulatory disclosures filed with the New York State Attorney General—specifically the *"Second Amendment To The Restated Offering Plan"* (dated July 1, 2001) and the *"Third Amendment To The Restated Offering Plan"* (dated June 17, 2002)—were entirely devoid of any reference to the Subject Premises (attached hereto as **Exhibits [X] and [Y]**).

220. In December 1998, the Enterprise utilized the U.S. Mail to transmit a fraudulent "Renewal Lease Form" to late Plaintiff Anita Tovar for immediate execution, introducing a new corporate entity identified as "Insignia Residential Group" acting as the purported agent for Defendant CHAOC.

221. This 1998 Renewal Lease Form was an unauthorized instrument that featured a generic, fabricated "DHCR" logo at the top, intentionally omitting the official State of New York seal and standard regulatory text mandated for legitimate New York City Rent Stabilization renewal agreements.

222. On December 21, 1998, driven by the ongoing threat of eviction and family displacement, late Plaintiff Anita Tovar executed this deficient instrument.

223. Enclosed within this 1998 lease packet was a fraudulent version of DHCR Form RA-23.5, entitled simply *"Notice to Owner of Persons Other Than Tenant Residing in Apartment,"* which lacked any municipal housing agency captions or the official New York State seal.

224. This instrument deliberately altered the caption of the official DHCR Form RA-23.5 (5-87), which legally reads: *"Notice To Owner Of Family Members Residing With*

*The Named Tenant in the Apartment Who May Be Entitled to Succession Rights/Protection From Eviction."*

225. Late Plaintiff Anita Tovar and her daughter, Plaintiff Monique Saunders (then a college student), completed and returned the accompanying generic "Tenant Information Sheet" to maintain a paper trail of their occupancy and preserve their future constitutional rights to housing due process (attached hereto as **Exhibit [Z]**).

226. Plaintiffs allege that the generation, alteration, and mailing of these facially deceptive lease renewal packets constituted individual **predicate acts of mail fraud under 18 U.S.C. § 1341**.

227. The Enterprise, acting through Defendant CHAOC and Insignia Residential Group, fabricated regulatory documents and altered statutory language to deliberately obscure the Plaintiffs' legal succession and eviction-protection rights, ensuring the Enterprise could continue extracting rental funds while shielding its unauthorized conversion of federal military property from state and federal housing oversight.

228. The 1998 Renewal Lease Form generated by the Enterprise documented a "Current Deposit" baseline of $424.55. Under this instrument, the Enterprise escalated the monthly rent to $456.53 and extracted an additional security deposit surcharge of $31.98 as a mandatory condition for the household's continued occupancy.

229. The Enterprise imposed these cumulative financial extractions while intentionally omitting to disclose late Plaintiff Anita Tovar's statutory housing protections as a military dependent, and with actual knowledge that they had failed to remediate the progressive structural subfloor wood rot and microbial growth caused by the 1983, 1989, and 1995 floods.

230. On January 6, 1999, Defendants CHAOC, Francis Greenburger, TEI, and their agent Insignia Residential Group utilized the U.S. Mail to transmit what they characterized as a "fully executed copy" of the lease renewal agreement (attached hereto as **Exhibit [X]**).

231. This mailing comprised only the execution page of the deficient 1998 Renewal Lease Form paired with a Rent Stabilization Association (RSA) Lease Rider revised in May 1996; the Enterprise completely omitted any countersigned acknowledgment or receipt of late Plaintiff Tovar's Form RA-23.5 Succession Rights Notice.

232. Plaintiffs allege that the Enterprise deliberately ignored the Succession Rights Notice to prevent the formal addition of Plaintiff Monique (Tovar) Saunders and her household to the lease records, thereby impeding the administrative tracking of her lawful succession rights.

233. Plaintiffs further allege that the generation and mailing of this incomplete regulatory packet on January 6, 1999, constituted a **predicate act of mail fraud under 18 U.S.C. § 1341**.

234. This tactical omission was deployed to maintain an unrecorded, parallel billing stream, insulate the Enterprise's unauthorized conversion of federal military property from municipal housing audits, and continue the systematic theft of rental funds through instruments entirely excluded from Defendant CHAOC's official unamended corporate books.

## XXV. REGULATORY DOCUMENT FRAUD AND EXPLOITATION OF THE DHCR ELECTRIC SUBMETERING APPLICATION

235. In June 2004, Defendant CHAOC utilized interstate wires and the U.S. Mail to file a fraudulent Form RA-70 (10/92) with the New York State Division of Housing and

Community Renewal ("DHCR"), captioned as an *"Owner's Application For Termination of Rent Inclusion Of Electric Current"* (attached hereto as **Exhibit [X]**).

236. The Enterprise executed this regulatory application for the Subject Premises with actual knowledge that:

- Defendant CHAOC lacked lawful title or ownership of the Subject Premises;
- No Sponsor had ever been legally designated or affiliated with this specific federal military housing unit;
- The FDIC had previously asserted total collection authority over the unit's underlying revenue streams in 1991; and
- The application contained false and material misrepresentations regarding compliance with utility regulations.

237. Defendant CHAOC further omitted to serve late Plaintiff Anita Tovar with copies of the mandatory structural attachments required by Form RA-70, intentionally concealing the data required for the occupants to verify the application or execute informed consent.

238. Due to this intentional concealment, late Plaintiff Anita Tovar was prevented from executing or submitting DHCR Form RTP-3A (3/90) (*"Answer To Notice And/Or Application"*), thereby withholding legal permission for the Enterprise to alter or decrease her dwelling space, utilities, or essential services (attached hereto as **Exhibit [Y]**).

239. At the time of this fraudulent 2004 regulatory filing, the monthly rental extraction imposed upon the Plaintiffs was $521.88. The formal relief sought by Defendant CHAOC in the Form RA-70 was a *"reduction in rent with a corresponding requirement that tenant pay the electric charges for the apartment as billed on the submeter."*

240. To justify this complex-wide shift, the Enterprise cited an overall electrical installation cost of approximately $3,711,803 across the building complex executed during 2002 and 2003.

241. However, instead of implementing the rent reductions mandated by their own DHCR filing, the Enterprise utilized the U.S. Mail to continuously transmit lease renewals extracting compounded, escalating monthly rent schedules, including: $521.88 in 2005; $520.53 in 2006; $551.84 in 2007; $619.15 in 2008; $619.15 in 2009; and $672.84 in 2010.

242. Plaintiffs allege that the systematic filing of this false Form RA-70, followed by the parallel mailing of escalating rent demands that contradicted the application's stated relief, constituted a continuous pattern of **predicate acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343**.

243. The Enterprise utilized the DHCR utility submetering framework as a deceptive financial tool to shift operational utility costs onto the tenants, while simultaneously extracting unmitigated, overcharged rent balances via the U.S. Mail to artificially pad its unrecorded cash flows.

244. On March 14, 2005, Defendant CHAOC, acting in concert with Defendant Mark Greenberg Real Estate Co. LLC ("MGRE"), utilized the U.S. Mail to transmit an explicit financial directive to late Plaintiff Anita Tovar (attached hereto as **Exhibit [X]**).

245. This correspondence formally declared: *"...If you choose to renew your lease, we may legally collect an additional amount of security from you, since your monthly rent will increase if you renew your lease…Please be sure to remit your check when you return the signed copies of the renewal. Said check MUST be made payable to CHAOC."*

246. The Enterprise issued this mail directive with actual knowledge that the demand for increased security deposit balances directly violated the financial terms set forth in their concurrent June 2004 DHCR Form RA-70 submetering application.

247. Plaintiffs allege that the generation and mailing of this March 14, 2005 collection letter constituted an affirmative **predicate act of mail fraud under 18 U.S.C. § 1341**.

248. This instrument was deployed as a deceptive tool to enforce a parallel, un-credited billing stream and extract illicit escrow balances under the false pretense of statutory rent-stabilization compliance, while intentionally withholding required structural utilities and maintenance from the occupants.

## XXVI. THE FRAUDULENT EXTRACTION OF DUAL DHCR UTILITY ORDERS AND MATERIAL CONCEALMENT

249. On August 16, 2006, the Enterprise, acting through Defendants Francis Greenburger, TEI, MGRE, and CHAOC, utilized fraudulent submissions to procure two parallel administrative orders from the DHCR Office of Rent Administration (attached hereto as **Exhibit [X]**).

250. The first regulatory instrument was an *“Order Granting Permission to Terminate Rent Inclusion of Electricity and Change from Master Metering to Submetering”* (Docket No. SF410028-OD), and the second was an *“Order Granting MCI [Major Capital Improvement] Rent Increase”* (Docket No. TB 230072 OM). Both instruments were executed under the signature of Rent Administrator Lilia Albano.

251. The Enterprise procured these administrative orders with actual knowledge that the Subject Premises was an exempt United States military housing unit that sat completely

outside the jurisdiction of local rent-stabilization utility conversions, and that the underlying applications contained false statements regarding tenant notice and compliance.

252. These orders deliberately omitted any mandatory dispute resolution mechanisms or recourse protocols for billing disputes, leaving the occupants entirely vulnerable to arbitrary, un-audited electrical extractions.

253. Upon receiving these unexpected orders via the U.S. Mail, late Plaintiff Anita Tovar immediately documented the lack of regulatory transparency by opening an official complaint log with the City of New York via the municipal 311 system and the Department for the Aging, recording the tracking data directly onto the face of the administrative order (attached hereto as **Exhibit [Y]**).

254. On or about August 31, 2006, the Enterprise utilized the U.S. Mail to transmit a highly deceptive notice letter executed by Defendant MGRE on behalf of Defendants CHAOC, Greenburger, and TEI (attached hereto as **Exhibit [Z]**).

255. This correspondence enclosed only a copy of the submetering order and stated: *"Enclosed is a copy of the DHCR rent reduction order which provides that you will begin paying electric charges for your apartment directly. Your rent no longer includes electricity…effective September 1, 2005."*

256. The Enterprise executed this mailing with a retroactively backdated effective date to manufacture immediate utility arrears, while entirely **omitting and concealing the existence of the second concurrent administrative order**—the Order Granting MCI Rent Increase.

257. Plaintiffs allege that the deliberate withholding and concealment of the MCI Rent Increase Order from the notice packet was a tactical artifice designed to prevent late

Plaintiff Anita Tovar from discovering the full compounded financial impact of the submetering scheme.

258. This concealment stripped the occupants of their right to file a timely administrative challenge, seek a military housing exemption under applicable grandfather clauses, or withhold consent from the reduction of their primary housing benefits.

259. Plaintiffs allege that the coordinated procurement, backdating, and selective mailing of these fraudulent DHCR orders constituted individual **predicate acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343**.

260. The Enterprise utilized the state's administrative apparatus as a weapon to shift capital installation costs ($3.7+ million) onto the tenants, while simultaneously extracting unauthorized, fluctuating utility fees via the U.S. Mail to inflate its unrecorded corporate revenue streams.

261. Plaintiffs allege that the Enterprise conspired to deceive late Plaintiff Anita Tovar and her household into complying with these contradictory DHCR orders to manufacture a fraudulent, un-audited baseline of consent.

262. The Enterprise utilized this deceptive framework to systematically misrepresent the Subject Premises as a standard, commercial "rent-stabilized unit" owned by Defendant CHAOC to multiple external entities, including:

- **Financial Lending Institutions**: To secure millions of dollars in leveraged commercial mortgages and lines of credit under false collateral pretenses;
- **Housing Regulatory Agencies**: To evade strict building code enforcement and avoid executing the required structural repairs to the flood-damaged subfloors;

- **The NYC Department of Finance (DOF)**: To improperly secure municipal property tax abatements;
- **The NYS Department of Taxation and Finance**: To secure unauthorized state tax relief; and
- **The Internal Revenue Service (IRS) and Federal Agencies**: To secure illicit federal tax credits and municipal infrastructure grants.

263. Defendants Francis Greenburger, TEI, and CHAOC executed these multi-agency filings with actual knowledge that they held no lawful title, deed, or ownership interest in the Subject Premises, which remained an exempt federal military housing unit.

264. On February 27, 2007, Defendant CHAOC and Defendant MGRE utilized the U.S. Mail to transmit a generic "Renewal Lease Form" paired with a coercive corporate Demand Notice to late Plaintiff Tovar (attached hereto as **Exhibit [X]**).

265. This instrument completely omitted the official State of New York seal and mandated regulatory text, demanding an escalated monthly rent of $587.84 and an increased security deposit surcharge of $39.74 as a mandatory condition for continued residency.

266. This 2007 renewal form further concealed the administrative record by intentionally omitting any disclosure regarding the "Current Deposit" baseline balances, which the Enterprise had been manipulating since the initial coerced transaction in August 1981.

267. Plaintiffs allege that the coordinated transmission of these multi-agency tax filings, loan applications, and fraudulent lease demands constituted individual **predicate acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343**.

268. The Enterprise utilized these deceptive instruments as a core financial engine to extract liquid assets from the occupants under false pretenses, while simultaneously leveraging a federal military asset to defraud municipal, state, and federal tax authorities for corporate enrichment.

## XXVII. COMPROMISED ENVIRONMENTAL CONDITIONS, MATERIAL CONCEALMENT, AND INTENSIFIED PHYSICAL AND ECONOMIC INJURIES

269. The Enterprise, acting through its corporate officers and designated property management agents, continuously issued fraudulent maintenance logs and false internal reports asserting a total absence of toxic mold or environmental hazards within the Subject Premises.

270. These material misrepresentations and deliberate omissions were deployed via the U.S. Mail to intentionally prevent late Plaintiff Anita Tovar and Plaintiff Monique Saunders from identifying the true structural source of the contamination, resulting in prolonged exposure, severe biological injuries, and concurrent economic losses.

271. On July 31, 2013, following decades of continuous exposure to the unremediated, toxic microbial colonies, fungal spores, and organic wood rot proliferating beneath the saturated subfloors, late Plaintiff Anita Tovar suffered an acute, life-threatening medical emergency.

272. This event required immediate Emergency Medical Services (EMS) ambulatory transport to a local Brooklyn hospital, where diagnostic procedures confirmed that her respiratory, cardiac, and vascular systems were profoundly compromised, necessitating a seven-day inpatient hospitalization for life-saving medical intervention (attached hereto as **Exhibit [X]**).

273. Plaintiffs allege that the Enterprise's multi-decade concealment and intentional refusal to remediate the environmental hazards—in direct breach of the Implied Warranty of Habitability—constituted the direct and proximate cause of the severe degradation of late Plaintiff Tovar's physical health and her subsequent 2013 hospitalization.

274. This severe physical collapse resulted in extensive economic injuries to the household, including thousands of dollars in uncompensated medical liabilities, ongoing rehabilitation costs, and forced temporary relocation expenses to Washington, D.C., where Plaintiff Monique Saunders—a licensed New York Registered Nurse—was compelled to provide full-time medical care for her mother.

275. This forced relocation directly fractured Plaintiff Monique Saunders' business and professional assets, requiring her to place the commencement of her legal career on immediate hold and forcing the indefinite delay of her formal District of Columbia Bar Admission swearing-in ceremony.

276. Plaintiffs allege that the Enterprise executed this pattern of maintenance neglect and document fraud to avoid the significant capital expenditures required to remediate a structurally compromised federal military asset.

277. This calculated omission directly resulted in severe, un-remediated environmental hazards that proximately inflicted catastrophic physical injuries and concrete, measurable financial devastation upon the Plaintiffs' business and property interests, satisfying the civil enforcement requirements of **18 U.S.C. § 1964(c)**.

278. Late Plaintiff Anita Tovar's acute 2013 medical emergency resulted in clinical incapacitation, leaving her cognitively and verbally incoherent due to a cerebrovascular accident (CVA/stroke) caused by severe systemic vascular and inflammatory stress.

279. This sudden incapacitation required Plaintiff Monique Saunders—as sole next-of-kin and a single mother—to immediately halt her professional activities in Washington, D.C., and execute emergency vehicular transit with her minor child to Brooklyn, New York, to assume primary medical advocacy and bedside care.

280. Diagnostic chest radiographs (X-rays) performed upon admission at New York-Presbyterian Brooklyn Methodist Hospital confirmed severe respiratory system pathology, documenting specific clinical abnormalities including abnormally low lung volumes, platelike atelectasis, patchy bibasilar atelectasis, and consolidation (attached hereto as **Exhibit [X]**).

281. The diagnostic imaging further revealed an ill-defined opacity immediately adjacent to the midthoracic spine.

282. Plaintiffs allege, based on contemporaneous medical records and established clinical pathology, that these specific radiographic markers—low lung volumes, bibasilar atelectasis, and thoracic spinal opacities—constitute direct objective indicators of chronic, restrictive inflammatory lung disease.

283. This localized pathological presentation is etiologically linked to long-term inhalation exposure to toxic indoor mold colonies, aerosolized fungal spores, and circulating mycotoxins. This biological colonization was caused by the Enterprise's multi-decade refusal to remediate the saturated flooring infrastructure of the Subject Premises, violating **NYS Real Property Law § 235-b**.

284. Peer-reviewed toxicological and epidemiological data, including clinical research from the University of Texas Southwestern Medical Center (UTSW), establishes that multi-decade inhalation exposure to indoor mold, localized fungal spores, and aerosolized mycotoxins acts as the direct etiological mechanism for hypersensitivity pneumonitis (HP).

285. This chronic inflammatory pathway causes permanent pulmonary scarring and progressive restriction, leading to measurable lung volume loss.

286. Clinical research further establishes that advanced age acts as a severe adverse prognostic factor for mold-induced hypersensitivity pneumonitis, wherein chronic environmental exposure rapidly accelerates the progression of the disease into irreversible, fibrotic HP.

287. This specific fibrotic pathology matches the permanent, restrictive pulmonary volume loss documented in late Plaintiff Anita Tovar during the final two decades of her life.

288. Plaintiffs allege that the chronic, recurring moisture incursions—specifically the 1983, 1989, and 1995 flooding events—promoted continuous microbial colonization within the subfloors, kitchen floor infrastructure, baseboards, and wall cavities of the Subject Premises.

289. This unmitigated biological growth served as the direct proximate cause of late Plaintiff Tovar's respiratory degradation, systemic vascular inflammation, and subsequent July 2013 emergency hospitalization.

290. By July 2013, this persistent, hidden environmental contamination had also inflicted documented biological injuries upon Plaintiff Monique Saunders, who experienced chronic restrictive respiratory deficits—including an inability to sustain

normal breath-holding volumes—originating from her childhood exposure within the Subject Premises.

291. Pediatric pulmonology data compiled by the United States Environmental Protection Agency (EPA) confirms that infants and children possess immature respiratory systems, breathe at a higher baseline rate, and inhale a significantly greater volume of air relative to body mass than adults, multiplying their localized exposure to bio-aerosols.

292. Early-life exposure to toxic indoor dampness and mold is clinically linked to a permanent 6% decrease in Forced Vital Capacity (FVC) that persists through adolescence, causing irreversible structural modifications to the developing lung parenchyma.

293. Plaintiffs allege that the remaining living Plaintiffs—including minor child Plaintiff D.C.S., who occupies the Subject Premises—are currently subjected to this identical, unremedied toxic environment.

294. The Enterprise's intentional concealment of these latent defects and its fraudulent maintenance reporting continue to expose the surviving family members to an imminent threat of irreversible pulmonary and systemic pathology.

295. This calculated omission was executed to avoid the capital costs of structural remediation, directly causing a continuous, severe injury to the Plaintiffs' possessory property interests and inflicting measurable financial and physical devastation in violation of **18 U.S.C. § 1964(c)**.

296. Plaintiffs allege that the Enterprise systematically refused to execute necessary structural repairs or mitigate the severe environmental hazards within the Subject Premises for the predatory purpose of forcing late Plaintiff Anita Tovar and her household to

permanently vacate the apartment (commonly known as an engineered "self-eviction" or "constructive eviction").

297. The Enterprise calculated that forcing the protected occupants to abandon the premises would allow corporate agents to enter, alter, and permanently destroy the physical evidence of their multi-decade property fraud, financial layering, and gross negligence.

298. Executing this constructive eviction would effectively spoliate the primary physical evidence of the building's latent structural defects and toxic biological colonization before it could be documented by independent experts, thereby shielding the principal actors from regulatory accountability, criminal exposure, and civil RICO liability under 18 U.S.C. § 1962.

## XXVIII. ADMINISTRATIVE HOUSING RE-LAYERING AND THE INSERTION OF AKAM ASSOCIATES

299. On March 19, 2014, approximately eight months after late Plaintiff Anita Tovar's acute emergency medical collapse, the Enterprise utilized the U.S. Mail to transmit an institutional "Welcome Package" to the Subject Premises (attached hereto as **Exhibit [X]**).

300. This corporate packet, issued on the letterhead of Defendant AKAM Associates, Inc. ("AKAM"), formally declared: *"AKAM Associates, Inc. has been appointed as managing agent of Clinton Hill Apts. Owners Corp., effective April 1, 2014…[introducing] new AKAM on-site General Manager James (Jim) Heller."*

301. The billing and financial instructions contained within this mailing explicitly restricted their application to a single class of residents, specifying in bold capitalization that *"the information below applies to tenants of Clinton Hill Apts. Owners Corp. ONLY…[and] THE INSTRUCTIONS BELOW APPLY TO CHAOC TENANTS."*

302. Because the Subject Premises remained a designated United States military housing unit outside the corporate jurisdiction or recorded title of Defendant CHAOC, the Plaintiffs did not constitute "CHAOC tenants."

303. Nevertheless, on or about February 6, 2015, Defendants Francis Greenburger, TEI, CHAOC, and their agents utilized the U.S. Mail to route a standard New York State Rent-Stabilized Renewal Lease Form through Defendant AKAM to the occupants, demanding immediate execution under the ongoing threat of eviction.

304. The corporate agent who transmitted this lease renewal packet intentionally omitted their signature from the AKAM transmittal letter, leaving the regulatory instrument facially unauthenticated.

305. On or about February 2015, while still suffering from severe, persistent pulmonary infections, chronic cardiovascular disease, and metabolic disorders originating from her decades-long toxic exposure within the apartment, late Plaintiff Anita Tovar signed and returned the renewal form out of fear of immediate family displacement.

306. Plaintiffs allege that the generation, back-office masking, and selective mailing of these unauthenticated lease forms by Defendant AKAM constituted distinct **predicate acts of mail fraud under 18 U.S.C. § 1341**.

307. The Enterprise introduced Defendant AKAM as an institutional shield to perpetuate a parallel, un-audited billing track, mask the underlying title defects from municipal housing regulators, and extract unlawful monthly rental surcharges from an incapacitated military dependent under false pretenses.

## XXIX. SECRECY IN FINANCIAL EXTRACTIONS AND VIOLATIONS OF ESCROW MANDATES

308. On February 26, 2016, approximately one year after routing lease renewals through AKAM, the Enterprise introduced yet another property management entity, utilizing the U.S. Mail to transmit an institutional cover letter and an IRS Form W-9 to late Plaintiff Anita Tovar (attached hereto as **Exhibit [X]**).

309. This correspondence, issued on the letterhead of Defendant Charles H. Greenthal Management Corp. ("Greenthal Management"), formally declared: *"Please be advised that Charles H. Greenthal Management Corp has received your security deposited check(s) from AKAM Associates. In order to complete the financial transaction transitioning from the prior agent to the current agent, we ask that you complete and return the enclosed W-9 form to the on-site management office…Erica Martinez…Clinton Hill Apts. Owner's Corp. 345 Clinton Avenue, Brooklyn, NY 11238."*

310. This transmittal letter was delivered entirely unsigned by any corporate agent, replicating the unauthenticated document layout previously deployed by AKAM to avoid direct employee accountability.

311. The Enterprise executed these complex escrow movements and corporate hand-offs in total secrecy, keeping the occupants entirely unaware that their personal security deposit funds had been transferred from TEI to AKAM in 2014, and subsequently transferred from AKAM to Defendant Greenthal Management in 2016.

312. Plaintiffs allege that the secret routing of these escrow accounts between third-party entities, coupled with the failure to provide formal statutory disclosures, constituted an explicit violation of **New York General Obligations Law § 7-105 (Failure to Notify of Security Deposit Transfer)**.

313. Under **GOL § 7-105**, a transferring landlord or management entity must notify the tenant of an escrow transfer **by registered or certified mail within five days**, explicitly detailing the name and address of the transferee corporate successor. Under **GOL § 7-105(3)**, any willful failure to comply with this statutory mandate constitutes an active **misdemeanor**.

314. Plaintiffs further allege that the Enterprise's unrecorded shifting of these funds constituted an explicit **Breach of the Trust Account Mandate under New York General Obligations Law § 7-103**.

315. Under **GOL § 7-103**, tenant security deposits remain the exclusive personal property of the tenant and **must be maintained as trust funds** inside a designated New York banking escrow account, strictly prohibited from being commingled with corporate capital or operational revenue assets.

316. Moving these funds secretly between third-party corporate entities without delivering a verified, formal accounting to the tenant demonstrates that the Enterprise failed to maintain a legitimate escrow trust account, constituting the tort of **conversion** and a **breach of fiduciary duty**.

317. Plaintiffs allege that the generation and mailing of this February 26, 2016 unauthenticated transmittal packet constituted a distinct **predicate act of mail fraud under 18 U.S.C. § 1341**.

318. The Enterprise deployed the IRS Form W-9 request as a **pretextual artifice** to fraudulently extract late Plaintiff Tovar's Social Security Number and Personally Identifiable Information (PII) to open unrecorded financial sub-accounts and mask illicit

layering transactions, hiding its unauthorized conversion of federal military property from federal regulatory oversight.

## XXX. COMMON LAW BUSINESS TORTS AND CONVERSION OF ESCROW ASSETS

319. Plaintiffs allege that the corporate actions and systemic omissions executed by Defendant Charles H. Greenthal Management Corp. ("Greenthal Management") constitute actionable common law business torts, independent of their integration into the overarching racketeering pattern.

320. By executing the unauthorized, unrecorded, and concealed transfer of the Plaintiffs' personal escrow funds from Defendant AKAM to Defendant Greenthal Management without the occupants' knowledge or prior written consent, the Enterprise committed the common law tort of **conversion**.

321. Under New York law, the Enterprise intentionally exercised unauthorized dominion and control over the Plaintiffs' specific, identifiable liquid property interest, permanently depriving the household of their possessory rights over their cash escrow assets.

322. Plaintiffs further allege that under **New York General Obligations Law § 7-103**, a landlord and their designated property management agents operate as statutory fiduciary trustees regarding a tenant's security deposit funds.

323. Defendant Greenthal Management, acting as the designated operational agent for Defendant CHAOC, assumed this strict fiduciary duty upon taking physical custody of the Plaintiffs' converted escrow checks.

324. The Enterprise directly breached this fiduciary duty by executing secret inter-corporate account transfers and transmitting an unsigned, unauthenticated transmittal notice to intentionally obscure the identity of the operational actors.

325. These deceptive practices violated the strict non-commingling and trust account mandates of **GOL § 7-103**, directly executing a breach of trust to shield an unauthorized property interest from discovery and advance the broader scheme to defraud under **18 U.S.C. § 1341**.

326. Plaintiffs allege that Defendant CHAOC and Defendant Greenthal Management (subsequently operating as FirstService Residential) are liable for Fraudulent Concealment under New York common law.

327. The Enterprise utilized a systematic pattern of unsigned corporate correspondence to intentionally obscure the true nature of the property ownership, unrecorded property transfers, and hidden financial transactions.

328. As statutory escrow trustees under New York General Obligations Law § 7-103, the Defendants held an affirmative fiduciary duty to disclose these material property and account facts to the Plaintiffs, but instead intentionally withheld them.

329. The Enterprise executed these account movements without delivering the mandatory legal notices required by GOL § 7-105, utilizing the unauthenticated, unsigned letters as a deliberate tool of concealment to shield their structural defects from detection and advance the mail and wire fraud schemes.

330. The IRS Form W-9 demand issued by Defendant Greenthal Management constituted a pretextual artifice designed to fraudulently procure late Plaintiff Anita Tovar's Social Security Number and sensitive Personally Identifiable Information (PII).

331. Because the Defendants had already converted and commingled the security deposit funds in direct violation of NYS GOL § 7-103, no legitimate banking trust account existed for the Subject Premises at the time of the demand.

332. The Enterprise sought this PII with the specific intent to utilize the tenant's sensitive personal identity data to open unauthorized financial sub-accounts, mask illicit corporate layering transactions, and insulate its unauthorized conversion of federal military property from federal regulatory oversight, violating 18 U.S.C. § 1028 (Identity Fraud) and 18 U.S.C. § 1341 (Mail Fraud).

## XXXI. ALTERATION OF IDENTITY DESIGNATIONS AND EXPLOITATION OF AN OCTOGENARIAN OCCUPANT

333. By October 2017, the Enterprise, acting through Defendants Francis Greenburger, TEI, CHAOC, and Greenthal Management, altered its payment directives and utilized the U.S. Mail to transmit updated collection mandates to the Subject Premises (attached hereto as **Exhibit [X]**).

334. This administrative directive instructed late Plaintiff Anita Tovar to make all future rental instruments payable directly to *"Clinton Hill Apts. Owners Corp."* and explicitly ordered her to designate her apartment unit identifier as "1HX" instead of the historical and contractually recognized designation of "1H."

335. This newly fabricated "1HX" notation had never previously been utilized by any municipal agency, housing utility provider, or corporate predecessor across the four decades of the Tovar family's occupancy.

336. At the time of this abrupt identifier modification, late Plaintiff Anita Tovar was an octogenarian, 80 years of age, who suffered from multiple chronic respiratory and systemic

inflammatory pathologies resulting from her long-term exposure to the unmitigated toxic mold colonies, aerosolized spores, and decaying subfloor structures inside the unit.

337. Plaintiffs allege that the Enterprise generated and mailed this arbitrary "1HX" designation as an active **predicate act of mail fraud under 18 U.S.C. § 1341**.

338. The alteration was a deceptive data-entry mechanism designed to bifurcate the property record, manipulate the municipal tax and housing registration rolls, and isolate the unit's cash flow into an unrecorded parallel tracking ledger.

339. The Enterprise executed these confusing administrative changes against severely ill elderly dependent to undermine her tracking of the property's title defects and ensure corporate agents could maintain an illicit possessory hold over the federal military asset, satisfying the civil enforcement elements of **18 U.S.C. § 1964(c)**.

## XXXII. THE COORDINATED HARASSMENT AND WEAPONIZATION OF PUBLIC RESOURCES (2020–PRESENT)

340. In January 2020, concurrent with the initial emergence of the COVID-19 pandemic in New York City, late Plaintiff Anita Tovar experienced a second life-threatening respiratory and systemic medical emergency.

341. In June 2020, to ensure continuous clinical advocacy, medical isolation management, and quarantine enforcement, Plaintiff Monique Saunders—a licensed New York Registered Nurse—re-established physical residency within the Subject Premises alongside her spouse, Plaintiff David Saunders, and minor child, Plaintiff D.C.S.

342. Late Plaintiff Tovar's medical isolation, clinical vulnerability, and quarantine protocols were profoundly exacerbated and prolonged by her underlying, permanent

restrictive lung capacity damage, which originated from multi-decade exposure to the toxic subfloor mold colonies inside the unit.

343. On or about July 30, 2020, the Plaintiffs delivered multiple formal requests for outstanding structural repairs, reasonable accommodation, and essential services to the Enterprise's management office.

344. Following these demands, Defendant CHAOC's Maintenance Supervisor, Vigan Ahmetaj, along with various corporate agents, entered and inspected the Subject Premises on multiple separate occasions.

345. Despite acquiring direct visual notice during these inspections, the Enterprise systematically ignored and denied the Plaintiffs' repair requests, affirmatively refusing to remediate the patent structural defects and visible toxic mold colonies proliferating across the bedroom baseboards, bathroom ceiling, kitchen subfloors, and common hallways.

346. Plaintiffs allege that the intentional refusal by Defendant Ahmetaj and the corporate principals to remediate these long-standing, 40-year latent defects constituted an ongoing breach of the Implied Warranty of Habitability under **New York Real Property Law § 235-b**.

347. The Enterprise utilized the administrative disruptions of the COVID-19 pandemic as a regulatory shield to maintain an environmental hazard, advance its pattern of tenant harassment, and continue the systematic extraction of rental funds via the U.S. Mail in violation of **18 U.S.C. § 1341**.

348. Upon establishing residency in June 2020 and discovering the un-remediated, hazardous state of the Subject Premises, Plaintiffs Monique Saunders and David Saunders

formally revived late Plaintiff Anita Tovar's long-disregarded demands for structural repairs, reasonable medical accommodations, and essential housing services.

349. In direct retaliation for reviving these demands, the Enterprise— acting through Defendants Francis Greenburger, TEI, CHAOC, and Greenthal Management—initiated a coordinated campaign of tenant harassment, intentionally disregarding the Plaintiffs' multi-agency maintenance notifications for a subsequent twenty-one (21) month period.

350. On April 12, 2022, in response to Greenthal Management's ongoing gross negligence, tenant discrimination, and structural maintenance deprivation, Plaintiffs opened an official municipal complaint log via the NYC-311 system, triggering an emergency investigation by the New York City Department of Housing Preservation and Development ("HPD"). Concurrently, Plaintiffs executed and filed a formal Decreased Services Application with the DHCR, which was assigned Docket Number KP 210025 S (attached hereto as **Exhibit [X]**).

351. On Monday, April 18, 2022, an HPD Inspector conducted a comprehensive physical and environmental inspection of the Subject Premises, formally documenting at least fourteen (14) distinct municipal code violations inside the apartment.

352. These fourteen official HPD violations were classified under strict statutory hazard levels, comprising two (2) Class A violations (non-hazardous conditions), ten (10) Class B violations (hazardous conditions), and two (2) Class C violations (immediately hazardous conditions, including unmitigated mold and structural ceiling breaches) (attached hereto as **Exhibit [Y]**).

353. Official HPD building registration and municipal violation databases establish that Defendant CHAOC maintained a broader, systemic pattern of housing deprivation,

recording at least 137 open, un-remediated building code violations across the complex in 2022.

353-A. The Enterprise's multi-year, bad-faith regulatory defiance and escalation of this infrastructure neglect is established by a subsequent, extraordinary official disclosure letter transmitted via the U.S. Mail to the Plaintiffs by the HPD on March 19, 2024, explicitly signed by Correspondence Liaison Crystal Cepeda. In this formal administrative notice, the HPD issued an official apology for its delayed response and formally disclosed that, following a comprehensive regulatory review of the property as of March 19, 2024, the HPD maintained fifty-eight (58) active, un- remediated housing code complaints on permanent public file specifically targeting the address of the Subject Premises at 210 Clinton Avenue, Apartment 1H, Brooklyn, New York 11205. Correspondence Liaison Crystal Cepeda confirmed that the HPD had already served the property owner—Defendant CHAOC—with formal Notices of Violations detailing comprehensive instructions to correct the hazardous conditions in a timely manner, explicitly advising the Plaintiffs of their statutory right to initiate an immediate tenant enforcement action against the owner for non-compliance.

354. Plaintiffs allege that these open violations were disproportionately concentrated within rent-regulated units occupied by Black and African American tenants, demonstrating a discriminatory and predatory operational policy across the highly gentrified neighborhood.

355. Following the issuance of the emergency HPD violations, the Enterprise agreed to address only minor, low-cost maintenance issues within the Subject Premises, while

affirmatively refusing to remediate the primary, latent structural defects—specifically the subfloor toxic mold, the water-warped floorboards, and the recurring plumbing leaks originating from the building's main common wall pipe chase

356. Plaintiffs allege that the intentional deployment of a multi-decade maintenance deprivation scheme, followed by selective, non-compliant repairs to bypass emergency municipal code violations, constituted individual predicate acts of wire fraud under 18 U.S.C. § 1343 and mail fraud under 18 U.S.C. § 1341.

357. The Enterprise utilized these deceptive administrative postures to extract full, unmitigated monthly rental and maintenance fees via the U.S. Mail under the false pretense of legal compliance, while intentionally maintaining a hazardous biological environment that caused severe, permanent injury to the Plaintiffs' business and property interests.

## XXXIII. THE UNLAWFUL COMMERCIAL ENTERPRISE AND SYSTEMIC TENANT INTIMIDATION

358. In November and December 2020, Plaintiffs delivered multiple formal written notifications to Defendant CHAOC's designated property management agents—specifically David Perez, Sophia Cemenja, and Parvez Ahmed of Defendant Greenthal Management (subsequently operating as FirstService Residential).

359. These notices detailed a continuous, severe private nuisance originating from Apartment 2H, located directly above the Subject Premises, which included daily unmitigated dog barking, structural thumping, high-impact stomping, and systemic animal scratching.

360. These extreme noise and structural disturbances originated from an unauthorized commercial dog boarding and pet care business operated inside Apartment 2H by Melissa G. Martin, which she registered with the New York Department of State under the corporate entity "Paw Paw Pet Care LLC" (attached hereto as **Exhibit [X]**).

361. Plaintiffs concurrently and repeatedly reported these severe disruptions to Defendant Madison Security Group's on-site personnel, including Security Guard Griffon and Security Directors Cordero and Atherton.

362. This security infrastructure and its core personnel, including Guard Griffon and Director Mark Atherton, were subsequently absorbed without operational interruption by Defendant Doyle Security Services under a successor commercial security contract with Defendant CHAOC.

363. On December 28, 2020, in direct retaliation for Plaintiffs exercising their lawful right to lodge noise complaints with corporate security personnel, Melissa G. Martin executed a coordinated campaign of physical intimidation at the Subject Premises.

364. Within a twenty-minute window, Defendant Martin repeatedly rang the Plaintiffs' doorbell and forcefully banged on the main entrance door on two separate occasions, attempting to coerce the occupants into opening the entryway during a period of mandatory medical quarantine.

365. Plaintiffs refused to open the entrance door or engage with Defendant Martin, explicitly instructing her through the door's viewing port to vacate the area and immediately cease the high-impact structural disturbances overhead.

366. Defendant Martin temporarily vacated the scene and returned to hang a concealment package on the Plaintiffs' doorknob containing decaying organic matter and an attached written directive stating: *"My name is Melissa Martin and I am your neighbor in 2H. If you hear noise, don't call security. Call me. My number is (917) 482-4356."* (attached hereto as **Exhibit [Y]**).

367. Plaintiffs allege that the generation and delivery of this directive by Defendant Martin was a calculated tactical maneuver executed in coordination with the broader Enterprise to intercept and suppress operational data.

368. Defendant Martin sought to coerce the Plaintiffs into bypassing the building's official security log network, thereby preventing corporate agents from documenting the ongoing commercial lease violations and shielding the Enterprise from regulatory and judicial scrutiny.

369. Plaintiffs further allege that the Enterprise's intentional refusal to intervene, combined with its active licensing of an illegal commercial animal operation directly above a medically compromised military dependent, constituted a deliberate violation of the Implied Warranty of Habitability under **New York Real Property Law § 235-b**.

370. The Enterprise utilized this continuous, weaponized nuisance as an extractive tool to degrade the Plaintiffs' physical environment, interfere with their quiet enjoyment, and force a constructive eviction to advance the broader scheme to defraud under **18 U.S.C. § 1962**.

## XXXIV. THE COLLUSIVE WEAPONIZATION OF EMERGENCY SERVICES AND SYSTEMIC COMMERCIAL VIOLATIONS

371. Plaintiffs allege that Defendants Francis Greenburger, TEI, CHAOC, Charles H. Greenthal Management Corp., FirstService Residential, and Attorney Kristen A. Mantell of Baron & Baron Esqs. P.C. colluded with upstairs resident Melissa Martin and her corporate entity, Paw Paw Pet Care LLC, to execute a coordinated campaign of tenant harassment. Throughout 2021, Plaintiffs repeatedly emailed and called the CHAOC-Greenthal management office and Madison Security Group to complain of the extreme noise disturbances coming through the ceilings of the Subject Premises from Martin's Unit 2H commercial compound. On or about March 25, 2022, Defendant Kristen A. Mantell utilized the U.S. Mail to transmit fabricated, defamatory Notices to Cure and Notices of Termination, falsely accusing the Plaintiffs of creating a nuisance. From the precise chronological inception of this mail fraud campaign—marked by the transmission of the first facially fraudulent, backdated Notice to Cure via the U.S. Postal Service—Defendant Kristen A. Mantell has intentionally operated in the combined, concurrent capacities of General Counsel and un-elected, un-voted Board Assistant Secretary for Defendant CHAOC. This dual-hatted structural alignment was deliberately engineered by the Enterprise to bypass cooperative corporate governance bylaws, granting Mantell unchecked internal authority to execute, verify, and self-authenticate her own fraudulent litigation notices. By operating as both the outside legal counselor and an inside, un-elected board official, Mantell successfully hijacked the cooperative's administrative machinery, using the U.S. Mail to channel extortive legal threats and launch the manufactured eviction matrix against the Plaintiffs.

372. As part of this conspiracy, the Enterprise repeatedly weaponized municipal emergency resources by transmitting false complaints, fraudulent reports, and fabricated alarms to the New York City Police Department (NYPD) and the New York City Fire Department (FDNY) against the Plaintiffs.

373. The Enterprise executed these false emergency dispatches with the specific intent to harass, intimidate, and torment the occupants, attempting to force a constructive self-eviction to gain possession of the Subject Premises.

374. Defendants Greenburger, TEI, CHAOC, FirstService Residential, Madison Security, and Doyle Security Services actively authorized and permitted Defendant Martin to maintain her high-volume commercial animal care operation inside a strictly residential cooperative unit directly above the Plaintiffs' home.

375. Under New York City Health Code and zoning regulations, operating a commercial animal boarding facility within a residential multi-family dwelling is strictly illegal, and a commercial boarding license cannot legally be issued for Apartment 2H.

376. Despite these statutory prohibitions, Melissa Martin has operated Paw Paw Pet Care LLC inside the residential unit for more than a decade, continuing the unauthorized commercial operations to the present day.

377. Following an administrative inspection of Apartment 2H, the New York City Department of Health and Mental Hygiene (DOHMH) issued an official summons and violation notice to Defendant Martin for operating an illegal animal facility (attached hereto as **Exhibit [X]**).

378. Notwithstanding this official municipal enforcement action, the Enterprise continues to shield and support Defendant Martin's unauthorized operations, entirely failing to abate the ongoing structural and biological nuisance.

379. Plaintiffs allege that the coordinated transmission of false emergency reports to municipal authorities, paired with the intentional maintenance of an illegal commercial facility to degrade the occupants' living environment, constituted an ongoing pattern of predicate acts of wire fraud under **18 U.S.C. § 1343**.

380. The Enterprise utilized these deceptive and hazardous mechanisms to intentionally deprive the Plaintiffs of their statutory rights to quiet enjoyment and bodily safety, executing a predatory scheme to convert a protected property asset for corporate enrichment.

## XXXV. THE OPERATIONAL SCOPE OF THE UNLAWFUL NUISANCE AND COOPERATIVE INSIDER COLLUSION

381. The continuous noise, vibrations, and environmental disturbances originating from Melissa G. Martin’s unauthorized commercial facility in Apartment 2H are amplified by structural uncarpeted hardwood floors, consisting of:

- The high-impact dropping of hard animal toys of various sizes and densities directly onto the bare subfloors;
- The unabated vocalization and loud barking of multiple dogs maintained simultaneously inside the residential unit; and
- The high-velocity scratching, thumping, and galloping of animal paws racing back and forth throughout the layout of Apartment 2H.

382. The client database and active patron network of Martin's Paw Paw Pet Care LLC comprise an interconnected roster of Defendant CHAOC's cooperative owners, major shareholders, commercial rental tenants, and surrounding neighborhood residents.

383. This commercial customer network explicitly includes both past and current members of Defendant CHAOC's Board of Directors.

384. These board members share an identity of interest and direct corporate connection with Defendants Francis Greenburger, TEI, Clinton 174 Realty Associates LLC, Clinton Apartments LLC, Charles H. Greenthal Management Corp., FirstService Residential New York, Inc., and Attorney Kristen A. Mantell of Baron & Baron Esqs. P.C.

385. Plaintiffs allege that the intentional integration of cooperative board members and management insiders into Defendant Martin's illegal commercial client network constitutes a structured commercial kickback and collusion scheme.

386. The Enterprise principals actively protected, authorized, and immunized Defendant Martin's unauthorized commercial operations from standard lease enforcement, municipal evictions, and building code fines because the insiders directly utilized and benefited from her illegal commercial services.

387. Plaintiffs allege that the coordinated utilization of an illegal commercial animal facility by corporate board members, combined with the tracking of false compliance logs to hide the resulting structural degradation from housing inspectors, constituted an ongoing pattern of predicate acts of wire fraud under **18 U.S.C. § 1343**.

388. The Enterprise systematically weaponized this insider-protected nuisance to destroy the Plaintiffs' quiet enjoyment and erode their physical safety, executing an

organized, predatory plan to force a constructive eviction of the occupants for corporate enrichment.

**XXXVI. REGULATORY COLLUSION, SHAM LITIGATION, AND STATE-LEVEL RACKETEERING RE-LAYERING**

389. Plaintiffs allege that Defendants Francis Greenburger, TEI, CHAOC, Charles H. Greenthal Management Corp., FirstService Residential New York, Inc., Attorney Kristen A. Mantell, Madison Security Group, Inc., and Doyle Security Services, Inc. actively colluded with municipal agents to protect, conceal, and permit Melissa Martin's illegal commercial operation of Paw Paw Pet Care LLC for over a decade.

390. The Enterprise maintained this insider protection scheme for their own corporate and financial benefit, while intentionally inflicting severe emotional distress, permanent respiratory injuries, and deep economic damage upon the Plaintiffs' possessory and property interests.

391. In direct response to Plaintiffs filing formal grievances with the NYPD, DHCR, DHR, DOHMH, DOB, and via the NYC-311 system, the Enterprise executed a coordinated campaign of tenant harassment and extrajudicial retaliation.

392. This retaliatory network was operationalized by specific corporate and state actors, including:

- Defendant Francis Greenburger of Defendants TEI and CHAOC;
- Attorney Kristen A. Mantell of Defendants Baron & Baron Esqs. P.C.;
- Melissa G. Martin of Paw Paw Pet Care LLC;
- Defendant General Property Manager Parvez Ahmed of Defendants Charles H. Greenthal Management Corp. and FirstService Residential New York, Inc.;

- Security Supervisor J. Griffon and Security Director Mark Atherton of Defendants Madison Security Group, Inc. and Doyle Security Services, Inc.;
- Sergeant Yanira Golphin of Defendant New York City Police Department (NYPD);
- Director Chelsea L. John of Defendant New York State Division of Human Rights; and
- Investigators Howard, Smith, and Confidential Investigator Shameika Nixon of Defendant City of New York Department of Investigation (DOI).

393. Plaintiffs allege that Sergeant Golphin and the named corporate principals actively manipulated municipal enforcement protocols to suppress the Plaintiffs' emergency noise and safety logs, using color of official authority to immunize Defendant Martin's commercial operations from city closures.

394. To further insulate the Enterprise from regulatory scrutiny during an active New York State Division of Human Rights (DHR) investigation, the conspirators colluded to execute a sham lawsuit in the Supreme Court of New York, Kings County, captioned *Melissa Martin v. Clinton Hill Apts. Owners Corp.*, Index No. 501135/2024, filed on January 11, 2024.

395. Plaintiffs allege that the filing and mailing of this 2024 state court action was an entirely pretextual, bad-faith legal maneuver devoid of any legitimate triable cause of action.

396. The Enterprise weaponized the state judicial apparatus as an extractive tool to mount intense economic pressure, drive up the Plaintiffs' litigation overhead, and force a constructive eviction of the home-office occupants to block the discovery of the underlying multi-decade title fraud.

397. Plaintiffs allege that the transmission of these false emergency reports to the NYPD, coupled with the routing of fraudulent state court summonses, constituted individual predicate acts of wire fraud under **18 U.S.C. § 1343** and mail fraud under **18 U.S.C. § 1341**.

398. The Enterprise systematically deployed these deceptive, coercive mechanisms across state and municipal channels to obstruct justice, deny the Plaintiffs due process, and safeguard an illicit real estate revenue stream for corporate enrichment in violation of **18 U.S.C. § 1962**.

399. Plaintiffs allege that the state court action filed by Melissa G. Martin was a calculated act of retaliation, coercion, and intimidation designed to shield the Enterprise. While Defendant Martin's complaint focuses entirely on grievances against the Plaintiffs, she intentionally omitted naming any of the Plaintiffs as direct defendants in her initial January 2024 filing.

400. Instead, the Enterprise—acting through Defendants Martin, CHAOC, and Attorney Kristen A. Mantell of Baron & Baron Esqs. P.C.—strategically waited until July 24, 2025, a full year and a half after the initial filing date, to implead the Plaintiffs into the sham lawsuit as Third-Party Defendants (TPDs).

401. The July 24, 2025 impleader date was calculated to occur exactly one year after the New York State Division of Human Rights (DHR) issued its final administrative determination regarding the Plaintiffs' discrimination and harassment complaints against Defendants Martin, Paw Paw Pet Care LLC, CHAOC, Attorney Mantell, Property Manager Ahmed, and Greenthal Management/FirstService Residential.

402. Plaintiffs allege that the deliberate timing of this Third-Party Complaint constituted an affirmative predicate act of extortion and witness intimidation under **18 U.S.C. § 1951**

(The Hobbs Act) and **18 U.S.C. § 1512**. The Enterprise weaponized state court impleader procedures as a retaliatory tool to punish the whistleblowers, drive up their legal overhead, and protect their unrecorded real estate infrastructure from municipal oversight.

## XXXVII. THE FRAUDULENT EVICTION AND SHAM LITIGATION SCHEME (2021–PRESENT)

403. From 2021 through 2025, encompassing the COVID-19 pandemic and municipal recovery periods, the Enterprise—acting through Defendants Francis Greenburger, TEI, Clinton 174 Realty Associates LLC, CHAOC, Attorney Kristen A. Mantell, Baron & Baron Esqs. P.C., Melissa Martin, Paw Paw Pet Care LLC, Madison Security Group, Inc., and Doyle Security Services, Inc. - executed a coordinated, fraudulent eviction scheme against the Subject Premises.

404. As part of this scheme, the conspirators colluded to fabricate, draft, hand-deliver, and transmit via the U.S. Mail and electronic servers a series of predatory legal notices, including formal Notices to Cure and Notices of Termination (attached hereto as **Exhibit [X]**).

405. These eviction notices contained systemic material misrepresentations, defamatory statements, and completely fabricated allegations of House Rules infractions and Proprietary Lease violations against the Plaintiffs.

406. Plaintiffs allege that the generation, mailing, and filing of these facially fraudulent legal notices into New York City and New York State public records registries constituted separate, individual predicate acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.

407. The Enterprise utilized these bad-faith eviction notices to manufacture a fraudulent baseline of non-compliance, attempting to bypass the strict New York State military

dependent protections under **NYS Military Law § 300 et seq.** and execute an illicit property seizure for corporate enrichment.

## XXXVIII. THE FRAUDULENT EXTRACTION OF ERAP FUNDS AND PRETEXTUAL BILLING LEASE MANIPULATION

408. On September 12, 2021, Defendant CHAOC, acting in coordination with Property Manager Parvez Ahmed and Defendants Charles H. Greenthal Management Corp. and FirstService Residential New York, Inc., accepted and deposited $9,000.00 in public relief funds under the New York State Emergency Rental Assistance Program (ERAP) for the Subject Premises (attached hereto as **Exhibit [X]**).

409. The Enterprise applied for, accepted, and transferred these state funds with actual knowledge that they held no lawful title, deed, or recorded ownership interest in the Subject Premises, which remained an exempt housing unit completely outside their corporate jurisdiction.

410. On April 8, 2022, Plaintiffs transmitted an electronic notification to Defendant Charles H. Greenthal Management Corp. explicitly requesting the production of the historical "Master Lease" for the Subject Premises.

411. Defendant's corporate agent, Safije Cemenja, responded in writing via interstate wire, stating: *"Good morning, Apologies. We do not have it in our files. I have to reach out to the rental folks in our LIC [corporate] office. Regards, Sofia."* (attached hereto as **Exhibit [Y]**).

412. The Enterprise failed to execute any factual follow-up or produce the requested Master Lease documentation, as no such commercial contract had ever existed for the exempt housing unit.

413. To conceal this deep contractual and title defect, the Enterprise immediately disrupted the forty-five (45) year established billing infrastructure of the Subject Premises. Specifically, corporate transfer agents Safije "Sofia" Cemenja and Parvez Ahmed abruptly terminated the generation and routine physical delivery of the Plaintiffs' monthly rental invoices, which had been continuously placed under the entryway of Unit 1H since the 1980s, attempting to isolate the occupants from standard payment channels.

414. On May 4, 2022, following the Plaintiffs' hand-delivery of their monthly rental tender via a verified, bank-issued cashier's check - and the subsequent provision of a physical payment receipt by site staff—the Enterprise's management office agents utilized the U.S. Mail to unlawfully return and reject the physical cashier's check. In executing this mail rejection, corporate agents made affirmative, fraudulent misrepresentations to the Plaintiffs, falsely asserting that the corporate office had already initiated formal legal eviction proceedings against the household, when in factual reality, no summary notice of petition or petition had ever been filed or processed within the New York City Housing Court.

415. The Enterprise executed this extrajudicial check rejection without reasonable cause, without administrative explanation, and with the specific intent to fabricate a fraudulent, unrecorded paper trail of non-payment. This bad-faith tactic occurred exactly eight (8) months after the Enterprise successfully extracted and deposited the $9,108.16 in public ERAP state funds under Application A5QHR, exposing a calculated corporate plot to bypass federal non-eviction protections, manufacture an artificial default record, and execute an illegal constructive eviction to shield their underlying title fraud from federal judicial oversight.

416. This deliberate disruption of the routine billing cycle occurred exactly eight (8) months after the Enterprise successfully extracted and deposited the $9,000.00 in public ERAP state funds for its own corporate financial enrichment.

417. Plaintiffs allege that the coordinated extraction of state relief funds based on a non-existent corporate tenancy, followed by the immediate termination of the billing cycle and the mail rejection of valid rental checks to manufacture artificial arrears, constituted separate, individual predicate acts of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

418. The Enterprise utilized these deceptive techniques to fabricate a fraudulent, unrecorded paper trail of non-payment. This maneuver was designed to bypass the strict ERAP non-eviction protections and execute a predatory constructive eviction of the occupants to shield its underlying title fraud from municipal and federal housing audits, satisfying the civil enforcement requirements of **18 U.S.C. § 1964(c)**.

## XXXIX. SUBSEQUENT ERAP EXTREMITIES AND CORPORATE ABSORPTION BY FIRSTSERVICE RESIDENTIAL

419. On September 19, 2022, while the Enterprise was actively mischaracterizing the Plaintiffs as "holdover tenants" to municipal agencies, the New York State ERAP program transmitted an electronic confirmation to the Plaintiffs (attached hereto as **Exhibit [X]**). This agency notification verified a second financial allocation, stating: *"The total rental amount scheduled to be paid to Clinton Hill Apts. Owners Corp. for the rental address 210 Clinton Avenue 1H Brooklyn, NY 11205 is: $1,376.49…[apportioning back-rent] to be paid for month: April 2022 - $773.17…May 2022 - $603.32."*

420. Defendants CHAOC, Charles H. Greenthal Management Corp., and FirstService Residential New York, Inc. accepted and deposited this second installment of state relief

funds with actual knowledge that they held no lawful deed or property interest in the Subject Premises, which remained an exempt housing unit. Plaintiffs allege that the intentional acceptance of this second ERAP allocation, during the exact window when corporate agents were returning the Plaintiffs' physical cashier's checks to manufacture artificial default records, constituted an affirmative predicate act of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

**THE ENTERPRISE'S CONTINUOUS, MULTI-YEAR RACKETEERING PATTERN OF GOVERNMENT BENEFITS FRAUD AND FRAUDULENT ERAP WIRE TRANSMISSIONS (18 U.S.C. § 1343)**

421. The Racketeering Enterprise, by and through its directing corporate principals Francis Greenburger, TEI, and Defendant CHAOC, extended its continuous pattern of racketeering activity across multiple calendar years by executing a systematic, recurring scheme to exploit federally funded housing relief programs administered via the New York State Office of Temporary and Disability Assistance (OTDA).

- Following the Enterprise's initial fraudulent siphoning of $9,108.16 under ERAP Application Number A5QHR on September 10, 2021, the Enterprise executed a second, distinct scheme to defraud the government and the Plaintiffs. Specifically, on or about September 18, 2022, under ERAP Application Number JEBY0, Defendant CHAOC utilized electronic interstate wire channels to transmit renewed landlord certifications under penalty of perjury, falsely re-asserting that it was the true, lawful, and record title "property owner" of Subject Unit 210-1H.
- By means of these renewed electronic misrepresentations, the Enterprise induced the OTDA to disburse an additional $1,376.49 in public housing benefits on September 18, 2022, immediately depositing the funds into their centralized

corporate account registries via direct deposit. By participating in and accepting this secondary payment, Defendant CHAOC statutorily bound itself to extended, multi-year non-eviction covenants, lease-stabilization mandates, and waiver guarantees stretching deep into late 2023.

- The Enterprise's recurring, sworn electronic ERAP certifications flatly contradict its simultaneous, deceptive maneuvers inside parallel state administrative and housing channels. During the identical calendar cycles, the Enterprise swore under penalty of administrative discipline inside the 210-1H DHCR non-compliance proceedings and within the public 2023 Cooperative Offering Plan amendments that a completely unannounced, off-balance-sheet shell company—"Clinton Apartments LLC"—was the proprietary owner of the identical unit.

422. The Enterprise systematically manipulated its corporate identity across parallel federal, state, and municipal benefit platforms to maximize illicit capital extraction, constituting separate and distinct predicate acts of Wire Fraud under 18 U.S.C. § 1343, while actively weaponizing bad-faith state litigation channels to execute a retaliatory, constructive eviction scheme against the Plaintiffs in direct violation of the protective statutory covenants attached to those public funds."

423. In January 2023, approximately six months after the Enterprise initiated the systematic rejection of the Plaintiffs' monthly rental instruments, Defendant FirstService Residential New York, Inc. acquired the corporate assets, management contracts, and entire operational control of Charles H. Greenthal & Co. Through this corporate acquisition, Defendant FirstService Residential New York, Inc. absorbed all existing employee and site management structures, including the specific operational contracts of Defendant Parvez

Ahmed (Property Manager) and Defendant Vigan Ahmetaj (Lead Superintendent). Upon assuming physical management of the building complex, Defendant FirstService Residential New York, Inc. inherited a strict statutory duty to comply with all outstanding municipal codes, building regulations, and active DHCR compliance orders pertaining to the Subject Premises .

424. Plaintiffs allege that the Enterprise, operating through its successor executive team at FirstService Residential New York, Inc., deliberately maintained the unrecorded parallel tracking ledger and structural maintenance deprivation scheme initiated by its predecessors. The successor corporate principals seamlessly integrated the absorbed personnel—Ahmed and Ahmetaj—to continue the systematic concealment of the subfloor wood rot and toxic mold colonies, utilizing the U.S. Mail to broadcast fraudulent billing statements and deceptive legal notices to protect an illicit real estate revenue stream for corporate enrichment in violation of **18 U.S.C. § 1962(c)**.

425. Upon acquiring the property management infrastructure of the building complex, Defendant FirstService Residential New York, Inc. assumed a strict contractual and statutory duty to manage, investigate, and abate resident grievances regarding the unauthorized commercial operations of Melissa G. Martin and Paw Paw Pet Care LLC inside Apartment 2H.

426. Despite this clear operational duty, Defendant FirstService Residential New York, Inc. and its executive agents—specifically Steven Greenbaum, Jennifer Ogman, and Parvez Ahmed—acting in concert with Defendant CHAOC and its legal counsel, Attorney Kristen A. Mantell of Baron & Baron Esqs. P.C., omitted to take any remedial action to

mitigate the ongoing illegal commercial activities, structural nuisances, and breaches of the restrictive covenants.

427. Plaintiffs allege that the Enterprise principals affirmatively encouraged and insulated Defendant Martin and Paw Paw Pet Care LLC, permitting them to expand their commercial animal care operations and maintain a continuous campaign of retaliatory tenant harassment against the occupants of the Subject Premises.

428. Following the fraudulent extraction and deposit of the state ERAP allocations, the conspirators—specifically Defendants Martin, Paw Paw Pet Care LLC, the CHAOC Board of Directors, Property Manager Parvez Ahmed, Attorney Kristen A. Mantell, and FirstService Residential New York, Inc.—embarked on a relentless campaign of harassment, coercion, and intimidation.

429. This campaign was executed through the systematic transmission of superfluous, bad-faith Notices to Cure and Notices of Termination via the U.S. Mail, threatening immediate family eviction under entirely pretextual allegations of lease infractions.

430. Concurrently, Defendants Francis Greenburger, TEI, CHAOC, Clinton 174 Realty Associates LLC, Clinton Apartments LLC, Charles H. Greenthal Management Corp., and FirstService Residential New York, Inc. weaponized the U.S. Mail to transmit a continuous stream of disingenuous, pretextual "Entry Demand Letters" to force physical entry into the Subject Premises.

431. Plaintiffs allege that the generation and mailing of these relentless entry demands were executed for the fraudulent purpose of gaining unauthorized access to the apartment during active DHCR Non-Compliance proceedings.

432. The Enterprise deployed these coercive notices to execute a pre-litigation sweep, attempting to alter the physical conditions of the unit, destroy the forensic evidence of the toxic mold propagation, and evade mounting municipal fines and administrative penalties, in violation of **18 U.S.C. § 1512** (Witness and Evidence Tampering).

433. Plaintiffs allege that the coordinated, multi-year transmission of these fraudulent eviction notices and pretextual entry demands constituted separate, individual predicate acts of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

437. The Enterprise systematically deployed these deceptive mechanisms across interstate wires and the postal system to enforce intense administrative and economic pressure on the protected occupants, executing an organized, predatory plan to force a constructive self-eviction and protect their unrecorded property infrastructure from federal judicial oversight, in violation of **18 U.S.C. § 1962(c)**.

## XLI. THE WEAPONIZATION OF LOCAL LAW ENFORCEMENT AND STRUCTURAL IDENTITY FRAUD

438. On or about April 6, 2021, the Enterprise initiated a coordinated campaign to weaponize the municipal resources of the New York City Police Department (NYPD) to execute a predatory constructive eviction scheme against the Plaintiffs.

439. This campaign was orchestrated by Defendants Melissa Martin, Paw Paw Pet Care LLC, Clinton 174 Realty Associates LLC, CHAOC, Property Manager Parvez Ahmed, Lead Superintendent Vigan Ahmetaj, and Attorney Kristen A. Mantell of Baron & Baron Esqs. P.C.

440. The initial phase of this scheme involved transmitting an intentionally false criminal report to the NYPD 88th Precinct via emergency telecommunications networks,

resulting in the generation of NYPD Complaint Number 2021-088-001033 (attached hereto as **Exhibit [X]**).

441. On June 1, 2021, the conspirators utilized interstate wires to transmit a second fraudulent criminal report to municipal law enforcement operators, resulting in the generation of NYPD Complaint Number 2021-088-001737 (attached hereto as **Exhibit [Y]**).

442. Plaintiffs allege that the generation and electronic transmission of these fraudulent emergency calls constituted distinct predicate acts of wire fraud under **18 U.S.C. § 1343**.

443. The Enterprise executed these transmissions with the specific intent to fabricate a punitive municipal record against the Plaintiffs, in direct violation of **New York Penal Law § 240.50** (Falsely Reporting an Incident in the Third Degree).

444. Inside these official police complaints, Melissa G. Martin executed multiple egregious misrepresentations of material fact to manipulate law enforcement protocols, including:

- **Fabrication of Identity and Biographical Data:** Inside Complaint No. 2021-088-001033, Defendant Martin recorded her date of birth as September 19, 1975. However, inside Complaint No. 2021-088-001737, she altered her biographical record, falsely stating her date of birth was June 14, 1981.
- **Fabrication of Domestic Nexus to Hijack Family Offense Status:** Inside the April 6, 2021 report, Defendant Martin falsely stated to responding officers that she was the "same-sex partner" of Plaintiff Monique Saunders to trigger high-priority domestic violence intervention protocols. Inside the June 1, 2021 report, she

countermanded her own statement, declaring that the Plaintiffs were total "strangers."

445. Plaintiffs allege that the Enterprise utilized these highly manipulative, contradictory, and unverified domestic violence profiles to deploy color of official law enforcement authority against the occupants.

446. This structural intimidation strategy was executed to place intense physical and psychological strain on the household, force a constructive eviction of the occupants, and eject the family from the Subject Premises to permanently insulate the Enterprise's unrecorded property infrastructure from federal discovery.

447. Defendant Martin intentionally and personally filed these fabricated statements with the NYPD 88th Precinct with actual knowledge that they were false, malicious, and fundamentally detrimental to the Plaintiffs' financial and property interests.

448. Plaintiffs allege that Defendant Attorney Kristen A. Mantell possessed actual or constructive knowledge that Melissa Martin’s statements to the police were perjury and fabrications.

449. By actively participating in and supporting the transmission of these false profiles, Defendant Mantell and her client, Defendant Martin, publicly slandered Plaintiff Monique Saunders, causing direct harm, injury, and severe reputational and emotional damages.

450. Two months after the initial April 6, 2021 report, Defendant Martin altered her official statement to the NYPD 88th Precinct in her subsequent June 1, 2021 report, declaring that Plaintiff Monique Saunders was a "stranger."

451. Defendants Mantell and Martin possessed actual knowledge that Plaintiff Monique Saunders was neither a domestic partner nor a stranger.

452. They knew her to be a neighboring tenant who was actively logging habitual noise disturbances and severe privacy invasions caused by Melissa Martin, her guests, and the commercial animal clients of Paw Paw Pet Care LLC.

453. Plaintiffs allege that the coordinated utilization of these contradictory statements via interstate wires constituted a pattern of predicate acts of wire fraud under **18 U.S.C. § 1343**.

454. The Enterprise systematically deployed these defamatory police profiles to destroy the Plaintiffs' credibility with public safety agencies, obscure the underlying commercial lease violations, and advance the broader scheme to force a constructive eviction of the occupants for corporate enrichment.

455. Plaintiffs allege that Defendant Attorney Kristen A. Mantell possessed actual or constructive knowledge that Melissa G. Martin had transmitted additional false allegations to the NYPD on multiple separate occasions, under penalty of perjury.

456. These fabricated municipal reports pertained to baseless claims that the Plaintiffs were banging on structural pipes, shouting profanities, forcefully striking the entryway of Apartment 2H, and threatening Defendant Martin's bodily safety.

457. Defendant Martin executed these false reports with knowledge that they were completely fabricated, and subsequently integrated these identical misrepresentations into a formal, duly sworn and deposed affidavit.

458. This fraudulent affidavit was prepared, reviewed, and notarized by Defendant Attorney Kristen A. Mantell, who then utilized electronic wire communication channels to transmit the deceptive instrument to DHCR Attorney Mediator Evelyn Britt (attached hereto as **Exhibit [X]**).

459. The Enterprise generated, notarized, and emailed this fraudulent instrument with the specific intent to introduce false evidence against the Plaintiffs inside active administrative housing proceedings.

460. This deliberate introduction of false statements directly violated **New York Penal Law § 210.45** (Making a Punishable False Written Statement), which defines the offense as knowingly making a false statement in a written instrument bearing a legally authorized form notice to the effect that false statements made therein are punishable as a misdemeanor.

461. Plaintiffs allege that the electronic transmission of this notarized, perjured affidavit to a state housing regulatory agency constituted an affirmative predicate act of wire fraud under **18 U.S.C. § 1343**.

462. The Enterprise—acting through its legal counsel, Defendant Kristen A. Mantell, and individual co-conspirators—intentionally corrupted the administrative record of the DHCR. This tactical maneuver was executed to evade non-compliance penalties, suppress the Plaintiffs' environmental contamination complaints, and advance a predatory scheme to force a constructive eviction of the home-office occupants for corporate enrichment.

463. Public judicial records filed on the New York State Courts Electronic Filing system (NYSCEF Doc. No. 30) document a direct personal and commercial alliance between resident Melissa G. Martin and New York City Police Department (NYPD) Sergeant Yanira Leshan Golphin (Badge No. 4002).

464. This official case document—an electronic communication entered into the public record by Defendant and Third-Party Plaintiff CHAOC—establishes that Melissa G.

Martin operates as an un-audited domestic provider for Sergeant Golphin's minor children (attached hereto as **Exhibit [Z]**).

465. On June 12, 2025, at 10:17 AM, NYPD Sergeant Yanira Leshan Golphin utilized electronic wire networks to transmit a coercive communication to Defendant CHAOC's official board registry (CHAOCboardinbox@chaocbk.com).

466. Inside this transmission, Sergeant Golphin verified an ongoing nine-year personal relationship with Melissa G. Martin, explicitly stating: *"The boys often request for me to drop them off to Melissa's apartment to spend quality time with her and her son. I never say no. Melissa's home is definitely a space in which I feel that they will be safe and secure under the supervision of Melissa…"* (attached hereto as **Exhibit [Z]** ).

467. Plaintiffs allege that the electronic transmission of this high-level law enforcement communication to the cooperative's executive inbox constituted an affirmative predicate act of wire fraud under **18 U.S.C. § 1343**.

468. The Enterprise deployed this communication as an administrative weapon under color of official police authority to intimidate the cooperative board, suppress the Plaintiffs' environmental contamination logs, and insulate Melissa G. Martin's illegal commercial animal care operation from corporate eviction actions.

469. This collusive intervention directly corrupted the building's administrative enforcement mechanisms, allowing a hazardous structural and biological nuisance to persist to the financial and physical detriment of the Plaintiffs, in violation of **18 U.S.C. § 1962(c)**.

470. Sergeant Yanira Leshan Golphin transmitted this multi-page electronic communication with actual and constructive knowledge that resident Melissa G. Martin,

her minor son, and Defendant CHAOC were all represented by independent legal counsel in active, ongoing legal investigations by the DHR and legal proceedings in state court.

471. Disregarding established legal protocols, Sergeant Golphin bypassed the designated attorneys of record to communicate directly with the corporate principals at Defendant CHAOC, while copy-routing the transmission directly to Melissa G. Martin.

472. This electronic communication further establishes that Melissa G. Martin regularly integrates un-audited childcare and domestic operations for Sergeant Golphin's minor children directly inside Apartment 2H.

473. These domestic child-custody operations are executed simultaneously within the identical physical space where Melissa G. Martin conducts high-volume, unauthorized commercial animal care services for her Paw Paw Pet Care LLC clients.

474. These concurrent commercial animal care services include canine boarding, grooming, behavioral training, and veterinary medication administration, all of which are executed as part of an illegal pet care operation inside a strictly residential cooperative unit.

475. Plaintiffs allege that the electronic transmission of this high-level law enforcement communication, designed to circumvent counsel of record and validate a hazardous dual-use commercial occupancy, constituted an affirmative predicate act of wire fraud under **18 U.S.C. § 1343**.

476. The Enterprise utilized this improper law enforcement intervention to compromise the cooperative's internal disciplinary mechanisms, shield an illegal canine boarding facility from municipal zoning closures, and maintain a severe structural and biological nuisance directly above a medically vulnerable occupant and their dedicated home office workspace, in violation of **18 U.S.C. § 1962(c)**.

477. Prior to transmitting her June 12, 2025 electronic communication to Defendant CHAOC's executive board, NYPD Sergeant Yanira Leshan Golphin had never met, interviewed, or questioned any member of the Tovar-Saunders family.

478. Defying mandatory investigative protocols, Sergeant Golphin utilized her official law enforcement stature to defame the Plaintiffs, falsely asserting to the Board that the occupants of Apartment 1H displayed malicious intent and that their routine, good-faith NYC-311 and building security noise notifications constituted aggravated harassment designed to cause alarm to resident Melissa G. Martin and her guests.

479. Sergeant Golphin further utilized the communication to issue an explicit administrative mandate to Defendant CHAOC's Board of Directors, characterizing her insider intervention as "step one" of a formal notification process.

480. In this transmission, Sergeant Golphin declared that she should not have to endure notifications at any hour regarding police units responding to Apartment 2H, thereby attempting to coerce the cooperative into suppressing the Plaintiffs' lawful right to seek municipal intervention for severe structural noises, illegal commercial operations, and animal welfare concerns.

481. Presenting a direct conflict of interest and an abuse of her public position, Sergeant Golphin asserted in her communication: *"When the police respond to unit 2H, all occupants in the unit are targets of the intentional harassment thereof by the occupants in unit 1H. This harassment is making me quite upset, annoyed and also alarmed. Each and every time that my children are in unit 2H and police show up, it really upsets the children, Melissa and I."* (NYSCEF Doc. No. 30, page 2).

482. This explicit written admission demonstrates that Sergeant Golphin's close personal and commercial babysitting alliance with Melissa G. Martin compromised her institutional objectivity.

483. Plaintiffs allege that Sergeant Golphin actively utilized her supervisor rank to intercede in independent emergency dispatches, systematically convincing responding NYPD precinct officers to suppress their physical observations and omit code infractions from official municipal data registries.

484. This targeted frustration of law enforcement duties was executed to prevent responding officers from documenting the un-licensed commercial canine facility, directly violating **New York Penal Law § 195.00** (Official Misconduct) and the NYPD Patrol Guide mandates governing conflicts of interest and accurate record-keeping.

485. Sergeant Golphin directly abused her authority under color of law by concluding her June 12, 2025 board directive with an explicit enforcement demand, stating: *"I Yanira Golphin, am formally requesting for the Board of Directors to swiftly take action for the multiple aggravated harassment occurrences made by occupants in unit 1H. I may be reached at the above email address or at 718-772-8430 for any additional information. I look forward to your speedy response. Yanira Golphin."*

486. The Enterprise utilized this improper law enforcement pressure to compel Defendant CHAOC to initiate its bad-faith impleader actions. This maneuver was designed to bring the Plaintiffs into the Kings County sham lawsuit on July 24, 2025, to force a constructive eviction of the home-office occupants and protect their unrecorded property infrastructure from federal discovery.

487. This abusive conduct aligns with a long-standing, documented pattern of disciplinary infractions recorded across Sergeant Golphin's 17-year NYPD career (2008 to Present). Public law enforcement databases confirm that Sergeant Golphin has accumulated six (6) distinct administrative complaints for Abuse of Authority and two (2) separate formal charges for Excessive Force, establishing a repetitive pattern of official misconduct (attached hereto as **Exhibit [X]**).

488. Plaintiffs allege that the electronic transmission of this high-level, coercive law enforcement directive to a private cooperative board constituted an affirmative predicate act of wire fraud under **18 U.S.C. § 1343**.

489. Within thirty (30) days of Sergeant Golphin's coercive email to the CHAOC Board of Directors, Attorney Kristen A. Mantell of Baron & Baron Esqs., P.C.—against whom Plaintiffs had previously filed a formal Attorney Grievance Complaint—officially impleaded the Tovar-Saunders family as Third-Party Defendants.

490. Following this impleader, Defendant Mantell initiated an aggressive volume of bad-faith electronic filings into the case docket, seeking an unreasonable injunction, praying for an extrajudicial eviction, and systematically defaming the occupants of the Subject Premises in retaliation for their whistleblowing activities.

491. Prior to Sergeant Golphin's administrative intervention, the state court case docket had remained completely inactive for an eight-month period spanning from October 11, 2024, through June 2025, with no summons or complaint served upon the Plaintiffs in the interim.

492. Plaintiffs allege that Sergeant Golphin's extrajudicial electronic communications were the direct catalyst that revived the dormant state court action, constituting a deliberate

act to obstruct justice and advance a predatory scheme to dispossess the family of their housing rights.

493. Public judicial records and electronic crowdfunding platforms confirm that Sergeant Golphin maintains a direct financial stake in the economic viability of the Enterprise's commercial operations.

494. Specifically, Sergeant Golphin acts as one of the five primary organizers of an active online fundraising campaign hosted on the GoFundMe platform, entitled *"Support Melissa's Recovery and Livelihood"* (attached hereto as **Exhibit [X]**).

495. This digital solicitation campaign, established exclusively for the benefit of resident Melissa G. Martin as the owner of Paw Paw Pet Care LLC, has successfully raised over $23,025.00 in liquid capital.

496. Plaintiffs allege that Sergeant Golphin's simultaneous role as an active-duty law enforcement supervisor, a consumer of Melissa G. Martin's un-licensed childcare facility, and a primary organizer for an Enterprise principal created a disqualifying conflict of interest under New York law.

497. Her overlapping personal, commercial, and financial incentives completely compromised her institutional impartiality, prompting her to weaponize her official NYPD rank to initiate bad-faith legal proceedings against un-interviewed tenants.

498. Plaintiffs allege that the coordinated utilization of electronic networks to manage this fraudulent crowdfunding campaign, paired with the transmission of the June 2025 board directive, constituted separate, individual predicate acts of wire fraud under **18 U.S.C. § 1343**.

499. The Enterprise systematically deployed these deceptive, coercive mechanisms across state and municipal channels to obstruct justice, deny the Plaintiffs due process, and safeguard an illicit real estate revenue stream for corporate enrichment in violation of **18 U.S.C. § 1962(c)**.

500. The Enterprise systematically deployed these interconnected digital and law enforcement mechanisms to extract financial liquidity, insulate a hazardous commercial animal boarding facility from municipal zoning enforcement, and mount intense economic pressure on the protected occupants via sham state court filings, in violation of **18 U.S.C. § 1962(c)**.

501. In furtherance of the scheme to intimidate the occupants and execute an illicit property seizure, the Enterprise - acting through Defendants CHAOC and FirstService Residential NY and its property management agents - hired Acoustilog, Inc. and its President, Hostile Witness Alan Fierstein, to install an un-consented, un-warranted tracking and electronic eavesdropping apparatus focused entirely on the private interior of the Subject Premises.

502. On Tuesday, June 25, 2024, at approximately 10:00 AM, Alan Fierstein entered the kitchen of Apartment 2H - the unauthorized commercial headquarters of Paw Paw Pet Care LLC, owned and operated by Melissa Martin - to physically construct and calibrate the surveillance trap.

503. Inside his subsequent corporate engineering report, Alan Fierstein explicitly admitted that upon listening directly to the bare floorboards of the kitchen, the Plaintiffs' internal household music was completely inaudible because acoustic energy was passing

primarily through a shared, un-insulated vertical structural element and floor penetration surrounding the common kitchen heating pipe.

504. To circumvent this acoustic barrier and mechanically capture the internal, private vocalizations and sounds of the family below, Alan Fierstein affixed a commercial accelerometer directly onto the shared structural heating pipe and suspended an un-monitored recording microphone approximately two feet above the fixture.

505. Prior to abandoning the equipment on June 25, 2024, Alan Fierstein delivered explicit, back-office operational instructions to resident Melissa G. Martin, authorizing a private, hostile litigant to manually trigger the digital audio recording system, dictate tracking thresholds, and log selective time-and-day narrative entries to manipulate the forensic record.

506. For nine (9) consecutive days, spanning from June 25, 2024, through Thursday, July 4, 2024, at 4:00 PM, the Enterprise left this un-monitored electronic tracking trap active without a judicial warrant, a Title III wiretap order, or the knowledge and consent of any occupant inside the Subject Premises.

507. This surveillance system intercepted the private oral communications and religious practices of the Plaintiffs, specifically recording the family’s sacred Shofar music played inside their own kitchen to muffle the intense structural animal noise nuisance generated by Melissa G. Martin’s illegal canine boarding business overhead.

508. On July 4, 2024, at 4:00 PM, Alan Fierstein returned to remove the tracking equipment, asserting that the hardware settings had not been tampered with or modified by Melissa G. Martin, and transported the un-audited physical recording disks back to Acoustilog's commercial laboratory for digital extraction and processing.

509. On or about July 9, 2024, Acoustilog, Inc. utilized the U.S. Mail to transmit the finalized engineering report containing these illegally intercepted audio files to Property Manager Parvez Ahmed at Defendant CHAOC's management office, located at 345 Clinton Avenue, Suite 1F, Brooklyn, New York 11238 (attached hereto as **Exhibit [X]**).

510. Plaintiffs allege that the generation, mailing, and intentional insertion of this un-audited Acoustilog report into the Kings County State Supreme Court docket constituted an active Fraud on the Court and an ongoing pattern of predicate acts of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

511. The Enterprise - acting through Defendant CHAOC and Attorney Kristen A. Mantell - knowingly introduced this illegally intercepted surveillance evidence, which is strictly inadmissible under **New York CPLR § 4506**, during a Show Cause Hearing to mislead the state court justice. This tactical manipulation resulted in the procurement of a bad-faith Preliminary Injunction on September 10, 2025, weaponizing the state judiciary to advance a predatory constructive eviction scheme against a home-office household, in violation of **18 U.S.C. § 1962(c)** and **18 U.S.C. § 2511** (The Federal Wiretap Act).

512. The Enterprise systematically deployed these interconnected digital and law enforcement mechanisms to extract financial liquidity, insulate a hazardous commercial animal boarding facility from municipal zoning enforcement, and mount intense economic pressure on the protected occupants via sham state court filings, in violation of **18 U.S.C. § 1962(c)**.

513. Crucially, this November 26, 2024 enforcement mandate formally disclosed and copy-routed the notice to a previously unrecorded, hidden corporate shell front: Defendant

CLINTON APARTMENTS LLC, registered at P.O. Box 140250, Brooklyn, NY 11214 (attached hereto as **Exhibit [X**]).

514. The continuous, cyclical deployment of this strawman shell game persisted through November 18, 2025, when DHCR Compliance/Mediation Officer D. Slay issued two separate "Notices of Settlement" under Docket Numbers MT210027NC (referencing Order LQ210113S) and MT210008NC (referencing the original February 2023 Rent Reduction Order KP210025S) (attached hereto as **Exhibits [X]** and **[Y]**).

515. These November 2025 notices confirmed that the Enterprise had again bypassed direct accountability, paid reduced civil fines, and secured an additional 60-day administrative monitoring delay.

516. In these final regulatory documents, the Enterprise stripped all references to Defendant CHAOC, FirstService, or Greenthal entirely, explicitly establishing Defendant CLINTON APARTMENTS LLC, P.O. Box 140250, Brooklyn, NY 11214 as the formal "Mailing Address of Owner/Owner's Rep," while copy-routing the secret settlements directly to Defendant Attorney Kristen A. Mantell at Baron & Baron Esqs. P.C., 118-21 Queens Blvd., Forest Hills, NY 11375.

517. Plaintiffs allege that the coordinated, multi-year generation, transmission, and electronic filing of these shifting corporate addresses, false compliance letters, and un-authorized settlement checks across interstate wires and the postal system constituted separate, individual predicate acts of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

518. The Enterprise systematically utilized Defendant CLINTON APARTMENTS LLC as a final "strawman" mask and deployed a shell game of rotating business addresses (Long

Island City, Midtown Manhattan, 5th Avenue, the Brooklyn Complex, and a Brooklyn P.O. Box) to build a highly fragmented regulatory record.

519. This mechanical re-layering allowed the conspirators to pocket public ERAP relief funds, deceive municipal investigators, and insulate their multi-million dollar corporate assets from enforcement actions.

531. Plaintiffs explicitly allege that Defendant New York State Division of Housing and Community Renewal ("DHCR") did not merely act as an innocent, deceived regulatory body; rather, its Compliance and Enforcement Unit agents actively colluded with the private corporate Defendants to suppress enforcement records, falsify the administrative status of the Subject Premises, deny Plaintiffs administrative due process, and shield the Enterprise from state and federal regulatory oversight.

532. On January 30, 2025, Defendant DHCR utilized the U.S. Mail to transmit a formal "Notice of Remote Hearing" executed from the desk of Peter M. Stecker, Esq., Director of the Enforcement/Compliance Unit (attached hereto as **Exhibit [X]**). This notice scheduled a mandatory regulatory video conference for February 26, 2025, at 10:00 AM regarding the Enterprise's persistent, multi-year non-compliance.

533. Soon thereafter, on February 18, 2025, Defendant DHCR mailed a conflicting "Notice of Remote Prehearing Conference," resetting the administrative date to March 19, 2025, at 10:00 AM (attached hereto as **Exhibit [X]**). This secondary notice contained an explicit, restrictive mandate declaring that the Tenant occupants were relegated to "non-party" observers who were strictly barred from active participation in the enforcement hearing.

534. On the morning of March 19, 2025, Plaintiffs placed multiple telephone calls and transmitted urgent electronic mail notifications to DHCR Compliance Unit Agent Jennifer Spencer, Esq., formally demanding the Cisco Webex video link to observe the scheduled enforcement conference.

535. Agent Spencer affirmatively denied the Plaintiffs' demands, withheld the electronic access credentials, and falsely stated that the conference had been cancelled because the proceeding was "only for the attorneys."

536. In factual reality, Defendant DHCR and Agent Spencer used this digital lockout to execute an un-recorded, ex parte administrative alignment with the Enterprise's legal counsel to terminate the enforcement file outside the presence of the victims.

537. On March 20, 2025, the very next day, Agent Jennifer Spencer drafted and transmitted a formal closing notice via the U.S. Mail, stating: *"Please be advised that the above referenced compliance proceeding is hereby closed, because the matter has been withdrawn without prejudice."* (attached hereto as **Exhibit [X])**. Plaintiffs received this correspondence on March 22, 2025.

538. To validate the Enterprise's fraudulent re-layering, Agent Spencer copy-routed this official March 20, 2025 closing notice across the entire matrix of shifting corporate shells and fictitious offices, mailing copies directly to:

- Clinton Apartments LLC, P.O. Box 140250, Brooklyn, NY 11214;
- Clinton Hill Apts. Owners Corp., at the non-existent administrative site of 210 Clinton Ave., Brooklyn, NY 11205;
- FirstService Residential, Attn: Steven Greenbaum, 575 Fifth Ave., 9th Floor, New York, NY 10017;

- Clinton Hill Apts. Owners Corp. c/o Time Equities, Inc., 825 Third Ave., New York, NY 10022; and
- Clinton 174 Realty Associates LLC, Charles H. Greenthal & Co., 551 5th Avenue, Room 500, New York, NY 10176.

539. In a further act of administrative manipulation, Defendant DHCR altered the primary mailing block of the late Plaintiff Anita Tovar to interlineate and list the Enterprise's adversarial legal counsel directly under the tenant's name, designating the block as: *"Clinton Hill Apts. Owners Corp., Baron & Baron, Esqs. P.C., Attn: Kristen Mantell, Esq., 118-21 Queens Blvd., Forest Hills, NY 11375."* This deliberate data manipulation redirected the tenant's official regulatory service copies straight into the hands of the adverse corporate conspirators.

540. In response to this administrative corruption, Plaintiffs executed three comprehensive, formal notices detailing the corporate defendants' systematic harassment, non-compliance, and ongoing fraud on the court. These detailed notices were delivered to DHCR Rent Administrator Margaret Ramroop via trackable U.S. Priority Mail on May 21, 2025, May 30, 2025, and June 30, 2025, respectively (attached hereto as **Exhibits [X], [Y]**, and **[Z]**).

541. Defendant DHCR and Rent Administrator Margaret Ramroop intentionally suppressed these priority filings, entirely omitting to issue a standard Docket Acknowledgment for any of the Plaintiffs' structural fraud notices, choosing instead to bury the researched evidence of corporate identity manipulation.

542. On July 17, 2025, Peter M. Stecker, Esq., acting in his capacity as Director of the DHCR Compliance Unit, utilized the U.S. Mail to transmit a final obstruction directive to

the Plaintiffs, declaring: *"Following referral for enforcement, this matter was returned for further processing. Upon further review of the file, there is insufficient evidence to continue with a formal prosecution. Accordingly, this matter is hereby closed..."* (attached hereto as **Exhibit [X]**).

543. Director Stecker issued this closing mandate with actual and constructive knowledge that the underlying file contained overwhelming, uncontested physical inspection records documenting twenty-three (23) severe, un-remediated building code violations.

544. To obscure this complete abdication of enforcement duty, Director Stecker falsely asserted that the related services issues would be re-inspected under subsequent dockets MT-210008-NC and MT-210027-NC, effectively locking the Plaintiffs into an endless, circular administrative loop designed to insulate the landlord from statutory penalties.

545. Forensic business registry audits executed by the Plaintiffs reveal that the primary entity utilized by Defendant DHCR to settle these enforcement files—Defendant CLINTON APARTMENTS LLC—functions as a fraudulent corporate "ghost shell."

546. According to official New York Department of State (DOS) records, Clinton Apartments LLC maintains a designated street address of 5614 15th Ave., Suite 1A, Brooklyn, NY 11219, but completely omits the registration of any lawful Registered Agent authorized to receive service of process.

547. This identical DOS street address is publicly associated with an unrelated entity, "Newport Management Company, LLC"—a commercial firm that has never maintained any contractual privity, property management duties, or business dealings with the Plaintiffs or the Subject Premises.

548. Plaintiffs allege that the coordinated, multi-year transmission of these deceptive prehearing lockouts, falsified closing letters, and un-acknowledged fraud disclosures across interstate wires and the postal system constituted separate, individual predicate acts of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

549. The Enterprise—by and through the direct collusion of Defendant DHCR and its compliance attorneys, Spencer and Stecker—knowingly used these deceptive techniques to suppress corporate code violations, protect an unrecorded parallel tracking ledger, and insulate a multi-million dollar real estate asset from statutory enforcement actions.

550. This targeted frustration of administrative duty allowed the private conspirators to leverage the state's regulatory authority to enforce rent extractions, maintain severe environmental hazards inside the apartment, and advance a predatory campaign of constructive eviction against the home-office family, in direct violation of **18 U.S.C. § 1962(c)**.

## XLIV. EXTENSION OF THE ENTERPRISE CONSPIRACY TO EXECUTIVE STATE REGULATORS

551. Plaintiffs explicitly allege that Defendant New York State Division of Human Rights ("DHR") and Defendant Letitia James, in her official capacity as Attorney General of the State of New York, did not merely act as neutral administrative conduits. Instead, their respective investigative units actively colluded with the private corporate Defendants, choosing to suppress material evidence of financial fraud, ignore municipal health violations, and inject structural bias into the official record to shield the Enterprise from federal question enforcement.

551. Plaintiffs formally escalated written notices, verified complaints, and investigative research binders to the Office of Attorney General Letitia James, explicitly documenting:

- A multi-decade pattern of Escrow and Security Deposit Fraud in direct violation of NYS General Obligations Law §§ 7-103 and 7-105;
- Ongoing retaliatory and wrongful eviction actions executed through bad-faith corporate instruments;
- An active New York City Department of Health and Mental Hygiene (DOHMH) investigation into Melissa G. Martin's un-licensed commercial facility, Paw Paw Pet Care LLC; and
- A coordinated effort by Defendant CHAOC to grant corporate consent enabling Defendant Martin to secure municipal licensing to operate a commercial animal facility within a residential multi-family housing complex.

553. The Office of Attorney General Letitia James entirely abdicated its statutory enforcement duties under the Martin Act (NYS General Business Law Art. 23-A) and the New York Executive Law. The agency suppressed the Plaintiffs' investigative records and chose to protect the Sponsor's unrecorded parallel cooperative ledger from state asset-seizure protocols.

554. Concurrently, the municipal paper trail documenting the illegal canine facility was systematically neutralized at the ground level. When Plaintiffs placed emergency NYC-311 calls prompting NYPD precinct responses, the investigations were actively thwarted from within by NYPD Sergeant Yanira Leshan Golphin, acting under a disqualifying conflict of interest.

555. This law enforcement suppression was executed in direct coordination with on-site security personnel, specifically Security Supervisor J. Griffon and Security Director Mark Atherton.

556. These individual security actors functioned as personal allies of Melissa G. Martin and maintained their exact monitoring positions when Defendant Doyle Security Services, Inc. absorbed the operational infrastructure of Defendant Madison Security Group, Inc., ensuring an unbroken chain of surveillance data suppression.

557. On May 17, 2022, Plaintiffs sought administrative remedy by filing an emergency housing discrimination and tenant harassment complaint with Defendant New York State Division of Human Rights ("DHR").

558. Defendant DHR completely abandoned its statutory obligation to execute an objective, timely investigation. The agency subjected the file to extraordinary administrative delays, conducted a highly truncated, incomplete telephone interview that excluded the Plaintiffs' core forensic evidence, and actively integrated deep, unlawful bias into the official investigatory record.

559. To deliberately undermine the Plaintiffs' credibility, Defendant DHR expanded its investigatory record to incorporate prejudicial, non-jurisdictional personal data, explicitly inserting Plaintiff Monique Saunders' Washington, D.C. administrative bar disbarment into the active housing file.

560. Defendant DHR utilized this personal data extraction to manufacture an appearance of tenant dishonesty, adopting the adversarial narrative of the private corporate Defendants without conducting a physical inspection of the unmitigated toxic mold colonies.

561. On June 3, 2024, Defendant DHR issued a final administrative determination letter, repeating the corporate Respondents' characterization of Plaintiff Monique Saunders as dishonest, declaring a total absence of probable cause, and dismissing the enforcement proceeding with prejudice.

562. Plaintiffs allege that the coordinated electronic transmission, selective indexing, and mailing of these biased DHR determinations, suppressed Attorney General disclosures, and falsified security logs across state lines constituted separate, individual predicate acts of mail fraud under **18 U.S.C. § 1341** and wire fraud under **18 U.S.C. § 1343**.

563. The Enterprise systematically weaponized the state's highest regulatory and civil rights enforcement bodies—the DHR and the Attorney General’s Office—to execute a complete administrative lockout.

564. By poisoning the regulatory record with highly prejudicial personal data and suppressing physical inspection logs, the conspirators insulated an illegal commercial canine facility from closure, protected a multi-million dollar real estate conversion from a Martin Act investigation, and maintained an unmitigated biological hazard to force a constructive eviction of the home-office occupants, in direct violation of **18 U.S.C. § 1962(c)**.

565. On September 18, 2024, at approximately 2:39 PM, the Enterprise expanded its scheme to manipulate municipal emergency resources by transmitting a false hazard report to the New York City Fire Department (FDNY).

566. This fraudulent transmission via telecommunications networks caused an emergency deployment of multiple FDNY personnel equipped with fire axes and a tactical battering ram to the Subject Premises.

567. These emergency personnel arrived prepared to execute a high-impact, destructive breaching entry through the front door of the Subject Premises without reasonable cause, a valid warrant, or an actual underlying emergency.

568. Plaintiffs allege that the electronic transmission of this fabricated emergency alarm to the FDNY constituted an affirmative predicate act of wire fraud under **18 U.S.C. § 1343**.

569. The Enterprise systematically deployed this life-threatening, deceptive tactic to manufacture intense physical terror, simulate a hazardous emergency profile for the unit, and weaponize municipal public safety teams to force a constructive eviction of the protected occupants for corporate enrichment in violation of **18 U.S.C. § 1962(c)**.

570. Plaintiffs' minor child was physically present inside the Subject Premises during this tactical emergency breach deployment, experiencing immediate terror and severe psychological trauma as a direct target of the Enterprise's weaponized physical coercion.

571. The minor child directly witnessed the arrival of emergency personnel carrying fire axes and a tactical battering ram targeted directly at the family's primary residential entrance door.

572. Plaintiffs allege that the Enterprise intentionally executed this false emergency transmission with actual knowledge that a minor child was present inside the unit.

573. The conspirators deployed this life-threatening tactic to inflict severe psychological trauma on the child and her guardians, intentionally exploiting a minor's presence to maximize terror and force a constructive eviction to protect their unrecorded property infrastructure from public discovery in violation of **18 U.S.C. § 1962(c)**.

574. Plaintiffs allege that Defendant Lead Superintendent Vigan Ahmetaj was the specific on-site management agent who took the operational lead in orchestrating this false emergency report and weaponizing the FDNY against the occupants.

575. Defendant Ahmetaj executed this false emergency transmission within twenty-four (24) hours of Defendant CHAOC's management abruptly closing its physical office

without explanation and announcing via electronic mail that *"the office is closed until further notice."*

576. Plaintiffs allege that the calculated closing of the management office, paired with the immediate electronic deployment of emergency personnel carrying breaching tools, constituted a coordinated **predicate act of wire fraud under 18 U.S.C. § 1343**.

577. The Enterprise utilized this administrative blackout and subsequent tactical emergency response to create a state of severe crisis, attempting to execute an extrajudicial property seizure while ensuring that individual corporate managers remained insulated from immediate physical or legal accountability, in violation of **18 U.S.C. § 1962**.

578. At present, the Enterprise continues to prosecute its bad-faith impleader action in the Supreme Court of New York, Kings County, under Case No. 501135/2024, attempting to execute an extrajudicial ejection of the Plaintiffs from the Subject Premises.

579. Plaintiffs allege that the ongoing maintenance of this Third-Party Complaint constitutes a systemic **fraud on the court**, executed to manipulate the state judiciary into validating an unlawful property seizure.

580. The Enterprise principals—acting through Defendant CHAOC and Attorney Kristen Mantell—are actively submitting falsified tenancy registrations, fabricated corporate property records, and perjured affidavits into the state court docket.

581. The conspirators are deploying these fraudulent instruments to intentionally misrepresent the true federal military housing status of the Subject Premises, mislead the state court justice, and strip the Plaintiffs of their property rights under false pretenses.

582. Plaintiffs allege that the continuous electronic filing and transmission of these fraudulent litigation documents across state servers constitute individual **predicate acts of wire fraud under 18 U.S.C. § 1343**.

583. The Enterprise systematically weaponizes this state court impleader as an extractive tool to force an illegal property seizure, drive up the Plaintiffs' litigation costs, and shield its multi-decade title fraud from federal discovery, in violation of **18 U.S.C. § 1962**.

584. Defendants CHAOC, FirstService Residential (individually and d/b/a Charles H. Greenthal & Co.), Steven Greenbaum, Jennifer Ogman, Property Manager Parvez Ahmed, Attorney Kristen A. Mantell of Baron & Baron Esqs., P.C., Clinton 174 Realty Associates LLC, and Clinton Apartments LLC assumed physical control over the property complex and continuously perpetuated the fraudulent scheme.

585. The Enterprise executed these property operations with actual knowledge of, and in direct defiance of, multiple binding municipal housing directives issued for the Subject Premises, including:

- **DHCR Order(s) Reducing Rent for Rent Stabilized Tenants**: Explicit administrative mandates ordering a reduction in rent due to documented decreases in essential services and structural infrastructure hazards (Docket Numbers KP 210025 S and LQ 210113 S);
- **DHCR Order(s) Directing Lease Renewal**: Formal determinations by the Office of Rent Administration establishing that the owner is required to renew the tenancy lease under statutory guidelines (Docket Number LQ 210020 RV);

- **DHCR Notice of Non-Compliance**: Official agency findings issued following physical property inspections confirming structural and environmental violations (Docket Numbers LP 210006 NC and MT 210027 NC); and
- **DHCR Notice of Referral to Enforcement Unit**: Formal administrative actions elevating the property record to the enforcement division due to the owner's persistent non-compliance and defiance of state housing orders (Docket Number MT 210008 NC).

586. Plaintiffs allege that the coordinated, multi-year transmission of fraudulent billing statements, bad-faith eviction notices, and deceptive legal filings across state lines via the U.S. Mail and electronic servers constituted separate, individual **predicate acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343**.

587. The Enterprise systematically deployed these deceptive practices to ignore binding state housing mandates, evade statutory non-compliance fines, and maintain an environmental hazard (toxic mold) to force a constructive eviction of the military occupants.

588. Plaintiffs allege that the executive management's integration of absorbed personnel and continuous defiance of state orders establishes **open-ended continuity under 18 U.S.C. § 1962**.

589. The racketeering activity is not an isolated or transient phenomenon, but rather the explicit, regular way of doing business for the successive management entities. This creates a live, imminent threat of ongoing property fraud, financial manipulation, and extrajudicial displacement against the Plaintiffs and similarly situated occupants, satisfying the civil enforcement requirements of **18 U.S.C. § 1964(c)**.

## XLV. THE INTRICATE PATTERN OF EXCLUSION AND INCLUSION OF GOVERNMENT DEFENDANTS AS NECESSARY RELIEF PARTIES

590. On April 14, 2022, Plaintiffs utilized the U.S. Mail to transmit a detailed, comprehensive formal Letter of Complaint via Certified Mail to Defendant Letitia James in her official capacity as the Attorney General of the State of New York, Division of Social Justice - Housing Protection Unit, located at 55 Hanson Place, Suite 1080, Brooklyn, New York 11217.

591. This formal regulatory submission was explicitly captioned *"Re: Housing Justice - Letter of Complaint Against Cooperative Owners Attempting to Fraudulently Force Out Long-Time Tenant from Rent-Stabilized Unit in Brooklyn,"* detailing the widespread corporate fraud, unrecorded property transfers, and ongoing maintenance deprivation targeting the Subject Premises.

592. The formal complaint provided Defendant Attorney General Letitia James with explicit, direct notice of the Enterprise's coordinated operations, stating: *"CHAOC and its agent, Baron and Baron, are acting in a predatory, harassing and retaliatory manner by engaging in acts of invasion of privacy, character assassination, statements, false and threatening reports (including a NY 'Karen Law' police call to the unit on May 27, 2021), service of false documents (Notice to Cure and Notice of Termination)... and the ongoing denial of maintenance/repairs/improvements."*

593. The regulatory complaint further alerted the Attorney General to the direct economic motives driving the Enterprise's racketeering pattern: *"Specifically, if CHAOC and its agents were to succeed in forcing Tenant(s) out of the rent-subsidized unit, CHAOC would collect a major financial gain considering the sales value of the property on today's Brooklyn real estate market."*

594. The submission explicitly detailed how Defendant Kristen A. Mantell and Baron & Baron Esqs., P.C., utilized the U.S. Mail to transmit a facially fraudulent, backdated Notice of Termination on March 31, 2022. This notice demanded extrajudicial removal by April 15, 2022, under the false pretense that the underlying lease term had expired, despite possessing actual knowledge that the fully executed lease renewal remained legally binding through April 30, 2023.

595. Based on these documented infractions, the Plaintiffs formally requested that the Attorney General initiate an investigation and enforce statutory sanctions against the conspirators under **New York Executive Law § 63(12)** and the **New York General Business Law (The Martin Act)** to address a multi-decade pattern of deceptive real estate conversion.

596. On April 21, 2022, the Office of the New York State Attorney General transmitted an official response to the Plaintiffs on behalf of Defendant Letitia James, establishing that the regulatory complaint would be maintained on permanent administrative file to trace, monitor, and assist in prosecuting systematic patterns of property fraud and illegality affecting consumers across the complex.

597. Plaintiffs explicitly name Defendant Letitia James, in her official capacity as Attorney General, as a Necessary Relief Party to this federal action pursuant to **Federal Rule of Civil Procedure 19(a)**.

598. Her inclusion is required to ensure complete, equitable due process and to enforce meaningful injunctive relief. This includes compelling the Office of the Attorney General to open its complete cooperative conversion archives, review the multi-decade unamended offering plan data, and monitor the outstanding **DHCR Non-Compliance and**

**Enforcement referrals** to prevent the permanent spoliation of physical and regulatory evidence by the Enterprise principals, satisfying the civil enforcement remedies under **18 U.S.C. § 1964(a)**.

## XLVI. THE CONTINUOUS PATTERN OF SECURITY DEPOSIT ESCROW FRAUD AND SYSTEMIC REGULATORY CONCEALMENT

599. On April 15, 2022, Plaintiffs analyzed historical family documents and uncovered an ongoing, multi-decade pattern of Security Deposit Escrow Fraud and violations of **New York General Obligations Law § 7-103** perpetuated by Defendants CHAOC and Charles H. Greenthal Management Corp. relating to the Subject Premises.

600. On April 15, 2022, Plaintiffs contacted the New York City 311 municipal intake system to report the unlawful commingling, conversion, and total absence of statutory interest disclosures regarding the Tenant's security deposit escrow funds, whereupon Plaintiffs were directed to file a formal regulatory complaint with the Office of the Attorney General.

601. On May 20, 2022, Plaintiffs transmitted an official Security Deposit Complaint (Form CFB003NYC - rev. 1/19) via U.S. Postal Service Priority Mail, which was successfully delivered to the Office of the Attorney General on May 23, 2022, explicitly naming Defendants CHAOC and Charles H. Greenthal Management Corp. as the violating corporate targets.

602. To substantiate the systemic bank and mail fraud, Plaintiffs attached ironclad documentary evidence to the official complaint, including:

- Fully executed lease renewal agreements dated December 14, 2020, and January 14, 2021.

- Written admissions from CHAOC and Greenthal agents falsely claiming, *"we do not have it [the Tenant's Master Lease] in our files..."* in an attempt to obscure the original lease terms.
- A historical 1990 corporate notice stating, *"GD Manhattan Realty Corp. has transferred your security deposit and accrued interest to an interest-bearing account at Goldome,"* accompanied by the fully executed IRS Form W-9 completed by Plaintiff Anita Tovar.
- Regulatory disclosures explicitly listing the **Federal Deposit Insurance Corporation (FDIC)** as a predecessor receiver/landlord, raising immediate federal bank-failure flags regarding the subsequent unrecorded transfer of escrowed funds.

603. On June 02, 2022, Plaintiffs contacted the OAG to confirm administrative processing and were informed that the Brooklyn Regional Office had assumed jurisdiction, assigning **Intake No. 1-362350825** to the operative file under the names of Monique (Tovar) Saunders and Anita Tovar.

604. On June 23, 2022, Plaintiffs conferred with OAG Agent Darryl White, who confirmed that Defendant CHAOC had flatly refused to respond to the State's regulatory inquiry or produce escrow tracking records, stating that the matter would be escalated to Senior Consumer Fraud Representative Jim Sfiroudis and advising Plaintiffs to launch an independent private enforcement lawsuit against CHAOC.

605. On July 25, 2022, exactly sixty (60) days post-delivery of the complaint, Plaintiffs contacted the Brooklyn Regional Office and spoke with Agent Melissa Adore, who disclosed that Senior Representative Sfiroudis had issued an official "Alert Letter" to the corporate targets, and that the OAG had merged this escrow violation into **File No. 22-**

**018011**—the exact same file number assigned to the Enterprise's broader property fraud, harassment, and wrongful eviction schemes.

606. Agent Melissa Adore further admitted that the OAG had prematurely closed the investigation, but agreed to reopen the case file to issue a formal demand letter via mail and electronic mail requiring an immediate corporate Answer from Defendants CHAOC and Charles H. Greenthal Management Corp.

607. On September 8, 2022, the Office of the Attorney General issued an official determination letter under **File #22-018011-M1** to Plaintiff Anita Tovar, stating: *"Dear Anita Tovar, we have presented your complaint to the company. Despite our repeated efforts, they have failed to respond. Unfortunately, we cannot assist you further... When the company refuse to cooperate, your only recourse is in court."*

608. Plaintiffs explicitly name Defendant Letitia James, in her official capacity as Attorney General, as a Necessary Relief Party to this count under **Federal Rule of Civil Procedure 19(a)**.

609. Her inclusion is structurally necessary under **18 U.S.C. § 1964(a)** to compel the OAG to produce all administrative records under File No. 22-018011-M1, exposing the deliberate pattern of non-response, non-compliance, and concealment utilized by CHAOC and Charles H. Greenthal Management Corp. to insulate their illicit escrow conversions from state and federal regulatory scrutiny.

## XLVII. THE PRIVATE SECURITY INFRASTRUCTURE, STRUCTURAL RE-LAYERING, AND THE EXTRAJUDICIAL ENFORCEMENT MATRIX

610. The physical, on-site execution of the Enterprise's pattern of tenant intimidation, systematic concealment, and extrajudicial document delivery was enforced by a captive private security apparatus operating sequentially under the corporate banners of Defendant

Madison Security Group, Inc., and its successor entity, Defendant Doyle Security Services, Inc.

611. In a calculated maneuver to re-layer the institutional machinery of the Enterprise and shield the corporate entities from compounding civil liability, Doyle Security Services, Inc., absorbed or replaced Madison Security Group, Inc., while seamlessly maintaining the exact same command structure, including Security Director Mark Atherton, Security Supervisor Griffon, and the identical roster of on-site security guards.

612. Throughout the preceding five (5) year period, Defendants Madison Security Group, Inc., Doyle Security Services, Inc., Director Mark Atherton, and Supervisor Griffon actively participated in the racketeering conspiracy by serving as an illicit operational shield for Co-Conspirator Melissa Martin's un-permitted commercial compound, "Paw Paw Pet Care LLC" (also known as Paw Paw Dog Walking and Pet Care) in Unit 2H.

613. Acting under the direct instruction of Defendants CHAOC, Parvez Ahmed, and Charles H. Greenthal Management Corp., these private security forces deliberately falsified logs, ignored continuous resident complaints, and physically escorted commercial clientele and animals into Unit 2H to actively conceal the compounding environmental hazards and actionable nuisance targeting the Plaintiffs.

614. The Enterprise systematically weaponized this private security force to bypass standard, lawful service of process channels under New York law, utilizing uniform-wearing guards as instruments of extrajudicial intimidation to deliver threatening, un-filed legal correspondence drafted by Attorney Kristen A. Mantell and Baron & Baron Esqs. P.C. directly to the Plaintiffs' door.

615. The absolute operational integration of this private security apparatus into the active litigation fraud is established by NYSCEF Public Record Doc. 41, wherein Security Director Mark Atherton executed a formal *Affidavit Pursuant to 22 NYCRR 202.7(f)* within the underlying sham litigation, swearing under penalty of perjury:

- That he is employed by Madison Security Group, Inc., and serves as the Director of Security for Third-Party Plaintiff CHAOC at 210 Clinton Avenue, Brooklyn, New York;
- That on July 11, 2025, at approximately 3:18 P.M., he personally executed the delivery of three (3) copies of the correspondence attached as Exhibit "A" directly to Anita Tovar, Monique Tovar-Saunders, and David Saunders at Apartment 1-H.

616. The "Exhibit A" described in Security Director Mark Atherton's sworn affidavit was the Verified Complaint of Plaintiff Melissa Martin. This reveals a highly coordinated and deceptive trick: the Enterprise used a corporate security guard to serve a private plaintiff's lawsuit papers while claiming he was doing so on behalf of the cooperative corporation, CHAOC. This proves that Melissa Martin's personal lawsuit and CHAOC's corporate legal actions are part of the exact same, single retaliatory scheme.

617. The utilization of Director Mark Atherton—a Jamaican national whose lawful immigration status and corporate authorization to work within the United States remains entirely undocumented—to execute high-pressure extrajudicial legal deliveries and residential tracking further demonstrates the Enterprise's reliance on unregulated, legally compromised personnel to enforce its predatory physical displacement operations.

618. The actions of Madison Security Group, Inc., Doyle Security Services, Inc., Director Mark Atherton, and Supervisor Griffon constitute distinct, actionable overt acts

in furtherance of the RICO conspiracy under 18 U.S.C. § 1962(d), transforming a licensed private security asset into an un-regulated paramilitary enforcement arm of the real estate enterprise.

## XLVIII. THE CORPORATE INTERVENTION OF CHARLES H. GREENTHAL CORP. AND THE DECEPTIVE CONCEALMENT OF MASTER LEASE RECORDS

619. In May 2022, concurrent with the peak of the Enterprise's retaliatory eviction maneuvers, Defendant Charles H. Greenthal Management Corp. actively integrated its operations into the pattern of racketeering by assuming executive management functions over the Subject Premises and enforcing the ongoing concealment of the Tenant's historical leasehold records.

620. On May 20, 2022, upon being named as a primary violating target in the Plaintiffs' official OAG Security Deposit Complaint, Defendant Charles H. Greenthal Management Corp., acting by and through its authorized agents, executed a coordinated corporate omission by flatly refusing to produce or locate the Tenant's original Master Lease, falsely stating in writing: "we do not have it in our files..."

621. This uniform statement was a fraudulent artifice designed to obscure the historical chain of tenancy, insulate predecessor landlords from escrow conversion liability, and systematically deny Plaintiff Anita Tovar her explicit regulatory rights to lease succession and interest accumulation under New York Rent Stabilization Regulations.

622. Throughout June and July 2022, Defendant Charles H. Greenthal Management Corp. furthered the execution of the mail fraud scheme by deliberately ignoring formal "Alert Letters" and demand notices transmitted by Senior Consumer Fraud Representative Jim Sfiroudis under OAG File No. 22-018011.

623. By choosing to completely ignore state regulatory inquiries, Defendant Charles H. Greenthal Management Corp. successfully forced the premature administrative closure of OAG File No. 22-018011-M1 on September 8, 2022, effectively exploiting the Attorney General's limited statutory role as a voluntary mediator to shield its illicit escrow manipulations from active law enforcement intervention.

624. The deliberate withholding of Master Lease records by Charles H. Greenthal Management Corp. constitutes an overt act of fraudulent concealment in direct furtherance of the RICO conspiracy under 18 U.S.C. § 1962(d), designed to leave the elderly, vulnerable Tenant without administrative recourse and to facilitate her (and her family members') extrajudicial removal from the rent-stabilized unit.

## XLIX. THE WEAPONIZATION OF STATE JUDICIAL MACHINERY, INSIDER REVOLVING-DOOR CONFLICTS, AND INTENTIONAL EVIDENCE SUPPRESSION

625. The Enterprise's weaponization of state and municipal regulatory machinery achieved its most predatory expression through a coordinated, retaliatory counter-strike orchestrated by Co-Conspirators Francis Greenburger, Time Equities Inc. (TEI), Clinton Hill Apts. Owners Corp. (CHAOC) agents, Parvez Ahmed, Charles H. Greenthal Management Corp., Attorney Kristen Mantell, and Baron & Baron尊s P.C., in direct collusion with Melissa Martin, who operates an illegal commercial enterprise under the trade name "Paw Paw Pet Care LLC" out of Cooperative Unit 2H with the explicit knowledge, permission, and direct patronage of Defendant CHAOC.

626. In a signed, formal affidavit submitted under penalty of perjury within the underlying retaliatory state court action (Index No. 501135/2024), Co-Conspirator Melissa Martin explicitly admitted that the Office of the New York State Attorney General directly

intervened in the parties' dispute by instructing, steering, and authorizing her to contact the New York City Department of Investigation (DOI). This targeted administrative steering occurred during the exact window that Kristen Mantell's spouse—former Baron & Baron law partner Benjamin Joshua Mantell, Esq.—was utilizing his professional network as a former Assistant Attorney General at the NYS Office of the Attorney General, alongside Martin's litigation counsel, Andrew H. Meier.

627. The institutional capture and "revolving-door" mechanism utilized by the Enterprise is clinically established by the professional trajectory of Co-Conspirator Benjamin Joshua Mantell, Esq., who exited the NYS Office of the Attorney General to migrate into the private sector as "Of Counsel" to Kristen A. Mantell at Baron & Baron Esqs. P.C. from January 2016 through April 2022 - the exact multi-year window during which the fraudulent Notices to Cure and Terminate were manufactured against the Plaintiffs.

628. In April 2022, concurrent with the Plaintiffs' formal filing of the OAG Property Fraud Complaint, Co-Conspirator Benjamin Joshua Mantell systematically migrated back into the municipal apparatus, securing successive appointments as an Administrative Law Judge for the New York City Department of Investigation and the New York City Department of Finance. This strategic judicial placement effectively positions an Enterprise principal inside the exact municipal tax and title recording agency responsible for tracking the unrecorded corporate asset transfers and conversion records of Defendant CHAOC, insulating the racketeering pattern from local oversight.

629. Prior to entering his formal appearance for Melissa Martin under the banner of Thompson LLP, Attorney Andrew H. Meier served as a high-ranking Deputy Section Chief

within the Office of the New York State Attorney General. In this capacity, Meier maintained direct, continuous personal and professional ties with Co-Conspirator Benjamin Joshua Mantell, completing an insular network of insider influence that links the landlord's litigation counsel directly to executive state regulators and sitting administrative judges.

630. The Racketeering Enterprise's internal execution is further advanced by the specific administrative authority and dynamic electronic privileges possessed by Co-Conspirator Benjamin Joshua Mantell, Esq., inside the administrative judiciary of the City of New York. In his capacity as an active City Administrative Law Judge for the New York City Office of Administrative Trials and Hearings (OATH), ALJ Mantell maintains un-restricted, high-level administrative entry credentials and systemic data access to the very city tribunal system responsible for issuing, adjudicating, and recording municipal regulatory enforcement actions, housing codes, and zoning violations.

631. Plaintiffs allege that the Enterprise utilized ALJ Mantell as an operative insider possessing the specialized regulatory proximity to monitor, shield, and insulate the OATH tribunal records of Co-Conspirator Melissa Martin's commercial canine violations from administrative scrutiny, effectively blinding the public registries to protect the Enterprise's broader $22,675,637.00 Treasury Stock asset-hoarding operations and off-balance-sheet conversion accounts.

632. The Plaintiffs forensically identified and exposed this flagrant conflict of interest, the Baron & Baron Esqs. P.C. institutional capture, and ALJ Mantell's embedded position within the OATH system inside a formal, highly detailed New York State Attorney Grievance Complaint executed and filed against Attorney Kristen A. Mantell in February

2025. This formal disciplinary disclosure provided the direct, bad-faith operational motive for Attorney Mantell to execute her subsequent, retaliatory 37-page Washington, D.C. Bar "document dump" and launch a sham state-court Third-Party Complaint five (5) months later to force an extrajudicial constructive eviction of the Plaintiffs' 54-year military leasehold dominion.

633. On January 11, 2024, Attorney Andrew H. Meier initiated the retaliatory RICO sham litigation mechanism in New York State Supreme Court, Kings County, utilizing the corporate infrastructure, letterhead, and legal resources of Defendant Thompson LLP to project a false aura of legitimate legal authority.

634. On January 13, 2026, in a calculated maneuver to re-layer the legal machinery of the Enterprise, Attorney Andrew H. Meier executed and filed a fraudulent "Consent to Change Attorney" form, substituting his newly formed or joined entity, Seidenstein Meier & Stein PLLC, as the incoming counsel of record for Co-Conspirator Melissa Martin.

635. This January 13, 2026 substitution document was signed by Daniel Seidenstein of Thompson LLP as the "outgoing attorney," despite the fact that Daniel Seidenstein had deliberately withheld his formal appearance from the court record and filed zero pleadings. This procedural deception confirms that Thompson LLP functioned as a passive clearinghouse for the initial phase of the fraud, while Seidenstein Meier & Stein PLLC actively adopted, ratified, and continues to execute the racketeering pattern to this day.

636. The collusive coordination between the ostensibly independent Co-Conspirator Melissa Martin and the corporate Defendant CHAOC achieved absolute operational transparency on June 18, 2026—a federal public holiday (Juneteenth)—when Martin's counsel, Andrew H. Meier, utilized the New York State Courts Electronic Filing

(NYSCEF) system to transmit an extraordinary, bad-faith advocacy letter to presiding Kings County Supreme Court Justice Peter P. Sweeney.

637. In this June 18, 2026 holiday wire communication, Attorney Andrew H. Meier dropped all pretenses of independent representation and actively argued in strict alignment with Defendant/Third-Party Plaintiff CHAOC, aggressively supporting the corporation's fraudulent cross-claims for extrajudicial ejectment, manufactured rent arrears, and ongoing use and occupancy fees targeting the Plaintiffs' long-term rent-stabilized unit.

638. The legal execution and litigation patterns directed by Attorney Andrew H. Meier constitute severe, independent violations of the New York Rules of Professional Conduct, specifically Rule 3.3 (Candor Toward the Tribunal) and Rule 8.4 (Professional Misconduct). Possessing actual and constructive documentary knowledge that his client had entered a formal administrative guilty plea before the OATH Tribunal under Summons No. 0803556811 for operating an illegal commercial canine facility, Attorney Meier intentionally suppressed this self-authenticating municipal conviction from the court record.

639. On October 21, 2026, to aggressively advance this real estate fraud and shield the Enterprise from federal scrutiny upon discovery of the Plaintiffs' DOHMH FOIL records, Attorney Meier induced the New York State Supreme Court (Justice Peter P. Sweeney) to issue an extraordinary, highly restrictive administrative order under Index No. 501135/2024 (NYSCEF Doc. 164). This adverse state order completely seals the Plaintiffs' public cross-claims (NYSCEF Doc. 143 and 148) and slaps a complete filing ban on the Plaintiffs, prohibiting them from e-filing any further pleadings without prior leave of court.

640. Simultaneously, the Enterprise weaponized this state court machinery to schedule a mandatory, non-adjournable evidentiary hearing on Monday, November 4, 2026, at 9:30 AM (NYSCEF Doc. 165) for the explicit purpose of hammering the Plaintiffs with ruinous financial sanctions for exposing the underlying corporate titles defects. This deceptive utilization of a state court seal and filing ban to suppress public FOIL disclosures, punish federal whistleblowers, and insulate an active pattern of commercial insurance fraud constitutes a direct act of Retaliation and Tampering under 18 U.S.C. §§ 1512 and 1513, and Obstruction of Justice under 18 U.S.C. § 1503, rendering the state court proceedings a complete nullity as a matter of law.

641. The Office of the New York State Attorney General actively facilitated this weaponized municipal Law Department referral against Plaintiff Monique Saunders—an active, licensed New York Registered Nurse—and her husband, explicitly targeting them in severe retaliation for executing their professional, ethical, and civic mandatory reporter duties in documenting and reporting suspected neglect and animal distress within the commercialized environment of Cooperative Unit 2H.

642. On June 28, 2022, exactly thirty (30) minutes following the sudden, bad-faith cancellation of a state-level regulatory mediation session with DHCR mediator Evelyn Britt - which was intentionally aborted due to the calculated absence of Charles H. Greenthal (now FirstService Residential NY) General Property Manager Parvez Ahmed representing Defendant CHAOC - the Enterprise triggered its weaponized municipal apparatus. This immediate retaliatory response was directly coordinated behind the scenes by Francis Greenburger, TEI, Kristen Mantell, Baron & Baron Esqs. P.C., and the executive management team at Charles H. Greenthal & Co.

643. At approximately 11:00 AM on June 28, 2022, three unannounced field agents from the New York City Department of Investigation (DOI)—identified as Confidential Investigator Shameika Nixon, Agent Howard, and Agent Smith—arrived at the Subject Premises, displayed tactical shields/badges, and aggressively demanded immediate entry into Plaintiffs' Unit 1H under a severe, fraudulent investigative pretense.

644. To extract immediate physical entry from the Plaintiffs during the heightened public health dangers of the COVID-19 pandemic, the DOI agents explicitly misrepresented the true nature of their presence, falsely claiming they were dispatched to investigate the historical complaints of harassment, retaliation, and commercial noise disturbances that the Plaintiffs had previously lodged against their upstairs neighbor.

645. Relying entirely on this fraudulent administrative pretense, the Plaintiffs granted entry to the three municipal operators for a high-pressure residential interrogation that lasted until approximately 12:00 PM, during which one of the unannounced field agents actively coughed throughout the enclosed residential space, presenting an immediate biological contamination threat to the occupants.

646. Upon securing physical entry, the tactical posture of the visit immediately shifted into an adversarial regulatory interrogation, during which Confidential Investigator Shameika Nixon demanded an un-warranted physical inspection of the Plaintiffs' private kitchen to visually audit the shared vertical heating pipe that mechanically joins the flooring of Martin’s illegal Unit 2H canine facility with the ceiling of the Plaintiffs’ Unit 1H.

647. Prior to concluding the residential extraction, the DOI agents dropped their administrative pretense and aggressively demanded: "I need you to tell the truth," explicitly

accusing the Plaintiffs in a highly condescending, coercive tone of utilizing the Administration for Children's Services (ACS) reporting system as a retaliatory tool against Co-Conspirator Melissa Martin.

648. The Plaintiffs forcefully denied the accusation and detailed the exhaustive, documented chronology of the severe noise disturbances, animal distress vocalizations, and un-remediated safety hazards emanating directly from Martin's un-permitted commercial dog-boarding and training compound overhead.

649. Following this high-pressure residential interrogation, only Confidential Investigator Shameika Nixon provided a physical business credential to the occupants, listing her direct municipal office contact number as 212-825-0812.

650. To achieve absolute administrative insulation and prevent the public disclosure of this collusive operation, the DOI operator subsequently refused to issue the Plaintiffs an official investigative reference number, and Confidential Investigator Nixon systematically refused to return multiple follow-up telephonic inquiries.

651. This deliberate operational blackout erected an insurmountable administrative barrier that intentionally blocked the Plaintiffs from filing a formal Freedom of Information Law (FOIL) request, effectively suppressing, spoliating, and concealing the official municipal intake records of this weaponized, state-directed administrative assault.

652. The deployment of the New York City Department of Investigation (DOI) via the direct guidance of the Attorney General's Office and the back-end coordination of Defendants Francis Greenburger, CHAOC, Parvez Ahmed, Charles H. Greenthal Management Corp., Kristen Mantell, and Baron & Baron Esqs. P.C. was calculated by the Enterprise to place Plaintiff Monique Saunders' professional nursing licensure in

immediate jeopardy, thereby leveraging the threat of catastrophic economic and professional ruin to compel the Plaintiffs to abandon their civil rights and capitulate to the extrajudicial displacement scheme.

## L. THE DEFRAUDATION OF THE DIVISION OF HUMAN RIGHTS (DHR) PROCESS AND PRE-EMPTIVE LITIGATION OVERLAPS

653. On May 17, 2022, following a series of retaliatory acts where Defendants CHAOC and Charles H. Greenthal Management Corp. rejected the Plaintiffs' legitimate rent payments and threatened a wrongful extrajudicial eviction, Plaintiffs formally initiated a comprehensive regulatory complaint before the New York State Division of Human Rights (DHR) in the name of the primary leaseholder, Plaintiff Anita Tovar.

654. The operative DHR complaint explicitly named as violating targets: CHAOC, Charles H. Greenthal Management Corp., General Manager Parvez Ahmed, Property Manager David Perez, Transfer Agent/Property Manager Safije Cemenja, upstairs occupant Melissa Martin, and newly inserted next-door co-op shareholder Noah Portes Chaikin (Unit 1A).

655. Demonstrating a patterns of early administrative obstruction, the DHR supervisor systematically refused the Plaintiffs' timely written requests—backed by definitive documentary evidence—to formally add Attorney Kristen A. Mantell and Baron & Baron Esqs. P.C. as named respondents to the active civil rights investigation.

656. The Enterprise co-conspirators deliberately stalled the administrative process for over seven months, failing to submit a Verified Answer and Position Statement to the DHR until December 22, 2022.

657. This collective response was coordinated and filed by Attorneys Barry G. Margolis and Alexander Rabinowitz of the law firm Abrams Garfinkel Margolis Bergson, LLP (located at 1430 Broadway, 17th Floor, New York, New York 10018), who acted as joint counsel for the Co-op Respondents—representing both the corporate landlord entity (CHAOC) and the supposedly adverse private tenant (Melissa Martin) as a single, unified defensive front.

658. To validate the fraudulent Position Statement, Attorney Kristen A. Mantell executed a false, back-end "Verification" document, which was corruptly notarized by her own law office paralegal, Jake Early.

659. Attached to this unified response was a highly defamatory Affidavit of Melissa Martin, which contained egregious material omissions and fraudulent counterclaims designed to intentionally mislead state civil rights investigators. Specifically, Defendant Martin attempted to weaponize her minor child's private medical diagnoses as a fraudulent, emotional shield to conceal the ongoing operations of her un-permitted commercial canine compound, "Paw Paw Pet Care, LLC" (a/k/a "Paw Paw Dog Walking and Pet Care") falsely accusing the Plaintiffs of disability discrimination and harassment.

660. In fact, the Plaintiffs' administrative noise and safety logs were dictated strictly by the high-velocity structural impact, high-decibel canine vocalizations, and severe environmental bio-hazards generated by the illegal pet business overhead. To execute this targeted character assassination and distract from their systemic housing code violations, the Enterprise conspirators deliberately attempted to leverage these sham discrimination claims to undermine Plaintiff Monique Saunders' unassailable professional stature as a licensed New York Registered Nurse (RN) with over 25 years of critical clinical and

professional experience, and Plaintiff David Saunders' distinguished background as a licensed minister, retired track-and-field athlete and dedicated volunteer high school youth track coach, using the U.S. Mail to broadcast defamatory statements designed solely to force the physical displacement of the Unit 1H occupants.

661. The internal administrative processing of the file was subjected to extreme regulatory subversion by newly hired DHR Investigator Alfonso Rodriguez—who admitted he was hired in 2023, approximately six months after the complaint's inception. Investigator Rodriguez:

- Abruptly terminated and never completed the Plaintiffs' mandatory telephonic interview;
- Systematically refused to accept, download, or review the comprehensive video, photographic, and electronic evidence of physical harassment and toxic environmental conditions submitted by the Plaintiffs; and
- Deliberately delayed the core field investigation for over one and a half years, refusing to interrogate the cooperative respondents regarding any of the documented evidence emailed to his attention.

662. The absolute bad faith and collusive nature of the Enterprise achieved complete operational clarity on January 11, 2024, when Co-Conspirator Melissa Martin, represented by former OAG Deputy Section Chief Andrew H. Meier, launched a retaliatory sham lawsuit in the New York State Supreme Court, Kings County, while Attorney Alexander Rabinowitz shifted roles to represent CHAOC in the exact same action—pretending the two entities were adverse parties.

663. This Supreme Court action was deliberately filed five months *before* the DHR had issued any administrative ruling, serving as a pre-emptive tactical strike to short-circuit the pending civil rights investigation, split the legal claims, and overwhelm the vulnerable occupants in a high-cost, multi-front litigation defense.

664. On June 3, 2024, approximately two years after the initial filing and three months after a sweeping executive leadership purge at the agency, the DHR transmitted a fraudulent *Final Determination and Order After Investigation* signed by Director of Housing Investigations Chelsea L. John (who had entered the agency's employment in November 2022).

665. The June 3, 2024 determination letter summarily closed the file by falsely stating that *"there is NO PROBABLE CAUSE to believe that the respondents have engaged in or are engaging in the unlawful discriminatory practice complained of,"* explicitly adopting the Enterprise's character assassination narrative by noting that *"Respondents state that Saunders has a history of dishonesty."*

666. This abrupt, un-evidenced administrative closure was directly tied to systemic institutional corruption and a decades-long backlog within the agency under DHR Commissioner Maria L. Imperial (who presided from November 2021 until her abrupt termination in March 2024).

667. As confirmed by a public media investigation published in the *Times Union* on March 15, 2024, entitled *"Division of Human Rights commissioner replaced due to performance,"* Commissioner Imperial was terminated by the Governor’s office just months before the Plaintiffs' ruling due to a pending, damning audit by the Office of the

State Comptroller identifying insufficient record-keeping, deep case backlogs, and an inability to process civil rights complaints.

668. Following the emergency insertion of Acting Commissioner Denise Miranda, Esq., in March 2024, the backlogged department rushed out the Plaintiffs' *No Probable Cause* determination within 90 days, deliberately omitting any mention of the Plaintiffs' statutory right to seek independent federal judicial review, and deceptively instructing the family that their sole legal recourse was an expensive Article 78 appeal to the New York State Court of Appeals.

669. The coordinated extraction of this fraudulent state administrative order by the Enterprise, coupled with the intentional transmission of false affidavits and character assassinations via the U.S. Mail and electronic networks, constitutes distinct predicate acts of mail and wire fraud under **18 U.S.C. § 1341 and § 1343**, directly subverting the state's civil rights machinery to facilitate the physical and economic destruction of the Plaintiffs.

## LI. THE EXHAUSTION OF FEDERAL FAIR HOUSING ACT CHANNELS AND THE CONVERSION TO CIVIL RICO JURISDICTION

670. Concurrent with the initiation of the state-level civil rights investigation, Plaintiffs sought parallel federal administrative protection by formally lodging a housing discrimination complaint with the **U.S. Department of Housing and Urban Development (HUD)**.

671. On November 28, 2022, the U.S. Department of Housing and Urban Development formally accepted the Plaintiffs' regulatory filing under the **Fair Housing Act**, subsequently transmitting an official notification letter to the Plaintiffs confirming that HUD had referred the operative complaint to the New York State Division of Human

Rights (DHR) for active evidentiary processing under the Act's mandatory state-deferral provisions.

672. The official HUD administrative directive explicitly notified the Plaintiffs of their concurrent, statutory right to bypass or supplement the state administrative track, stating: *"In addition to filing your complaint with the NYS DHR you may file a civil lawsuit in Federal district court... You must file any civil lawsuit no later than 2 years after the alleged discriminatory housing practice occurred or ended."*

673. Following the issuance of this federal administrative referral, the progressive, retaliatory, and weaponized operations executed by the Enterprise co-conspirators escalated to a scale that extended far beyond standard civil rights infractions or localized housing discrimination.

674. As a Black Hebrew family residing within the highly gentrified, high-value real estate corridor of the Clinton Hill neighborhood in Brooklyn, New York, the Plaintiffs were targeted not merely with discriminatory animus, but with a highly sophisticated, multi-layered corporate racket designed to strip them of their long-term rent-stabilized leasehold estate.

675. The predatory mechanisms deployed by the Defendants—including systemic security deposit escrow conversion, the physical deployment of private security forces to execute extrajudicial legal deliveries, the fraudulent electronic holiday transmission of illegal ejectment advocacy letters, and the "revolving door" weaponization of the Office of the Attorney General and the Department of Investigation—constitute a continuous, interlocking pattern of racketeering activity.

676. Having fully satisfied and exhausted their administrative diligence options, and recognizing that the ongoing conspiratorial conduct constitutes an active, open-ended criminal enterprise, Plaintiffs are formally exercising their statutory right to invoke the independent jurisdiction of the **United States District Court for the Southern District of New York (SDNY)** under **18 U.S.C. § 1964(c)** and the supplemental jurisdictional protections of **28 U.S.C. § 1367**.

## LII. COERCIVE INTERFERENCE WITH ADMINISTRATIVE INSPECTIONS AND WEAPONIZATION OF EMERGENCY SERVICES AS POST-FILING RICO HARASSMENT

677. To systematically insulate their structural violations from regulatory citation, Defendants CHAOC, Parvez Ahmed, Vigan Ahmetaj (the former Maintenance Supervisor acting as an on-site operational agent), and additional executive principals of the Francis Greenburger and Time Equities Inc. (TEI) matrix actively deployed their captive security apparatus to disrupt official municipal oversight.

678. Following the Plaintiffs' transmission of emergency notifications to the NYC 311 system, the Department of Housing Preservation and Development (HPD), the Division of Housing and Community Renewal (DHCR), the Division of Human Rights (DHR), and the Fire Department of New York (FDNY) regarding systemic decreased services, severe life-safety hazards, and an illegally double-gated, inoperable terrace and secondary fire escape egress door, the Enterprise executed a coordinated campaign of on-site intimidation.

679. Acting under the direct, explicit command of Defendants Parvez Ahmed, Vigan Ahmetaj, and the TEI leadership, Security Director Mark Atherton, Security Supervisor Griffon, and a rotating roster of uniform-wearing Madison Security Group and Doyle Security Services guards physically swarmed the Plaintiffs' Unit 1H.

680. These private security forces were systematically deployed to physically intercept, shadow, and compromise official DHCR administrative inspections, scheduled maintenance repair appointments, and third-party contractor remediation assessments, utilizing their physical presence to intimidate inspectors, censor the Plaintiffs' verbal testimonies, and suppress the on-site cataloging of structural building defects.

681. The operational desperation of the Enterprise culminated in the execution of multiple "false flag" maintenance emergency entries, wherein the Defendants corruptly manufactured pretextual reports of hazardous conditions to weaponize the Fire Department of New York (FDNY) against the occupants.

682. These manufactured emergencies forced the physical dispatch of FDNY fire apparatus and personnel directly to the Subject Premises, utilizing emergency sirens, high-pressure residential entry, and municipal law enforcement mechanics to inflict acute emotional distress, cause community-wide character defamation, and stage a pretextual extrajudicial home invasion targeting the family.

683. Following the formal commencement and service of this federal Civil RICO lawsuit within the United States District Court for the Southern District of New York (SDNY), the frequency, intensity, and severity of this tactical harassment campaign expanded exponentially rather than abated.

684. This severe post-filing escalation constitutes a direct, actionable violation of **18 U.S.C. § 1512 (Tampering with a Witness, Victim, or an Informant)** and **18 U.S.C. § 1513 (Retaliating Against a Witness, Victim, or an Informant)**, demonstrating an open-ended racketeering pattern wherein the Enterprise routinely uses physical intimidation and

weaponized municipal emergency resources to punish federal litigants for seeking judicial protection under the laws of the United States.

**LIII. THE SUDDEN DISRUPTION OF COUNSEL AND FRAUDULENT DEFENSIVE FRAGMENTATION**

685. The legal and structural stability of the Enterprise fractured on June 1, 2026, at 12:21 PM, when Attorney Alexander Rabinowitz executed an abrupt, unannounced electronic modification within the New York State Courts Electronic Filing (NYSCEF) system under Index No. 501135/2024.

686. The official NYSCEF record notification explicitly confirmed the sudden deletion and removal of Alexander Rabinowitz's legal representation from the defense of Respondent/Third-Party Plaintiff CHAOC, stating: "The Consent/Representation by ALEXANDER RABINOWITZ was removed from the Respondent Clinton Hill Apts. Owners Corp.. Consent/Representation was removed as this attorney is no longer associated with the firm or attorney representation is changing within the firm."

687. This sudden withdrawal is a material, post-filing development that highlights defensive panic within the conspiracy. Having realized that his multi-year dual representation of both the corporate landlord (CHAOC) and the private plaintiff (Melissa Martin) before the DHR had been exposed as a core operational vehicle for Civil RICO collusion, Rabinowitz or his firm sought to strip his name from the active state court record to evade impending federal accountability.

688. This structural removal directly triggered the June 18, 2026 federal holiday wire communication executed by Co-Conspirator Andrew H. Meier. With Rabinowitz's consent abruptly terminated, Meier was forced to step out of the shadows to file his bad-faith holiday advocacy letter to Judge Sweeney, desperately trying to prop up CHAOC's

collapsing third-party ejectment claims before the upcoming June 22, 2026 Order to Show Cause hearing.

689. This frantic, shifting pattern of attorney representation and holiday filings constitutes an active, open-ended conspiracy to manipulate the state court record under 18 U.S.C. § 1962(d), proving that the Enterprise actors are actively changing corporate shapes, altering electronic court designations, and rewriting their defensive matrix in real-time to avoid federal judicial enforcement.

## LIV. EXTRAJUDICIAL DISPLACEMENT MANEUVERS IN DIRECT DEFIANCE OF BINDING DHCR ORDERS AND EXPLOITATION OF PLAINTIFFS' BEREAVEMENT

690. The extreme malice and predatory execution of the Enterprise's racketeering pattern achieved total operational transparency through the coordination of high-pressure state-court maneuvers precisely timed to exploit the medical collapse, hospitalization, and subsequent passing of the family's matriarch.

691. On September 4, 2025, while Plaintiff Anita Tovar lay on her deathbed in the hospital, Plaintiffs were forced to execute and file a formal Motion to Dismiss the Enterprise's predatory Third-Party Complaint (NYSCEF Doc. 53). Four months later, on January 30, 2026, Plaintiff Anita Tovar succumbed to her medical conditions and passed away, plunging the family into deep bereavement and the handling of her final estate affairs.

692. Capitalizing on this catastrophic family tragedy with calculated, predatory timing, Defendant Attorney Kristen A. Mantell launched a series of high-pressure legal counter-strikes in February 2026, e-filing aggressive opposition motions to exploit the family's acute period of vulnerability and force the physical ejectment of the surviving family members from Unit 1H.

693. This pattern of litigation-backed extortion was previously weaponized to restrict the family's basic constitutional protections. On November 12, 2025, Plaintiffs filed a Motion to Dismiss and Vacate a bad-faith Temporary Restraining Order/Preliminary Injunction (NYSCEF Doc. 120), exposing the chilling effect and direct violation of their Freedom of Religion regarding the sacred playing of their Hebrew Shofar music within their private kitchen.

694. In direct retaliatory response, on November 14, 2025, Defendant Kristen A. Mantell and Baron & Baron Esqs. P.C. e-filed a Third-Party Plaintiff's Memorandum of Law in Opposition (NYSCEF Doc. 121), which Mantell digitally signed and paired with a highly collusive, fabricated corporate endorsement to mislead the court.

695. To execute this filing, Mantell directed CHAOC Board Member Alyssa Alpine—whom Mantell maintained as an unelected Board Assistant Secretary to bypass cooperative corporate bylaws—to draft and sign a fraudulent "Verification" page. Mantell then directed Tamika Antoinette Linton-Jones, a Transfer Agent employee for Charles H. Greenthal Management Corp. (now FirstService Residential), to corruptly notarize the Verification document (e-filed as NYSCEF Doc. 125), appending a copy of Mantell's original Third-Party Verified Complaint and her own digitally signed Affirmation in Opposition.

696. This intricate network of e-filed court documents and fraudulent verifications is being aggressively advanced before Kings County Supreme Court Justice Peter P. Sweeney to demand immediate ejectment and the extraction of manufactured rent arrears. This extrajudicial push operates in absolute defiance of the fact that the New York State Division of Housing and Community Renewal (DHCR) maintains multiple, fully active,

unappealed, and legally binding Administrative Orders concerning the Subject Premises, including:

- A mandatory DHCR Order directing the immediate renewal of the Plaintiffs' Unit 1H rent-stabilized leasehold estate;
- A compulsory DHCR Order directing the immediate refund of illegally extracted rent overcharges to the Plaintiffs;
- A binding DHCR Rent Reduction Order slashing the legal monthly rent due to systemic decreased services, severe structural maintenance deprivation, and un-remediated safety hazards; and
- An active DHCR Directive commanding CHAOC to execute immediate, comprehensive physical repairs to the building's infrastructure.

697. By moving the state court to enforce an immediate ejectment and extract financial arrears based on billing calculations that the state’s highest housing authority has already formally ruled are illegal overcharges, the Defendants are actively engaging in **sham litigation and a fraud on the court**, utilizing the state judiciary to bypass and nullify binding regulatory statutes.

698. The Defendants' calculating choice to launch an aggressive eviction push during a family's acute period of bereavement—while simultaneously hiding the existence of active DHCR rent reductions and lease-renewal orders from the state court judge—is an intentional tactic designed to completely overwhelm the Plaintiffs, break their capability to mount a legal defense, and force their immediate displacement from a rent-stabilized unit that Defendant CHAOC does not lawfully own.

699. The orchestration of this emergency state-court ejectment mechanism to bypass active DHCR orders constitutes an open overt act of coercive extortion under **18 U.S.C. § 1951** and a direct violation of federal witness tampering statutes under **18 U.S.C. § 1512 and § 1513**. It demonstrates that the Enterprise will routinely weaponize the local legal system and exploit personal human tragedy to enforce its predatory real estate speculation and clear out long-term, protected tenants.

## LV. THE FABRICATED COMMERCIAL NUISANCE MATRIX AND STRUCTURAL ADMINISTRATIVE INVERSION

700. To systematically weaponize the physical environment of the Subject Premises and force the structural collapse of the Plaintiffs' health and residential stability, Co-Conspirator Melissa Martin intentionally transformed Unit 2H into a commercial hub of high-intensity acoustic and physical harassment.

701. Operating with the explicit permission, knowledge, and corporate patronage of Defendant CHAOC and its successive managing agents, Co-Conspirator Melissa Martin regularly introduced multiple human children, alongside a rotating commercial roster of feline and canine clients, into her un-permitted "Paw Paw Pet Care LLC" boarding compound.

702. Co-Conspirator Melissa Martin systematically directed, encouraged, and allowed these human and animal clients to execute unrestricted, continuous, and high-impact acoustic disturbances directly over the ceiling of Plaintiffs' Unit 1H, including deliberate jumping, thumping, stomping, marching, wrestling, yelling, screaming, and the violent banging of heavy objects on uncarpeted hardwood flooring.

703. This structural acoustic assault was executed with calculated, premeditated intent to inflict acute psychological distress, constant anxiety, severe physiological irritation, and

extreme discomfort upon the Plaintiffs within their own home, explicitly targeting Plaintiff Anita Tovar during the progressive decline of her terminal medical conditions.

704. Whenever the Plaintiffs attempted to utilize lawful municipal and administrative channels to report these pervasive housing code and lease violations—lodging formal complaints with CHAOC Management, dispatched on-duty Madison/Doyle Security guards, the NYC 311 municipal intake system, dispatched 911 New York City Police Department (NYPD) officers, the New York State Division of Human Rights (DHR), and the New York State Division of Housing and Community Renewal (DHCR)—the Enterprise executed a sophisticated administrative inversion.

705. On April 12, 2022, Plaintiffs formally initiated a comprehensive DHCR Tenant Harassment Complaint on behalf of the family, which the agency processed under **Docket No. KP 21001-HL** and assigned to Attorney Evelyn Britt to oversee formal mediation and enforcement proceedings.

706. The Enterprise immediately initiated a pattern of procedural delay and document suppression; although Defendant CHAOC, by and through Attorney Kristen A. Mantell, gave the DHCR mediator explicit written notice that the corporation would respond in writing by May 31, 2022, no corporate Answer or Position Statement was ever forwarded to the Plaintiffs.

707. At the initial scheduled conference on June 23, 2022, at 10:00 AM, Defendant Kristen A. Mantell appeared empty-handed, deceptively claiming she was withholding the corporate submission because she was "waiting for one more affidavit," while General Property Manager Parvez Ahmed intentionally boycotted the session, forcing Mediator Evelyn Britt to adjourn the enforcement conference to July 14, 2022.

708. When the mandatory conference was finally convened, the Enterprise assembled a hostile defensive front consisting of Attorney Kristen A. Mantell, Parvez Ahmed (falsely designated as General Manager), and Desi Ndreu (falsely designated as Chief Operating Officer for Charles H. Greenthal Management Corp.), confronting Plaintiff Monique Saunders and her husband David Saunders.

709. During this recorded administrative session, Defendant Parvez Ahmed—who had never once entered the interior of Unit 1H—corruptly turned the tables on the victims of the fraud by hurling defamatory statements into the state record, falsely claiming the Plaintiffs had "destroyed" the apartment when, in reality, the family had expended their own personal financial resources to execute aesthetic improvements, including applying fresh paint and removing dangerous, rusted 1970s-era window bars.

710. To neutralize the mediator's enforcement authority, Attorney Kristen A. Mantell made explicit, fraudulent representations to Mediator Evelyn Britt, pledging under false pretenses that she would cooperate with the incoming management team to present the family with an accurate, legally binding lease renewal agreement—a promise that remains completely unfulfilled to this very day.

711. The Enterprise subsequently utilized this hijacked mediation track to subject the family to an endless cycle of predatory, scheduled contractor inspections under the false pretense of defining a "scope of work"; however, these invasive entries never resulted in a single repair or the required physical replacement of the rotting wood floors.

712. In absolute bad faith, CHAOC, Parvez Ahmed, and Charles H. Greenthal Management Corp. flatly refused to admit the existence of toxic sub-surface mold colonization within the unit, actively denying the bio-hazard despite the fact that visible,

dangerous mold had been thoroughly inspected, verified, and officially cited in multiple public records by city HPD Inspectors and DHCR Inspector L. Peters.

713. This deceptive administrative inversion was utilized by the Enterprise as a fraudulent legal foundation to strip the Plaintiffs of their regulatory tenant-harassment protections, neutralize the pending DHCR mediation track managed by Attorney Evelyn Britt, and provide a pre-baked, false pretext to justify their ongoing, predatory demand for the extrajudicial ejectment and displacement of the family.

714. The intentional orchestration of this commercialized acoustic harassment, coupled with the transmission of false cross-complaints of tenant harassment via the U.S. Mail and electronic court networks to state mediators and judges, constitutes distinct, actionable predicate acts of wire fraud under **18 U.S.C. § 1343** and extortion under **18 U.S.C. § 1951**, directly abusing state regulatory and judicial procedures to silence federal civil rights litigants.

## LVI. THE FRAUDULENT MUNICIPAL LICENSING SCHEME, ADMINISTRATIVE SUBVERSION OF THE DOHMH, AND SYSTEMIC HEALTH CODE VIOLATIONS

715. To secure official municipal insulation for her illicit commercial operations, Co-Conspirator Melissa Martin initiated a fraudulent application process with the New York City Department of Health and Mental Hygiene (DOHMH) to obtain an operational permit and license for a "small animal care and handling facility" directly inside Cooperative Unit 2H.

716. Freedom of Information Law (FOIL) records extracted by the Plaintiffs from the DOHMH reveal that Melissa Martin completed an online regulatory portal application, introducing a series of fraudulent business documents into the municipal archive to project a false aura of legitimate, permitted corporate operations, including:

- Articles of Organization for "Paw Paw Pet Care LLC" listing the primary place of business as 210 Clinton Ave., Apt. 2H, Brooklyn, NY 11205-3422 (Filing No. 090728000119);
- IRS Form SS-4 confirming the extraction of Employer Identification Number (EIN) 27-0681771;
- A NYS Department of Taxation and Finance Certificate of Authority under ID No. 27-0681771, validated on May 16, 2011; and
- A sealed "Travelers Insurance Notice" envelope addressed to the residential co-op unit to simulate commercial compliance while concealing internal statement data.

717. To satisfy mandatory statutory worker's compensation disclosure requirements, Co-Conspirator Melissa Martin submitted a Hartford Business Service Center "Summary of Insurance" for Policy Number 76 WEG BC4S7W (Policy Term April 5, 2025, to April 5, 2026), underwriting an Account Policy Recap for Worker's Compensation through the Twin City Fire Insurance Company.

718. This commercial underwriting document contained material, fraudulent misrepresentations designed to deceive municipal regulators, explicitly utilizing **Class Code 8831** under the specific operational classification of *"Veterinary Hospital - including receptionists and drivers,"* reporting a corporate payroll of $66,000.00.

719. In fact, Co-conspirator Melissa Martin is not a licensed veterinarian, is not an animal health care professional of any kind, employs no veterinary receptionists or drivers, and prior to this fraudulent submission, maintained zero statutory worker's compensation insurance coverage for her illicit operations.

720. The absolute illegality, un-permitted nature, and biological hazard of this residential compound was formally cited on July 18, 2025, at 11:20 AM, when DOHMH Inspector C. Dawson (Badge No. 3489) from the Division of Environmental Health executed a physical inspection of Unit 2H, issuing DOHMH Summons No. 0803556811 for operating a commercial kennel, grooming salon, and boarding establishment without a current valid permit in direct violation of NYC Health Code § 161.09(a).

721. Faced with compounding administrative enforcement and the exposure of this FOIL fraud matrix, Melissa G. Martin formally entered a written administrative guilty plea before the OATH Tribunal under Summons No. 0803556811, executing full cash payment of the $1,000.00 maximum statutory fine, thereby judicially and conclusively admitting on the public municipal record that her residential pet care operation was entirely illegal and un-permitted.

722. Immediately following this administrative conviction, and for the sole purpose of bypassing municipal zoning closures and building code fines, CHAOC resident shareholder Melissa Martin executed a fraudulent electronic re-application via the DOHMH portal to secure an animal boarding license. Inside this renewed electronic wire transmission, Defendant Martin intentionally manipulated her corporate identity parameters, falsely certifying under penalty of perjury that her residential multi-family cooperative apartment unit was a fully operational "Veterinary Hospital—including receptionists and drivers" under Insurance Class Code 8831.

723. Defendant Martin executed these fraudulent, perjured administrative statements with actual knowledge that they were completely fabricated, and subsequently integrated these identical misrepresentations into a formal, duly sworn state court affidavit. This

deceptive strategy was knowingly adopted, ratified, and advanced across interstate wires and mail networks by the Enterprise principals and litigation counsel Andrew H. Meier and Daniel Seidenstein to support an illegal summary ejectment action, constituting a distinct pattern of Wire Fraud under 18 U.S.C. § 1343 and Subornation of Perjury under 18 U.S.C. § 1622.

724. Despite the explicit intervention, active summonses, and mandatory equipment removal orders issued by the DOHMH, Co-Conspirator Melissa Martin - backed by the continuous, protective shelter, permission, and direct patronage of Defendants CHAOC, Parvez Ahmed, and Charles H. Greenthal Management (acquired by FirstService Residential NY) - flatly defied the city's enforcement mandates and continues to operate her illegal animal boarding facility out of Unit 2H to this day.

725. The transmission of these falsified commercial insurance recaps and fraudulent veterinary classifications through interstate electronic networks to the DOHMH constitutes independent, actionable overt acts of **wire fraud under 18 U.S.C. § 1343**, executed by the Enterprise to deceptively subvert municipal health ordinances, maintain an actionable acoustic and environmental nuisance, and advance the ongoing extortion and displacement campaign targeting the Plaintiffs.

## LVII. RITUALISTIC HARASSMENT, PATTERNED SLEEP DEPRIVATION, AND EXPERT ACOUSTIC TAMPERING

726. The Enterprise's campaign of physical and psychological coercion escalated into highly targeted, ritualistic stalking and calculated sleep deprivation designed to break the Plaintiffs' physical health and drive them from the Subject Premises. Co-Conspirator Melissa Martin, a practicing witch, has systematically weaponized her proximity in Unit

2H to execute predatory, targeted spiritual and physical harassment against the Plaintiffs' Black Hebrew family.

727. Co-Conspirator Melissa Martin has repeatedly approached the Plaintiffs' open first-floor window at the Subject Premises with a black cat on a red leash, using the opening to cast targeted, hostile gestures and conduct audio-directed ritualistic chanting down into the connected vertical kitchen pipes at dusk and pre-dawn. This strategic choice of timing and placement was explicitly calculated to project high-decibel, distressing acoustic frequencies directly through the plumbing infrastructure into the Plaintiffs' private home and dedicated business office workspace.

728. To systematically induce chronic physiological fatigue and disrupt the Plaintiffs' employment, Co-Conspirator Melissa Martin initiated a precise pattern of sleep deprivation. Martin routinely utilizes a hard stick or heavy instrument to violently tap and beat on the bare hardwood floors directly above the Plaintiffs' bedroom at 4:30 AM and late into the night while the family, including their minor child, is asleep.

729. To insulate this calculated acoustic assault from municipal citation and provide a false scientific shield for Defendant CHAOC's retaliatory state court impleaders, the Enterprise brought in Defendants Acoustilog, Inc. and its President, Alan Fierstein. Acting under the direction of Attorney Kristen A. Mantell, Defendant Alan Fierstein conducted rigged, parameters-manipulated acoustic testing inside the building.

730. In his subsequent official reports, Defendant Alan Fierstein intentionally masked, omitted, and concealed the existence of Melissa Martin’s un-permitted commercial dog facility, her intentional stick-tapping patterns, and her structural acoustic harassment. This deceptive manipulation of data parameters was executed to manufacture a false scientific

pretext of tenant non-compliance, trick state court judges, and insulate the overall eviction and extortion racket from federal judicial scrutiny.

731. The execution of this ritualistic harassment and rigged expert testing, coupled with the transmission of false, self-authenticated noise complaints via electronic court networks and the U.S. Mail, constitutes distinct, actionable predicate acts of wire fraud under **18 U.S.C. § 1343** and extortion under **18 U.S.C. § 1051**, directly abusing state judicial procedures to silence federal civil rights litigants.

## LVIII. THE DEFENDANTS' ONGOING CONTUMACIOUS DEFIANCE AND ABSOLUTE OPERATIONAL DEFAULT ON THE OPEN FEDERAL COURT LEDGER

732. The Racketeering Enterprise's continuous policy of evading lawful regulatory oversight achieved total visibility on October 20, 2026. Pursuant to the strict statutory timelines established under the Federal Rules of Civil Procedure, the mandatory deadline for Defendants Clinton Hill Apartment Owners Corp. (CHAOC) and FirstService Residential New York, Inc. to formally Answer, plead, or otherwise respond to the Plaintiffs' operative pundits expired completely.

733. A comprehensive audit of the live electronic case file confirms that both primary corporate Defendants failed to file any responsive pleading, failed to move for relief, and failed to have an attorney enter a formal Notice of Appearance on the record. This absolute operational default occurs on the open record while their un-appeared counsel at Herrick Feinstein LLP remain paralyzed by Magistrate Judge Wang's Document 54 Order.

734. The Enterprise's choice to blow past their mandatory federal answer deadlines while simultaneously weaponizing a highly irregular, one-sided state court sanctions filing ban (NYSCEF Doc. 164) to seal the Plaintiffs' public cross-claims constitutes a coordinated campaign of malicious prosecution and bad-faith litigation. The Enterprise is actively

attempting to use local court machinery to execute a retaliatory, constructive eviction of a federal civil rights plaintiff and obstruct their witness status. Accordingly, immediate federal intervention via a complete stay under the Anti-Injunction Act (28 U.S.C. § 2283) is necessary to protect the primary jurisdiction of this Honorable Court.

## LIX. CRIMINAL EXPLOITATION OF MUNICIPAL LAW ENFORCEMENT, RACIALIZED DEFAMATION, AND SYSTEMATIC IDENTITY MANIPULATION

735. The Enterprise's campaign of targeted intimidation and physical displacement against the Plaintiffs' Black Hebrew family achieved its most dangerous, racially weaponized expression through the execution of successive, fraudulent police reports designed to trigger armed municipal intervention under lethal pretenses.

736. On April 6, 2021, concurrent with the height of the COVID-19 pandemic and the global civil unrest surrounding the May 25, 2020 murder of George Floyd, Co-Conspirator Melissa Martin traveled to the local NYPD 88th Precinct and initiated **Complaint No. 2021-088-001033**. In this official municipal filing, Martin executed a pattern of criminal identity fraud and structural defamation, falsely reporting to the NYPD that Plaintiff Monique Saunders was her "Same-Sex Partner," withholding any racial designation, and deliberately fabricating her own date of birth as September 18, 1975, to systematically alter the data metrics within the police routing systems.

737. On June 1, 2021, to accelerate the threat of armed municipal extraction against the occupants, Co-Conspirator Melissa Martin executed a second, fraudulent emergency filing under **Complaint No. 2021-088-001737**. In this sequential report, Martin completely inverted her prior identity parameters, falsifying her date of birth as June 14, 1981, and explicitly re-classifying Plaintiff Monique Saunders as a "Black Stranger" and Plaintiff David Saunders as a "Tan Stranger." Martin falsely claimed that these "strangers" were

violently banging on vertical building infrastructure and screaming profanities through the floor at her and her minor son—behavior that the Plaintiffs have never engaged in.

738. While the NYPD did not execute a field dispatch in response to the first identity-tampering report, the Enterprise successfully triggered its weaponized municipal mechanism on the second call. In direct response to the June 1, 2021 racialized "stranger" report, two (2) armed NYPD officers were dispatched to the Subject Premises. The armed officers aggressively rang the Plaintiffs' doorbell and subjected the family to an on-site interrogation regarding the fabricated pipe-banging and profanity claims.

739. During this high-pressure June 1, 2021 armed interrogation, Plaintiffs produced definitive, un-assailable real-time video evidence recorded in March 2021. This surveillance footage captured Co-Conspirator Melissa Martin and her son actively trespassing on the courtyard lawn, standing less than two (2) feet away from the Plaintiffs' open first-floor window, and aggressively staring directly into the interior of the private residential home office workspace.

740. Upon physical review of this ironclad video data, the responding NYPD officers instantly realized that Co-Conspirator Melissa Martin had completely fabricated her allegations. The public officers immediately aborted their adversarial interrogation of the Plaintiffs, marched upstairs to Unit 2H, and formally commanded Melissa Martin to immediately cease her predatory window-stalking, stay away from the first-floor window perimeter, and permanently halt the high-impact jumping over the Plaintiffs' heads.

741. Having effectively resolved the crisis by exposing Martin's fraud, the responding NYPD officers exited the Subject Premises without generating a formal domestic incident

report. This left the official complaint numbers lingering in the municipal system as un-investigated, false administrative markers.

742. This weaponized police dispatch was executed during a period of acute national trauma for the Black Hebrew community following the broad-daylight murder of George Floyd by armed law enforcement officers. The presence of armed police officers interrogating her parents at their front door inflicted severe, un-remediated psychological trauma and terror upon the Plaintiffs' minor child, who was present inside Unit 1H and became instantly consumed with severe anxiety that her parents would be subjected to summary, extrajudicial violence.

743. The deep-seated criminality and collusive nature of the broader Enterprise achieved complete visibility when Co-Conspirator Melissa Martin, corporate Defendant CHAOC, Attorney Kristen A. Mantell, and the successive legal teams representing the conspiracy consciously adopted these un-investigated, fraudulent police filings.

744. Possessing actual knowledge that the NYPD had discovered the reports were entirely fabricated, the Defendants systematically used interstate wires and mail networks to introduce **Complaint No. 2021-088-001033** and **Complaint No. 2021-088-001737** as substantive negative evidence against the family during the DHR civil rights investigation and within the active, ongoing NYS Supreme Court Kings County Third-Party Complaint under Index No. 501135/2024.

745. The transmission of these contradictory, falsified police reports through municipal data networks, followed by their deliberate introduction into state administrative and judicial records to support an illegal summary eviction, constitutes distinct pattern of **wire fraud under 18 U.S.C. § 1343**, **mail fraud under 18 U.S.C. § 1341**, and **perjury**

**manipulation under 18 U.S.C. § 1622 (Subornation of Perjury)**. This confirms that the Enterprise co-conspirators deliberately exploited racial tensions, manipulated police data, and knowingly introduced fraudulent evidence into courts of law to advance their predatory real estate eviction racket and destroy the commercial livelihood of the Plaintiffs.

## LX. ATTORNEY KRISTEN MANTELL'S RETALIATORY SYNCHRONIZATION AND THE COORDINATED CONSPIRACY TO OBSTRUCT FEDERAL REDRESS ENFORCEMENT

746. To maintain this obstructive shield, the Enterprise deployed a shifting grid of collusive attorneys, including Daniel Seidenstein of Thompson LLP, Andrew H. Meier of Seidenstein Meier & Stein PLLC, Barry G. Margolis, and Alexander Rabinowitz. Plaintiffs allege that Attorneys Barry G. Margolis and Alexander Rabinowitz, operating by and through the corporate infrastructure of Abrams Garfinkel Margolis Bergson, LLP (AGMB Law), executed an egregious Fraud on the Court and collusive litigation pattern by simultaneously representing both the corporate landlord (CHAOC) and the private resident (Melissa Martin) as a unified defensive front before the New York State Division of Human Rights (DHR) under Case No. 10214815.

Concurrently, in January 2024 - months prior to the issuance of the DHR's final agency determination—said counsel turned around and staged a deceptive, manufactured "adversarial" posture within the New York State Supreme Court (Index No. 501135/2024), appearing as defense counsel for CHAOC against Co-Conspirator Martin. This fraudulent staging was executed for the corrupt purpose of misleading the state court judiciary, splitting the Plaintiffs' claims, and initiating a retaliatory summary eviction track to pre-emptively undermine the pending federal civil rights investigations and conceal the

Enterprise's $43,678,345.00 hidden bank collateral pledging fraud under the crime-fraud exception.

746.1 Plaintiffs allege that as of the active filing date of October 23, 2026, the open electronic ledger of this United States District Court documents a total courtroom boycott and absolute absence of appearance by Defendants CLINTON HILL APARTMENTS OWNERS CORP. (CHAOC) and FIRSTSERVICE RESIDENTIAL NEW YORK, INC. Following the expiration of their mandatory statutory return tracks, these two core management Defendants remain in absolute, un-rebutted operational default under Federal Rule of Civil Procedure 55(a), having legally forfeited their right to challenge the Plaintiffs' property tracking parameters or dispute their unbroken 54-year military leasehold dominion.

746.2. Plaintiffs further allege that while Defendants Francis Greenburger and Time Equities, Inc. (TEI) have entered a limited administrative appearance through counsel (ECF No. 51), the Enterprise principals continue to maintain a highly coordinated, fractured defensive stance. The total non-appearance and default of corporate entities CHAOC and FirstService Residential operates in tandem with Co-Conspirator Melissa G. Martin (d/b/a Paw Paw Pet Care LLC), Madison Security Group, Inc., and Doyle Security Services, Inc. to execute intense physical surveillance, window stalking, and localized residential intimidation against the Plaintiffs' home office sanctuary, combining their resources to bypass federal jurisdiction, enforce fabricated House Rule violations under a proprietary lease that the Plaintiffs never executed, and effectuate an illegal extrajudicial

constructive eviction against a native-born United States military household under the crime-fraud exception.

746.3. Plaintiffs allege that the corporate Defendants continue to actively coordinate with Co-Conspirator Melissa G. Martin (d/b/a Paw Paw Pet Care LLC), Madison Security Group, Inc., and Doyle Security Services, Inc. to execute intense physical surveillance, window stalking, and localized residential intimidation against the Plaintiffs' home office sanctuary.

The Enterprise purposefully deployed this multi-layered, bad-faith strawman activity and unannounced shell entities—including "Clinton 174 Realty" and "Clinton Apartments LLC"—to combine their resources, bypass federal jurisdiction, enforce fabricated House Rule violations under a proprietary lease that the Plaintiffs never executed, and effectuate an illegal extrajudicial constructive eviction against a native-born United States military household under the crime-fraud exception, rendering all ongoing state-level summary proceedings a complete structural nullity..

747. Concurrently, forensic chronological audit of the state court ledger (Index No. 501135/2024) reveals that Co-Conspirator Melissa G. Martin initiated the primary sham state action in January 2024, deliberately naming and targeting the Plaintiffs' household throughout the entirety of her moving pleadings. Notwithstanding the severe, explicit allegations directed against the occupants, the Enterprise principals and their collusive legal teams intentionally concealed the existence of said lawsuit from the Plaintiffs for over a year, executing an active information blackout while they litigated the matter behind the Plaintiffs' backs to pre-stage a fraudulent, uncontested record before the state judiciary.

747.1. On March 6, 2025, upon discovering the hidden state court docket through an independent electronic data search, the Plaintiffs formally intercepted this ex parte mechanism, meticulously generating and transmitting a five-page "Named Non-Party's Notice of Fraud Upon the Court" pursuant to Section 202.5 of the Uniform Civil Rules for the Supreme Court and County Court directly to the electronic wire channels of Supreme Court Justice Peter P. Sweeney and New York Court of Appeals Chief Judge Rowan D. Wilson. This formal statutory notice explicitly alerted the state judiciary that Plaintiff Melissa Martin, Defendant CHAOC, and attorneys Kristen A. Mantell, Andrew H. Meier, Barry G. Margolis, and Alexander Rabinowitz were actively colluding to withhold mail and physical service from the primary interest holders in flagrant violation of Rule 3.4(a)(3) of the Rules of Professional Conduct.

747.2. On March 10, 2025, the Office of Court Administration (OCA) Executive Office, acting by and through Chief Clerk Michael Pulizotto, Esq., processed and received the Plaintiffs' emergency disclosure, establishing absolute, actual pre-service knowledge on the face of the state judicial record that the underlying lawsuit was a fraudulent corporate fabrication.

Operating in direct, bad-faith disregard of this formal warning, the state court tribunal, colluding with the Conspirators' counsel, buried the Plaintiffs' Notice of Fraud, and subsequently utilized a highly irregular, unconstitutional administrative order (NYSCEF Doc. 164) to completely seal self-authenticating municipal records proving Co-Conspirator Melissa Martin's underlying canine criminality.

By executing these calculated filing bans and shielding an un-permitted commercial nuisance, the Enterprise legal agents and their compromised administrative parts engaged in a textbook expression of organized schemes to defraud, relying on corrupt public officials to execute a severe abuse of the public trust, constituting separate and distinct predicate acts of Witness Tampering and Retaliation under 18 U.S.C. §§ 1512–1513, and the active obstruction of justice under 18 U.S.C. § 1503.

748. In executing this counter-strike, Attorney Kristen Mantell, in direct collusion with Defendants Francis Greenburger, TEI, CHAOC, and Hostile Witness resident Melissa G. Martin, intentionally synchronized the filing of the State Court Third-Party Complaint to match the exact one-year anniversary of the Plaintiffs' receiving their official HUD/DHR Final Determination Notice. Under applicable federal civil rights and housing statutes, the Plaintiffs possessed a strict, one-year statutory window from the date of said notice letter to initiate a formal federal civil action for financial and civil redress.

749. The Enterprise conspirators intentionally deployed this state court impleader at that precise anniversary milestone for the corrupt, extrajudicial purpose of exhausting the Plaintiffs' emotional and financial reserves, attempting to administratively trap the *pro se* occupants within a local state forum, and maliciously obstruct the Plaintiffs from executing their statutory right to file this federal civil rights action before the expiration of the federal clock. This calculated manipulation of judicial timelines constitutes an affirmative predicate act of Witness Tampering and Retaliation under 18 U.S.C. §§ 1512 and 1513, and Obstruction of Justice under 18 U.S.C. § 1503.

750. To maintain this obstructive shield, the Enterprise deployed a shifting grid of collusive attorneys, including Daniel Seidenstein of Thompson LLP, Andrew H. Meier of Seidenstein Meier & Stein PLLC, Barry G. Margolis, and Alexander Rabinowitz. These corporate actors continuously engaged in a severe Fraud on the Court, utilizing unrecorded property assets, executing fraudulent "Consent to Change Attorney" substitutions to scrub their collusive dual-representation lines from the public record, and inducing State Supreme Court Justice Peter P. Sweeney to enter a highly irregular administrative order (NYSCEF Doc. 164) that completely seals the Plaintiffs' public cross-claims and slaps an unlawful filing ban on the occupants in direct violation of their Fourteenth Amendment Due Process rights.

751. This state-level judicial capture is further insulated by New York City Corporation Counsel agent Madison Moore, who exhibited a total lack of candor during municipal settlement conferences by actively concealing the NYC Department of Investigation's (DOI) fraudulent June 28, 2022 home intrusion and masking the severe conflict of interest involving Kristen Mantell’s spouse, Benjamin Joshua Mantell, sitting as an Administrative Law Judge inside the very agency overseeing the conversion records of Defendant CHAOC, rendering the ongoing state proceedings a complete nullity under the crime-fraud exception.

## LXI. THE CORPORATE BOARD'S INTENTIONAL LITIGATION BOYCOTT, 1991 FDIC ASSET SEIZURE HISTORY, THE MULTI-AGENCY SECURITIES FRAUD MATRIX, AND THE COERCIVE CONVERSION OF THE 1972 CLINTON HILL (CH) CHRONOLOGICAL LEASEHOLD DOMINION

752. The continuous, bad-faith litigation tactics executed by the Conspirators achieved absolute organizational coordination on Wednesday mornings at the executive business

offices of Defendant CHAOC, located at 345 Clinton Avenue, Suite 1F, Brooklyn, New York 11238. Plaintiffs allege that during their weekly management meetings, the executive board principals of CHAOC and FirstService Residential NY explicitly resolved to execute an intentional, bad-faith litigation boycott of this federal action, purposefully choosing to blow past their mandatory October 20, 2026 federal answer deadline to remain in absolute operational default. This calculated boycott was synchronized to match the execution of a highly irregular state court ambush (NYSCEF Doc. 164) designed to seal the Plaintiffs' public disclosures and obstruct federal judicial oversight.

751.1 The Enterprise's pattern of administrative deception, multi-agency data manipulation, and intentional witness intimidation achieved a highly predatory expression following the Plaintiffs' initial filing of this federal action on November 17, 2025. Specifically, on February 10, 2026, the Plaintiffs' household intercepted an unauthorized, deceptive piece of mail generated by third-party administrator Broadspire Services, Inc., operating on behalf of Markel Insurance Company under Claim Number 190799439-001.

751.2. In this formal electronic and physical communication, the Enterprise's primary corporate principal, Defendant Time Equities Inc. (TEI), explicitly logged the Plaintiffs' federal Civil RICO filing within their commercial liability insurance ledger as a "Physical Property Loss" or "Injury Claim," hard-coding the exact date of the Plaintiffs' federal filing (11/17/2025) as the official municipal "Date of Loss."

751.3. Operating under this fraudulent insurance infrastructure, the Enterprise conspirators intentionally weaponized their commercial insurance administrators to execute an extrajudicial data-extraction campaign, utilizing the U.S. Mail to demand that Plaintiff Monique Saunders immediately surrender her private Social Security Number

("SSN") and Medicare Beneficiary Identifier ("MBI") under the false statutory pretext of Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (MMSEA).

751.4. Because no personal injury claim, medical settlement, or third-party judgment existed between the parties, the Enterprise's bad-faith deployment of these deceptive regulatory disclaimers was executed for the corrupt purpose of siphoning a federal witness's private identity parameters to feed into their insular local tracking databases, constituting separate and distinct predicate acts of Mail Fraud under 18 U.S.C. § 1341 and post-filing Witness Harassment under 18 U.S.C. § 1513(e), rendering their parallel state court actions a complete nullity as a matter of law.

## LIX.1. THE ENTERPRISE'S DECEPTIVE INFILTRATION OF HOUSING ADMINISTRATIVE CHANNELS AND THE MANUFACTURED CLOSURE OF THE MANDATORY HARASSMENT REGISTRY

751.5. The structural collusion and administrative capture directed by the Conspirators achieved absolute operational transparency between May 19, 2023, and June 7, 2023, within the electronic wire channels of the New York State Division of Housing and Community Renewal (DHCR). Plaintiffs allege that following the issuance of a formal DHCR Order Reducing Rent for Rent Stabilized Tenants on February 6, 2023, the Enterprise principals - including Francis Greenburger, TEI, CHAOC, and corporate management agents Parvez Ahmed and Kristen A. Mantell - engaged in deliberate, contumacious non-compliance, executing only minor cosmetic repairs out of multiple explicit statutory mandates.

751.6. To mask this ongoing contempt and insulate themselves from compounding HPD municipal building code violations, the Enterprise utilized the administrative machinery of DHCR Associate Attorney and Mediator Evelyn Britt to execute a predatory "procedural

trap." Following Plaintiff Monique Saunders' formal, electronic transmission on May 19, 2023, withdrawing the household from the stagnant mediation track due to ongoing multi-agency civil rights investigations and un-mitigated landlord harassment, the agency operator actively intervened to shield the corporate Defendants.

751.7. Specifically, via electronic wire notifications transmitted on May 22, 2023, and June 2, 2023, DHCR Associate Attorney Evelyn Britt issued a series of administrative ultimatums, falsely asserting that withdrawing from a compromised mediation was "not an option" and explicitly threatening that the Plaintiffs' refusal to participate in further unilateral conferences would result in the summary "closure of the complaint altogether" on Wednesday, June 7, 2023.

751.8. The Enterprise deliberately exploited this manufactured administrative erasure to wipe their operational liabilities, utilizing the forced closure of the harassment docket to bury their continuous failure to execute the February 2023 rent-reduction and financial restitution mandates. This bad-faith coordination between executive housing regulators and corporate counsel deprived the Plaintiffs of independent, neutral administrative review, constituting independent predicate acts of Wire Fraud under 18 U.S.C. § 1343 and Mail Fraud under 18 U.S.C. § 1341, rendering the subsequent state-court summary actions a complete nullity under the crime-fraud exception.

752. This litigation boycott is structurally designed to mask a massive, multi-decade real estate title, tax evasion, bank fraud, and securities fraud scheme. Forensic audit of the Enterprise's historical records reveals that on November 30, 1982, Defendant Francis Greenburger and Time Equities Inc. (TEI) engineered the cooperative conversion of the Subject Premises by obtaining predatory multi-million dollar financing packages directly

from Goldome Bank for Savings and its wholly-owned mortgage banking subsidiary, Goldome Realty Credit Corp., which were actively managed and directed by Chief Executive Officer Ross B. Kenzie, Chief Operating Officer Thomas A. Cooper, and Subsidiary President Kevin J. O'Neil.

753. This litigation boycott is structurally designed to mask a massive, multi-decade real estate title, tax evasion, bank fraud, and securities fraud scheme. Forensic audit of the Enterprise's historical records reveals that on November 30, 1982, Defendant Francis Greenburger and Time Equities Inc. (TEI) engineered the cooperative conversion of the Subject Premises by obtaining predatory multi-million dollar financing packages directly from Goldome Bank for Savings and its wholly-owned mortgage banking subsidiary, Goldome Realty Credit Corp., which were actively managed and directed by Chief Executive Officer Ross B. Kenzie, Chief Operating Officer Thomas A. Cooper, and Subsidiary President Kevin J. O'Neil.

754. Following a systemic pattern of insider balance-sheet inflation, deceptive mortgage syndications, and unsafe lending practices directed by Kenzie, Cooper, and O'Neil - which subsequently prompted sweeping federal fraud lawsuits by the FDIC against Goldome's former directors - the U.S. Regulatory Authorities declared Goldome Bank insolvent and executed a catastrophic asset seizure on May 31, 1991. This sovereign federal intervention took absolute physical and structural custody of one hundred fifty-four (154) sponsor-retained cooperative units - including the proprietary shares attached to the Plaintiffs' primary Subject Unit 210-1H - effectively breaking up the initial racketeering and predatory financing conduit operating between Greenburger, TEI, and the failed banking executives.

755. To evade federal liquidation protocols and public oversight following this structural break-up, the Enterprise conspirators executed sub-surface, unrecorded asset shuffles across overlapping partnerships including Clinton Hill Equities Group, hiding these historical federal receivership linkages from the Plaintiffs' fifty-four (54) year unbroken chain of possessory title, which was lawfully established in 1972 under federal military assignment when the premises functioned as active-duty United States Navy housing barracks. Following the 1984 acquisition, the Enterprise misrepresented housing codes, using coercive administrative notices to force and manipulate the Plaintiffs' military household into an artificial state-regulated "rent-stabilized" category solely to strip their permanent federal possessory rights and conceal their underlying title defects.

756. The systemic immunity, persistent non-enforcement, and structural protection enjoyed by the Racketeering Enterprise across multi-decade operational cycles are directly procurable by means of sophisticated, high-velocity "pay-to-play" political campaign contributions and strategic financial coordination with executive regulators. Plaintiffs allege that corporate principals Francis Greenburger and Time Equities Inc. (TEI) utilized their centralized financial networks to execute extensive, targeted individual political donations to the executive campaign ledgers of New York Attorney General Letitia James and allied municipal regulatory actors, including documented individual public contribution records dated March 7, 2012 ($400.00), January 6, 2015 ($200.00), May 29, 2015 ($200.00), and July 21, 2015 ($200.00).

757. In direct exchange for this continuous stream of political capital and institutional influence, executive state and city oversight agencies systematically turned a blind eye to the Plaintiffs' docketed property fraud disclosures, deliberately burying explicit evidence

of tax evasion, corporate document forgery, and illegal asset-hoarding. The New York State Office of the Attorney General (OAG) Real Estate Finance Bureau actively breached its mandatory, non-discretionary statutory duties under the Martin Act (General Business Law Article 23-A), consciously permitting the Sponsor syndicate to maintain an indefinite, un-converted "Sponsor-in-Control" status for over forty (40) years, allowing them to quietly park 144 un-purchased apartment units comprising exactly 16,149 sponsor-retained shares as hidden corporate inventory valued at $22,675,637.00 in Treasury Stock to artificially manipulate gross income metrics and preserve corporate tax shelters.

758. The Enterprise's pattern of bad-faith litigation practices, Civil RICO collusion, and intentional witness retaliation achieved an egregious expression through the systematic, coordinated weaponization of Plaintiff Monique Saunders' historical professional records by the Enterprise's legal agents. Plaintiffs allege that over a continuous four-year operational cycle, Attorneys Kristen A. Mantell of Baron & Baron Esqs. P.C., alongside Barry G. Margolis and Alexander Rabinowitz of Abrams Garfinkel Margolis Bergson, LLP (AGMB Law), operating in direct collusion, intentionally transmitted, e-filed, and introduced thirty-seven (37) pages of Plaintiff Monique Saunders' historical, uncontested Washington, D.C. Bar (DC Bar) voluntary resignation and disciplinary docket records in their totality across multiple state administrative and judicial dockets, including the New York State Division of Human Rights (DHR), the New York State Division of Housing and Community Renewal (DHCR), and directly onto the public electronic ledger of the New York State Supreme Court under Index No. 501135/2024.

759. Enterprise co-conspirators Mantell, Margolis, and Rabinowitz executed this systematic, coordinated public "document dump" of highly sensitive historical records—

which arose from uncontested proceedings during a period of profound personal and emotional challenges nearly ten (10) years prior - in direct, malicious retaliation for the Plaintiffs' family executing their civic right in filing a formal New York State Attorney Grievance Complaint against Kristen A. Mantell and her law firm in February 2025. Exactly five (5) months following the filing of said disciplinary grievance, Attorney Mantell initiated the sham state court Third-Party Complaint, deploying these unrelated, decade-old private records with the specific, corrupt intent to inject severe, extrajudicial implicit bias into the minds of state mediators, investigators, and presiding judicial officers, deliberately attempting to destroy the Plaintiffs' credibility and alienate the tribunals from reviewing the underlying merits of the property action.

760. Forensic chronological audit of the state court ledger (Index No. 501135/2024) reveals that Co-Conspirator Melissa G. Martin initiated the primary sham state action in January 2024, deliberately naming and targeting the Plaintiffs' household throughout the entirety of her moving pleadings. Notwithstanding the severe, explicit allegations directed against the occupants, the Enterprise principals and their collusive legal teams intentionally concealed the existence of said lawsuit from the Plaintiffs for eighteen (18) consecutive months, executing an active information blackout while they litigated the matter behind the Plaintiffs' backs to pre-stage a fraudulent, uncontested record before the state judiciary.

761. On March 6, 2025, upon discovering the hidden state court docket through an independent electronic data search, the Plaintiffs formally intercepted this ex-parte mechanism, meticulously generating and transmitting a five-page "Named Non-Party's Notice of Fraud Upon the Court" pursuant to Section 202.5 of the Uniform Civil Rules directly to the electronic wire channels of Supreme Court Justice Peter P. Sweeney and

New York Court of Appeals Chief Judge Rowan D. Wilson. This formal statutory notice explicitly alerted the state judiciary that Plaintiff Melissa Martin, Defendant CHAOC, Kristen A. Mantell, Andrew H. Meier, Barry G. Margolis, and Alexander Rabinowitz were actively colluding to withhold mail and physical service from the primary interest holders in flagrant violation of Rule 3.4(a)(3) of the Rules of Professional Conduct.

762. On March 10, 2025, the Office of Court Administration (OCA) Executive Office, acting by and through Chief Clerk Michael Pulizotto, Esq., processed and received the Plaintiffs' emergency disclosure, establishing absolute, actual pre-service knowledge on the face of the state judicial record that the underlying lawsuit was a fraudulent corporate fabrication. Operating in direct, bad-faith disregard of this formal warning, the state court tribunal buried the Plaintiffs' Notice of Fraud, and subsequently utilized a highly irregular administrative order (NYSCEF Doc. 164) to completely seal self-authenticating municipal records proving Melissa Martin's underlying canine criminality, while slap-ordering an unlawful, absolute filing ban on the occupants, flatly refusing to hear the Plaintiffs' Motion to Dismiss the sham Third-Party Complaint, and summarily ignoring the Plaintiffs' documented religious scheduling conflicts.

763. The structural collusion and administrative capture directed by the Conspirators achieved absolute operational transparency within the electronic wire channels of the DHCR, where the Plaintiffs meticulously transmitted formal, comprehensive Notices of Harassment, Corporate Collusion, and Fraud Upon the Tribunal via USPS Priority Mail on August 22, 2022; May 21, 2025; May 30, 2025; and June 27, 2025. Notwithstanding the strict mandates of 9 NYCRR § 2525.5, the captured housing agency issued zero (0) administrative case dockets and zero (0) formal responses, relying instead on Associate

Attorney and Mediator Evelyn Britt to issue a series of bad-faith ultimatums on May 22, 2023, and June 2, 2023, threatening that the Plaintiffs' refusal to participate in unilateral conferences would result in the summary closure of their harassment case, purposefully executing a total regulatory blackout to block state housing inspectors from discovered their multi-million dollar off-balance-sheet asset hoarding operations.

764. The Enterprise’s pattern of administrative deception and post-filing witness intimidation extended directly onto the federal record following the Plaintiffs' initial filing of this action on November 17, 2025 . On February 10, 2026, the Plaintiffs' household intercepted an unauthorized, deceptive piece of mail generated by Broadspire Services, Inc., operating on behalf of Markel Insurance Company under Claim Number 190799439-001, wherein Defendant Time Equities Inc. (TEI) explicitly mined the federal Center for Medicare and Medicaid Services (CMS) National Plan and Provider Enumeration System (NPI) database to target Plaintiff Monique Saunders’ active credentials as a licensed Registered Nurse with over 25 years of experience.

765. Operating under this fraudulent insurance infrastructure, the Enterprise conspirators logged the Plaintiffs' federal Civil RICO filing within their commercial liability insurance ledger as a fake "Physical Property Loss," fabricating her federal filing date (11/17/2025) as an administrative "Date of Loss," and utilized the U.S. Mail to demand that she immediately surrender her private Social Security Number ("SSN") under the false statutory pretext of Section 111 of the MMSEA. Because Plaintiff Monique Saunders is not a Medicare beneficiary and possesses zero personal injury claims with TEI, this deceptive regulatory demand was a calculated, fraudulent administrative ambush executed to illicitly extract her private identifiers, bind her CMS provider profile to a fabricated

claim file, and manufacture a fraudulent record to compromise her professional nursing licensure, constituting separate predicate acts of Mail Fraud under 18 U.S.C. § 1341, Wire Fraud under 18 U.S.C. § 1343, and post-filing Witness Harassment under 18 U.S.C. § 1513(e).

766. Plaintiffs allege that the overarching cooperative conversion plan engineered by Defendants Francis Greenburger, TEI, and their corporate partners was systematically utilized as a predatory instrument of racial discrimination, institutional gentrification, and deliberate demographic displacement. The Enterprise targeted the long-term, working-class Black, African-American, African, and West Indian residential community—including the Plaintiffs' long-term Black Hebrew military household entrenched since 1972 - for systematic extrajudicial eviction from the historic Clinton Hill neighborhood, utilizing unrecorded shell entities like "Clinton Apartments LLC" to intercept public housing funds and pay minor $250.00 administrative fines from the shadows, corruptly deploying a multi-decade strategy of administrative friction to force a constructive eviction, in flagrant violation of the Fair Housing Act (42 U.S.C. § 3601) and the Civil Rights Act of 1866 (42 U.S.C. § 1982), rendering the ongoing state summary actions an unconstitutional nullity under the crime-fraud exception, and giving rise to the organized schemes to defraud and severe public corruption charges detailed herein.

767. This pattern of administrative deception is structurally identical to the Enterprise's state level corporate shell game. Inside the 2023 Public Cooperative Offering Plan and the parallel DHCR Non-compliance and Enforcement Proceedings, the Enterprise introduced a completely unannounced paper ghost titled "Clinton Apartments LLC" as the proprietary "owner" of Unit 210-1H and several other off-balance-sheet corporate units.

768. Plaintiffs allege that the Enterprise's unannounced utilization of this limited liability company constitutes a fatal, threshold trigger violation of the New York Martin Act (General Business Law § 352-eeee) and an active element of Mail Fraud under 18 U.S.C. § 1341. Despite the Plaintiffs' family maintaining an unbroken, fifty-four (54) year lawful possessory leasehold dominion over Subject Unit 1H stretching flawlessly back to 1972, the Enterprise conspirators executed this corporate title transfer completely from the shadows, failing to serve, deliver, or provide the occupants with any formal statutory Notice of Change in Ownership, lease-assumption disclosures, or certified real property transfer documentation.

769. The Enterprise secretly utilized this unannounced LLC to pay minor $250.00 administrative settlement fines behind closed doors within the DHCR enforcement proceedings, intentionally creating a fraudulent regulatory smokescreen and deliberately blocking the non-efiling Plaintiffs from observing or participating in the hearings. This deceptive maneuver was executed solely to prevent state housing inspectors from executing a forensic audit of the underlying books and discovering that the Enterprise was actively hoarding $22,675,637.00 in unrecorded Treasury Stock assets, siphoning public ERAP and PPP funds, and utilizing Attorney Kristen Mantell's spouse sitting as an Administrative Law Judge inside the New York City Department of Finance to insulate their illicit real estate racket from federal judicial oversight under New York RPAPL Article 5.

770. Plaintiffs allege that the overarching cooperative conversion plan engineered by Defendants Francis Greenburger, TEI, and their corporate partners was systematically utilized as a predatory instrument of racial discrimination, institutional gentrification, and deliberate demographic displacement. The Enterprise targeted the long-term, working-

class Black, African-American, African, and West Indian residential community - including the Plaintiffs' long-term Black Hebrew military household entrenched since 1972 - for systematic extrajudicial eviction and displacement from the Subject Premises and the historic Clinton Hill neighborhood, maliciously clearing out non-purchasing minority families to capture their leasehold estates and re-allocate the residential inventory to higher-income Caucasian occupants.

771. To execute this racially motivated demographic engineering plot without triggering civil rights enforcement, the Enterprise legal and management agents deployed a multi-decade strategy of administrative friction, selective reduction of essential services, and predatory economic coercion. By burying hyper-complex, 296-page corporate schedules within unannounced offering amendments, manufacturing artificial default records via the mail-rejection of physical bank cashier's checks, and utilizing unrecorded shell entities like "Clinton Apartments LLC" to intercept public housing funds, the Enterprise intentionally exploited the legal and financial insulation of the occupants to force a constructive eviction, in flagrant violation of the Fair Housing Act (42 U.S.C. § 3601) and the Civil Rights Act of 1866 (42 U.S.C. § 1982), rendering the ongoing state-level summary actions an unconstitutional nullity under the crime-fraud exception.

## LXIII. PRAYER FOR RELIEF AND DEMAND FOR MULTI-LAYERED DAMAGES

WHEREFORE, Plaintiffs *pro se* respectfully request that this Honorable Court enter judgment in their favor and against the Defendants, granting the following multi-layered relief:

A. Civil RICO Damages: Awarding Plaintiffs compensatory, special, and economic damages in the principal amount of Twelve Million Dollars ($12,000,000.00) for severe, documented

injuries to their business, financial, and home-office property interests resulting from Defendants' direct violations of 18 U.S.C. § 1962;

B. Statutory Treble Damages: Trebling the principal award of compensatory property and financial damages automatically to Thirty-Six Million Dollars ($36,000,000.00) pursuant to the mandatory civil enforcement remedies set forth in 18 U.S.C. § 1964(c);

C. Emotional and Consequential Damages: Awarding Plaintiffs full compensatory, consequential, and non-economic damages in an amount to be determined at trial for the profound emotional distress, psychological trauma, chronic sleep deprivation, and severe physical pulmonary pathologies and respiratory injuries inflicted upon the family under the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367;

D. Punitive and Exemplary Damages: Awarding exemplary and punitive damages in an amount to be determined at trial to punish the target Defendants' malicious, bad-faith, and willful disregard for human life, religious liberties, health, and statutory housing protections, and to deter such transnational predatory real estate rackets from occurring in the future;

E. Federal Criminal Prosecution Referral: Formally referring the complete administrative and judicial record of this civil action to the United States Attorney for the Southern District of New York and the Federal Bureau of Investigation (FBI) pursuant to 18 U.S.C. § 3057, with an explicit

judicial recommendation that a federal grand jury be empaneled to investigate the Defendants' ongoing patterns of wire fraud, mail fraud, securities fraud, witness tampering, and institutional corruption;

F. Equitable, Injunctive, and Declaratory Relief: Entering a permanent injunction, protective order, and declaratory judgment pursuant to 18 U.S.C. § 1964(a) and FRCP 26(c) to:

F1. Restrain and enjoin the Defendants, their agents, employees, and co-conspirators from continuing their unlawful entry demands, physical security surveillance, ritualistic window harassment, and fraudulent eviction notices;

F2. Stay, suspend, and permanently vacate all collusive, retaliatory eviction and summary proceedings currently pending in state courts under Index No. 501135/2024;

F3. Compel Defendant Necessary Relief Party The City of New York, by and through the DOI and Law Department, to immediately produce all un-redacted field reports, electronic recordings, and case file records generated during the June 28, 2022 residential interrogation of the Plaintiffs;

F4. Compel Defendant Necessary Relief Party New York State Division of Human Rights to produce all internal agency communications, audit metadata, and investigator logs concerning the processing and sudden expedited closure of Case Record File No. 10214815;

F5. Compel Defendant Necessary Relief Party Letitia James, in her official capacity as Attorney General, to produce all administrative files under File No. 22-018011-M1 and open the historical cooperative conversion archives; and

F6. Declare that the Subject Premises is an exempt housing unit over which Defendant CHAOC holds no lawful corporate jurisdiction, leasehold contract, or chain of title ownership;

F7. Declare that the Subject Premises is an exempt housing unit over which Defendant CHAOC holds no lawful corporate jurisdiction, leasehold contract, or chain of title ownership; and

F8. Permanently restrain, enjoin, and disqualify Hostile Witness Attorney Andrew H. Meier, Esq., and his associated professional firms - specifically including Thompson LLP and Seidenstein Meier & Stein PLLC - from entering any unauthorized appearances, interjecting hostile third-party filings, or executing obstructive cross-motions on this federal docket, on the basis that his private client (Melissa G. Martin) has been fully removed from party-defendant status, stripping said counsel of all legal standing, contractual privity, and jurisdictional authority to participate within this federal civil rights and racketeering action under the crime-fraud exception.

G. Compulsion of Corporate Enforcement and Body Attachment: Issuing a preliminary and permanent order explicitly binding the individual executive board members, corporate officers, and principal controllers of the corporate Defendants—specifically including any non-compliant managing agents or officers of Defendants CLINTON HILL APARTMENTS OWNERS CORP. (CHAOC) and FIRSTSERVICE RESIDENTIAL NEW YORK, INC. under the global command of Founder Jay S. Hennick—affirming that any future willful non-compliance, persistent courtroom evasion, or defiance of this Court's injunctive and discovery mandates shall result in an immediate finding of Civil Contempt; and exercising this Court's inherent sovereign authority and

statutory powers pursuant to 28 U.S.C. § 1651 (The All Writs Act) and Federal Rule of Civil Procedure 4.1 to issue formal Warrants of Body Attachment directed to the United States Marshals Service, commanding federal marshals to physically arrest, detain, and hold said non-compliant corporate executives in federal custody until they fully purge themselves of contempt, produce the required unrecorded corporate books, and completely satisfy the civil rights and racketeering remedies ordered by this Court;

H. Mandatory Relocation Expenses: Ordering the Defendants, jointly and severally, to immediately pay all out-of-pocket and forward-looking relocation expenses, including commercial moving costs, temporary housing stipends, and full leasehold or ownership re-establishment fees and costs, to enable the Plaintiffs and their family to safely relocate their residential home office away from the hostile environment of the Subject Premises;

I. Whistleblower Compensation and Emergency Protection: Awarding Plaintiffs formal whistleblower compensation and entering an immediate protective order pursuant to 18 U.S.C. § 1513(e) to insulate the Plaintiffs from ongoing economic, professional, and physical retaliation, protecting Plaintiff Monique Saunders' professional nursing licensure, and compensating the family for exposing a systemic matrix of municipal corruption, escrow conversion, and state regulatory capture;

J. Litigation Fees and Costs: Awarding Plaintiffs the full recovery of all out-of-pocket litigation costs, filing fees, and disbursements incurred in the prosecution of this federal action; and

K. Other Relief and Reservation of Rights: Granting such other, further, or alternative relief as this Court deems just, proper, and equitable under the complex and extraordinary circumstances of this case. Plaintiffs pro se explicitly reserve the absolute right to supplement, modify, or amend this Second Amended Complaint within the contractually or statutorily prescribed timeframes governing federal practice.

**THE SEVERAL COUNT DISCLOSURE AND DEMAND FOR JURY TRIAL**

Plaintiffs pro se hereby formally, unconditionally, and permanently demand a trial by jury on all counts, claims, and issues triable of right by a jury in the above-entitled action pursuant to Federal Rule of Civil Procedure 38(b) and the Seventh Amendment to the Constitution of the United States.

Dated: October 23, 2026
Brooklyn, New York

Respectfully submitted,

/s/ *Monique A. Saunders*
MONIQUE (TOVAR) SAUNDERS, RN, JD
Plaintiff pro se, Individually, and as
Representative for the Estate of Anita Tovar
210 Clinton Avenue, Apartment 1H
Brooklyn, New York 11205-3422
Phone: (347) 647-0120
Email: moniquesaundersrnjd@gmail.com

/s/ *David Saunders*
DAVID SAUNDERS
Plaintiff pro se, Individually, and as
Natural Parent / Next Friend of Minor Child (DCS)
210 Clinton Avenue, Apartment 1H
Brooklyn, New York 11205-3422
Phone: (347) 647-1219

**PLAINTIFFS' VERIFICATION PURSUANT TO 28 U.S.C. § 1746**

We, Monique Saunders and David Saunders, declare under penalty of perjury pursuant to the laws of the United States of America, specifically 28 U.S.C. § 1746, that we are the *pro se* Plaintiffs in the foregoing operative Second Amended Civil RICO Complaint; that we have read the contents and deep historical timelines thereof; and that all factual allegations, municipal complaints, and corporate asset-hoarding disclosures contained therein are true, accurate, and correct to the best of our personal knowledge, information, and belief.

Executed on October 23, 2026.

/s/ *Monique A. Saunders*
MONIQUE (TOVAR) SAUNDERS, RN, JD

/s/ *David Saunders*
DAVID SAUNDERS

Dated: October 23, 2026
Brooklyn, New York